# EXHIBIT 1

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

CHRISTOPHER KOHLS and,                     Case No.  24-cv-03754 (LMP/DLM)
MARY FRANSON

       Plaintiffs,

vs.

KEITH ELLISON, in his official capacity
as Attorney General of Minnesota, and
CHAD LARSON, in his official capacity
as County Attorney of Douglas County,

       Defendants.

**DEFENDANT ATTORNEY GENERAL KEITH ELLISON'S MEMORANDUM
OPPOSING PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

BACKGROUND ........................................................................................ 5

I.   THE DANGERS OF DEEPFAKES TO ELECTIONS AND DEMOCRACY. .......................... 5

   A.   Overview of AI and Deepfakes. .................................................... 5

   B.   Deepfakes Enhance the Pervasiveness and Persuasiveness of Misinformation. ........................................................................... 7

   C.   The Threat of Deepfakes to Elections. ......................................... 9

II.  MINNESOTA ENACTS THE ELECTORAL DEEPFAKE LAW. ......................... 9

III. PLAINTIFFS BRING BELATED LAWSUIT. ................................................. 11

ARGUMENT ......................................................................................... 13

I.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ........................................... 13

   A.   Plaintiffs Lack Standing Because They Have Failed to Allege Injury. ...... 13

      1.   Plaintiffs have not alleged any past, present, or imminent violation of the statute. ........................................................ 14

         a.   The statute covers only deepfakes that a reasonable person would perceive as real, not satire or parody. ............. 14

         b.   The statute does not apply to Plaintiffs' alleged conduct. ........................................................................ 16

      2.   Plaintiffs face no imminent risk of prosecution. ............................ 19

      3.   The statute has not chilled Plaintiffs' conduct. ............................. 20

   B.   Plaintiffs' Facial Challenge Fails Because Minnesota's Electoral Deepfake Statute Has a Legitimate Sweep. .................................. 21

      1.   The deepfake statute contains important limitations on its scope. ....................................................................................... 22

      2.   None of the electoral deepfake statute's applications violate the First Amendment. ...................................................................... 23

         a.   The First Amendment does not protect the false speech that the electoral deepfake statute prohibits. ......................... 24

            i.   Electoral deepfakes are false speech that cause legally cognizable harm. ........................................... 24

            ii.  Electoral deepfakes are false speech made to accomplish a fraud. .................................................. 26

|   |   | b. | Even if the statute reaches some speech protected by the First Amendment, the statute is constitutional. | 26 |
|   |   |   | i. | Intermediate scrutiny applies. | 27 |
|   |   |   | ii. | The electoral deepfake statute passes intermediate scrutiny. | 30 |
|   |   |   | iii. | The electoral deepfake statute passes strict scrutiny. | 34 |
|   |   |   |   | (a) The statute is necessary. | 35 |
|   |   |   |   | (b) The statute does not sweep too broadly. | 36 |
|   |   |   |   | (c) No significant interests are left unregulated. | 37 |
|   |   |   |   | (d) No less-infringing regulation is possible. | 38 |

3.  The electoral deepfake statute's plainly legitimate sweep is not outweighed by substantial theoretical unconstitutional applications ................................................................. 38

C.  The Deepfake Statute Is Not Void for Vagueness. .................................... 40

1.  The deepfake statute provides fair notice of its proscriptions. ........ 41

2.  The electoral deepfake statute does not authorize discriminatory enforcement. ............................................ 44

II.   PLAINTIFFS FAIL TO DEMONSTRATE ANY POSSIBILITY OF IRREPARABLE HARM. .................................................................................................... 45

III.  THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST DO NOT FAVOR AN INJUNCTION. ................................................................................... 47

CONCLUSION ................................................................................... 48

## INTRODUCTION

In September 2023, two days before polls opened, a purported audio recording of a conversation between the leader of Progressive Slovakia and a leading newspaper's editor went viral on social media. In the recording, the candidate—who was then leading in the polls—appeared to discuss how his party had rigged the election. This recording followed hot on the heels of a viral video purporting to show the candidate promising to raise the price of beer. He then narrowly lost the election to a candidate with close ties to Vladimir Putin. Months later, on the day before voting started for New Hampshire's U.S. presidential primary, thousands of New Hampshire voters received a robocall from "Joe Biden" discouraging them from voting in the Democratic primary.

While arising in different countries and political contexts, a common thread united these incidents: "deepfakes." Deepfakes are highly realistic video, audio, and other digital content generated by artificial intelligence (AI) that show a person doing or saying something they did not. Deepfakes are rapidly transforming the misinformation landscape across the globe.

With the growing threat of AI-generated misinformation, Minnesota and dozens of states across the political spectrum responded to the unique threats posed by deepfakes to elections.[1] In 2023 and 2024, Minnesota enacted a narrow statute that criminalizes the knowing or reckless dissemination of deepfakes that are intended to injure a candidate or influence an election. Minnesota's law only applies to deepfakes that a reasonable person

---

[1] https://www.citizen.org/article/tracker-legislation-on-deepfakes-in-elections/

would perceive as real. And it only applies in short, defined periods before elections, when counterspeech and traditional methods of debunking misinformation are least effective.

Plaintiffs Christopher Kohls is a self-described content creator and Mary Franson a Minnesota legislator who likes to post AI-created parodies of real politicians. They claim that Minnesota's deepfake law violates the First and Fourteenth Amendments and seek a pre-enforcement injunction. The Court should deny their motion for three principal reasons. First, Plaintiffs lack standing because Minnesota's statute does not cover the parodies they seek to disseminate or have disseminated). Second, even if Plaintiffs had standing, they failed to establish a likelihood of success on their facial First Amendment and vagueness challenges.

Finally, Plaintiffs' delay in seeking injunctive relief discredits any claim of irreparable harm. Minnesota's deepfake statute has been in effect since 2023. Franson even voted for the law. Yet Plaintiffs waited until 16 months after the law was first passed, and over four months after it was amended this year, to sue. Moreover, because the statute applies only in certain defined periods before an election, it will not even be enforceable when the Court hears this motion. The Court should deny injunctive relief.

## BACKGROUND

## I.    THE DANGERS OF DEEPFAKES TO ELECTIONS AND DEMOCRACY.

### A.    Overview of AI and Deepfakes.

In the past two years, AI has developed and improved in unprecedented ways. AI "refers to computer systems designed to perform tasks that typically require human intelligence, such as recognizing speech, making decisions, solving problems, and

understanding natural language." Hancock Decl. ¶ 7. Within the broader AI universe, "Generative AI" can "create[] new content—such as text, images, or videos—by learning patterns from large datasets." *Id.* ¶ 8. The paradigmatic examples of generative AI are Large Language Models (LLMs) like ChatGPT. *Id.* LLMs are now powerful tools on social media platforms. *Id.* ¶ 9. Among other things, LLMs can create social media content, power chatbots and virtual assistants, engage in content moderation, recommend content to users, and generate images and videos. *Id.*

Deepfakes are a type of generative AI. *Id.* ¶ 10; West Decl. ¶¶ 7-12. These digital "forgeries" are "highly realistic, AI-generated manipulations of digital content—typically videos or images—where a person's likeness, voice, or actions are convincingly altered or fabricated." Hancock Decl. ¶ 10. Deepfakes thus "mimic real and nonexistent people saying and doing things that never happened." West. Decl. ¶ 7.

Recent advancements in generative AI have had a profound impact on the production of deepfakes. Hancock Decl. ¶¶ 14-16. Deepfakes are now easier than ever to produce—and more realistic than ever. *Id.* Indeed, in the past, creating convincing audio and video required expertise and could take months. West Decl. ¶¶ 8-9. Now, nearly anyone can create a deepfake in seconds with a short prompt and for a small subscription fee. *Id.* Moreover, the quality of those deepfakes has improved dramatically. *Id.* While early deepfake images "struggled" to replicate various human features, those "weaknesses have nearly been erased." *Id.* ¶ 12. And nearly as quickly as certain "tells" of deepfakes become known, the technology has already progressed to eliminate enhance those features such that they are no longer reliable in spotting a deepfake. *Id.*

## B. Deepfakes Enhance the Pervasiveness and Persuasiveness of Misinformation.

The combination of rapid technological advancements and the viral nature of social media has significantly transformed the misinformation landscape. Hancock Decl. ¶ 17. Deepfakes spread most effectively through social-media platforms like Facebook, Instagram, X, YouTube, TikTok Reddit, 4chan, Telegram, and WhatsApp. West Decl. ¶¶ 13-16. Generative AI makes it cheap and easy to produce large amounts of false and misleading deepfakes that spread through these mediums. Hancock Decl. ¶ 17. It also allows misinformation, in the form of deepfakes, to be tailored to specific audiences and individuals. *Id.* These deepfakes are hard to detect. *Id.* And they are hard to combat. *Id.*

The reason is that deepfakes "enhance the persuasiveness of misinformation." *Id.* ¶ 18. Humans tend to trust "what they see and hear," which makes deepfakes "particularly effective in influencing beliefs and opinions." *Id.* A growing body of psychological research shows that deepfakes are more likely to be believed than text-based misinformation. *Id.* ¶ 19. That same research shows that deepfakes "can significantly influence political beliefs by presenting convincing false narratives that are difficult to refute," undermining social trust in vital institutions. *Id.* ¶¶ 20-23. Indeed, even when told about a deception, individuals struggle to identify deepfakes. *Id.* The challenge is more pronounced on social media, where deepfakes proliferate. *Id.*

Because deepfakes are persuasive and seem authentic, they pose profound "risks to democratic processes." *Id.* ¶ 23. They are a "potent tool," allowing malicious actors to

fabricate credible evidence that discredits public figures, incites unrest, or even manipulates elections. *Id.*

Deepfakes further present unique risks because traditional fact-checking methods cannot effectively counter them. *Id.* ¶¶ 24-30; West Decl. ¶¶ 20-23. For example, deepfakes often lack the "textual inconsistencies or factual errors that traditional methods uncover." Hancock Decl. ¶ 24. Moreover, deepfakes spread rapidly across multiple social media platforms, hampering timely detection and correction. *Id.* ¶ 25; West Decl. ¶¶ 13-16. Indeed, "[b]y the time a fact-checker debunks one deepfake in one community, there are already five more spreading virally on social media," which social media algorithms are designed to amplify. West Decl. ¶¶ 20-22. Similarly, labeling content as a "deepfake" can make people more skeptical; but the same label can undermine the credibility of authentic information. Hancock Decl. ¶ 26. And erroneously labeling content as a deepfake further "delegitimize[s] truthful communication and diminish[es] public confidence in accurate information." *Id.* Delegitimizing truthful content is known as "'the liar's dividend,' where individuals exploit the existence of deepfakes to deny the authenticity of real events by claiming they are fabricated." *Id.*

Deepfakes are also unique because of the impact of false memory and repeated exposure. *Id.* ¶ 28-30. A large, global study found that deepfakes "contribute to the Illusory Truth Effect (ITE)—a psychological phenomenon where repeated exposure to misinformation increases its perceived accuracy." *Id.* Thus, individuals who had been exposed to deepfakes—political and non-political—were more likely to believe them. *Id.* This study, and other research, confirms that deepfakes "make[] false political information

more believable," thereby "posing a threat to democratic institutions and processes." *Id.* ¶ 29.

### C.    The Threat of Deepfakes to Elections.

Deepfakes' threat to democratic institutions and outcomes—including elections—is real and happening now. Last year, in Slovakia, for example, a fake audio recording emerged a few days before a presidential election. West Decl. ¶ 19. In the recording, one candidate said he had "rigged the election." *Id.* The audio was fake, but it went viral; the candidate lost a close election. *Id.* Closer to home, New Hampshire residents received fake audio from Joe Biden urging them not to vote in the Democratic primary, while Chicago residents saw false video of a leading candidate in a tight mayoral race. *Id.* And before election day in Taiwan, a group associated with the Chinese Communist Party posted a deepfake falsely depicting a main candidate endorsing another candidate. *Id.*

## II.    MINNESOTA ENACTS THE ELECTORAL DEEPFAKE LAW.

In 2023, the Minnesota legislature addressed the emerging threat of deepfakes. The legislation concerned two of the most pressing issues: "revenge porn" and elections. *See* 2023 Minn. Laws ch. 58, §§ 1-3 (to be codified at Minn. Stat. §§ 604.32, 609.771, 617.262). Relevant here, the legislature adopted a targeted set of criminal penalties and civil remedies to address the unique threats that deepfakes pose to elections. Minn. Stat. § 609.771. In doing so, the House bill's chief sponsor testified in multiple committee hearings about the risks AI poses to election integrity. *E.g.*, *Hearing on H.F. 1370 before the H. Elections Fin. & Pol'y Comm.*, 93d Leg., Reg. Sess. (Minn. Feb. 15, 2023) (statement of Rep. Zach

Stephenson) [Farrell Decl. ¶ 24].[2] The Senate bill's chief sponsor similarly testified about those same threats and affirmed that bill was focused on deceptive deepfakes—not parodies. *See, e.g., Hearing on S.F. 1394 before the S. Elections Comm.*, 93d Leg., Reg. Sess. (Minn. Mar. 14, 2023) (statement of Sen. Maye Quade) at 1:28:05-:29:10 [Farrell Dec. ¶ 28]. The deepfake statute passed with near-unanimous, bipartisan support, including that of Franson. *See* Minn. H.J., 93d Leg., Reg. Sess. 8481 (2023) (vote 131-0); Minn. S.J., 93d Leg., Reg. Sess. (2023) (vote 66-1).

The legislature further refined the law this year. *See* 2024 Minn. Laws ch. 122, art. 2, §§ 76-78 (to be codified at Minn. Stat. § 609.771, subds. 2-4) [hereinafter 2024 Amendments].[3] The amendments strengthened the statute before the 2024 election cycle, using the recent Biden robocall as an example of deepfakes' growing threat. *See, e.g., Hearing on S.F. 3550 before the S. Elections Comm.*, 93d Leg., Reg. Sess. (Minn. Feb. 15, 2024) (statement of Sen. Maye Quade) [Farrell Decl. ¶ 33]. In supporting the bill, Minnesota's Secretary of State summarized the risks: "If AI generated deepfakes are used to misdirect voters, the result could be disruption and disenfranchisement. In the hands of those who want to mislead, A.I. tools can represent a revolution in their ability to cause harm and corrode faith in our system." *Hearing on H.F. 3625 before the H. Elections Fin.*

---

[2] Links to all the Minnesota House and Senate committee hearings on the deepfake legislation in 2023 and 2024 are listed in paragraphs 24-33 of the Farrell declaration.

[3] The 2024 amendments to section 609.771 are not yet codified, but available here: https://www.revisor.mn.gov/laws/2024/0/112/laws.2.76.0#laws.2.76.0.

& *Pol'y Comm.*, 93d Leg., Reg. Sess. (Minn. Feb. 21, 2024) (statement of Minn. Sec'y of State Steve Simon) at 1:08:20-:33 [Farrell Decl. ¶ 31].

In its current form, section 609.771 prohibits disseminating deepfakes only if "the person knows or acts with reckless disregard about whether the item being disseminated is a [deepfake]," and three conditions are satisfied. *Id.* § 76, subd. 2(a). First, dissemination must be made without the depicted individual's consent. *Id.*, subd. 2(1). Second, the disseminator must intend to injure a candidate or influence an election result. *Id.*, subd. 2(2). And last, the law applies only if disseminated in strict time periods: either "within 90 days before a political party nominating convention" or "after the start of the absentee voting period prior to a presidential nominating primary, or a regular or special state or local primary or general election." *Id.*, subd. 2(3)(i)-(ii). The statute defines several key terms that are relevant to understanding its scope. Minn. Stat. § 609.771, subd. 1 (defining "candidate," "deep fake," "depicted individual"). It also creates criminal and civil penalties and remedies for enforcement. *Id.* subds. 3, 4; 2024 Amendments, §§ 77-78.

## III.    PLAINTIFFS BRING BELATED LAWSUIT.

In late September, Plaintiffs challenged the deepfake statute. According to the complaint, Kohls creates and posts political satire on multiple social-media platforms. Compl. ¶ 8. Earlier this summer, Kohls posted a video parodying U.S. Presidential candidate Kamala Harris. *Id.* Kohls generated the narration in the video through AI, interspersing it with real clips of Harris. *Id.* Kohls labeled the video as parody. *Id.* The video includes Vice President Harris making many absurd statements, like:

- "I was selected because I am the ultimate diversity hire."

- "[I]f you criticize anything I say, you're both sexist and racist."

- "I may not know the first thing about running the country, but remember that's a good thing if you're a deep state puppet."

- "I had four years under the tutelage of the ultimate deep state puppet, a wonderful mentor, Joe Biden. Joe taught me rule number one: carefully hide your total incompetence."

- "You think the country went to [beeped out expletive] over the past four years? You ain't seen nothing yet."

*Id.* ¶ 26.[4] Elon Musk retweeted the video. Musk's tweet produced over 100 million impressions; his post was retweeted more than 240,000 times. *Id.* ¶ 8.

Franson is a state representative and candidate for reelection next week. *Id.* ¶ 16. Franson voted for the 2023 deepfake statute but opposed the 2024 amendments. *Id.* ¶¶ 44, 60. She retweeted the Kohl's parody video. *Id.* ¶ 33. She alleges she has concerns about liability under the statute, but does not allege she has been investigated or prosecuted. *Id.* ¶ 34.

Plaintiffs allege that the deepfake statute infringes on their First Amendment free speech rights and is unconstitutionally vague in violation of the Fourteenth Amendment. *Id.* ¶¶ 87-122. They bring facial and as-applied challenges against the Minnesota Attorney General and the Douglas County Attorney. *Id.* ¶¶ 18-19. As relief, Plaintiffs seek a permanent injunction prohibiting the enforcement of the deepfake statute plus a declaratory judgment. *Id.* at 48. They now seek a preliminary injunction.

---

[4] The video is available here: https://www.youtube.com/watch?v=sVspeqNnoWM.

## ARGUMENT

A preliminary injunction is an extraordinary remedy. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). When deciding whether to issue a preliminary injunction, courts consider: (1) irreparable harm to the movant; (2) the harms of granting or denying the injunction; (3) the moving party's likelihood of success on the merits; and (4) the public interest. *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023). No single factor is dispositive; the court must balance all factors before issuing an injunction. *Id.*

Here, no factor favors injunctive relief. Plaintiffs are not likely to succeed on the merits because they lack standing and their facial First and Fourteenth Amendment claims are deficient; they have failed to show irreparable harm; and the equities and public interest favor Minnesota.

## I. PLAINTIFFS ARE UNLIKELY TO SUCCEED.

The Court should deny Plaintiffs' motion because they are unlikely to succeed on the merits. Plaintiffs lack standing and, alternatively, their facial First Amendment and vagueness claims will not succeed.

### A. Plaintiffs Lack Standing Because They Have Failed to Allege Injury.

As a threshold matter, Plaintiffs are unlikely to succeed because they lack standing. To establish Article III standing, a plaintiff must show (1) a concrete, particularized injury, (2) that is fairly traceable to the defendant, and (3) that the court can redress with a favorable decision. *Turkish Coal. of Am., Inc. v. Bruininks*, 678 F.3d 617, 621 (8th Cir. 2012). Plaintiffs lack standing here for several reasons.

### 1. Plaintiffs have not alleged any past, present, or imminent violation of the statute.

To establish injury in fact, Plaintiffs must show either that they face an imminent risk of prosecution for past conduct, *see Eckles v. City of Corydon*, 341 F.3d 762, 768 (8th Cir. 2003), or that the challenged statute is chilling them from engaging in arguably protected speech. *281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011) [hereinafter *281 Care Comm. I*]. To meet these standards, Plaintiffs must identify conduct that is at least "arguably proscribed" by the challenged law. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014).

Plaintiffs argue that the statute "arguably proscribes" their conduct because it could be read to cover their activities. *See* Mem. 16. But Plaintiffs rely on an interpretation that cannot be squared with the statute's plain language.

### a. The statute covers only deepfakes that a reasonable person would perceive as real, not satire or parody.

The statute does not sweep as broadly as Plaintiffs claim. The statute defines deepfake as:

> [A]ny video recording, motion-picture film, sound recording, electronic image, or photograph, or any technological representation of speech or conduct substantially derivative thereof:
>
> (1) that is so realistic that a reasonable person would believe it depicts speech or conduct of an individual *who did not in fact engage in such speech or conduct*; and
>
> (2) the production of which was substantially dependent upon technical means, rather than the ability of another individual to physically or verbally impersonate such individual.

Minn. Stat. § 609.771, subd. 1(c) (emphasis added).

14

Critically, the statute requires that the representation be realistic enough so that a reasonable person would believe its content is real. *Id.* Thus, the statute covers only deepfakes realistic enough to convince a reasonable person that the depicted person did or said something that they did not do or say.[5] By prohibiting only depictions that a reasonable person would believe are real, the statute excludes parody, which the Supreme Court has defined as content that no reasonable person would believe to be factual. *See Hustler v. Falwell,* 485 U.S. 46, 57 (1988) (First Amendment protected parody of public figure that "could not 'reasonably be understood as describing actual facts about [respondent] or actual events in which [he] participated.'").

The narrow reach of the deepfake definition in the electoral context stands in stark contrast to the definition in the deepfake revenge-porn statutes enacted in the same bill. The revenge-porn definition does not incorporate the requirement that the person did not engage in the conduct, instead prohibiting more broadly conduct that is a naturalistic representation. *Compare* Minn. Stat. § 609.771, subd. 1(c), *with id.* § 617.262, subd. 1(b)(1).

This difference in scope reflects the legislature targeting different harms. In the case of deepfake revenge porn, the harm stems from using a person's likeness to produce pornographic material, regardless of whether a reasonable person would believe that the content is real. For instance, a deepfake video depicting sexual acts supposedly occurring

---

[5] Such videos would include the deepfake video that Plaintiffs note the legislature discussed, such as a false depiction of Ukraine's president "urging his troops to retreat and surrender" to Russia. Compl. ¶ 42.

on the Moon would still qualify, even though no one would believe that the depicted acts actually happened. In the election context, however, the harm stems not from appropriating a person's likeness or identity, but rather from the impact on *a reasonable observer's understanding of reality*. As a result, the law excludes satirical or parodic material from the definition of "deepfake." Such material would not cause a reasonable person to think that the depicted individuals actually did something that they did not do.

b.      **The statute does not apply to Plaintiffs' alleged conduct.**

When the scope of the deepfake statute is properly understood, Plaintiffs lack standing because their alleged conduct is beyond the statute's scope. A plaintiff cannot manufacture standing simply by proffering an interpretation of the challenged law that might cover their conduct. *Christian Action League of Minn. v. Freeman*, 31 F.4th 1068, 1074 (8th Cir. 2022).

A court must construe the law at issue before assessing whether it applies to a plaintiff's conduct. *See id.*; *see also Missouri v. Yellin*, 39 F.4th 1063, 1070 (8th Cir. 2022) (rejecting request to enjoin hypothetical interpretation that federal government had explicitly disclaimed and without alleging injury from government's actual interpretation). For example, in *Christian Action*, the plaintiff sought to enjoin enforcement of a harassment statute against it for planned conduct. *Christian Action*, 31 F.4th. at 1072. The Court ultimately determined that, although the statute was facially ambiguous, the plaintiff lacked standing because the statute, properly construed, did not prohibit the desired activities. *Id.* at 1074.

16

Plaintiffs suggest they have standing merely by identifying supposed legal disputes about a statute's scope. Mem. 16. But as *Christian Action* and *Yellin* illustrate, the "arguably proscribed" standard recognizes that people might be reasonably chilled, and therefore would have standing, only when there is a high likelihood exists that their lawful activities might trigger mistaken enforcement. It does not apply when plaintiffs unilaterally assert a broad reading of a statute that no enforcement authority endorses.

Neither case Plaintiffs cite for their understanding of "arguably proscribed" establish that a mere dispute over statutory interpretation confers standing. Indeed, one case did not even involve a statutory-interpretation dispute. *See Animal Legal Def. Fund v. Vaught*, 8 F.4th 714, 718-19 (8th Cir. 2021). In the other, the court did not assess the scope of the challenged statute as part of the standing analysis; it instead held that plaintiffs failed to demonstrate likelihood of success because they could not show that the statute applied to their speech. *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 701 (8th Cir. 2021). In that same case, however, the dissent argued that the plaintiffs lacked standing because the challenged statute did not cover their conduct. *Id.* at 702 (Colloton, J., dissenting). And the following year, the Eighth Circuit issued two decisions (*Christian Action*, *Yellin*) adopting that analysis: a plaintiff lacks standing if the statute does not apply to the speech at issue. Those decisions control here.

Thus, Plaintiffs cannot establish injury without showing that the statute, properly construed, arguably applies to their conduct. Plaintiffs' allegations make clear that it does not.[6] Plaintiffs' Complaint discusses only the following specific posts and materials:

- Franson's retweet of an account that posted laughing emojis in response to "an image by the Babylon Bee, a satire publication, captioned 'Oh No! Tim Walz Just Waved So Hard His Arms Flew Off!'" accompanied by an image depicting "Gov. Walz at a political rally, except his forearms have flown off their bones." Compl. ¶ 5.

- The Kohls video created "in the style of a campaign ad for Vice President Kamala Harris" narrated by a "voice that sounds like Kamala Harris" saying "outlandish things like 'Joe taught me rule number one: carefully hide your total incompetence'". Compl. ¶¶ 5-6. Kohls labeled this video "parody" when he posted it YouTube, and acknowledged that "'Sound or visuals were significantly edited or digitally generated.'" *Id.* ¶ 6; *see also id.* ¶ 26 (more fully describing video).

- Franson's retweet of Elon Musk's post sharing the July 26 video and commenting, "This is amazing 😂.". *Id.* ¶ 5.

- Kohls's video depicting "an imaginary phone call between Harris and Tim Walz, featuring AI-generated dialogue from both candidates where the voice of 'Harris' claims 'we're both radical communists' before recounting Walz's perceived political liabilities." *Id.* ¶ 31.

Plaintiffs' memorandum supporting injunctive relief motion is even narrower, discussing only Kohls' July 26 video. Mem. 5-8.

Plaintiffs do not allege that any law enforcement authority in Minnesota has claimed or even suggested that these posts violate the deepfake law. And for good reason: While perhaps in poor taste, none is even arguably "so realistic that a reasonable person would believe it depicts speech or conduct of an individual who did not in fact engage in such

---

[6] To the extent Plaintiffs argue whether California law prohibits their conduct, those arguments are irrelevant to Minnesota law.

speech or conduct." Minn. Stat. § 609.771, subd. 1(c)(1). Plaintiffs repeatedly concede this, emphasizing the implausibility of their posts and noting their additional efforts to present them as satire or parody. *See, e.g.*, Compl. ¶ 27 (describing content as "obviously far-fetched and over-the-top content of the video make its satirical nature clear to many viewers"); *see also* Mem. 2, 5. Because Minnesota law does not prohibit any of their alleged conduct, Plaintiffs lack injury.

Nor can Plaintiffs save their standing argument by vaguely referring to *other* content that they claim the law prevents them from "making, distributing, and consuming." Mem. 16. Conclusory allegations are insufficient to establish injury. *See Missouri Roundtable for Life v. Carnahan*, 676 F.3d 665, 673-74 (8th Cir. 2012). Plaintiffs have not described any such materials with enough specificity to determine if any could reasonably be interpreted to violate the statute.

### 2.    Plaintiffs face no imminent risk of prosecution.

Parties bringing a pre-enforcement challenge based on past conduct must allege more than a speculative possibility of enforcement. *See Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 998 (8th Cir. 2022). Conclusory allegations about potential criminal sanctions are insufficient to establish a First Amendment injury. *Missouri Roundtable*, 676 F.3d at 673.

Here, Plaintiffs have not—and cannot—allege that either Defendant intends to prosecute them under the deepfake statute. Plaintiffs instead broadly speculate that the statute "will be enforced against Plaintiffs and impose criminal liability on them for creating and/or disseminating AI-generated political commentary on social media."

Compl. ¶ 100. In this case, the absence of any enforcement activities is particularly striking given the amount of attention Plaintiffs allege the July 26 video received. *See id.* ¶ 8. Unless and until Plaintiffs can allege facts indicating that they are at imminent risk of prosecution, they lack a cognizable injury.

### 3.    The statute has not chilled Plaintiffs' conduct.

Parties may also establish standing to bring pre-enforcement challenges by demonstrating that a statute's existence chills them from otherwise engaging in arguably protected speech. *281 Care Comm. I*, 638 F.3d at 627. Establishing a chilling injury requires a plaintiff to show objectively reasonable self-censorship to avoid a credible threat of prosecution or other adverse action. *Henderson v. Springfield R-12 Sch. Dist.*, 116 F.4th 804, 810 (8th Cir. 2024). When a plaintiff does not claim any threatened or likely prosecution, they do not sufficiently allege a justiciable dispute. *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298-99 (1979). Further, a court need not credit general, conclusory allegations when a complaint's more specific allegations belie them. *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).

Plaintiffs do not allege a chilling injury. As previously discussed, Plaintiffs do not describe with any specificity what materials they have refrained from disseminating. Moreover, their actions show that the deepfake law has not affected what they post. S*ee, e.g.*, Compl. ¶¶ 81; Mem. 11, 16. For example, Plaintiffs repeatedly proclaim their intent to continue posting the type of content they claim violates the law. *See*, *e.g.*, Compl. ¶¶ 31, 36-37, 85. And Plaintiffs' online accounts underscore they have not been "chilled." Not only are the cited posts still up, they have posted other similar materials, in some cases

20

asserting that they might violate the law. *See* Farrell Decl. Exs. 1-21 (collecting Franson social media posts and Kohls videos). Because Plaintiffs allege no chilling injury, they lack standing.

### B.    Plaintiffs' Facial Challenge Fails Because Minnesota's Electoral Deepfake Statute Has a Legitimate Sweep.

Even if Plaintiffs had standing, their First Amendment claims will fail on the merits. Plaintiffs seek to enjoin the electoral deepfake statute in all applications. Mot. 1. Because this relief would reach beyond Plaintiffs' circumstances, they must satisfy the rigorous standards for a facial challenge. *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010).

Even in First Amendment cases, where the standard is less stringent, choosing to pursue a facial challenge "comes at a cost." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024). Constitutional claims are better handled on a case-by-case basis, not en masse. *Id.* Claims of facial invalidity often rest on speculation about the law's coverage and its future enforcement. *Id.* And facial challenges threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways. *Id.* Facial challenges are thus "hard to win." *Id.* In the First Amendment context, a plaintiff can prevail on a facial challenge only if it can show that a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep. *Id.*

In *Moody*, the Supreme Court reiterated this framework for facial challenges, and then vacated injunctions from two circuits because the plaintiffs failed to make the proper showing. *Id.* Applying *Moody*, the Eighth Circuit has outlined a process for a proper facial

analysis. The first step is assessing the challenged law's scope, which includes considering the activities that the law prohibits or regulates. *GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 669 (8th Cir. 2024). The second step is determining which of the law's applications violate the First Amendment. *Id.* at 670. The last step is to measure the unconstitutional applications against the remaining provisions. *Id.*

As the parties seeking a preliminary injunction, Plaintiffs bear the burden of establishing that they are entitled to relief. *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 441 (1974). Yet they make no attempt to engage with the *Moody* test. Indeed, Plaintiffs do not even cite *Moody* (or *GLBT*). Instead, Plaintiffs make the same mistake as the *Moody* plaintiffs, focusing narrowly on why they believe the electoral deepfake law wrongly extends to political speech that constitutes parody (it does not). Mem. 1-5, 18-37. Their failure to grapple with any part of the *Moody* test is alone a sufficient basis for denying injunctive relief. *See GLBT*, 114 F.4th at 670. Properly applying that analysis also makes clear that Plaintiffs are unlikely to prevail.

### 1.    The deepfake statute contains important limitations on its scope.

The first step in a facial challenge is assessing the challenged law's scope. The deepfake statute prohibits (1) disseminating[7] a deepfake (2) if the person knows or acts with reckless disregard about whether the item being disseminated is a deepfake, (3) without the depicted individual's consent, (4) with the intent to injure a candidate or

---

[7] The statute also prohibits contracting to disseminate deceptive deepfakes, but Plaintiffs make no argument about this provision.

influence an election's result, and (5) dissemination occurs within 90 days of a nominating convention or after absentee voting has begun, which is 46 days before an election. 2024 Amendments § 76, subd. 2(a); Minn. Stat. § 203B.081, subd. 1. Moreover, as discussed extensively above, the statute defines "deepfake" as a false depiction "that is so realistic that a reasonable person would believe it depicts speech or conduct of an individual who did not in fact engage in such speech or conduct." Minn. Stat. § 609.771, subd. 1(c)(1).

These requirements place four important constraints on the law's scope. First, by confining deepfakes to creations so realistic that a reasonable person would believe it depicts real conduct, the law does not include parodies. Second, the law requires two stages of intent. At the first level, the law applies only if a person knows the deepfake is false or recklessly disregards its probable falsity. Third, the other intent requirement further narrows the statute. The disseminator must intend to injure a candidate or more generally influence an election. And finally, the limited time in which the prohibition applies confines the statute's application to those periods where deepfakes are most difficult to address with counterspeech: shortly before and while people are casting votes.

### 2. None of the electoral deepfake statute's applications violate the First Amendment.

Correctly understood, none of electoral deepfake's applications violate the First Amendment. All speech covered by the law falls into categories recognized by the Supreme Court as lacking First Amendment protection. Alternatively, even if the statute captures some protected speech, the statute satisfies the applicable level of scrutiny.

       **a.**      **The First Amendment does not protect the false speech that the electoral deepfake statute prohibits.**

While free speech rights are, of course, broad, the First Amendment does not protect certain categories of speech. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942). These unprotected categories include "false speech undertaken to accomplish a legally cognizable harm." *Animal Legal*, 8 F.4th at 786. They also include false speech made to accomplish a fraud. *See United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality opinion); *see also id.* at 734 (Breyer, J., concurring). The speech affected by the electoral deepfake statute falls into these categories.

       **i.**      **Electoral deepfakes are false speech that cause legally cognizable harm.**

States can proscribe "[f]alse speech aimed at accomplishing a legally cognizable harm." *Animal Legal*, 8 F.4th at 786. If the false speech involves matters of public concern, it may be prohibited when made with "actual malice," which requires knowledge or reckless disregard of falsity. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 755 (1985).

Minnesota's law bans deepfakes that fit squarely into this class of unprotected speech. The proscribed deepfakes are definitionally false: the statute applies only to deepfakes depicting conduct that did not happen. Minn. Stat. § 609.771, subd. 1(c)(1). Moreover, the statute proscribes dissemination of deepfakes only when the disseminator "knows or acts with reckless disregard" as to falsity, consistent with the First Amendment's actual-malice standard. 2024 Amendments, § 76, subd. 2(a).

Finally, the proscribed deepfakes work multiple legally cognizable harms. A knowingly false statement intended to harm a candidate is defamation. Knowing and reckless defamatory falsehoods are unprotected by the First Amendment because of the harms they inflict on an individual's dignity and reputation. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342-43 (1974). Even when deepfakes are more generally intended to influence an election, they harm voter rights. Free and fair elections are a cornerstone of our democracy. The right to cast votes is a fundamental right that further protects all other rights. *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964). Intentionally providing voters with false or misleading information injures that right. *Soltysik v. Padilla*, 910 F.3d 438, 445-46 (9th Cir. 2018); *Bishop v. Bartlett*, 575 F.3d 419, 424 (4th Cir. 2009); *Burton v. Georgia*, 953 F.2d 1266, 1269 (11th Cir. 1992); *cf. Grimes v. Smith*, 776 F.2d 1359, 1367 (7th Cir. 1985) (recognizing Congress's power to proscribe misleading of voters). Indeed, in the context of shareholder voting, the Eighth Circuit has recognized that providing false or misleading information to voters is actionable because such statements interfere with "the free exercise of voting rights." *Carpenters' Pension Fund of Ill. v. Neidorff*, 30 F.4th 777, 786 (8th Cir. 2022); *see also Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1087 (1991) (recognizing that providing false information when shareholders vote creates a legally cognizable harm).

Minnesota's electoral deepfake statute reaches only those deepfakes intended to cause such harms. The deepfake must be made with actual malice and either be intended to injure a candidate or more generally influence an election. In either circumstance, the

deepfake works a legally cognizable harm. It is therefore entitled to no First Amendment protection.

### ii. Electoral deepfakes are false speech made to accomplish a fraud.

The government may also prohibit false speech made to accomplish a fraud. *Alvarez*, 567 U.S. at 717. Such prohibitions are permissible even without a financial or property loss. *Id.* at 721. Rather, intent to defraud is satisfied if the false statement is made "to cause the deceived person to follow some course he would not have pursued but for the deceitful conduct." *United States v. Lepowitch*, 318 U.S. 702, 704 (1943).

The deepfakes banned by Minnesota's law also fit squarely into this category. The deepfakes are false statements, made with actual malice, and intended to cause voters to impact how a voter would vote "but for the deceitful conduct," either by specifically injuring a candidate or more generally by influencing the election. Minn. Stat. § 609.771, subd. 2(3). Minnesota may thus prohibit them consistent with the First Amendment.

### b. Even if the statute reaches some speech protected by the First Amendment, the statute is constitutional.

Even if the Court concludes that the deepfake statute reaches speech entitled to some First Amendment protection, the Court should deny Plaintiffs' motion because the law is constitutional. The law is subject only to intermediate scrutiny. But even if the Court applies strict scrutiny, the law is narrowly tailored to serve compelling government interests.

### i.    Intermediate scrutiny applies.

Plaintiffs cite but gloss over *Alvarez*—the Supreme Court's leading case on false statements—and imply that it holds that all laws regulating false statements are subject to strict scrutiny. But the best reading of *Alvarez* is that intermediate scrutiny should apply to Minnesota's law. Critically, the *Alvarez* majority could not agree if constitutionally protected false statements should be subject to strict scrutiny or intermediate scrutiny. *Compare Alvarez*, 567 U.S. at 724 (plurality opinion) (applying strict scrutiny), *with id.* at 731 (Breyer, J., concurring) (applying intermediate scrutiny). Justice Breyer's concurrence recognized that "[t]he dangers of suppressing valuable ideas" are lower when false statements concern easily verifiable facts, as contrasted with false statements "about philosophy, religion, history, the social sciences, the arts, and the like." *Id.* at 730-31. He also identified a wide range of federal statutes prohibiting false speech—including statutes regulating fraud, perjury, and impersonation of government officials—and observed that those statutes contained limitations that narrowed them "to a subset of lies where specific harm is more likely to occur." *Id.* at 736. Justice Breyer concluded that intermediate scrutiny should apply to government regulations of these types of false speech. *Id.* at 731-32.

Post-*Alvarez*, the Eighth Circuit further recognized the diminished value of false factual statements, even in the electoral context. *Nord v. Walsh Cnty.*, 757 F.3d 734, 743 (8th Cir. 2014) (recognizing that untrue campaign statements "may be deserving of less protection."). And based on the *Alvarez* concurrence, other district courts have applied intermediate scrutiny to falsehoods intended to impact how people vote. *See, e.g.*, *Nat'l*

*Coalition on Black Civil Participation v. Wohl*, 661 F. Supp. 3d 78, 120-21 (S.D.N.Y. 2023) (applying intermediate scrutiny to robocalls conveying false information to discourage people from absentee voting); *United States v. Mackey*, 652 F. Supp. 3d 309, 344-45 (E.D.N.Y. 2023) (applying intermediate scrutiny to tweet claiming voters could vote via text message). The Court should do so here as well.

Plaintiffs disregard the conflicting *Alvarez* opinions regarding the standard of review. Instead, they make conclusory arguments that the statute is per se unconstitutional or that strict scrutiny applies. None has merit.

Plaintiffs first argue that the electoral deepfake statute sanctions viewpoint discrimination that is "per se" unconstitutional. Mem. 23. In doing so, Plaintiffs expand the viewpoint-discrimination doctrine well beyond the boundaries established by the Supreme Court. Viewpoint discrimination occurs "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). But the deepfake statute does not favor any specific ideology or opinion. Instead, the statute generally prohibits deepfakes, regardless of the message conveyed.

Plaintiffs' contrary arguments are unmoored from the statute's text. They claim that the statute "privileges speech intended to ossify existing voting patterns over speech intended to alter voting patterns" and "prohibits negative political commentary . . . while allowing positive or laudatory commentary." Mem. 21-22. But the statute prohibits deepfakes intended to influence an election, regardless of whether they influence voters to change who they are voting for or to solidify voter support. Indeed, whether a deepfake is

viewed as negative or positive will inevitably vary: a deepfake of a candidate promising to cut the corporate tax rate to zero will be viewed as a blessing by some and disaster by others. But the statute is concerned only about the nonconsensual nature of the deepfake—not whether it promotes or disparages any ideology, opinion, or perspective. It is thus not viewpoint discriminatory.

Eighth Circuit precedent from earlier this year drives the point home. *Animal Legal* involved a First Amendment challenge to an Iowa law that prohibited false speech to gain access or employment with agricultural facilities. 89 F.4th at 1068. The law applied only to false speech intended to harm the agricultural facility. *Id.* The court rejected animal rights organizations' argument that the law amounted to viewpoint discrimination by criminalizing only false speech intended to harm facilities. *Id.* at 1069-70. The court held that the statute did not distinguish speakers based on viewpoints and simply criminalized using "deception to gain employment with intent to harm a facility." *Id.* The intent requirement was viewpoint neutral: "the offender would be liable for deceptively praising the facility ('I love the work you do, and I want to support it!') or deceptively criticizing the facility ('This facility is poorly managed, and I will help increase profits.')." *Id.* Because the law did "not prefer laudatory lies over critical falsehoods," it did not constitute viewpoint discrimination. *Id.*

So too here. The electoral deepfake statute is indifferent to whether the deepfake is ossifying, change-inducing, laudatory, or derogatory. What matters is the knowing or reckless dissemination of a deepfake with intent to intent to injure a candidate or influence an election. The statute thus does not discriminate based on viewpoint.

Plaintiffs argue that *281 Care Committee* dictates that strict scrutiny applies. Mem. 21. But *281 Care Committee* applied strict scrutiny because the challenged statute "target[ed] falsity, as opposed to the legally cognizable harms associated with a false statement." *281 Care Comm. v. Arneson*, 766 F.3d 774, 783 (8th Cir. 2014) [hereinafter *281 Care Comm. II*]. Here, by contrast, the challenged statute targets the legally cognizable harms associated with deepfakes—injuring candidates or influencing voter behavior, both of which undermine the state's compelling interest in electoral integrity. Because the deepfake ban reaches a narrow "subset of lies where specific harm is more likely to occur," *Alvarez*, 567 U.S. at 736, intermediate scrutiny applies to any applications of the statute that reach constitutionally protected speech.

### ii. The electoral deepfake statute passes intermediate scrutiny.

A law survives intermediate scrutiny so long as it promotes a substantial governmental interest that would be achieved less effectively without the regulation and does not burden substantially more speech than necessary to further the interest. *Turner Broad. Sys., Inc. v. Fed. Commc'ns Comm'n*, 520 U.S. 180, 213-14 (1997). The electoral deepfake statute easily satisfies this standard.

First, Minnesota has a compelling, and certainly substantial, interest in electoral integrity. Indeed, the Supreme Court has already recognized that a broader interest in "ensuring that an individual's right to vote is not undermined by fraud in the election process" is compelling. *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion). And applying *Burson*, this Court recently recognized the state's compelling interest in

reducing misinformation aimed at preventing someone from voting. *Minn. Voters All. v. Ellison*, No. 23-CV-2774, 2024 WL 4222829, at *5 (D. Minn. Sept. 17, 2024), *appeal filed* No. 24-3094 (8th Cir. Oct. 16, 2024). Minnesota's interest in preventing electoral deepfakes serves the state's compelling interest in electoral integrity.

Second, Minnesota's interest in electoral integrity would be achieved less effectively absent the deepfake statute. The government satisfies its burden if it demonstrates a real need to act to protect the interest. *Traditionalist Am. Knights of the Ku Klux Klan v. City of Desloge*, 775 F.3d 969, 975 (8th Cir. 2014). Courts should be "loath to second-guess the Government's judgment" to that effect. *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 478 (1989).

The record demonstrates such a need. Unlike historical lies, deepfakes are unique in that their audio-visual nature make them significantly more likely to be believed than false text-based information. Hancock Decl. ¶¶ 23-24. Moreover, the ease with which deepfakes can be created has led to a surge in creating and disseminating deepfakes, allowing them to be used to present convincing misinformation at scale. *Id*. ¶¶ 14, 17; West Decl. ¶ 9. Deepfakes have been used across the globe to influence elections since their barrier to entry has lowered. West Decl. ¶¶ 9, 19. Indeed, deepfakes may have played a role in the outcomes of elections in Slovakia and Taiwan this year. *Id.* ¶ 19. The record further demonstrates that deepfakes are currently being used to influence the 2024 election. *Id*. ¶¶ 13, 19. Existing tools for combatting that influence are inadequate. *Id.* ¶¶ 20-23. There is thus a real need to keep the deepfake statute.

Despite the urgent and widely recognized need to act on deepfakes, Plaintiffs propose two ways in which Minnesota could supposedly achieve its interest without the law: counterspeech and existing causes of action. Mem. 29-30. Neither protects Minnesota's interest as well as the deepfake statute.

As to counterspeech, Plaintiffs submitted no evidence to support their assertion. The record evidence instead demonstrates that even when viewers know of deepfakes, they still struggle to distinguish between real and manipulated content. Hancock Decl. ¶¶ 21, 28-29. Moreover, counterspeech works only with viable means of combatting the falsehood. Deepfakes primarily spread on social-media websites. *Id.* ¶ 16, 25; West Decl. ¶ 13. Those websites determine what posts are seen by users based on algorithms that favor content more likely to result in user engagement. West Decl. ¶ 21. Indeed, deepfakes are generally designed to go viral. *Id.* ¶ 16. Deepfakes are significantly more favored for display by those algorithms than counterspeech responding to a deepfake. *Id.* ¶ 21. This is particularly so because the low cost and high speed of AI-generated content enables malicious actors to "flood the zone" with misinformation, overwhelming information ecosystems with misinformation. *Id.* ¶¶ 15, 20; Hancock Decl. ¶ 17. Thus, in almost all cases, it will be impossible to engage in counterspeech that will adequately, or even meaningfully, respond to a deepfake. *Cf. Davis v. FEC*, 554 U.S. 724, 753-54 (2008) ("[F]ar from contravening the First Amendment, [the law] actually advances its core principles. If only one candidate can make himself heard, the voter's ability to make an informed choice is impaired."). Counterspeech is thus not sufficient to protect Minnesota's interest in combatting deepfakes that are designed to harm the electoral process.

Existing causes of action—like defamation, false light, privacy torts, and copyright infringement—are also insufficient. Private rights of action require private parties to choose to incur the significant costs of litigation to vindicate legal rights. But protecting the public's compelling interest in electoral integrity cannot be at the mercy of private actors. Nor do such actions protect the state's election-integrity interests, as such actions are unlikely to resolve before the election and do not enjoin the speech. Moreover, Minnesota does not even recognize one cause of action highlighted by Plaintiffs. *See Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 235 (Minn. 1998) (declining to recognize tort of false light).

Plus, each private cause of action Plaintiffs identify has elements that do not address the unique harms that flow from deepfakes. For example, defamation requires the defendant's speech harm the plaintiff's reputation. *Rouse v. Dunkley & Bennett, P.A.*, 520 N.W.2d 406, 410 (Minn. 1994). But a deepfake portrayal may not harm the depicted person's reputation, yet still influence an election. Similarly, copyright-infringement claims require that the original work on which a derivative deepfake is created was made with the depicted individual's approval. *See* 17 U.S.C. §§ 101-02 (requiring that works be fixed in a tangible medium to be subject to copyright protection and defining "fixed" to mean by the author or with the author's approval). Deepfakes may thus be created without violating copyright law, yet such deepfakes nevertheless still work electoral harms on Minnesota's interest.

Finally, the statute does not burden more speech than necessary to further Minnesota's interest. *281 Care Committee II* recognized that it is "difficult . . . to envision

other, less restrictive means" besides counterspeech to pursue the state's interest, but declined to uphold the statute at issue in that case because there was no reason to presume counterspeech would insufficiently vindicate that interest. 766 F.3d at 793-94. Here, in contrast, multiple experts agree that counterspeech is insufficient to combat the unique harms that deepfakes inflict. Indeed, the deepfake ban explicitly accounts for limits on counterspeech, restricting when the statute applies to ninety days before nominating conventions and while voting is occurring. 2024 Amendments, § 76. In other words, the law applies when counterspeech will be particularly ineffective and is unlikely to prevent the election-integrity harms.

### iii.    The electoral deepfake statute passes strict scrutiny.

Even if strict scrutiny applies, the statute meets the standard. A statute passes strict scrutiny if it is narrowly tailored to serve a compelling interest. *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015). The electoral deepfake statute does so.

For the reasons discussed above, Minnesota's interest in reducing deepfakes aimed at influencing elections—and thereby protecting the state's interest in electoral integrity—is compelling. Plaintiffs' claim that preventing "quid pro quo" corruption is the *only* permissible ground for state regulation of false speech on elections is simply wrong. Mem. 23. Plaintiffs rely on cases dealing with campaign-finance laws for that claim, not false speech. *E.g.*, *FEC v. Cruz*, 596 U.S. 289, 305 (2022); *Citizens United v. FEC*, 558 U.S. 310, 318 (2010). And, contrary to Plaintiffs' claim, the Court has long recognized a state's compelling interest  in preserving election integrity and protecting voters from confusion and undue influence. *Burson*, 504 U.S. at 199.

The deepfake ban is narrowly tailored to further these interests. A statute that affects constitutionally protected speech is narrowly tailored to serve the state's compelling interest if (a) the statute actually advances the state's interest, (b) the statute does not sweep too broadly, (c) the statute does not leave significant influences bearing on the interest unregulated, and (d) no other statute could advance the interest as well and infringe less speech. *Doe v. Bell*, 969 F.3d 883, 892 (8th Cir. 2020). The deepfake statute meets these requirements.

### (a)     The statute is necessary.

First, the deepfake statute actually advances the state's interest. A statute meets this requirement if it is "actually necessary." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). As previously discussed, deepfakes are particularly harmful to Minnesota's election-integrity interests because their audio-visual nature makes them particularly susceptible to belief, even when individuals know about deepfakes. Moreover, deceptive deepfakes are actively being used to influence the 2024 election. Existing tools, meanwhile, are inadequate to address these harms. The ban established by Minnesota is actually necessary to combat that influence.

Plaintiffs offer no evidence to the contrary, just their own speculation and second-guessing of legislative judgment. They principally point to the lack of Minnesota-specific election-influencing deepfakes when the legislature enacted the law, Mem. 28. But the expert evidence conclusively establishes that deepfakes pose a massive threat to elections, and that deepfakes *have* influenced elections across the globe. Minnesota (and the dozens

of states who have enacted similar laws) should not be faulted for addressing the threat before it manifests in Minnesota.

### (b) The statute does not sweep too broadly.

Second, the deepfake statute does not sweep too broadly. The law covers only deepfakes intended to cause specific harms that implicate Minnesota's interest: injuring a specific candidate or influencing an election through deception. The intent requirement narrowly targets these harms. Moreover, the actual-malice requirement ensures that someone who disseminates a deepfake mistakenly believing that it is real does *not* violate the statute.

Still, Plaintiffs insist that the statute overreaches, principally repeating their argument that the statute covers parodies. Mem. 28. Not so. As previously discussed, the statute only reaches portrayals where a reasonable person would believe the depicted individual engaged in the depicted conduct—not parodies. *See supra* Arg. Sec. I.A.1.

Citing *281 Care Committee II*, Plaintiffs further contend that the ban somehow "perpetuates the very fraud" it prohibits because it provides a private right of action. Mem. 28. The deepfake statute importantly differs from the statute at issue there. That statute allowed *anyone* to file an administrative complaint with an executive-branch agency. *See 281 Care Comm. II*, 766 F.3d at 778; *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 269 n.4 (Minn. 2001) (explaining that administrative-hearing office is executive-branch agency). Here, by contrast, only a limited class of plaintiffs—elected officials and those directly harmed by the deepfake's dissemination—can pursue civil relief. *See* Minn. Stat. § 609.771, subd. 4 (limiting who may seek

injunctive relief). Moreover, the forum for deepfake complaints is court, not an executive-branch agency. Deepfake complaints are subject to Rule 11 and the court's inherent authority to sanction parties for frivolous complaints and attempts to weaponize the complaint process. Thus, the electoral-machination concerns that doomed the statute in *281 Care Committee II* are not present here. *Cf.* 2024 Minn. Laws ch. 123, art. 18, § 10 (to be codified as Minn. Stat. § 554.16) (authorizing attorney's fees as anti-SLAPP tool to discourage frivolous litigation); *Leindecker v. Asian Women United of Minn.*, 848 N.W.2d 224, 228 (Minn. 2014) (noting anti-SLAPP statutes curb civil lawsuits that discourage expression).

### (c)   No significant interests are left unregulated.

Third, the deepfake statute does not leave significant influences bearing on the interest unregulated. Plaintiffs omit this prong from their narrow tailoring argument. Mem. 23-31. But regardless, Minnesota's deepfake statute wholly addresses the harms that motivate it. It reaches all false, nonconsensual, knowingly made deepfakes that are intended to cause specific harms. And while deepfakes in general are concerning, the legislature remained mindful of First Amendment free-speech rights by retaining the actual-malice requirement and the narrow timeframe. *Hearing on S.F. 3550 Before the S. Elections Comm.*, 2023 Leg., 93th Sess., at 11:22-14:40 (Minn. Feb. 15, 2024) (statements of Sens. Mark Koran & Erin Maye Quade) [Farrell Decl. ¶ 33]; *Hearing on H.F. 1370 Before the H. Elections, Fin., & Pol'y Comm.*, 2023 Leg., 93th Sess., at 13:30-14:15 (Minn. Feb. 15, 2023) (statement of Rep. Zach Stephenson) [Farrell Decl. ¶ 24]; *see also Dun & Bradstreet*, 472 U.S. at 755 (emphasizing significance of actual-malice standard).

### (d)    No less-infringing regulation is possible.

Finally, no other regulation infringing less on free-speech rights could replace the deepfake statute. As discussed above, Plaintiffs' proposed alternatives of counterspeech and private actions do not protect Minnesota's compelling election-integrity interests. This is particularly true during the period when the statute applies, ninety days before nominating conventions and while voting is occurring. Accordingly, no less-infringing regulation is possible.

\* \* \*

Because these four requirements are satisfied, Minnesota's deepfake statute is narrowly tailored to serve the state's compelling interests in electoral integrity.

### 3.    The electoral deepfake statute's plainly legitimate sweep is not outweighed by substantial theoretical unconstitutional applications.

The last step in a facial challenge analysis is measuring unconstitutional applications against the lawful ones. *GLBT*, 114 F.4th at 670. Unless the plaintiff has demonstrated that the ratio of unlawful-to-lawful applications is "lopsided enough to justify the 'strong medicine' of facial invalidation," the challenge fails. *United States v. Hansen*, 599 U.S. 762, 784 (2023). This comparison dooms Plaintiffs' motion.

As the preceding discussion makes clear, the First Amendment does not protect the speech that deepfake statute prohibits because it causes legally cognizable harm or amounts to fraud. But even if some unconstitutional applications exist, those narrow circumstances do not create such a lopsided balance to warrant striking down the entire statute. The statute applies to two types of deepfakes: those that injure a candidate and those that more

generally influence an election. The candidate-injury application falls squarely within bedrock First Amendment jurisprudence allowing states to prohibit defamatory falsehoods (subject to actual-malice requirements like the one in the deepfake ban). *Gertz*, 418 U.S. at 341. And even if a slight gap exists between the statute's prohibition and the elements of defamation, Minnesota laws are to be construed narrowly to avoid constitutional concerns. *See State v. Crawley*, 819 N.W.2d 94, 105 (Minn. 2012) (rejecting First Amendment facial challenge because, despite statute not satisfying all defamation elements, court could construing it narrowly and limit it to defamation). And as to the second category, it is difficult to fathom when a deepfake made with actual malice intended to influence an election would be entitled to constitutional protection (and not satisfy the appropriate level of scrutiny). But even if such cases exist, they would be rare compared to the statute's constitutional applications.

Because of the statute's plainly legitimate sweep, Plaintiffs' facial challenge is unlikely to succeed on the merits, even if they hypothesize a potential impermissible application. [8]

---

[8] Plaintiffs plead facial and as-applied First Amendment claims, but they seek preliminary injunctive relief only for their facial claims. Regardless, Plaintiffs cannot prevail in an as-applied challenge because they do not allege that the challenged law has been unconstitutionally applied to them. *Phelps-Roper v. Ricketts*, 867 F.3d 883, 896 (8th Cir. 2017). Moreover, Plaintiffs plead free speech claims under the Minnesota Constitution. Mem. 18. But the Eleventh Amendment bars state law claims against the Attorney General. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (federal courts lack authority to order state officials to conform their conduct to state law); *Minn. Voters Alliance v. Walz*, 492 F. Supp. 3d 822, 833 (D. Minn. 2022) (same).

## C.    The Deepfake Statute Is Not Void for Vagueness.

Nor are Plaintiffs likely to succeed on their vagueness challenge. A law is unconstitutionally vague if it (1) "fails to provide a person of ordinary intelligence fair notice of what is prohibited" or (2) "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Although a more stringent test applies when a statute interferes with First Amendment rights, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Id.* (quotation omitted). Moreover, in facial vagueness challenges, courts must consider limiting constructions. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494-95 & n.5 (1982).

As an initial matter, Plaintiffs wrongly conflate their vagueness and First Amendment claims. Vagueness and free-speech claims are distinct. The former stems from the due process clause, while the latter is rooted in the First Amendment. *Williams*, 553 U.S. at 304. Vagueness asks only whether a statute provides fair notice or too much enforcement discretion to the government. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18-21 (2010). It does not turn on scope of protected speech the law applies to, which is the province of the First Amendment overbreadth doctrine. *Id.* Plaintiffs improperly conflate these concepts, arguing that the law is vague because it implicates "vast amounts" of protected speech. Mem. 32. Because Plaintiffs rest their vagueness claim on overbreadth arguments, they are unlikely to succeed on the former.

### 1.     The deepfake statute provides fair notice of its proscriptions.

Even under the proper vagueness analysis, Plaintiffs are unlikely to succeed. Despite their attempt to parse and inject confusion into various statutory phrases, the deepfake statute provides fair notice of what it proscribes.

**Reasonable Person.** Plaintiffs first challenge the "reasonable person" standard incorporated into the "deepfake" definition. Mem. 32-33. They suggest the standard as elusive because people may vary in what they consider realistic. *Id.*

The "reasonable person" standard is pervasive, having been used for generations throughout criminal and civil law; it has a long common law pedigree and "settled legal meaning[]." *Williams*, 553 U.S. at 306; *Pope v. Illinois*, 481 U.S. 497, 501 n.3 (1987); *Reasonable Person*, *Black's Law Dictionary* (12th ed. 2024) (defining "reasonable person" as "[a] hypothetical person used as a legal standard"). In obscenity prosecutions, for example, the jury must be instructed on whether "a reasonable person" would find serious literary, artistic, political, or scientific value in allegedly obscene material, taken as a whole. *Pope*, 481 U.S. at 500-01. Similarly, in defamation, true threat, and impersonation cases, a statement is not punishable if a reasonable person would not perceive the statement as factual or threatening. *E.g.*, *Nunes v. Lizza*, 12 F.4th 890, 896-99 (8th Cir. 2021) (defamation); *Doe v. Pulaski Cnty. Special Sch. Dist.*, 306 F.3d 616, 622-24 (8th Cir. 2002) (true threat); *United States v. Gilbert*, 143 F.3d 397, 398-99 (8th Cir. 1998) (impersonation).

Because the "reasonable person" standard has been used for generations in numerous contexts, it does make  the deepfake" statute unconstitutionally vague.

**Substantially Dependent Upon Technical Means.** Plaintiffs next attack the phrase "substantially dependent upon technical means," which appears in the subclause limiting the law to deepfake production "substantially dependent upon technical means, rather than the ability of another individual to physically or verbally impersonate such individual." Minn. Stat. § 609.771, subd. 1(c)(2). Plaintiffs' argument fails for three reasons.

First, the phrase "substantially dependent upon technical means" provides sufficiently clear notice of the conduct within its ambit—namely, the use of technological tools and processes, rather than human mimicry, to create deceptive content. Indeed, in the context of deepfakes, the phrase "technical means" is readily understood to encompass digital manipulation, AI, and other technological methods used to fabricate or alter content. The statute's explicit contrast between "technical means" and physical and verbal impersonation reinforces this interpretation. *See* Minn. Stat. § 609.771, subd. 1(c)(2). Moreover, the modifier "substantially" is a common legal term that courts have repeatedly upheld against vagueness challenges. *See, e.g.*, *United States v. Washam*, 312 F.3d 926, 930-31 (8th Cir. 2002); *accord Recht v. Morrisey*, 32 F.4th 398, 415 (4th Cir. 2022). "Substantially dependent" requires only that technical means play a predominant role in creating the deceptive content—a determination well within the competence of courts and juries to make.

Second, Plaintiffs divorce the language from its context, ignoring that it narrows the "deepfake" definition. A narrowing definition limits vagueness; it does not create it. *Holder*, 561 U.S. at 20-21; *Williams*, 553 U.S. at 306.

Third, Plaintiffs claim that the July 26 video illustrates the phrase's ambiguity, advancing several strained hypotheticals to make the same point. As a threshold matter, as previously discussed, the deepfake law does not cover the July 26 parody video. And even if any doubt exists, the Attorney General's "limiting construction" further dooms Plaintiffs' vagueness challenge. *Flipside*, 455 U.S. at 495 n.5 (federal courts must consider "any limiting construction that a state court or enforcement agency has proffered"). But more fundamentally, Plaintiffs ignore that the deepfake statute's principal concern is AI-generated content, not minor video editing. And despite whatever scenarios Plaintiffs may proffer, a statute does not become vague merely because a plaintiff can conjure up a hypothetical close cases. *Hill v. Colorado*, 530 U.S. 703,t 732-33 (2000); *Williams*, 553 U.S. at 305-06.

**Intent to Injure a Candidate or Influence the Result of an Election.** Finally, Plaintiffs contend that the statute's "intent" language is impermissibly vague. But "scienter requirements alleviate vagueness concerns." *Gonzalez v. Carhart*, 550 U.S. 124, 149-50 (2007); *see also, e.g.*, *Hill*, 530 U.S. at 732. And here, the deepfake law imposes two scienter requirements: the disseminator of a deceptive deepfake must (1) "know[] or act[] with reckless disregard about whether the item being disseminated is a deepfake" and (2) "with the intent to injure a candidate or influence the result of an election." 2024 Amendments, § 76, subd. 2(a); Minn. Stat. § 609.771, subd. 2(4).

These scienter requirements are grounded in well-settled legal principles and ameliorate Plaintiffs' vagueness concerns. Indeed, the knowledge or reckless disregard requirement mirrors the longstanding actual malice standard for public-official defamation

claims. *See N.Y. Times v. Sullivan*, 376 U.S. 254, 279-80 (1964). And the intent language incorporates a well-settled mental state requirement from Minnesota's criminal code ("with intent to"). *See* Minn. Stat. § 609.02, subd. 9 (defining "with intent to," for purposes of criminal law as "the actor either has the purpose to do the thing or cause the result specified or believes that the act, if successful, will cause the result"); *Duhe v. City of Little Rock*, 902 F.3d 858, 864 (8th Cir. 2018) (rejecting vagueness challenge in part because ordinance incorporated *mens rea* standards defined in state's criminal code). By incorporating a well-settled intent standard, the deepfake statute limits the class of potential acts to those with the specific purpose of injuring a candidate or influencing an election. Taken together, these scienter requirements give fair notice of whether future conduct violates the law. They do not render the statute vague.

Plaintiffs do not meaningfully argue otherwise. They entirely ignore the baseline requirement that the disseminator knowingly or recklessly distribute a deceptive deepfake. Nor do they acknowledge that the intent language further cabins the statute's scope. Instead, Plaintiffs reiterate their core claim that the statute is too broad because it captures too much speech. Mem. 35-36. That argument goes to overbreadth, not vagueness, and fails on its own terms for the reasons already discussed.

### 2.    The electoral deepfake statute does not authorize discriminatory enforcement.

Plaintiffs last argue that the electoral deepfake statute encourages arbitrary or discriminatory enforcement. A statute cannot be struck down as arbitrary or discriminatory if it contains minimal enforcement guidelines. *Gonzalez*, 550 U.S. at 150. The deepfake

statute exceeds this standard: the scienter requirements and the statute's detailed definitions narrow the law's scope and limit prosecutorial discretion.

Second, to the extent that Plaintiffs sound alarm bells about civil enforcement, "the consequences of imprecision" in the civil context "are qualitatively less severe." *Flipside*, 455 U.S. at 49899. That is especially true here given that potential civil plaintiffs are limited to elected state and municipal officials, those depicted in the deceptive deepfake, and candidates directly injured by the deceptive deepfake. Minn. Stat. § 609.771, subd. 4.

Finally, in this preenforcement challenge, Plaintiffs' concerns about arbitrary-and-discriminatory enforcement are speculative. *Gonzalez*, 550 U.S. at 150. Despite seeking the extraordinary remedy of a preliminary injunction, Plaintiffs submitted no evidence of any discriminatory or arbitrary enforcement. The Court should not indulge Plaintiffs' speculation about arbitrary enforcement.

## II. PLAINTIFFS FAIL TO DEMONSTRATE ANY POSSIBILITY OF IRREPARABLE HARM.

To get an injunction, Plaintiffs must demonstrate that they are likely to suffer irreparable harm. *Winter*, 555 U.S. at 22. Inability to establish a likelihood of irreparable harm is an independent ground for denying an injunction. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

Plaintiffs have not established a likelihood of irreparable harm for four independent reasons. First, no irreparable harm exists when a challenged statute does not cover the desired activities. *Turtle Island Foods, SPC v. Richardson*, 425 F. Supp. 3d 1131, 1141 (W.D. Mo. 2019), *aff'd*, 992 F.3d at 701-02 (holding court did not abuse discretion in determining plaintiffs failed to show irreparable harm). A defendant's statement that a

challenged law does not cover particular conduct dispels any claim of irreparable harm. *Ness v. City of Bloomington*, 437 F. Supp. 3d 714, 723 (D. Minn. 2020). That is the case here.

Second, Plaintiffs' admissions that the deepfake law has not chilled them undercut their claimed harm. Compl. ¶¶ 31, 37. A plaintiff whose conduct has not changed since enactment of the challenged provision "seriously undermine[s]" any claim of harm. *Minn. State Coll. Student Ass'n, Inc. v. Cowles*, 620 F. Supp. 3d 835, 854-55 (D. Minn. 2022).

Third, Plaintiffs' inability to establish likelihood of success on the merits also precludes a finding of irreparable harm. *See Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015).

Finally, a plaintiff must demonstrate reasonable diligence to show irreparable harm. *See Adventist Health Sys./SunBelt, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 17 F.4th 793, 805-06 (8th Cir. 2021) (affirming no irreparable harm existed when plaintiff waited a year to challenge new policy); *see also Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889, 894 (8th Cir. 2024); *Cowles*, 620 F. Supp. 3d at 855.

The delay is particularly egregious with respect to Franson. As a legislator who helped enact the deepfake law, she was aware of the law since February 6, 2023, when the original bill was first introduced to the House. And she voted to enact it on May 16, 2023. Compl. ¶¶ 40, 51.[9] Despite that awareness, Plaintiffs waited more than a year after the law

---

[9] Although the 2024 amendments added penalties for violations, the 2023 law already included criminal penalties and the potential for injunctive relief. Nor did the amendments affect the statute's definition of deepfake. Compl. ¶¶ 57, 61-66.

was enacted and two months after they both first disseminated Kohls's July 26 video. Instead of seeking relief promptly, they asked this Court to expedite review of their motion and potentially halt enforcement of a law intended to protect elections just weeks before a presidential election. They have not—and cannot—offer any reasonable justification for their delays.

### III.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST DO NOT FAVOR AN INJUNCTION.

Neither the balance of the equities nor the public interest favors injunctive relief. These factors essentially merge when a plaintiff seeks injunctive relief against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). To analyze these factors, the court must balance the harms that arise from granting or denying the injunction, paying particular attention to the public consequences. *Winter*, 555 U.S. at 24.

The equities and public interest decisively cut against an injunction here. Most importantly, Plaintiffs have failed to show a likelihood of success, which is fatal to any request for injunctive relief. *Eggers v. Evnen*, 48 F.4th 561, 566-67 (8th Cir. 2022).

Nor will Plaintiffs suffer any injury without injunctive relief. As they have for nearly the past year and half, they are free to engage in political satire and parody and offer their viewpoint. The deepfake statute does not proscribe these expressive activities. Their delay in seeking injunctive relief and their conduct before and after they did so prove that they are not injured. Minnesota, by contrast, will suffer irreparable injury from an injunction. Indeed, when a court enjoins a state "from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301,

1303 (2012). That injury is even more pronounced than usual here because an injunction would significantly impede the conduct of fair elections in Minnesota. *See Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020) (recognizing harm in enjoining state election procedures).a

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction. Minnesota's deepfake law prohibits only a narrow class of unprotected speech. The narrow reach of the law is underscored by the Complaint—Plaintiffs identify no meaningful threat of enforcement against them for their past or future conduct. They are therefore unlikely to succeed on the merits and face no irreparable harm.

Dated:  November 1, 2024

Respectfully submitted,

KEITH ELLISON
State of Minnesota
Attorney General

/s/ **Pete Farrell**
LIZ KRAMER (#0325089)
Solicitor General
PETER J. FARRELL (#0393071)
Deputy Solicitor General
ANGELA BEHRENS (#0351076)
ALLEN COOK BARR (#0399094)
Assistant Attorneys General

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1010 (Voice)
liz.kramer@ag.state.mn.us
peter.farrell@ag.state.mn.us
angela.behrens@ag.state.mn.us
allen.barr@ag.state.mn.us

ATTORNEYS FOR KEITH ELLISON

|#5924499-v2

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

CHRISTOPHER KOHLS and,           Case No.  24-cv-03754 (LMP/DLM)
MARY FRANSON

        Plaintiffs,

     vs.                         **LR 7.1 CERTIFICATE OF
COMPLIANCE**

KEITH ELLISON, in his official capacity
as Attorney General of Minnesota, and
CHAD LARSON, in his official capacity
as County Attorney of Douglas County,

        Defendants.


I, Pete Farrell, certify that Defendant Attorney General Keith Ellison's Memorandum Opposing Preliminary Injunction complies with Local Rule 7.1(f) and (h).

I further certify that, in preparation of this memorandum, I used Microsoft Word 365, and that this word processing program has been applied specifically to include all text, including headings, footnotes, and quotations in the following word count.

I further certify that the above-referenced memorandum contains 11,737 words and is printed in 13-point Times New Roman font.

**Signature on following page**.

1

Dated:  November 1, 2024

KEITH ELLISON
State of Minnesota
Attorney General

/s/ **Pete Farrell**
LIZ KRAMER (#0325089)
Solicitor General
PETER J. FARRELL (#0393071)
Deputy Solicitor General
ANGELA BEHRENS (#0351076)
ALLEN COOK BARR
Assistant Attorneys General

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1010 (Voice)
(651) 282-5832 (Fax)
liz.kramer@ag.state.mn.us
peter.farrell@ag.state.mn.us
angela.behrens@ag.state.mn.us
allen.barr@ag.state.mn.us

ATTORNEYS FOR KEITH ELLISON