UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

X CORP.,                                    Court File No. 25-cv-1649 (LMP/DLM)

                Plaintiff,

vs.                                         **DEFENDANT'S ANSWER TO**
                                            **PLAINTIFF'S COMPLAINT**

KEITH ELLISON, in his official capacity,
as Attorney General of Minnesota,

                Defendant.


Keith Ellison, in his official capacity as Attorney General of Minnesota, as and for

his Answer to Plaintiff's Complaint, admits, denies, and alleges as follows:

Except as hereinafter expressly admitted, qualified, denied, or otherwise answered,

Defendant denies each and every allegation in the Complaint.

1.     Plaintiff X Corp. brings this action challenging the constitutionality and legal
validity of Minnesota Statutes § 609.771 ("Section 609.771"), which prohibits—under
threat of injunctive or equitable relief and criminal penalties, including imprisonment and
significant fines—"person[s]," which includes social media companies, such as X Corp.,[1]
from (i) disseminating or (ii) entering into a contract to disseminate certain election-related
content of which the State of Minnesota disapproves and deems to be a "deep fake."

ANSWER: The allegations in Paragraph 1, including Footnote 1, are Plaintiff's own

description of its lawsuit, to which no answer is required. To the extent a response is

---

[1] Section 609.771 does not define "person," and under Minnesota law "'Person' may
extend and be applied to bodies politic and corporate, and to partnerships and other
unincorporated associations." Minn. Stat. § 645.44(7); *see* § 645.44(1) (this definition
applies to "Minnesota Statutes or any legislative act," including the word "person"
"unless another intention clearly appears"); *Webb* v. *State*, 2021 WL 161959, at *3
(Minn. Ct. App. Jan. 19, 2021) ("[Section 645.44(7)'s definition of person] applies to all
Minnesota statutes, including criminal statutes, unless otherwise provided.").

required, Defendant denies these allegations. Defendant further states that the statutes and cases cited in Paragraph 1 and Footnote 1 speak for themselves; these include Minnesota Statutes sections 609.711, 645.44(7), and 645.44(1); as well as *Webb v. State*, 2021 WL 161959, at *3 (Minn. Ct. App. Jan. 19, 2021). Defendant denies these allegations to the extent they are inconsistent with these materials.

2.      The statute (a) violates the free speech rights of X and other social media platforms under the First and Fourteenth Amendments of the United States Constitution and Article I, Section 3, of the Minnesota Constitution, both facially and as-applied to Plaintiff; (b) is preempted by the immunity afforded to X Corp. by 47 U.S.C. § 230(c)(1); and (c) violates the First and Fourteenth Amendments of the United States Constitution, because its requirements are so vague and unintelligible that social media platforms cannot understand what the statute permits and what it prohibits, which will lead to blanket censorship, including of fully protected, core political speech.

ANSWER: Deny

3.      Section 609.771 has the effect of impermissibly replacing the judgments of social media platforms about what content may appear on their platforms with the judgments of the State. And it imposes liability on the platforms to the extent that their judgments about content moderation are inconsistent with those imposed by the State.

ANSWER: Deny

4.      Worse yet, Section 609.771 creates an enforcement system, backed with the threat of ***criminal liability***, that incentivizes platforms to err on the side of removing any content that presents even a close call as to whether it is a "deep fake" prohibited by the statute. Under this enforcement system, platforms that keep up content presenting a close call under the statute run the risk of criminal penalties, but there is no penalty for erring on the side of too much censorship. This system will inevitably result in the censorship of wide swaths of valuable political speech and commentary and will limit the type of "uninhibited, robust, and wide-open" "debate on public issues" that core First Amendment protections are designed to ensure. *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 270 (1964).

ANSWER: Deny. Defendant further states that the allegations in Paragraph 4 quote a decision of the United States Supreme Court that speaks for itself. Defendant denies these allegations to the extent they are inconsistent with that decision.

5.     All that is necessary to violate Section 609.771—and risk the imposition of jail time—is for a social media company, like X Corp., to "disseminate[] a deep fake" or even just "enter[] into a contract or other agreement to disseminate a deep fake" when the company "knows or acts with reckless disregard about whether" the item is a deep fake, as long as the item is (1) disseminated within 90 days before a political party nominating convention or after the start of the absentee voting period prior to a presidential nomination primary, or a regular or special state or local primary or general election, (2) made without the consent of the individual depicted, and (3) made with the intent to injure a candidate or influence the result of an election. *See* § 609.771(2).

ANSWER: Paragraph 5 quotes and cites Section 609.771; that statute speaks for itself and Defendant denies the allegations to the extent inconsistent therewith.  Defendant denies any remaining allegations.

6.     A "Deep fake," according to Section 609.771, is "any video recording, motion- picture film, sound recording, electronic image, or photograph, or technological representation of speech or conduct substantially derivative thereof: (1) that is so realistic that a reasonable person would believe it depicts speech or conduct of an individual who did not in fact engage in such speech or conduct; and (2) the production of which was substantially dependent upon technical means, rather than the ability of another individual to physically or verbally impersonate such individual." § 609.771(1)(c). According to Defendant Ellison, deep fakes are "highly realistic video, audio, and other digital content generated by artificial intelligence (AI) that show a person doing or saying something they did not."[2]

ANSWER: Paragraph 6, including Footnote 2, quotes and cites Section 609.771 and a memorandum of law; the cited materials speak for themselves and Defendant denies the

---

[2] Ex. 1 (Defendant Attorney General Keith Ellison's Memorandum Opposing Preliminary Injunction at 4, *Kohls* v. *Ellison*, No. 24-cv-03754 (LMP/DLM) (D. Minn. Nov. 1, 2024), ECF No. 19 ("Ellison PI Opp.")).

allegations to the extent inconsistent therewith. Defendant denies any remaining allegations.

7.      Here is an example of one. In March 2023, an X user named Eliot Higgins (@EliotHiggins) used artificial intelligence to imagine what the arrest of Donald Trump could look like as a way of providing political commentary reminding the public that the then-criminal prosecutions of now-President Trump constituted acts of "violence of the state" perpetrated on the current president:[3]

ANSWER: Defendant presently lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7, and on that basis, denies these allegations. Defendant further states that allegations in Paragraph 7, including in Footnote 3, include a photo and a website that speak for themselves. Defendant denies these allegations to the extent they are inconsistent with these materials.



---

[3] Ex. 2 (Eliot Higgins (@EliotHiggins), X (Mar. 20, 2023, 5:22 PM),
https://x.com/EliotHiggins/status/1637927681734987777 (last visited Apr. 23, 2025)).

8.     Thus, a social media company, like X Corp., could be accused of violating the statute—and potentially be subjected to criminal liability—for merely having these pictures displayed on its platform within the time periods set forth under Section 609.771(2)(a)(3)(i)–(ii), as doing so would be contracting with a user (through Terms of Service), resulting in the "dissemination" of a deep fake that satisfies the three requirements of Section 609.771(2) (quoted above in Paragraph 5), as long as the company "knows or acts with reckless disregard" about whether the material in question was a "deep fake" under the statute. This cannot withstand constitutional scrutiny.

ANSWER: The allegations in Paragraph 8 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies these allegations.

9.     As the United States Supreme Court has observed, our strong First Amendment protections for such speech are based on our nation's "profound national commitment" to protecting "uninhibited, robust, and wide-open" "debate on public issues," even if it often "include[s] vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Sullivan*, 376 U.S. at 270. As such, the First Amendment provides the strongest of protections for such speech, and will not tolerate even indirect efforts by the government to incentivize others to censor or restrict such speech.     *See, e.g.*, *Smith* v. *Cal.*, 361 U.S. 147, 154–155 (1959) (striking down, on First Amendment grounds, city ordinance providing for strict liability on booksellers for possession of books later judged to be obscene, which encouraged "self- censorship" and "impeded" the "distribution of all books, both obscene and not obscene"); *National Rifle Ass'n of Am.* v. *Vullo*, 602 U.S. 175, 190 (2024) ("A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf."); *Interstate Cir., Inc.* v. *City of Dallas*, 390 U.S. 676, 678, 684 (1968) (recognizing that a film exhibitor's First Amendment rights were implicated by a law requiring it to inform the government whether films were "suitable" for children); *NetChoice, LLC* v. *Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024) (strict scrutiny applies to governmental efforts to "deputize[] private actors into censoring speech based on its content").

ANSWER: The allegations in Paragraph 9 consist of quotations from decisions of the United States Supreme Court and the United States Court of Appeals for the Ninth Circuit. All of these decisions speak for themselves. Defendant denies these allegations to the extent they are inconsistent with these materials. Defendant further states that the

allegations in Paragraph 9 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies these allegations.

10. Section 609.771's problematic enforcement system provides enormous incentives for social media platforms, such as X, to censor speech on their platforms that the government disfavors—here, content that constitutes a "deep fake" under the statute. It does this by providing for enforcement of violations of the statute through (i) criminal penalties, including jail time and fines, and (ii) causes of action that can be brought by the Minnesota Attorney General, every Minnesota county attorney, and every Minnesota city attorney for injunctive or equitable relief against persons "violating" or "reasonably believed to be about to violate" the statute. §§ 609.771(3), (4).

ANSWER: Defendant denies the allegation in the first sentence of Paragraph 10. As to the allegation in the second sentence of Paragraph 10, Defendant states that Section 609.771 is a statute that speaks for itself. Defendant denies these allegations to the extent they are inconsistent with these materials. To the extent a response is required, Defendant denies these allegations.

11. Platforms may be prosecuted criminally or can be sued if governmental officials, depicted individuals, or candidates think the platform has not censored enough content; but the platform may not be prosecuted or sued by anyone if it has arguably censored too much content under the statute. The result is a system that highly incentivizes platforms to remove any content that presents a close call to avoid criminal penalties and costly lawsuits altogether.

ANSWER: Defendant states that the allegations in the first sentence of Paragraph 11 are legal conclusions to which no response is required. To the extent a response is required, Defendant denies these allegations. Defendant denies the allegations in the second sentence of Paragraph 11.

12. Section 609.771 suffers from a compendium of serious First Amendment infirmities. Primary among them is that Section 609.771 imposes a system of prior restraint on speech, which is the "most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n* v. *Stuart*, 427 U.S. 539, 559 (1976). The statute authorizes lawsuits to be brought and injunctions to issue against individuals "reasonably

believed to be about to violate" the statute—i.e., it authorizes injunctions preventing individuals from publishing "deep fakes" before they are even published. § 609.771(4). This constitutes a classic prior restraint and cannot withstand constitutional scrutiny. Section 609.771's authorization of injunctive or equitable relief as to content that has already been disseminated (i.e., as to persons that are "in the course of violating" the statute, § 609.771(4)) also constitutes a prior restraint on speech, because it authorizes speech to be taken down prior to a final determination that the content is unprotected under the First Amendment. *See, e.g.*, *Garcia* v. *Google, Inc.*, 786 F.3d 733, 747 (9th Cir. 2015) (forcing Google through "takedown order" to remove content previously published on YouTube prior to a final determination that the content was unprotected amounted to a "classic prior restraint on speech").

ANSWER: Deny. Defendant further states that the allegations in Paragraph 12 are legal conclusions to which no response is required. Defendant further states that the allegations in Paragraph 12 contain quotations from Section 609.771 and decisions of the United States Supreme Court and the United States Court of Appeals for the Ninth Circuit, all of which speak for themselves. Defendant denies these allegations to the extent they are inconsistent with these materials.

13.    Section 609.771 also violates the First Amendment because it runs counter to the United States Supreme Court's recent decision in *Moody* v. *NetChoice, LLC*, in which the Court held, in no uncertain terms, that when a social media platform "present[s] a curated and 'edited compilation of [third party] speech,'" that presentation "is itself protected speech." 603 U.S. 707, 744 (2024) (quoting *Hurley* v. *Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 570 (1995)); *see also Moody*, 603 U.S. at 729–30 ("A private party's collection of third-party content into a single speech product (the operators' 'repertoire' of programming) is itself expressive, and intrusion into that activity must be specially justified under the First Amendment."); *id.* at 738 (quoting *Miami Herald Pub. Co.* v. *Tornillo*, 418 U.S. 241, 258 (1974) ("The choice of material, the decisions made [as to] content, the treatment of public issues— whether fair or unfair—all these constitute the exercise of editorial control and judgment   For a paper, and ***for a platform too***.")).[4] Because Section 609.771 impermissibly replaces the judgments of the covered platforms about what speech may be permitted on their platforms with those of the government, it cannot be reconciled with *Moody*.

---

[4] Unless otherwise indicated, emphases in quotes are added and internal citations and quotations are omitted.

ANSWER: Deny. Defendant further states that the allegations in Paragraph 13 constitute legal conclusions to which no response is required. Defendant further states that the allegations in Paragraph 13 contain quotations from Section 609.771 and decisions of the United States Supreme Court, all of which speak for themselves. Defendant denies these allegations to the extent they are inconsistent with these materials.

14.    Section 609.771 disregards numerous significant First Amendment holdings by the Supreme Court in *Moody*—specifically, that (i) it is not a "valid, let alone substantial" interest for a state to seek "to correct the mix of speech" that "social-media platforms present," *id.* at 740; (ii) a "State 'cannot advance some points of view by burdening the expression of others,'" *id.* at 744 (quoting *Pac. Gas & Elec. Co.* v. *Pub. Utilities Comm'n of Cal.*, 475 U.S. 1, 20 (1986)); (iii) the "government may not, in supposed pursuit of better expressive balance, alter a private speaker's own editorial choices about the mix of speech it wants to convey," *id.* at 734; (iv) "it is no job for government to decide what counts as the right balance of private expression—to 'un-bias' what it thinks biased, rather than to leave such judgments to speakers and their audiences. That principle works for social-media platforms as it does for others," *id.* at 719; and (v) "[h]owever imperfect the private marketplace of ideas," a "worse proposal" is "the government itself deciding when speech [is] imbalanced, and then coercing speakers to provide more of some views or less of others," *id.* at 733. *See also Hustler Mag., Inc.* v. *Falwell*, 485 U.S. 46, 56 (1988) ("[I]t is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas.").

ANSWER: Deny. Defendant further states that the allegations in Paragraph 14 constitute legal conclusions to which no response is required. Defendant further states that the allegations in Paragraph 14 contain quotations from Section 609.771 and decisions of the United States Supreme Court, all of which speak for themselves. Defendant denies these allegations to the extent they are inconsistent with these materials.

15.    Section 609.771 also runs counter to the First Amendment's staunch protection of core political speech. Section 609.771 censors speech about "public issues and debate on the qualifications of candidates," to which the "First Amendment affords the **broadest protection**" to ensure the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *McIntyre* v. *Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995). It imposes unintelligible prohibitions on allowing a specific

category of speech under threat of enormous liability if it is not removed to the government's satisfaction. The statute greatly incentivizes covered platforms to censor all content that could reasonably fall within the statute's purview to avoid substantial enforcement costs. This, in turn, will severely chill important political speech—specifically, the use of exaggerated or unfavorable visual means to undermine and combat political opponents, which, as the Supreme Court has recognized, is ingrained in the historical fabric of U.S. political commentary and subject to the strongest of First Amendment protections.

ANSWER: Deny. Defendant further states that the allegations in Paragraph 15 constitute legal conclusions to which no response is required. Defendant further states that the allegations in Paragraph 15 contain quotations from Section 609.771 and decisions of the United States Supreme Court, all of which speak for themselves. Defendant denies these allegations to the extent they are inconsistent with these materials.

16.     Whether it be "Walt McDougall's characterization" in 1884 "of Presidential candidate James G. Blaine's banquet with the millionaires at Delmonico's as 'The Royal Feast of Belshazzar,'" or contemporary imaginings of Donald Trump's arrest,[5] or what a second term under President Biden would look like,[6] "graphic depictions and satirical cartoons have played a prominent role in public and political debate," and "it is clear that our political discourse would [be] considerably poorer without them." *Falwell*, 485 U.S. at 54–55. Indeed, "YouTube videos, Facebook posts, and X tweets are the newspaper advertisements and political cartoons of today, and the First Amendment protects an individual's right to speak regardless of the new medium these critiques may take." *Kohls* v. *Bonta*, 752 F. Supp. 3d 1187, 1195–96 (E.D. Cal. 2024) (holding that California Assembly Bill ("AB") 2839, providing causes of action against individuals who post

---

[5] Ex. 2 (Eliot Higgins (@EliotHiggins), X (Mar. 20, 2023, 5:22 PM)); *see also* Ex. 3 (MNHouseInfo, *House Floor Session 3/30/23 – Part 2* (at 1:21:10), YOUTUBE (Mar. 30, 2023), https://www.youtube.com/watch?v=OyAZkqMGgMQ&t=4870s (last visited Apr. 23, 2025)) (Bill Sponsor, Minnesota Representative Zack Stephenson, advocating for the law to cover the images posted by Higgins). All exhibit transcripts, which were downloaded directly from the websites, are auto-generated and uncertified. The transcripts and audios were reviewed to confirm the accuracy of the portions quoted herein.

[6] Ex. 4 (GOP, *Beat Biden*, YOUTUBE (Apr. 25, 2023), https://www.youtube.com/watch?v=kLMMxgtxQ1Y (last visited Apr. 23, 2025)).

certain election-related "materially deceptive content" generated with artificial intelligence, likely violated the First Amendment on its face because the statute's "legitimate sweep pales in comparison to the substantial number of its applications . . . which are plainly unconstitutional").

ANSWER: Defendant denies the allegations in Paragraph 16, including Footnote 5, as vague. Defendant further states that the allegations in Paragraph 16, including Footnote 5, include quotations from various pieces of media as well as quotations from decisions of the United States Supreme Court and the United States District Court for the Eastern District of California, all of which speak for themselves. Defendant denies these allegations to the extent they are inconsistent with these materials.

17. There is a long history of the strongest of First Amendment protections for speech critical of government officials and candidates for public office that includes tolerance for potentially false speech made in the context of such criticisms. And there is a long history of skepticism of any governmental attempts to regulate such content, no matter how well-intentioned they may be. As both the Supreme Court and Judge Learned Hand have noted, "[t]he First Amendment" "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues than through any kind of authoritative selection. To many, this is, and always will be, folly; but we have staked upon it our all." *Sullivan*, 376 U.S. at 270 (quoting *United States* v. *Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943) (Hand, J.)). Section 609.771 runs counter to these principles by attempting to impose by "authoritative selection" the permissible content on social media platforms, rather than allowing the "multitude of tongues" engaging in political debate and commentary on those platforms to do so.

ANSWER: As to the allegations in the first two sentences of Paragraph 17, Defendant denies as vague. As to the allegations in the third and fourth sentences of Paragraph 17, up to and including the *Sullivan* citation, Defendant states that this allegation constitutes a legal conclusion to which no response is required. To the extent a response is required, Defendant denies these allegations. Defendant further states that the allegations in the third and fourth sentences of Paragraph 17 quote a decision of the United States

Supreme Court, which speaks for itself. Defendant denies these allegations to the extent they are inconsistent with these materials. Defendant denies the allegations in the fifth sentence of Paragraph 17.

18.    Accordingly, Section 609.771 violates the First Amendment of the United States Constitution and Article I, Section 3, of the Minnesota Constitution, both facially and as-applied to X Corp. Section 609.771 imposes a prior restraint on speech that forces platforms to censor only certain election-related content of which the State of Minnesota disapproves and also directly and impermissibly interferes with the constitutionally protected content-moderation speech rights of social media platforms like X. And Section 609.771 does so notwithstanding that less speech- restrictive alternatives would advance Minnesota's "interest in electoral integrity."[7]

ANSWER: Deny. Defendant further states that the allegations in Paragraph 18 are legal conclusions to which no response is required. To the extent a response is required, Defendant denies these allegations. Defendant further states that the allegations in and referred to by Footnote 7 are from a document that speaks for itself. Defendant denies these allegations to the extent they are inconsistent with these materials.

19.    Section 609.771 also directly contravenes the immunity provided to social media platforms by 47 U.S.C. § 230(c)(1), which prohibits treating interactive computer service providers like X Corp. as the "publisher or speaker of any information provided by another information content provider." Section 609.771 does so because it provides causes of action for "injunctive or equitable relief" and for criminal penalties, including imprisonment, against platforms such as X if they disseminate, or enter into an agreement to disseminate, user content that violates the statute.

ANSWER: Deny. Defendant further states that the allegations in Paragraph 19 are legal conclusions to which no response is required. To the extent a response is required, Defendant denies these allegations.

---

[7]  Ex. 1 (Ellison PI Opp.) at 30–31, 33–34, 38.

20.     So too does Section 609.771 violate the First and Fourteenth Amendments of the United States Constitution for vagueness. The statute's requirements are so vague and unintelligible that social media platforms cannot understand how to comply with them; thus, those subject to its language will be compelled to over-censor speech to avoid costly litigation potentially leading to criminal liability, over countless judgment calls surrounding whether the statute prohibits particular pieces of content. And here, the vagueness concern is particularly acute because Defendant Ellison holds specific animus toward Plaintiff X Corp. and its owner Elon Musk that appears to be motivated by political disagreements. As recently as February 4, 2025, Defendant Ellison called Musk a "rich punk," a "billionaire baby," and a "fascis[t]," and said it is ***"certainly possibl[e]"*** that he will file a ***criminal*** action against Musk.[8]

ANSWER: The allegations in the first sentence of Paragraph 20 consist of legal conclusions to which no response is required. To the extent a response is required, Defendant denies these allegations. As to the allegations in the second and third sentences of Paragraph 20, Defendant denies these allegations. As to the allegations in the fourth sentence of Paragraph 20, including Footnote 8, Defendant states that the quotations refer to various pieces of media that speak for themselves. Defendant denies these allegations to the extent they are inconsistent with these materials.

21.     In pursuing this action, X Corp. seeks declaratory and injunctive relief on the grounds that Section 609.771 (i) violates the free speech rights of X and other social media platforms under the First Amendment of the United States Constitution and Article I, Section 3, of the Minnesota Constitution, both facially and as-applied to Plaintiff; (ii) directly conflicts with, and is thus preempted by, the immunity afforded to X Corp. by 47 U.S.C. § 230(c)(1); and (iii) violates the First and Fourteenth Amendments of the United States Constitution because its requirements are so vague and unintelligible that social media platforms cannot understand what the statute permits and what it prohibits, which will lead to blanket censorship, including of valuable political speech.

---

[8]  *See* Ex. 5 (The Dean Obeidallah Show, *Minn AG Keith Ellison: We will be looking into potential crimes committed by Elon Musk* (at 04:29, 09:23, 10:00, 16:54), YOUTUBE (Feb. 4, 2025), https://www.youtube.com/watch?v=SqE7XG-39n4 (last visited Apr. 23, 2025)); *see also id.* (at 05:15) ("we've filed lawsuits [against Musk], ***we're gonna file more***").

ANSWER: The allegations in Paragraph 21 constitute legal conclusions and Plaintiff's own description of its lawsuit to which no response is required. To the extent a response is required, Defendant denies these allegations.

22.     In pursuing this action, X Corp. seeks to vindicate the deprivation of constitutional rights under color of state statute, ordinance, regulation, custom, and/or usage. X Corp. is also entitled to attorneys' fees and costs if it prevails on any of its Section 1983 claims. *See* 42 U.S.C. § 1988.

ANSWER: The allegations in the first sentence of Paragraph 22 are Plaintiff's own description of its lawsuit, to which no response is required. To the extent a response is required, Defendant denies these allegations. The allegations in the second sentence of Paragraph 22 are a legal conclusion to which no response is required. To the extent a response is required, Defendant denies these allegations.

23.     Plaintiff X Corp. is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in Bastrop, Texas. X Corp. provides the X service, which is a real-time, open, public conversation platform, where people can see every side of a topic, discover news, share their perspectives, and engage in discussion and debate. X allows people to create, distribute, and discover content and has democratized content creation and distribution. X allows users to create and share ideas and information instantly through various product features, including public posts.

ANSWER: Defendant presently lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23, and on that basis, denies these allegations. Defendant further states that the allegations in the second, third, and fourth sentences of Paragraph 23 are vague, and on that basis denies them.

24.     Defendant Keith Ellison is the Attorney General of the State of Minnesota and is charged with enforcing Section 609.771. *See* § 609.771(4)(1). X Corp. sues Attorney General Ellison in his official capacity as the person charged with enforcing Section 609.771.

ANSWER: Admit that Defendant is the Attorney General of the State of Minnesota and is *a* person (but not the sole person) who has the authority to seek relief under Minn. Stat. § 609.771, subd. 4. Admit that X Corp. sues Defendant in his official capacity. Deny all remaining allegations.

25.    This Court has jurisdiction over X Corp.'s federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a) and 42 U.S.C. § 1983, because X Corp. alleges violations of its rights under the U.S. Constitution and laws of the United States. The Court has jurisdiction over X Corp.'s state claim pursuant to 28 U.S.C. § 1367.

ANSWER: Admit

26.    This Court has authority to grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and under the Court's inherent equitable jurisdiction.

ANSWER: Admit

27.    Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because the Defendant is located, resides, and has offices in this judicial district and in the State of Minnesota, and the violations of X Corp.'s rights are occurring and will occur within this judicial district. Section 609.771 was also enacted in this judicial district.

ANSWER: Defendant admits the allegations in the first sentence of Paragraph 27, with the exception of the allegation that any "violations of X Corp.'s rights are occurring and will occur within this judicial district," which Defendant denies. Defendant admits the allegations in the second sentence of Paragraph 27.

28.    Section 609.771 applies to a "person who disseminates a deep fake or enters into a contract or other agreement to disseminate a deep fake" if the "person knows or acts with reckless disregard about whether the item being disseminated is a deep fake and dissemination: (1) is made without the consent of the depicted individual; (2) is made with the intent to injure a candidate[9] or influence the result of an election; and (3) takes place

---

[9] "Candidate" means "an individual who seeks nomination or election to a federal, statewide, legislative, judicial, or local office including special districts, school districts, towns, home rule charter and statutory cities, and counties." § 609.771(1)(b).

either: (i) within 90 days before a political party nominating convention; or (ii) after the start of the absentee voting period prior to a presidential nomination primary, or a regular or special state or local primary or general election." § 609.771(2)(a).[10]

ANSWER: The allegations in Paragraph 28, including Footnotes 9 and 10, quote Section 609.771 and cite Exhibit 6, which speak for themselves. Defendant denies these allegations to the extent they are inconsistent with these materials.

29.    As noted above, under the statute, a "deep fake" is defined as "any video recording, motion-picture film, sound recording, electronic image, or photograph, or any technological representation of speech or conduct substantially derivative thereof: (1) that is so realistic that a reasonable person would believe it depicts speech or conduct of an individual who did not in fact engage in such speech or conduct; and (2) the production of which was substantially dependent upon technical means, rather than the ability of another individual to physically or verbally impersonate such individual." § 609.771(1)(c).

ANSWER: The allegations in Paragraph 29 quote Section 609.771, which is a statute that speaks for itself. Defendant denies these allegations to the extent they are inconsistent with the statute.

30.    A person who disseminates a deep fake or enters into a contract or other agreement to disseminate a deep fake under the conditions forbidden under the statute is "guilty of a crime" and "may be sentenced . . . (1) if the person commits the violation within five years of one or more prior convictions under this section, to imprisonment for not more than five years or to payment of a fine of not more than $10,000, or both; (2) if the person commits the violation with the intent to cause violence or bodily harm, to imprisonment for not more than 364 days or to payment of a fine of not more than $3,000, or both; or (3) in other cases, to imprisonment for not more than 90 days or to payment of a fine of not more than $1,000, or both." §§ 609.771(2)(a), (3)(a)(1)–(3).

---

[10] The statute's prohibitions are ***currently*** triggered under Section 609.771(2)(a)(ii) because (i) Minnesota sends absentee ballots "at least 46 days before the election," and (ii) there will be elections in Minnesota this year on May 13, August 12, and November 4. *See* Ex. 6 (*2025 Minnesota Absentee Ballot Application*, https://www.sos.state.mn.us/media/2444/english-regular-absentee-ballot-application.pdf (last visited Apr. 23, 2025)).

ANSWER: The allegations in Paragraph 30 quote Section 609.771, which is a statute that speaks for itself. Defendant denies these allegations to the extent they are inconsistent with the statute.

31.     In addition, a "cause of action for injunctive or equitable relief may be maintained against any person who is reasonably believed to be about to violate or who is in the course of violating this section by: (1) the attorney general; (2) a county attorney or city attorney; (3) the depicted individual[11]; or (4) a candidate for nomination or election to a public office who is injured or likely to be injured by dissemination." § 609.771(4).

ANSWER: The allegations in Paragraph 31, including Footnote 11, quote Section 609.771, which is a statute that speaks for itself. Defendant denies these allegations to the extent they are inconsistent with the statute.

32.     Section 609.771 "does not apply to a broadcaster or cable television system that disseminates a deep fake produced by a candidate if the broadcaster's or cable television system's dissemination is required by federal law." § 609.771(2)(b).

ANSWER: The allegations in Paragraph 32 quote Section 609.771, which is a statute that speaks for itself. Defendant denies these allegations to the extent they are inconsistent with the statute.

33.     Section 609.771 only applies "(i) within 90 days before a political party nominating convention; or (ii) after the start of the absentee voting period prior to a presidential nomination primary, or a regular or special state or local primary or general election." § 609.771(2)(a).

ANSWER: The allegations in Paragraph 33 quote Section 609.771, which is a statute that speaks for itself. Defendant denies these allegations to the extent they are inconsistent with the statute.

---

[11] "Depicted individual" means "an individual in a deep fake who appears to be engaging in speech or conduct in which the individual did not engage." § 609.771(1)(d).

34.    X Corp. is, at least, a "person" that—by requiring users to agree to its Terms of Service[12] before they may use the platform, after which the user could engage in conduct prohibited by the statute—"enters into a contract or other agreement to disseminate a deep fake" under the circumstances set forth in and proscribed by Section 609.771(2)(a).

ANSWER: The allegations in Paragraph 34 are a legal conclusion to which no response is required. To the extent a response is required, Defendant denies these allegations. Exhibit 7, cited in Footnote 12, is a document that speaks for itself. Defendant denies the allegations in Footnote 12 to the extent consistent therewith.

35.    X and other social media platforms already maintain robust policies and features that address what they view as problematic content. Because those policies are different from, and in certain respects conflict with, those set forth in Section 609.771, Section 609.771 impermissibly substitutes the State's content-moderation policies in this important area for those of social media platforms and impermissibly imposes liability on them for noncompliance with the State's preferred content-moderation policies. This violates the First Amendment.

ANSWER: Defendant presently lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 35, and on that basis, denies these allegations. As to the allegation in the second and third sentences of Paragraph 35, Defendant states that these allegations constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies.

36.    For instance, the X platform has a feature called "Community Notes" that allows users to flag content that they believe needs context, which could include "deep fakes," as defined under Section 609.771. Through Community Notes, users of the X platform may provide additional context or information about content that will appear along with the content if enough of the community's "contributors," who otherwise hold diverse viewpoints, deem the additional commentary to be helpful. And, in recognition of the fast-paced nature of social media, X has accelerated Community Notes, and now indicates "Lightning Notes" that start appearing on posts within an hour of being proposed,

---

[12]  Ex. 7 (*Terms of Service*, X, https://x.com/en/tos (last visited Apr. 23, 2025)).

or within an hour of the post itself going live. Any user can become a Community Notes "contributor," so long as they (i) have no recent X rule violations, (ii) joined X at least six months ago, and (iii) provide a phone number. X provides contributors with alias profiles that are not linked to their main X profile, and X Corp. does not write or edit these notes.

ANSWER: Defendant presently lacks knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 36, and on that basis, denies these

allegations.

37.    X's Community Notes feature is so effective that Meta has announced that it will employ a similar system on Facebook, Instagram, and Threads. *See, e.g.*, Ex. 8 (*Community Notes: A New Way to Add Context to Posts*, META TRANSPARENCY CENTER (Apr. 7, 2025), https://transparency.meta.com/features/community-notes (last visited Apr. 23, 2025)).

ANSWER: Defendant presently lacks knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 37, and on that basis, denies these

allegations. Defendant further states that the Meta website referenced in these allegations

is a website that speaks for itself. Defendant denies these allegations to the extent they

are inconsistent with this website.

38.    In addition, any X user may comment on posted content, providing additional context or disagreement in the form of "replies" to a post or by making a separate post that quotes and comments on the posted content. These general post and reply features on X are likewise an effective form of counterspeech to combat deceptive or misleading content.

ANSWER: As to the allegations in the first sentence of Paragraph 38, Defendant

states that it presently lacks knowledge or information sufficient to form a belief as to the

truth of these allegations, and on that basis, denies them. As to the allegations in the

second sentence of Paragraph 38, Defendant states that these allegations constitute legal

conclusions to which no response is required. To the extent a response is required,

Defendant denies these allegations.

39.     Another feature on the X platform that combats deceptive or misleading content using counterspeech is a tool called "Grok AI – Explain This Post." The tool, which users can employ by clicking a button on the top-right corner of a post, leverages Grok, X's artificial intelligence chat bot, to provide detailed context and information about particular posts, which can help the user understand whether the content is truthful and/or is generated using artificial intelligence.

ANSWER: Defendant presently lacks knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 39, and on that basis, denies these

allegations.

40.     X also maintains an "Authenticity" Policy that covers "Synthetic and Manipulated Media," under which users "may not share inauthentic media, including, manipulated, or out-of- context media that may result in widespread confusion on public issues, impact public safety, or cause harm ('misleading media')." Ex. 9 (*Authenticity*, X (Jan. 2025), https://help.x.com/en/rules- and-policies/authenticity (last visited Apr. 23, 2025)). Under the policy, in "situations where [X is] unable to reliably determine if [the content] is misleading media, [X] may not take action." *Id.* How X enforces its Authenticity Policy "depend[s] on the severity of the violation as well as any previous history of violations." *Id.* One such way in which X may "take action" to enforce its policy is to label posts containing misleading media, to help people understand the content's authenticity, and to provide additional context.

ANSWER: Defendant presently lacks knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 40, and on that basis, denies these

allegations. Defendant further states the Authenticity Policy referenced in these allegations

is a document that speaks for itself. Defendant denies these allegations to the extent they

are inconsistent with this Policy.

41.     Under X's Authenticity Policy—which is publicly available to all users of the platform as well as to the public generally—X considers, e.g., the following in determining whether to remove and/or label content:

a.  Whether the media is "significantly and deceptively altered, manipulated, or fabricated in a way that fundamentally changes its meaning and can result in widespread confusion on public issues, impact public safety, or cause serious harm"; and

19

b. Whether the media is "shared in a deceptive manner or out-of-context or with intent to deceive people about the nature or origin of the content and can result in widespread confusion on public issues, impact public safety, or cause serious harm[.]" *Id.*

ANSWER: Defendant presently lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41, and on that basis, denies these allegations. Defendant further states the Authenticity Policy referenced in these allegations is a document that speaks for itself. Defendant denies these allegations to the extent they are inconsistent with this Policy.

42. X's Authenticity Policy also makes clear that "[s]haring manipulated or out-of- context media in non-deceptive ways" is "[a]llowed" under the policy. *Id.*

ANSWER: Defendant presently lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42, and on that basis, denies these allegations. Defendant further states the Authenticity Policy referenced in these allegations is a document that speaks for itself. Defendant denies these allegations to the extent they are inconsistent with this Policy.

43. Other covered platforms—e.g., Meta, YouTube, TikTok, Snapchat, Rumble, and Google Search—likewise have their own policies designed to address false, misleading, and/or manipulated media. Each has a different approach to addressing such content. And each approach is different from the State's approach embodied in Section 609.771.

ANSWER: Defendant presently lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43, and on that basis, denies these allegations. The allegations in Paragraph 43 reference Section 609.771, which is a statute that speaks for itself. Defendant denies these allegations to the extent they are inconsistent with the statute.

44.     Social media content moderation is an inherently controversial undertaking. How social media companies apply their content-moderation rules to particular posts is a sensitive and controversial exercise that is subject to rigorous debate and controversy. Put another way, deciding what content should appear on a social media platform is a question that engenders considerable debate among reasonable people about where to draw the correct proverbial line. This is particularly true of election-related content and is certainly true of the type of content that is arguably covered by Section 609.771's definition of deep fakes.

ANSWER:    Defendant presently lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44, and on that basis, denies these allegations. The allegations in Paragraph 44 reference Section 609.771, which is a statute that speaks for itself. Defendant denies these allegations to the extent they are inconsistent with the statute.

45.     The State has never explained why X's Authenticity Policy, combined with its "Community Notes" program, use of Grok AI, and other comment and reply features, are insufficient to address the "deep fake" content targeted by Section 609.771. In fact, they work very well.

ANSWER:    Deny.

46.     Nor has the State explained why the policies of other social media platforms, coupled with counterspeech from other users of the platforms—including counterspeech from Defendant Ellison's office and other government officials—are insufficient to address the "deep fake" content targeted by Section 609.771 in a less speech-restrictive manner.

ANSWER:    Deny.

47.     Defendant Ellison has displayed specific animus toward X Corp. and its owner Elon Musk.

ANSWER:    Deny.

48.     On September 2, 2024, Defendant Ellison's X account posted the following message in Portuguese thanking Brazil: "obrigado Brasil!" Ex. 10 (Keith Ellison (@keithellison), X (Sept. 2, 2024, 5:33 PM), https://x.com/keithellison/status/1830720700019028109?lang=en (last visited Apr. 23, 2025)).

21

ANSWER:   The allegations in Paragraph 48 refer to a social media post, which speaks for itself. Defendant denies these allegations to the extent they are inconsistent with the social media post. Defendant further affirmatively states that @keithellison is Mr. Ellison's personal X account and not his official X account (which is @AGEllison).

49.   Defendant Ellison's post followed the Brazilian government blocking the X platform throughout the country and initiating a criminal investigation against Elon Musk, which occurred because X refused to follow Brazilian court orders to censor opposition voices, including opposition government officials in Brazil.

ANSWER:   Defendant denies the allegations in Paragraph 49. Defendant further affirmatively states that @keithellison is Mr. Ellison's personal X account and not his official X account (which is @AGEllison).

50.   Not only has Defendant Ellison failed to publicly explain the meaning of his September 2, 2024 post, or even condemn the Brazilian government's censorship of oppositionist government officials, he has continued to post about, and criticize, Musk.

ANSWER:   Paragraph 50 either references a social-media post that speaks for itself or alludes to other social media posts from Mr. Ellison's personal account that are not identified with any specificity. As such, Defendant is without knowledge or information sufficient to respond, and denies the allegations.

51.   As recently as February 4, 2025, on a YouTube show, Defendant Ellison called Musk a "rich punk," a "billionaire baby," and a "fascis[t]." *See* Ex. 5 (The Dean Obeidallah Show, *Minn AG Keith Ellison: We will be looking into potential crimes committed by Elon Musk* (at 04:29, 10:00, 16:54), YOUTUBE (Feb. 4, 2025), https://www.youtube.com/watch?v=SqE7XG- 39n4 (last visited Apr. 23, 2025)). Defendant Ellison even said, in no uncertain terms, that it is "certainly possibl[e]" he will file a ***criminal*** action against Musk. *Id.* (at 9:23); *see also id.* (at 05:15) ("we've filed lawsuits [against Musk], ***we're gonna file more***").

ANSWER:   The allegations in Paragraph 51 include assertions about alleged statements by the Defendant, to which Defendant responds that his statements speak for

themselves. Defendant denies these allegations to the extent they are inconsistent with his

statements.

52.    While Defendant Ellison has every right to voice personal opinions, what he may not do is use the government as a vehicle to criminally target individuals based on personal or political animus, as he has threatened to do. Defendant Ellison's specific animus toward X Corp. and Musk exacerbates Section 609.771's constitutional infirmities as-applied to X Corp. This is particularly so, given that the statute's vagueness gives Defendant Ellison unfettered discretion to selectively prosecute those, like X Corp. and Elon Musk, that he apparently perceives to be his political enemies.

ANSWER: Defendant denies the allegations in Paragraph 52. The allegations in

Paragraph 52 reference Section 609.771, which is a statute that speaks for itself. Defendant

denies these allegations to the extent they are inconsistent with the statute.

53.    X Corp. realleges and incorporates herein by reference each and every allegation set forth above.

ANSWER:   Defendant repeats and incorporates by reference all responses to the

allegations in each Paragraph of the Complaint.

54.    Section 609.771 violates the First Amendment of the United States Constitution and Article I, Section 3, of the Minnesota Constitution by providing injunctive or equitable enforcement and carrying criminal penalties of imprisonment and significant fines against social media platforms like X, if they do not censor content on their platforms to the State's liking—that is, if the platform violates the statute or is "reasonably believed to be about to violate" the statute.[13]

ANSWER:   The allegations in Paragraph 54, including Footnote 13, constitute

---

[13]  Section 609.771 violates Article I, Section 3, of the Minnesota Constitution for all of the same reasons that it violates the First Amendment of the United States Constitution. *See Tatro* v. *Univ. of Minn.*, 816 N.W.2d 509, 516 (Minn. 2012) ("Because the Minnesota constitutional right to free speech is coextensive with the First Amendment, we look primarily to federal law for guidance."); *Minn. Majority* v. *Mansky*, 708 F.3d 1051, 1054 n.1 (8th Cir. 2013) ("[Minnesota Constitution claims] are evaluated using the same standard as those under the U.S. Constitution.").

legal conclusions to which no response is required. To the extent a response is required,

Defendant denies the allegations.

55.    First, Section 609.771 imposes a prior restraint on speech, which is the "most serious and the least tolerable infringement on First Amendment rights," *Stuart*, 427 U.S. at 559, and does so as to speech concerning "public issues and debate on the qualifications of candidates," to which the "First Amendment affords the ***broadest protection***" to protect the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *McIntyre*, 514 U.S. at 346.

ANSWER:    The allegations in Paragraph 55 constitute legal conclusions to which

no response is required. To the extent a response is required, Defendant denies the

allegations.

56.    The statute imposes a prior restraint on speech because Section 609.771(4) provides causes of action for injunctive or equitable relief, backed by criminal penalty, against persons that have not yet violated the statute, i.e., before the content has ever been disseminated. *See* § 609.771(4) (imposing causes of action for injunctive or equitable relief against persons "reasonably believed to be ***about to violate***" the statute). Section 609.771 also imposes such lawsuits with respect to content that has already been disseminated— that is, against persons that are "in the course of violating" the statute, § 609.771(4)— which is a prior restraint on speech as well. *See, e.g.*, *Garcia*, 786 F.3d at 747 (forcing the "takedown" of previously published speech was a "classic prior restraint"). Because Section 609.771 is a "system of prior restraints of expression," there is "heavy presumption against its constitutional validity," which it does not overcome. *Bantam Books, Inc.* v. *Sullivan*, 372 U.S. 58, 70 (1963); *accord Garcia*, 786 F.3d at 747 (noting the "historical and heavy presumption against such restraints").

ANSWER:    The allegations in Paragraph 56 constitute legal conclusions to which

no response is required. To the extent a response is required, Defendant denies the

allegations.

57.    Second, because Section 609.771 imposes content-, viewpoint-, and speaker-based speech restrictions, it triggers constitutional review under strict scrutiny, which it cannot withstand.

ANSWER:    The allegations in Paragraph 57 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

58.    Social media platforms, such as X, "present[] a curated and 'edited compilation of [third party] speech,'" which "is itself protected speech." *Moody*, 603 U.S. at 744 (quoting *Hurley*, 515 U.S. at 570); *see also id.* at 729–30 ("A private party's collection of third-party content into a single speech product (the operators' 'repertoire' of programming) is itself expressive, and intrusion into that activity must be specially justified under the First Amendment.").

ANSWER:    The allegations in Paragraph 58 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

59.    By forcing social media platforms to remove and modify particular speech that they may not otherwise remove or modify—i.e., certain election-related "deep fake[s]"—Section 609.771 forces platforms to "speak a particular message," thus "alter[ing] the content of their speech" and rendering the statute "content-based." *X Corp.* v. *Bonta*, 116 F.4th 888, 900 (9th Cir. 2024) (quoting *Nat'l Inst. of Fam. & Life Advocs.* v. *Becerra ("NIFLA")*, 585 U.S. 755, 766 (2018)); *see also Wash. Post* v. *McManus*, 944 F.3d 506, 511–13, 519 (4th Cir. 2019) (striking down state law that required, in an effort to address foreign interference in U.S. elections, "online platforms," within "48 hours of an ad being purchased," to "display somewhere on their site the identity of the purchaser, the individuals exercising control over the purchaser, and the total amount paid for the ad," and declaring the law "a compendium of traditional First Amendment infirmities" that would "chill speech"); *id.* at 515 ("each banner feature of the Act—the fact that it is content-based, targets political expression, and compels certain speech—poses a real risk of either chilling speech or manipulating the marketplace of ideas"). Section 609.771 also impermissibly substitutes the judgment of the government for that of social media platforms as to what constitutes a "deep fake" covered by the statute and whether it should remain on their platforms.

ANSWER: The allegations in Paragraph 59 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

60.    In addition, the underlying content that the statute targets—i.e., the content delineated in Section 609.771(2)(a)—is itself constitutionally protected. In other words, because Section 609.771(2)(a) does not require actual injury, the speech prohibited thereunder is not inherently defamatory speech that is unprotected by the First Amendment. *See Kohls*, 752 F. Supp. 3d at 1193 (holding that AB 2839 "does much more than punish potential defamatory statements since the statute does not require actual harm").

ANSWER: The allegations in Paragraph 60 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

61.    Accordingly, Section 609.771 is a content-based law—that is, it "target[s] speech based on its communicative content," *Reed* v. *Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015)— and no exception applies here to the longstanding rule that such regulations trigger strict scrutiny. *NIFLA*, 585 U.S. at 767 (quoting *Brown* v. *Ent. Merchs. Assn.*, 564 U.S. 786, 792 (2011) ("This Court's precedents do not permit governments to impose content-based restrictions on speech without persuasive evidence . . . of a long (if heretofore unrecognized) tradition to that effect.")). By "specifically target[ing] speech within political or electoral content pertaining to candidates," Section 609.771 "delineates acceptable and unacceptable content based on its purported truth or falsity and is an archetypal content-based regulation that our constitution considers dubious and subject to strict scrutiny." *See Kohls*, 752 F. Supp. 3d at 1195.

ANSWER: The allegations in Paragraph 61 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

62.    The statute triggers strict scrutiny for two additional reasons. First, it discriminates based on the identity of the speaker, by exempting, pursuant to Section 609.771(2)(b), certain "broadcaster or cable television system[s]." *See, e.g.*, *Sorrell* v. *IMS Health Inc.*, 564 U.S. 552, 571 (2011) (laws that interfere with the speech rights of only certain speakers "justify application of heightened scrutiny" particularly when they are aimed at specific content); *see also Moody*, 603 U.S. at 738 (quoting *Tornillo*, 418 U.S. at 258) (the First Amendment applies to social media platforms as it does to traditional media). Second, Section 609.771 discriminates based on viewpoint, because it permits election-related content that is "positive about a person," while restricting such content if it is "derogatory." *Iancu* v. *Brunetti*, 588 U.S. 388, 393 (2019) (quoting *Matal* v. *Tam*, 582 U.S. 218, 249 (2017) (Kennedy, J., concurring) (explaining that such differential treatment

"reflects the Government's disapproval of a subset of messages it finds offensive" and "is the essence of viewpoint discrimination")).

ANSWER: The allegations in Paragraph 62 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

63.    Section 609.771 may stand, then, only if the government proves that the statute is "narrowly tailored to serve compelling state interests," *NIFLA*, 585 U.S. at 766 (quoting *Reed*, 576 U.S. at 163), and no "less restrictive alternative would serve the [g]overnment's purpose," *X Corp.*, 116 F.4th at 903 (quoting *United States* v. *Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000)).

ANSWER: The allegations in Paragraph 63 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

64.    Section 609.771 fails strict scrutiny because, even if Minnesota has a compelling interest in electoral integrity, the statute is not the "least restrictive means" available to further that interest, and the State may "regulate the content of constitutionally protected speech" only "if it chooses the least restrictive means" to do so. *Playboy Ent. Grp., Inc.*, 529 U.S. at 813; *see also Kohls*, 752 F. Supp. 3d at 1191, 1195–96 (striking down AB 2839 under strict scrutiny because it was not the "least restrictive means available for advancing the State's interest" in "protecting the integrity and reliability of the electoral process," given that "[o]ther statutory causes of action such as privacy torts, copyright infringement, or defamation already provide recourse to public figures or private individuals whose reputations may be afflicted by artificially altered depictions peddled by satirists or opportunists on the internet"); *Ex parte Stafford*, 2024 WL 4031614, at *4–6 (Tex. Crim. App. Sept. 4, 2024) (applying strict scrutiny and striking down on First Amendment grounds Texas statute prohibiting "knowingly represent[ing] in a campaign communication that the communication emanates from a source other than its true source" because there were "narrower means of achieving the State interests," including enforcing an existing statute). Moreover, it is not a "valid, let alone substantial" interest for a state to seek "to correct the mix of speech" that "social-media platforms present." *Moody*, 603 U.S. at 740; *see also id.* at 744 (quoting *Pac. Gas & Elec. Co.*, 475 U.S. at 20) ("[A] State 'cannot advance some points of view by burdening the expression of others.'").[14]

---

[14]  Nor would Section 609.771 survive under any lesser standard of review.

ANSWER: The allegations in Paragraph 64, including Footnote 14, constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

65.    Section 609.771 also fails strict scrutiny because it is woefully underinclusive, as it only applies during a fraction of the year. *See* § 609.771(2)(a) (applying only "(i) within 90 days before a political party nominating convention; or (ii) after the start of the absentee voting period prior to a presidential nomination primary, or a regular or special state or local primary or general election"). This undermines any argument by the government that Section 609.771 supports a compelling state interest in banning deep fakes.

ANSWER: The allegations in Paragraph 65 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

66.    Section 609.771 is facially invalid under the First Amendment because "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Americans for Prosperity Found.* v. *Bonta*, 594 U.S. 595, 615 (2021). It is also unconstitutional as-applied to X Corp.

ANSWER: The allegations in Paragraph 66 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

67.    There is a *bona fide* and actual controversy between X Corp. and Defendant because Defendant is charged with enforcing, and intends to enforce, Section 609.771, even though it violates the First Amendment of the United States Constitution and Article I, Section 3, of the Minnesota Constitution, both facially and as-applied to X Corp.

ANSWER: The allegations in Paragraph 67 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

68.    X Corp. maintains that Section 609.771 is illegal and unconstitutional. Defendant claims otherwise.

ANSWER: Admit.

69.    X Corp. requests a judicial determination regarding the validity of Section 609.771 to prevent the harm caused by its enactment. Such a determination is both necessary and appropriate to avoid the deprivation of X's and other social media platforms' constitutional rights, which would occur if Section 609.771 is applied to X or any other platform.

ANSWER: The allegations in the first sentence of Paragraph 69 are Plaintiff's own description of its lawsuit, to which no answer is required. To the extent a response is required, Defendant denies these allegations. The allegations in the second sentence of Paragraph 69 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

70.    Given the violation of the First Amendment of the United States Constitution and Article I, Section 3, of the Minnesota Constitution, X Corp. seeks injunctive relief against enforcement of Section 609.771. X and other social media platforms covered by the statute would be irreparably harmed if they were forced to comply with Section 609.771's requirements and have no adequate remedy at law.

ANSWER: The allegations in Paragraph 70 constitute legal conclusions and Plaintiff's own description of its lawsuit to which no response is required. To the extent a response is required, Defendant denies the allegations.

71.    X Corp. realleges and incorporates herein by reference each and every allegation set forth above.

ANSWER:   Defendant repeats and incorporates by reference all responses to the allegations in each Paragraph of the Complaint.

72.    47 U.S.C. § 230(c)(1) directly conflicts with, and thus preempts, Section 609.771.

ANSWER:    The allegations in Paragraph 72 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

73.    47 U.S.C. § 230(e)(3) provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."

ANSWER: The allegations in Paragraph 73 quote 47 U.S.C. § 230(e)(3), which is a statute that speaks for itself. Defendant denies these allegations to the extent inconsistent therewith.

74.    Section 609.771 imposes liability on social media platforms by holding them responsible for the content of what is on their platforms, as if they were the publisher of that content. It requires removal of content that the State disfavors (i.e., "deep fake[s]" that are otherwise covered by the statute) and imposes criminal liability on the platforms if they do not comply to the satisfaction of the State. *See* §§ 609.771(2)–(3).

ANSWER:    The allegations in Paragraph 74 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

75.    "Liability" under Section 230(e)(3) includes being subjected to the kind of injunctive and other equitable relief authorized by Section 609.771(4).

ANSWER: The allegations in Paragraph 75 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

76.    X is an "interactive computer service," as that term is defined under 47 U.S.C. § 230(f)(2).

ANSWER:    The allegation in Paragraph 76 is a legal conclusion to which no response is required. To the extent a response is required, Defendant denies this allegation.

77.     Section 609.771 directly contravenes the immunity provided to social media platforms by 47 U.S.C. § 230(c)(1), which prohibits treating interactive computer service providers as the "publisher or speaker of any information provided by another information content provider."

ANSWER:   The allegation in Paragraph 77 is a legal conclusion to which no response is required. To the extent a response is required, Defendant denies this allegation.

78.     Section 609.771 violates Section 230(c)(1) because it provides causes of action for "injunctive or equitable relief" and for potential criminal penalties, including imprisonment and fines, on account of content posted on their platforms by users. Section 609.771 thus treats social media platforms "as the publisher or speaker of [] information provided by another information content provider," 47 U.S.C. § 230(c)(1), and imposes liability against them that is inconsistent with the immunity provided by Section 230(c)(1).

ANSWER:   The allegations in Paragraph 78 constitute legal conclusions to which no response is required.  To the extent a response is required, Defendant denies these allegations.

79.     Section 230(c)(1) bars "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *Johnson* v. *Arden*, 614 F.3d 785, 792 (8th Cir. 2010) ("declin[ing]" to "construe § 230(c)(1) as permitting liability against [service provider] for material originating with a third party"); *see, e.g.*, *Barnes* v. *Yahoo!, Inc.*, 570 F.3d 1096, 1102– 03 (9th Cir. 2009) (finding that Yahoo! was entitled to immunity under Section 230(c)(1) for "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content"), *as amended* (Sept. 28, 2009); *Calise* v. *Meta Platforms, Inc.*, 103 F.4th 732, 744 (9th Cir. 2024) (finding that Meta was immune under Section 230(c)(1) from claims that would require it to "actively vet and evaluate third-party ads" in order to remove them).

ANSWER:   The allegations in Paragraph 79 quote Section 230(c)(1) and cases, which speaks for themselves. Defendant denies these allegations to the extent they are inconsistent with these materials.

80.     There is a *bona fide* and actual controversy between X Corp. and Defendant because Defendant is charged with enforcing, and intends to enforce, Section 609.771, even though such enforcement is precluded and preempted by 47 U.S.C. § 230(c)(1).

ANSWER: The allegations in Paragraph 80 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies these allegations.

81.    X Corp. maintains that Section 609.771 is invalid and void as a matter of law because it is preempted by 47 U.S.C. § 230(c)(1). Defendant claims otherwise.

ANSWER:    Admit.

82.    X Corp. seeks a declaratory judgment that Section 609.771 is legally invalid and unenforceable, because it is precluded and preempted by 47 U.S.C. § 230(c)(1).

ANSWER:    The allegations in Paragraph 82 are Plaintiff's own description of its lawsuit, to which no answer is required. To the extent a response is required, Defendant denies these allegations.

83.    Given the violation of 47 U.S.C. § 230(c)(1), X Corp. seeks injunctive relief against enforcement of Section 609.771. X Corp. would be irreparably harmed if it were forced to comply with, or litigate, Section 609.771's requirements and has no adequate remedy at law.

ANSWER:    The allegations in Paragraph 83 constitute legal conclusions and Plaintiff's own description of its lawsuit to which no response is required. To the extent a response is required, Defendant denies these allegations.

84.    X Corp. realleges and incorporates herein by reference each and every allegation set forth above.

ANSWER:    Defendant repeats and incorporates by reference all responses to the allegations in each Paragraph of the Complaint.

85.    Section 609.771 is void for vagueness under the First and Fourteenth Amendments of the U.S. Constitution because the statute's prohibitions are so unintelligible that they "fail[] to provide a person of ordinary intelligence fair notice of what is prohibited" and are "so standardless that [they] authorize[] or encourage[] seriously discriminatory enforcement." *Fantasysrus 2, L.L.C.* v. *City of E. Grand Forks, Minn.*,

881 F. Supp. 2d 1024, 1032 (D. Minn. 2012) (quoting *United States* v. *Williams*, 553 U.S. 285, 304 (2008)).

ANSWER:    The allegations in Paragraph 85 constitute legal conclusions to which

no response is required. To the extent a response is required, Defendant denies these

allegations.

86.    X, other social media platforms, and other "persons" covered by the statute cannot understand what Section 609.771 prohibits. Nor would "a person of ordinary intelligence."

ANSWER:    Deny.

87.    Those covered by the statute cannot understand what constitutes a "[d]eep fake" under Section 609.771(1)(c), because they cannot understand what content is "so realistic that a reasonable person would believe it depicts speech or conduct of an individual who did not in fact engage in such speech or conduct." § 609.771(1)(c)(1).  Nor can they determine when "production" of the content is "substantially dependent upon technical means." § 609.771(1)(c)(2).

ANSWER:    Deny.

88.    Those covered by the statute cannot understand what it means under the statute to "disseminate[] a deep fake or enter[] into a contract or other agreement to disseminate a deep fake." § 609.771(2)(a).

ANSWER:    Deny.

89.    Those covered by the statute cannot understand when such dissemination is made "with reckless disregard about whether the item being disseminated is a deep fake"; "without the consent of the depicted individual"; or "with the intent to injure a candidate or influence the result of an election." § 609.771(2)(a).

ANSWER:    Deny.

90.    Due to the vagueness and ambiguity of these terms and phrases, Section 609.771 fails to provide "a reasonable opportunity to know what" the statute "prohibit[s]." *D.C.* v. *City of St. Louis, Mo.*, 795 F.2d 652, 653 (8th Cir. 1986).

ANSWER:   The allegations in Paragraph 90 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies these allegations.

91.   Section 609.771 "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* (emphasis in original); *see also, e.g.*, *NAACP* v. *Button*, 371 U.S. 415, 432 (1963) (holding that the "standards of permissible statutory vagueness are strict in the area of free expression"). This is particularly dangerous with this statute, given that Defendant is charged with enforcing Section 609.771 and has openly expressed animus toward Elon Musk, the Executive Chairman and Chief Technology Officer of X Corp.

ANSWER:   The allegations in Paragraph 91 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies these allegations.

92.   There is a *bona fide* and actual controversy between X Corp. and Defendant because Defendant is charged with enforcing, and intends to enforce, Section 609.771, even though it violates the First and Fourteenth Amendments of the United States Constitution for vagueness.

ANSWER:   The allegations in Paragraph 92 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies these allegations.

93.   X Corp. maintains that Section 609.771 is illegal and unconstitutional because it is void for vagueness under the First and Fourteenth Amendments of the United States Constitution. Defendant claims otherwise.

ANSWER:   Admit.

94.   X Corp. requests a judicial determination regarding the validity of Section 609.771 to prevent the harm caused by its enactment. Such a determination is both necessary and appropriate to avoid the deprivation of X's and the other social media platforms' constitutional rights, which would occur if Section 609.771 is applied to X or any other social media platform.

ANSWER:    The allegations in the first sentence of Paragraph 94 are Plaintiff's own description of its lawsuit, to which no answer is required. To the extent a response is required, Defendant denies these allegations. The allegations in the second sentence of Paragraph 94 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies these allegations.

95.    Given the violation of the First and Fourteenth Amendments of the United States for vagueness, X Corp. seeks injunctive relief against enforcement of Section 609.771. X and other covered platforms would be irreparably harmed if they were forced to comply with Section 609.771's requirements and have no adequate remedy at law.

ANSWER:    The allegations in Paragraph 95 constitute legal conclusions and Plaintiff's own description of its lawsuit to which no response is required. To the extent a response is required, Defendant denies the allegations.

## AFFIRMATIVE AND OTHER DEFENSES

1. Plaintiff lacks standing.

2. Plaintiff's claims are not ripe.

3. Plaintiff fails to state a claim upon which relief can be granted.

## DEFENDANT'S PRAYER FOR RELIEF

WHEREFORE, Defendant respectfully requests that this Court: (1) dismiss Plaintiff's Complaint with prejudice and on the merits; (2) enter judgment in Defendant's favor with respect to all of the claims and causes of action set forth in the Complaint; (3) award Defendant's costs, reasonable attorney fees and disbursements; and (4) any other relief that the Court deems just and proper under these circumstances.

Dated: May 15, 2025

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

s/ **Janine Kimble**
PETER FARRELL (#0393071)
Deputy Solicitor General

JANINE KIMBLE (#0392032)
IAN TAYLOR, JR. (#0401548)
MADELEINE DEMEULES (#0402648)
Assistant Attorneys General

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1424 (Voice)
(651) 282-5832 (Fax)
Peter.Farrell@ag.state.mn.us
Janine.Kimble@ag.state.mn.us
Ian.Taylor@ag.state.mn.us
Madeleine.DeMeules@ag.state.mn.us

ATTORNEYS FOR DEFENDANT

|#6081745-v3