# EXHIBIT 2

```
 1                 IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF CALIFORNIA
 2

 3     Christopher Kohls, et al.,
            Plaintiffs,
 4
       vs.                            Sacramento, California
 5                                    No. 2:24-cv-02527
       Rob Bonta, in his official     Tue., Aug. 05, 2025
 6     capacity as Attorney           1:06 p.m.
       General of the State of
 7     California, et al.,
            Defendants.
 8     _____/

 9                      TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE JOHN A. MENDEZ, SENIOR JUDGE
10                         ---oOo---

11
       APPEARANCES:
12
         For the Plaintiff X Corp.:    Cahill, Gordon, & Reindel,
13                                     LLP
                                       32 Old Slip
14                                     New York, NY  10005
                                       By:  Joel Kurtzberg
15                                     Attorney at Law

16       For the Defendants:          Office of the Attorney
                                      General
17                                    455 Golden Gate Ave.
                                      Suite 11000
18                                    San Francisco, CA  94102
                                      By:  Kristin A. Liska
19                                    Deputy Attorney General

20
       (Appearances continued on following page)
21
         Official Court Reporter:     Kimberly M. Bennett,
22                                     CSR, RPR, RMR, CRR
                                       501 I Street
23                                     Sacramento, CA 95814

24     Proceedings recorded by mechanical stenography, transcript
       produced by computer-aided transcription
25
```

1                         APPEARANCES CONTINUED

2      For the Plaintiffs The        Alliance Defending Freedom
       Babylon Bee, LLC, Rickert,    44180 Riverside Parkway
3      Kohls:                        Lansdowne, VA 20176
                                     By:  Johannes
4                                    Widmalm-Delphonse

5
       For the Plaintiff Kohls:      Hamilton Lincoln Law
6                                    Institute
                                     1629 K Street, NW
7                                    Suite 300
                                     Washington, DC 20006
8                                    BY:  Theodore H. Frank
                                          Attorney at Law
9
10     For the Plaintiff Rumble,     Alliance Defending Freedom
       Inc.:                         44180 Riverside Parkway
11                                   Lansdowne, VA 20176
                                     BY: Mathew W. Hoffmann
12                                   Attorney at Law

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1      (Call to order of the court, 1:06 p.m.)

2           THE CLERK:  Calling Civil Case No. 24-cv-2527, Kohls,

3   et al. vs. Bonta, et al.

4           THE COURT:  All right.  Good afternoon.

5      Appearances, please.

6           MR. KURTZBERG:  Good afternoon, Your Honor.  Joel

7   Kurtzberg from Cahill, Gordon, & Reindel on behalf of Plaintiff

8   X Corp.

9           MR. WIDMALM-DELPHONSE:  Johannes Widmalm-Delphons on

10  behalf of Plaintiffs The Babylon Bee and Kelly Chang Rickert,

11  and for the purposes of arguing AB 2839 also on behalf of

12  Christopher Kohls.

13          MS. LISKA:  Good afternoon, Your Honor.  Kristin

14  Liska on behalf of the Defendants.

15          THE COURT:  All right.  I know there are a number of

16  other lawyers in the court but I only ask for the lawyers who

17  are going to be arguing to make appearances.

18     We're going to take up AB 2655 first for a number of

19  reasons.  The main one being, I think, Ms. Liska, as you will

20  find out, I think that's the clearer statute and the

21  applicability of the law to that statute and whether it can

22  withstand strict scrutiny and Constitutional muster.

23     Cutting to the chase, I don't believe there are any

24  circumstances that would allow that statute to remain.  And

25  what I want to focus on -- it's always interesting to me that

1    when I read briefs, sometimes the most compelling argument is

2    the argument at the end of the briefs, and that is the argument

3    about whether AB 2655 is preempted.

4        Also, just for the record, I should have said at the

5    outset, these are cross-motions for summary judgment that are

6    before the Court today.

7        One side comment for the lawyers.  While I appreciate the

8    amount of information you provided to me, and I think both

9    sides are in agreement that this is a case that's ripe for

10   summary judgment, and that, really, the legal issues

11   predominate, it doesn't -- it doesn't help me much, though, to

12   submit brilliant and interesting declarations from experts who

13   don't agree on everything because that tends to create a

14   factual issue that gives the Court pause as to whether summary

15   judgment is actually appropriate here.

16       So while I enjoyed looking at the expert declarations,

17   reading them and absorbing them, that was my thought process,

18   just so all of you know, when I was going through them, that

19   they're helpful, but be careful about not creating an issue

20   that would prevent you from getting summary judgment.  I don't

21   think that's the problem here.  I think both sides agree,

22   again, that this is ripe for summary judgment on these

23   cross-motions.

24       So the Plaintiffs have argued that I should grant summary

25   judgment on AB 2655 because it directly conflicts with, and is

1   preempted by, the immunity afforded by Section 230 of the

2   Communications Decency Act.  That's codified at 47 United

3   States Code Section 230(c)(1) and 230(c)(2).  That Act

4   prohibits holding interactive computer service providers liable

5   for third-party content or for their content moderation

6   efforts.

7       By the way, I don't think any of the lawyers have been in

8   my court before for hearings on motions.  Unlike an appellate

9   argument, you really just get to answer questions.  You don't

10  have to -- as much as you may have prepared a wonderful

11  15-minute speech, that doesn't happen because I know what

12  you're going to say.  I really just want you to answer

13  questions that I have raised by your very well-written briefs.

14  So I compliment you on the briefs.

15      So let's look at Section 230.  The -- as I said, the

16  Plaintiffs have challenged AB 2655 as being preempted.

17  230(c)(2) provides that, "No provider or user of an interactive

18  computer service shall be held liable on account of..."

19      "(A) Any action voluntarily taken in good faith to restrict

20  access to or availability of material that the provider or user

21  considers to be obscene, lewd, lascivious, filthy, excessively

22  violent, harassing, or otherwise objectionable; or"

23      "(B) Any action taken to enable or make available to

24  information content providers or others the technical means to

25  restrict access to such material."

1       The arguments that the State raises in response to 230-2

2   were interesting to say the least, but it focused primarily on

3   how should the Court read the term "liability."

4       And then the second part -- hang on.

5       This is from the Plaintiffs' response to Defendants' motion

6   for summary judgment at Docket 79.  Defendants make two efforts

7   to evade preemption, according to the Plaintiffs.

8       First, the Defendants [sic] argue that "230 is inapplicable

9   because AB 2655 does not authorize suits in which the Plaintiff

10  can recover monetary damages against the platform."

11      In response to that, the Plaintiffs [sic] in their brief,

12  Ms. Liska, cite a number of cases in response to that argument.

13      The Defendants -- I'm sorry, the Plaintiff -- I keep

14  calling them -- the Plaintiffs argue, "Courts across the

15  country," including a court here in the Eastern District of

16  California, "have rejected Defendants' argument, holding that

17  Section 230 immunizes interactive computer service providers

18  from claims for injunctive relief concerning content posted by

19  third parties on their platforms.  Those courts have recognized

20  that to rule otherwise would undermine the entire purpose of

21  Section 230 immunity."

22      They cite Republican National Committee vs. Google out of

23  the Eastern District by Judge Calabretta.

24      They say that "Defendants' position is also squarely

25  contradicted by Section 230's plain text, which confirms that

1   it protects interactive computer service providers from

2   liability."

3       And then, again, there is another -- as part of their brief

4   there's another four or five pages.

5       And you got a chance to respond to that argument.  And in

6   your response to that argument on the -- just the definition of

7   liability, you doubled down on your Black's Law Dictionary

8   argument and gave me nothing else.  I take that as a concession

9   that you think the Plaintiffs are correct, at least with

10  respect to the definition of liability.

11      Am I wrong?

12          MS. LISKA:  I mean, I'm -- I'm hesitant to completely

13  concede or forfeit an argument, but I think that we -- you

14  know, they cite the cases they cite, we cite the authority we

15  cite.  I don't have much more to give Your Honor on that point.

16          THE COURT:  You have nothing other than Black's Law

17  Dictionary?

18          MS. LISKA:  You know, I think that that's -- yeah,

19  that's -- we've -- we've -- we've done our best in the briefing

20  on that.  I don't have much more to add.

21          THE COURT:  There is nothing wrong with conceding

22  once in a while.  You know, it just seemed, to me, pretty clear

23  that they had answered your Black's Law Dictionary argument

24  pretty persuasively.

25      Mr. Kurtzberg, I assume you wouldn't disagree with my

1  conclusion?

2        MR. KURTZBERG:  No, Your Honor.  I would agree with

3  that.

4        THE COURT:  Careful, also, by the way, regarding the

5  definition you use for Black's Law Dictionary, that also might

6  not be accurate in terms of the liability issue.

7     So the second part of this argument as to why the State

8  believes that there isn't preemption, again, it's an argument

9  that you asked me to -- as the Defendants point out, you ask me

10  to adopt the reasoning of Anderson vs. TikTok, a Third Circuit

11  case.  That, in and of itself, is a dangerous ask in a Ninth

12  Circuit court, that you ask me to adopt a Third Circuit

13  reasoning.

14     But setting that aside, as the Plaintiffs argue, you're

15  asking me to overturn longstanding Ninth Circuit precedent

16  about Section 230 itself.  And, again, the Plaintiffs argue

17  that I should decline to do so.  As they point out, Anderson

18  was decided on materially dissimilar facts.  It involved a

19  cause of action arising out of particular characteristics of

20  TikTok's expressive algorithm, and it does not control here.

21     They cite to Dyroff vs. Ultimate Software Group, Inc., a

22  Ninth Circuit case in 2019.  They cite other numerous courts

23  regarding what extent Moody impacts the protections afforded by

24  Section 230, and rejected the argument -- very argument that

25  the State has advanced here.  And, again, they go on listing

1   numerous other cases.

2      I didn't, again, find your response to that argument to be

3   persuasive.  You -- you don't necessarily address specifically

4   the arguments raised by the Plaintiffs in your -- in your final

5   brief, in your opposition filed at Docket 82, you simply argue

6   that 2655 is not preempted because it does not treat platforms

7   as publishers or speakers of information provided by another.

8   I would disagree.

9      No one disagrees that Section 230 does not prevent the

10  government from holding a platform liable for its own conduct.

11  That's not what this statute does, though.  And, again, you

12  doubled down citing Anderson vs. TikTok.

13     You argue their arguments are not persuasive.  I would

14  disagree.  I'll give you an opportunity to tell me why you

15  think I'm wrong.  But I think clearly the Plaintiffs prevail

16  simply on the preemption argument as I read 2655.

17     Go ahead.

18         MS. LISKA:  A couple -- a couple points, Your Honor.

19     If you're talking about the arguments they raise in their

20  opposition, we wouldn't have had an opportunity to respond to

21  those.  The parties didn't do reply briefs here so they were

22  simultaneously filed oppositions.  Just to make that -- that

23  point clear to Your Honor.  I don't want you to think --

24         THE COURT:  I --

25         MS. LISKA:  -- that we ignored arguments that they

1    filed in their opposition.

2          THE COURT:  And I would agree.  They were both filed

3    on June 6th, so I understand that.  But I'm going to give you

4    an opportunity at this point.

5          MS. LISKA:  I also just want to note for the sake of

6    thoroughness and ethical obligations that the Ninth Circuit did

7    release another Section 230(c) precedent on Friday.  I figured

8    this out late afternoon yesterday, so no one had a chance to

9    bring this to the Court's attention.  But because it's

10   potentially relevant and binding authority, I did want to make

11   sure that I flagged that they had released a decision.  I

12   believe it involves the Meta platform and child sex abuse

13   materials, child exploitation materials.

14         THE COURT:  Do you think it changes my analysis at

15   all in this case?

16         MS. LISKA:  I mean, I think that it's relevant that

17   there are aspects of the claims that were brought.

18      The case involves claims brought involving child

19   exploitation materials that were shared by an algorithm.  And

20   there were certain aspects of the claims that the Ninth Circuit

21   held were not preempted under Section 230, which I do think is

22   relevant and salient here.

23      I also want to be clear, we're not arguing that -- that

24   Moody overturns the Ninth Circuit precedent.  And we're not

25   arguing that this Court should find that the Ninth Circuit

1  precedent has been overturned.  Our argument is that the Ninth

2  Circuit precedent recognizes, consistent with other circuits,

3  that you can hold a platform liable, or an internet company

4  liable, for their own conduct, and that what AB 2655 does is

5  holds platforms liable for their own conduct, and that Moody

6  understands and recognizes that when expressive decisions are

7  being made by an online platform, those decisions are their own

8  conduct, not a third-party speech.

9      I would also just like to pull back a little here and I

10  think there are a couple salient points to make.

11      First is that the statute doesn't just apply to entities

12  that make publishing decisions or that engage in publishing

13  activities.  The statute applies broadly to large online

14  platforms which are defined as a public-facing internet

15  website, web application, or digital application, including a

16  social media platform, etc., that had at least one million

17  California users during the preceding 12 months.

18      So it is entirely possible that there are regulated

19  entities that the statute applies to that do not act as

20  publishers, in which case the statute is treating all companies

21  the same.  There is nothing special about being a publisher or

22  publishing choices that is being singled out here.  It's

23  creating a statutory duty, which is what we think is sort of

24  the salient language we pull from the AB vs. Salesforce case,

25  that when you're talking about a statutory duty that's imposed

1  on all entities, not simply on publishers, we're talking about

2  regulations of their own conduct and not regulations that hold

3  them accountable as a publisher.

4      The second thing I think is salient here is to note that

5  this kind of law -- their argument would basically mean that

6  the government has no authority to ever impose restrictions on

7  what kind of content can be on the internet.  This would apply

8  to prohibitions on showing child sex abuse materials, because

9  such a regulation --

10          THE COURT:  You think that's their argument here?

11          MS. LISKA:  I -- I believe -- well, the argument --

12  their argument they make here would equally apply.  If the

13  government said that you have to create a way for such

14  materials to be reported and remove them if they are on your

15  platforms, then they would make the same argument that

16  Section 230(c) preempts.

17      I see no distinction between the requirement to remove

18  political deepfakes within the scope of the law or requirements

19  to remove child pornography materials, or other kinds of

20  materials like advertisement for, you know, illegal entities.

21      There maybe a difference in a First Amendment context, of

22  course, because we're talking about different kinds of speech,

23  but for purposes of Section 230(c) liability, their argument is

24  effectively that the government cannot tell them they cannot

25  have certain content on a platform whether or not the platform

1   engages in any content moderation to begin with because the law

2   applies broadly, and I don't think that that is what

3   Section 230(c) was about.

4       It wasn't really about the government being able to say we

5   don't want certain content on the internet, it was about

6   concerns that if they could be held liable for things like

7   defamation or tort, content providers, internet platforms,

8   would have basically a, you know, rock-and-a-hard-place choice;

9   either choose to moderate and open yourself up to expansive

10  monetary liability that could drive you out of business, or

11  don't choose to moderate at all.  And this law has nothing to

12  do with that debate because, if anything, it takes that choice

13  out of the company's hands by saying certain content cannot be

14  on your website.

15      And the third point I would like to make is that if Your

16  Honor is concerned about the preemption, it's unclear what the

17  preemption argument has to do with respect to the reporting

18  requirement or the labeling.  Perhaps there is some interplay

19  with the requirement to remove, but the labeling requirement

20  would be distinct because it doesn't require that they edit --

21  you know, make decisions to review and remove content, it's a

22  labeling requirement.

23      So we would encourage the Court to engage in a severability

24  analysis and preempt as little of the law that is actually

25  implicated as possible.

14

1          THE COURT:  We'll get to severability in a second.

2     Mr. Kurtzberg, do you want to respond to that?

3          MR. KURTZBERG:  Yes, Your Honor.

4     This law, unlike the child exploitation case that was

5     decided -- and that case, by the way, involved my client, X

6     Corp., it did not involve Meta -- involves classic publisher

7     liability.  It does exactly what the Dyroff court in the Ninth

8     Circuit decision in 2019 says that they cannot do.

9          In that case, the court rejected the argument that if an

10    interactive computer service provider makes editorial decisions

11    about third-party content they lose their 230 immunity, or

12    somehow become the content creator because they're exercising

13    editorial discretion.

14         This is not -- this statute is not about content created by

15    platforms that are covered, like X Corp., it is purely -- it is

16    the quintessential example of what Section 230 was directed at

17    as the Ninth Circuit has interpreted that law.

18         It goes to content posted by third parties on the actual

19    platform, and then places -- or it requires -- or imposes --

20    sorry -- liability on the platforms through the enforcement

21    mechanisms of injunctive proceedings that are permitted, which

22    are liability as defined by all of the cases that we cited, for

23    failing to exercise the editorial discretion the way the State

24    wants it to.  It treats them as a publisher.  It says, you

25    didn't remove this content, and therefore we're going to enjoin

1    what you are doing.

2        As for the other provisions, like the labeling requirement,

3    that's no different.  The decision to somehow treat the content

4    differently or add a label to it, or identify it in a certain

5    way, is also part of the editorial judgment that a publisher

6    would exercise and should be treated precisely the same way

7    under Section 230.  There is absolutely no reason to treat

8    those differently.

9        And if you look carefully at the Dyroff case, and you look

10   at all of the other cases that we cited, both in our brief and

11   in the supplemental authority letters that we sent, there are

12   no cases -- none -- that go their way.  All of the cases go our

13   way and say, when you base a cause of action on requiring a

14   platform to edit, remove, take down content that is posted by

15   third parties, that is what --

16        THE COURT:  Your clients aren't involved in any way

17   in the production, the creation, of these deepfake videos?

18        MR. KURTZBERG:  That is correct, Your Honor, and that

19   is why 230 solidly applies.

20        THE COURT:  Okay.  I also took it or got the

21   impression from the briefs that your clients -- your client, in

22   effect, is already doing much of what California wants it to do

23   in terms of these -- these videos or other material that

24   California obviously has an interest in trying to prevent, but

25   that, in effect, the statute is unnecessary.

1      Is that a proper impression that I got from the briefs?

2           MR. KURTZBERG:  I would agree with that.

3      We -- in our briefs -- this partly goes to the First

4  Amendment questions, I know we're focused on 230 here, but not

5  just my client but all the platforms -- we put in evidence that

6  every platform has its own policy as to how to deal with this

7  kind of deepfake video.  And under both 230 and the First

8  Amendment, the government cannot substitute its judgment for

9  the judgments of platforms like X, like Meta, like YouTube,

10  like Rumble, all of the ones that we put into the record.  Each

11  of those has a policy.  They are entitled under the First

12  Amendment to exercise their judgment, to implement that policy

13  as they see fit.  And they are provided immunity under

14  Section 230 to implement that policy as they see fit without

15  government interference.

16      Self-regulation is what all of the cases in the 230 context

17  talk about.  That's the goal of 230.  And this law directly

18  interferes with that and is preempted.

19           THE COURT:  So let's move to severability.

20           MS. LISKA:  Your Honor, can I respond to his --

21           THE COURT:  Go ahead.  Sure.

22           MS. LISKA:  Just two --

23           THE COURT:  Make your record.

24           MS. LISKA:  Sorry.  Just two quick points.

25      I do think it's salient -- you know, they do point to the

1   cases that exist.  I don't believe any case involves --

2   involves a law analogous to what we see here.  I don't think

3   that any of those cases involve a law that directly determines

4   what kind of content should or should not be on an internet

5   platform.  They involve tort claims and the like, which relates

6   to the question of where the nature of the duty that's sought

7   to be enforced comes from.

8        And so in a tort case there is some sort of allegation that

9   there is a duty as a publisher to take certain reasonable care.

10  This is a statutory duty that has nothing to do with the nature

11  of a publisher.

12       And I do want to just point out that if their argument is

13  that the First Amendment protects their ability to decide what

14  content to have, and Section 230 immunizes them from any sort

15  of liability related to those expressive decisions they make,

16  they are creating an no man's land on the internet.  Their

17  arguments do apply quite equally to any other law that would

18  seek to say that certain type of content, whether it's

19  advertisements for illegal drugs, whether it is child

20  pornography and other similar materials, whether it is, you

21  know, concerning, you know, defamation, other kinds of

22  political deepfakes -- maybe not defamation but, you know, any

23  law that has kind of direct control of this sort of content

24  cannot be enforced against them.  And that is precisely the

25  kind of get out of jail free card/no man's land that the Ninth

18

1    Circuit is clear Section 230 does not create.

2              THE COURT:  You think by limiting my decision to the

3    issues just before this Court, which is deepfake videos, that's

4    going to create some type of precedent for -- for them -- for

5    these platforms that, oh, let's use this decision now to argue

6    we can do anything we want?  I mean, that's what I hear you

7    saying.

8              MS. LISKA:  But that is --

9              THE COURT:  Aren't I limited to the facts of this

10   case?

11             MS. LISKA:  No.  You are.  You are, Your Honor.

12             THE COURT:  Okay.

13             MS. LISKA:  But the logic of their decision -- the

14   logic that they're putting in front of you, they have not

15   identified a distinction between this scenario and these facts

16   and others, which I -- you know, we would say is problematic.

17        The idea that Section 230 means that they can do whatever

18   they want without consequences, you know, I think pretty

19   tellingly is a problematic interpretation.

20             THE COURT:  I don't hear them saying that, though.

21        Ms. Kurtzberg, is that what you're saying?

22             MR. KURTZBERG:  No, Your Honor.  That is not what I'm

23   saying.  And --

24             THE COURT:  Are there situations where you think

25   there would be consequences?

1          MR. KURTZBERG:  There could be --

2          THE COURT:  Not that you're required to argue that,

3   but --

4          MR. KURTZBERG:  There are situations where there

5   could be consequences, and they tend to be situations, as the

6   Ninth Circuit recognized in the child pornography case, or --

7   there are a ton of Section 230 cases.

8      First, if the platforms do something that starts to make

9   them into content creators --

10          THE COURT:  Right.

11          MR. KURTZBERG:  -- where they are actually

12   influencing the content or guiding the content, or have

13   drop-down menus that sort of direct the content in a certain

14   way, they could lose their 230 immunity.

15      But even in the context of child pornography, the Ninth

16   Circuit said that some causes of action are preempted and some

17   are not.  And this case is a much easier case.  This case does

18   not involve that type of content.  This case involves content,

19   and there are no arguments that we have become a content

20   creator or that we are the ones shaping the content.  And so

21   this case is easy.  Section 230 does apply.

22          THE COURT:  Do you agree with that, they're not

23   shaping the content at all?

24          MS. LISKA:  I mean, we would disagree insofar as --

25          THE COURT:  How are they shaping the content?

1          MS. LISKA:  The decisions that they make with respect

2     to which content should be permitted or not is expressive

3     activity that involves -- that is their own actions and

4     decisions.  And, you know, I think --

5          THE COURT:  Give me a specific example.  That's

6     really vague.  What are they doing that you think takes them

7     outside the 230 immunity?

8          MS. LISKA:  So I would just say our position is that

9     with respect to a statute that -- that -- the statute itself

10    says that specific kinds of content should not be on internet

11    platforms.  There is not --

12         THE COURT:  Which they have nothing to do with

13    creating.

14         MS. LISKA:  Which is not targeted solely to

15    publishers because this law does not just apply to companies

16    that engage in this kind of -- engage in kind of expressive

17    activity ala Moody.  This applies to all internet platforms

18    whether or not they do any content moderation --

19         THE COURT:  Well, they have to have a certain

20    number of --

21         MS. LISKA:  Yeah.  They have to have a certain number

22    of users, but it doesn't --

23         THE COURT:  A large online --

24         MS. LISKA:  It doesn't turn on -- you know, it

25    doesn't turn on, for instance, only social media platforms.

1    There are laws California has recently passed that do target

2    social media platforms.  There are similar kind of content

3    providers.  This statute applies broadly to all internet

4    platforms.  It doesn't care whether or not they content

5    moderate.  And it creates a statutory duty that has nothing to

6    do with the fact that they've chosen to make certain types of

7    content decisions or not.

8        And we would argue that that sort of statute is not within

9    the scope of Section 230.  It's holding them responsible for

10   their own actions.  It is creating a duty on them directly that

11   does not in any way, shape, or form tie to a third-party speech

12   like a defamation claim.  And it's outside the scope of what

13   230(c) is about.  It's not about the government's ability to

14   say --

15            THE COURT:  It's your argument that it holds them for

16   their own actions.  They don't have anything to do with

17   these -- with these videos that the State is objecting to.

18   That's -- we can talk about that for the next argument about

19   the other assembly bill.  But they're not doing anything.

20   And -- and that's where 230 says to you -- to the State, you

21   can't go after them if they're not involved in the production

22   of these materials that the State finds shouldn't be on -- on

23   the internet, shouldn't be put up by the providers.  They're

24   not -- they're not involved.

25        I don't know if -- I don't want to get -- go down that

22

1    path, whether you get money from the user or whether there is

2    any monetization involved.  But it's just the fact that it's

3    there on their platforms, then the State says, you have to

4    remove it, you have to label it, you have to report it, it can

5    be enforced, and there are certain exemptions.  It's a

6    five-part -- five components of the law.

7        It -- it punishes them for -- for -- for doing something

8    that they're clearly protected by Section 230 from doing.

9            MS. LISKA:  We would say that with respect to

10   something like a defamation claim, where all they've done is

11   host the content and the defamation originates from the

12   underlying post, that, yes, that argument applies.

13       We would say the difference here is that the statute itself

14   obligates them to take certain actions, whether they're

15   publishers or not, and by failing to take the actions required

16   by the statute it's holding them accountable for their own

17   actions not for the content of somebody else's speech in the

18   way a defamation or libel claim --

19           THE COURT:  What actions, though?

20           MS. LISKA:  The action of not removing content the

21   law requires them to remove.

22           MR. KURTZBERG:  Your Honor, if I may?

23           THE COURT:  Go ahead.

24           MR. KURTZBERG:  The actions that she's talking about

25   are precisely the ones that are forbidden for liability under

23

1    230.  Our actions -- treating us as a publisher.  Treating us

2    -- because we can make a decision to keep up the content or

3    take it down, treating us as if we're liable for what it was

4    all of a sudden as if we published it.  This is precisely what

5    230 was designed to prevent against.

6         And it's -- and the reasoning that was just given by

7    opposing counsel actually supports the argument that 230 should

8    be preempted -- that the statute should be preempted under 230.

9              THE COURT:  Okay.  You mentioned severability.

10   Again, it's not an argument that contains a lot of detail.

11   It's at the end of the -- end of the brief.  And that -- that,

12   in part, is my biggest concern about a severability argument,

13   even though I may have raised it in the order that I issued

14   regarding the preliminary injunction.

15        Without more, Ms. Liska, I don't think the Court is in a

16   position to -- to issue an order that in effect says, okay, the

17   law does contain a severability provision, but this part and

18   this part and this part are clearly unconstitutional, this part

19   and this part survive the motion for summary judgment, because

20   it -- that creates -- or makes the Court uncomfortable as

21   you're turning me into a legislator.  And last time I looked, I

22   wasn't elected, I was appointed.  And absent more detail in

23   your brief, to simply argue, Judge, there are parts of this

24   that are severable, but you figure it out, doesn't help me.

25        So how do I figure this out?

24

1          MS. LISKA:  So --

2          THE COURT:  Because you -- again, you don't -- it's

3    obviously not the -- the thrust of your argument, it's --

4    it's -- I don't want to belittle it, but it -- in effect it's a

5    throwaway argument.  It's, it's there, it's in the statute, and

6    you can do this, Judge.

7       Well, how do I do this?  You've got to help me.

8          MS. LISKA:  So I -- I would say, you know, two

9    responses.

10      One is it's difficult to do a severability analysis without

11   knowing precisely what was unconstitutional and how that

12   content squares.  So we're also happy to do supplemental

13   briefing on this.  You know, once Your Honor has kind of

14   decided what is invalid, we can always submit supplemental

15   briefs addressing the question of severability.

16      Second, you know, the --

17         THE COURT:  Why didn't you do it initially?

18         MS. LISKA:  Well, we do specifically --

19         THE COURT:  You start out the paragraph saying,

20   assuming arguendo that the Court finds, here are the portions

21   that the Court could sever and here is why.

22         MS. LISKA:  We do specifically state that the three

23   distinct requirements within AB 2655 meet the requirements of

24   severability.  We lay out the proper test under California law,

25   which is that a severability clause creates a presumption of

1   severance.

2       Courts then apply a three-prong test, which is that it must

3   be grammatically, functionally, and volitionally separable.

4   Grammatical separability requires if -- that you can excise

5   parts of the statute it grammatically remains intact.  This is

6   on page 29 of our brief.  Functional severability questions

7   whether or not the law would continue to function if you

8   removed the parts that are unconstitutional or invalid.

9   Volitional separability asks whether the legislature would have

10  adopted the remainder had it foreseen the partial invalidity.

11      And we specifically state that the three requirements are

12  grammatically separable from one another, which follows from

13  the fact that they are in separate sections so you can easily

14  excise the one section of the law that each requirement is in,

15  leaving it grammatically intact.

16      We say that they are independently enforceable; meaning

17  that they meet the requirement for functional severability.

18      And we state that given the findings and the severability

19  clause, the legislature would have required -- would have

20  regulated the remainder of the statute were parts of it

21  unconstitutional.

22      So I think we do make that case -- that argument out to the

23  Court and state that the three parts meet those three

24  requirements under California law.

25      And I understand the Court's concerns with respect to

26

1   acting like a legislator, but I also would say, you know,

2   California has a relatively kind severability doctrine, and I

3   think that, you know, that's the way the courts do the

4   statutory interpretation in the state.  And that's, you know,

5   the approach that they take.  And particularly given the

6   inclusion of a severability clause and the presumption that it

7   occupies under California law, I think it would behoove the

8   Court to do this analysis.  It's a purely legal question.  It

9   doesn't depend on any factual development of any sort.  It's

10  just that the three prongs of the California test are met,

11  which we've laid out for the Court.

12          THE COURT:  Mr. Kurtzberg, why isn't the reporting

13  requirement, the blocking requirement, and the labeling

14  requirement severable?

15          MR. KURTZBERG:  None of it is severable, Your Honor.

16  The removal requirement, which requires censorship, is --

17          THE COURT:  She's only -- she's talking the

18  reporting, blocking, and labeling requirement.

19          MR. KURTZBERG:  Sure.  So the removal is the blocking

20  requirement.  Sorry.  We used different language in our briefs

21  to talk about it.

22      But the removal or blocking requirement, the censorship

23  requirement, where you're taking content off, is barred under

24  Section 230 for the reasons that we've already discussed, as is

25  the labeling requirement.

27

1          The labeling requirement is changing the content of what is

2     on our platform, dictating to us what to do.  That is governed

3     by Section 230.

4          We're left with only two -- three other potential arguable

5     provisions of the statute.  One is the reporting requirement,

6     which is found at 20515(a).

7          If you look at 20515(a), it reads as follows:

8          "A large online platform shall provide an easily accessible

9     way for California residents to report to that platform content

10    that should be removed pursuant to Section 20513 or labeled

11    pursuant to Section 20514."

12         In other words, the reporting requirement is a reporting

13    requirement that is supposed to identify content.  It is

14    directly linked to the sections that we just discussed and it

15    cannot stand on its own, a reporting requirement to report

16    violations of provisions of a statute that are subject to

17    Section 230 immunity.

18         And then we're left with enforcement provisions, which also

19    can't stand on their own because there is nothing left to

20    enforce because all of it violates 230.

21         And the only other provisions of the statute are certain

22    exemptions to the very requirements that are preempted, which

23    obviously don't stand on their own and are irrelevant if the --

24    if the actual core part of the statute is blocked or -- because

25    it's subject to Section 230 immunity.

28

1        So I don't see any way -- how any of the requirements can

2   stand in the face of Section 230 immunity or our First

3   Amendment challenge.  Which, again, I know we're focused on 230

4   immunity, but the reporting requirement on its face

5   grammatically says it's reports for content to be removed

6   pursuant to Section 20513 or labeled pursuant to Section 20514.

7   If those are unconstitutional under the Supremacy Clause

8   because of Section 230, then the reality is that that can't

9   stand on its own.  Why would you have some sort of reporting

10  requirement for something that is unlawful?

11        MS. LISKA:  Your Honor, I'll just chime in real

12  quick, just to make your job a little easier.

13        I think we do agree that if both the blocking and

14  labeling -- the removal and labeling are invalid, it is a hard

15  sell that the remainder of the law would be severable.

16        But I think that our argument really is that if this Court

17  believes that one of those two pieces, either the requirement

18  to remove or the requirement to label, just one, is either

19  unconstitutional or preempted, there is a very good and strong

20  severability argument that the remaining un -- the part that

21  remains is still -- should be -- should be severed.  So that if

22  the labeling requirement falls, it should be severed and the

23  removal requirement stands.  And vice versa, if the removal

24  requirement is preempted, the labeling requirement can still

25  stand.

1      Your Honor may believe both are invalid.  I think there is

2   some distinction between the labeling and removal for 230(c).

3   I don't know that I've persuaded you on that today, but we've

4   made our best -- best effort.

5              THE COURT:  Mr. Kurtzberg, if I grant the motion for

6   summary judgment simply on the preemption argument, do you

7   believe the Court needs to reach the arguments on the First

8   Amendment and Article 1, Section 2 of the California

9   Constitution?

10             MR. KURTZBERG:  No, Your Honor.  I don't think you'd

11  be required to do that.

12             THE COURT:  Okay.  I understand the risk is these

13  cases go up on appeal, and if the Court is reversed by the

14  Ninth then everything comes back.  But I also believe that the

15  preemption argument is so strong that it would withstand any

16  appellate review, and really is one of the stronger legal bases

17  for granting summary judgment.

18     Ms. Liska, do you think I need to reach First and

19  Fourteenth -- First Amendment issues?

20             MS. LISKA:  No, Your Honor.  If you concluded that

21  both the blocking and removal requirements are preempted, we

22  would think you do not need to necessarily go any further.

23             THE COURT:  Okay.  I'm not going to issue a written

24  opinion.  I will give you my reasons as to why I believe

25  summary judgment in this case is appropriate and the

1  Plaintiffs' motion for summary judgment should be granted on AB

2  2655, and the State Defendants' cross-motion for summary

3  judgment should be denied on this statute.

4      As I've indicated, the AB 2655 directly conflicts with, and

5  is preempted by, the immunity afforded by Section 230 of the

6  Communications Decency Act.  As we've discussed, there are, in

7  effect, five main components of AB 2655; a reporting

8  requirement, a removal requirement, a labeling requirement, an

9  enforcement mechanism, and then exemptions.

10     The Plaintiffs have argued that 2655 is preempted under

11  federal law and is invalid under the Supremacy Clause.  That

12  clause provides that "the laws of the United States shall be

13  the supreme law of the land.  Any thing in the constitution or

14  laws of any state to the contrary notwithstanding."

15     Congress does have the power under the Supremacy Clause to

16  preempt state law where their exists a "conflict" between

17  federal and state law.  That is, "where it's impossible to

18  comply with both state and federal requirements, or where state

19  law stands as an obstacle to the accomplishment and execution

20  of the full purpose and objectives of Congress."

21     In this case the Plaintiffs have argued that the

22  Communications Decency Act expressly preempts AB 2655.  The Act

23  states that, "No cause of action may be brought and no

24  liability may be imposed under any state or local law that is

25  inconsistent with this section."  That's at 47 USC

1    Section 230(e)(3).

2        Specifically, Plaintiffs have argued that AB 2655 directly

3    conflicts with, and is thus preempted by, the immunity afforded

4    by three parts of Section 230; Section 230(c)(1),

5    Section 230(c)(2), and Section 230(e).

6        AB 2655 contravenes both Section 230(c)(1) and

7    Section 230(e) of the Communications Decency Act because it

8    impermissibly treats interactive computer service providers as

9    the "publisher or speaker of any information provided by

10   another information content provider," section 230(c)(1) and

11   that section holds -- 230(c)(2)(B) holds that interactive

12   computer service providers liable on account of any action

13   "taken to enable or make available to information content

14   providers or others the technical means to restrict access to

15   objectionable material."

16       It's interesting that in its assessment of the materials

17   the Court reviewed that the California Senate Judiciary

18   Committee in effect acknowledged that AB 2655 would likely, in

19   quotes, face a preemption challenge under Section 230.  That's

20   at Plaintiffs' Statement of Undisputed Facts, No. 171.  The

21   California Senate Judiciary Committee conceded that AB 2655

22   "provides for the potential liability of platforms for failing

23   to block and prevent certain content from being posted or

24   shared by users," even though Section 230 "immunizes internet

25   platforms from virtually all suits arising from third-party

 1  content."

 2      Section 230(c)(1) of the Communications Decency Act

 3  provides that "No provider or user of any interactive computer

 4  service shall be treated as the publisher or speaker of any

 5  information provided by another information content provider."

 6  This statute expressly preempts contrary state law.  In the

 7  federal statute it provides that, "No cause of action may be

 8  brought and no liability may be imposed under any state or

 9  local law that is inconsistent with this section.  That's at 47

10  USC Section 230(e)(3).

11      This express preemption clause of Section 230 not only

12  prevents the imposition of liability under inconsistent state

13  laws, but it also prevents any action from being brought under

14  an inconsistent state law.

15      Section 230(c)(1) bars any liability where the alleged duty

16  violated derives from an entity's conduct as a publisher,

17  including "reviewing, editing, and deciding whether to publish

18  or withdraw from publication third-party content."  That's a

19  Ninth Circuit case, Barnes vs. Yahoo!, Inc. from 2009.

20      Both parties agree that the Ninth Circuit has developed a

21  three-part test to determine whether platforms are entitled to

22  immunity.  Both parties discuss in their briefs Calise vs. Meta

23  Platforms, Inc., a 2024 Ninth Circuit case, borrowing from

24  Barnes vs. Yahoo!.  Under Calise, Section 230 preempts claims

25  against, "1, a provider or user of an interactive computer

1   service, 2, whom a plaintiff seeks to treat as a publisher or

2   speaker and, 3, of information provided by another information

3   content provider."  Both sides agree that the Calise/Barnes

4   cases set forth the relevant test.

5       The first and third prongs of Calise/Barnes are pretty

6   straightforward.  Under the first prong, X and Rumble are

7   properly understood as interactive computer services as defined

8   in Section 230.  That term is defined expansively and it

9   encompasses websites and apps who do not create their own

10  content but rather allow users to post on their platforms.

11  That's the Dyroff case that we have been discussing.  Both

12  Plaintiffs X and Rumble are websites whose content consists of

13  posts made by users rather than by the companies themselves,

14  and as such they are interactive computer services under

15  Section 230 under the first and third prongs.

16      Plaintiffs and the Defendants disagree about the

17  applicability of the second prong; that is, whether AB 2655

18  treats platforms as publishers of third-party content.  They

19  disagree about whether 2655 imposes the type of liability

20  prohibited by Section 230.  These two key dispositive factors

21  of immunity under Section 230(c)(1) are the crux of this case.

22      As the Court has indicated, in effect, the State has

23  conceded implicitly the liability argument.  The Plaintiffs

24  have clearly shown through their briefs and numerous

25  authorities cited in their briefs that the State's argument

1   with respect to liability has little or no merit.

2       The State tries to defend AB 2655 by arguing that it does

3   not treat platforms as the publisher or speaker of information

4   provided by a third-party.  The Court disagrees with that.

5       The Plaintiffs have argued that 2655 is preempted by

6   Section 230(c)(1) because the removal, labeling, and reporting

7   provisions of the law impermissibly treat the covered platforms

8   as publishers of third-party content.  Publishing activity

9   includes "reviewing, editing, and deciding whether to publish

10  or withdraw from publication third-party content."  Publishing

11  also includes editorial decisions and functions ancillary to

12  the decision to make content available.  Thus, publishing has

13  been found to "involve reviewing and editing," such as

14  "reviewing material submitted for publication, perhaps editing

15  it for style or technical fluency."  That's the Barnes case.

16      Here, the conduct that the removal, labeling, and reporting

17  requirements regulate can be understood as traditional

18  publishing activity that Section 230 immunizes.  AB 2655's

19  removal requirement at California Election Code Section 25 --

20  20513 mandates that platforms remove materially deceptive

21  content within 72 hours after it is reported, but the Ninth

22  Circuit has recognized taking down content is "quintessential

23  publishing conduct."  That's the Calise case.  Because

24  "removing content is something that publishers do," AB 2655's

25  imposition of "liability on the basis of such conduct

1  necessarily involves treating the covered platform as a

2  publisher of the content it failed to remove."

3      Additionally, the labeling requirement also qualifies as

4  publishing activity because it mandates that covered platforms

5  develop and implement procedures to identify and label

6  materially deceptive content.  That's in the law at Sections

7  20513 to 201516.

8      While courts in our -- in the Ninth Circuit have not

9  squarely ruled that labeling requirements fall under publisher

10  responsibilities, courts have recognized that similar decisions

11  surrounding rules about postings, whether to limit advertising

12  on a posting, and choices about what content can appear and in

13  what form are editorial choices that fall within the purview of

14  traditional publisher functions.  Lewis vs. Google, Inc., a

15  Northern District of California case, 2020, and In Re: Social

16  Media Adolescent Addiction Personal Injury Products Liability

17  Litigation, a Northern District of California case in 2023.

18  Adding labels to posts is similar to editing posts because it

19  does transform how content may appear on the website.

20      Finally, the reporting requirement set forth at California

21  Election Code Section 20515 also treats covered platforms as

22  publishers of third-party material because only content that

23  has not been removed pursuant to 20513 or labeled pursuant to

24  20514 is subject to reporting.  In other words, the reporting

25  requirement treats covered platforms as publishers because it

1    hinges on the removal and labeling requirements which both

2    treat platforms as publishers.

3        Plaintiffs have also challenged AB 2655 as preempted under

4    Section 230(c)(2).  Section 230(c)(2) provides that, "no

5    provider or user of an interactive computer service shall be

6    held liable on account of, A, any action voluntarily taken in

7    good faith to restrict access to availability of material that

8    the provider or user considers to be obscene, lewd, lascivious,

9    filthy, excessively violent, harassing, or otherwise

10   objectionable, or B, any action taken to enable or make

11   available to information content providers or others the

12   technical means to restrict access to such material."

13       As with Section 230(c)(1), the Court finds and reads

14   liability to capture monetary relief as well as injunctive or

15   other equitable forms of relief.

16       Plaintiff argues that AB 2655 violates Section 230(c)(2)(B)

17   through its reporting and enforcement requirements.  These

18   requirements provide causes of action for "injunctive or other

19   equitable relief against" covered platforms that do not

20   successfully comply with the reporting requirement.  In other

21   words, Plaintiffs have argued that AB 2655 implicates

22   Section 230(c)(2)(B) because a platform's attempt to comply

23   with the reporting requirement is an action to make available

24   the technical means to restrict access to objectionable

25   content.  The reporting system mandated by AB 2655 would count

1    as an action taken to make available the technical means to

2    restrict access to objectionable material.

3         Defendants have argued that the reporting requirement has

4    nothing to do with providing the technical means of blocking or

5    restricting access to certain material.  They argue that a

6    reporting feature is not akin to antispam e-mail filters,

7    obscenity-blocking software, anti-script extensions on a

8    browser.  However, given that Section 230(c)(2)'s provisions

9    were meant to "remove disincentives for the development of

10   software that filters out objectionable or inappropriate

11   material," the Court reads the reporting requirement as

12   infringing on the immunity that platforms enjoy in filtering

13   their own content.  That's Zango, Inc. vs. Kaspersky Lab, Inc.,

14   a Ninth Circuit case from 2009.

15        Because the reporting requirement would require covered

16   platforms to create software that filters or screens

17   objectionable material such as political deepfakes and subjects

18   them to liability for not doing so within 36 hours, the Court

19   holds that AB 2655 also contravenes the immunity in

20   Section 230(c)(2) -- the immunity that Section 230(c)(2) gives

21   platforms filtering out content.  Because platforms will face

22   enforcement if the reporting mechanism they implement does not,

23   in the view of the government, satisfy the reporting

24   requirement, Section 20516 directly contravenes

25   Section 230(c)(2)(B).

1    And then finally on severability, we discussed that.  It

2  does -- AB 2655 does contain a severability clause at Election

3  Code Section 20520.  The State has requested the Court save any

4  portion of the law that is severable, but no parts of this

5  statute are severable because the entire statute is preempted.

6    The statute as a whole imposes the State's preferred

7  content-moderation scheme on covered platforms backed by a

8  looming threat of costly, expedited litigation if the platforms

9  do not sufficiently comply.  This regime is antithetical to the

10 objectives set forth by Congress in enacting Section 230, which

11 were to encourage self-regulation and self-moderation

12 unfettered by the types of threats of liability that AB 2655

13 effects and encourages.  Republican National Committee, Ninth

14 Circuit case from 2003, which the court held that Congress

15 enacted Section 230 "to encourage voluntary monitoring for

16 offensive or obscene material."  In re: Apple, Inc. App Store

17 Simulated Casino-Style Games Litigation, Northern District of

18 California case from 2022, in which the court wrote, "The

19 legislative history makes clear that Congress enacted

20 Section 230 to remove the disincentives to self-regulation."

21 In re: Facebook Simulated Casino-Style Games Litigation also

22 supports the Court's holding.

23    No parts of AB 2655 can be salvaged from Section 230's

24 broad preemption framework, and the Court refuses and denies

25 the State's request to sever any portions of this statute.

1    There are a number of other preliminary injunction factors

2  that the Court is required to consider.  Obviously, the Court

3  has found that the Plaintiffs are likely to and have succeeded

4  on the merits.  Plaintiffs are granted a permanent injunction

5  because they have also satisfied the remaining factors for a

6  permanent injunction.  That requires a showing of irreparable

7  injury, that other remedies are inadequate, and the balance of

8  hardships and the public interest favor an injunction.

9    The Court finds that the Plaintiffs would be irreparably

10  harmed absent injunctive relief because loss of their

11  Section 230 immunity would upend their existing content

12  moderation scheme, subject them to litigation risk for failing

13  to comport with California's complicated method of election

14  content moderation.  Plaintiffs assert that complying with AB

15  2655 would be nearly impossible because platforms cannot be

16  expected to know what a candidate has or has not said because

17  the number of individuals captured by California's law is

18  unbounded.

19    For example, the 2026 election cycle has at least 866

20  people qualifying as "candidates" under Section 20512(c).

21  Moreover, the term "elected official" is undefined by the

22  statute, meaning it could cover up to several hundreds of

23  thousands of "elected officials" nationwide.  The Ninth Circuit

24  has stated "that an alleged constitutional infringement will

25  often alone constitute irreparable harm."  Associated General

40

1    Contracts vs. Coalition for Economic Equity, a Ninth Circuit

2    case from 1991.

3        As for the adequacy of other remedies, the Ninth Circuit

4    case law holds that "constitutional violations cannot be

5    adequately remedied through damages."  That's American Trucking

6    Association vs. City of Los Angeles, Ninth Circuit case from

7    2009.

8        And the balance of hardships and the public interest favor

9    an injunction in this case because California cannot violate

10   the Supremacy Clause, and "it is always in the public interest

11   to prevent the violation of a party's constitutional rights."

12       As Plaintiffs have argued, under AB 2655, internet

13   platforms would be incentivize to overcompensate and censor too

14   much to avoid liability.  This over-censorship would eliminate

15   content to any covered platform user's detriment and would harm

16   the public's access to an uninhibited marketplace of ideas.

17       The Court grants, again, the Plaintiffs' motion for summary

18   judgment and denies Defendants' cross-motion for summary

19   judgment based on the Supremacy Clause and permanently enjoins

20   Defendants from enforcing AB 2655 because Plaintiffs have

21   established they will suffer irreparable injury if AB 2655 is

22   not enjoined, that other remedies are inadequate, and that the

23   balance of hardships and public interest favor an injunction.

24       I'm going to give my court reporter a break.  We'll take up

25   the other --

1          MS. LISKA:  Your Honor, may I ask a real quick

2    clarification question?

3       With respect to that permanent injunction, is the scope of

4    it as to the Plaintiffs in this case or do you seek to enjoin

5    the entire statute facially as applied to other entities it

6    regulates and not party to this action?

7          THE COURT:  Do you want to respond to that?

8          MR. KURTZBERG:  I think that -- the relief that we

9    sought, I think that the question goes to the Supreme Court's

10   recent decision in Trump v. CASA which addresses whether or not

11   an injunction can go beyond the scope of the parties.

12      I do think that we would request that the injunctive relief

13   be specific to the Plaintiffs in the case in light of that

14   decision.  But we do think that we've also asked for a

15   declaration that the law is preempted under Section 230, and I

16   assume that your relief also includes a declaration that that's

17   the case.

18         MS. LISKA:  To the extent that there is such a

19   declaration, we would just ask that it be limited to entities

20   that constitute interactive computer services under the federal

21   Communications Decency Act, just so that to the extent that

22   there are entities that don't fall within that scope, who would

23   fall within the law's regulation, I don't know that Your

24   Honor's ruling as to preemption would apply to those entities

25   if they are not interactive computer services.

1          THE COURT:  I'm sorry, but I just find it interesting

2     that you cite to the Trump case and the State is, in effect,

3     asking the Court to apply the Trump case here to limit the

4     scope of the injunctive relief.

5        Right?

6          MS. LISKA:  We --

7          THE COURT:  Just an interesting --

8          MS. LISKA:  We would -- we would certainly like the

9     scope of relief to be limited.  I also just want to make sure,

10    though, that for purposes of my client's ability to comply with

11    the law and the Court's order that we are clear what the scope

12    is because we do not want to violate any order from this Court.

13    So if this Court intends to bind us to apply AB 2655 to

14    parties -- to entities not party to this suit, we would just

15    like that to be clear.

16          THE COURT:  I don't intend to apply -- the answer to

17    that question is simple.  I don't intend to apply the

18    injunction -- the permanent injunction to parties that aren't

19    part of this lawsuit.

20          MS. LISKA:  Thank you.

21          THE COURT:  The other question I had -- because it --

22    the law applies only to large online platforms, and that's

23    defined in the law.  Mr. Kohls himself was a Plaintiff in the

24    AB 2655 case but he's not a large online platform, I would take

25    it.  He's an individual.  Is that correct?

1          UNIDENTIFIED SPEAKER:  Yes, Your Honor.

2          THE COURT REPORTER:  I don't know who said that.  Who

3   said that?

4          THE COURT:  Who said that?  We can't hear you.

5          MR. FRANK:  Ted Frank for Christopher Kohls.

6          THE COURT:  Okay.

7          MR. FRANK:  Mr. Kohls is affected because he relies

8   on online providers to distribute his material.

9          THE COURT:  But he's not a large online platform as

10  defined in the statute itself.  He's an individual, right?

11         MR. FRANK:  That is correct.

12         THE COURT:  Okay.  I don't know if he has standing.

13  That wasn't challenged, but I don't think he has standing to

14  challenge 2655.

15     Is The Babylon Bee a large online platform --

16         MR. WIDMALM-DELPHONSE:  No, Your Honor.

17         THE COURT:  -- as defined in the law?

18         MR. WIDMALM-DELPHONSE:  No, Your Honor.

19         THE COURT:  So you don't have standing either.

20         MR. WIDMALM-DELPHONSE:  Your Honor, we would argue

21  that we do because --

22         THE COURT:  It says, "A public-facing internet

23  website, web application, or digital application, including a

24  social media platform as defined in Section 22675 of the

25  Business and Professions Code, video sharing platform,

1   advertising network, or search engine that had at least

2   1,000,000 California users during the preceding 12 months."

3          MR. HOFFMANN:  Your Honor, Matthew Hoffmann on behalf

4   of Plaintiff Rumble.

5      I can --

6          THE COURT:  What happened to Babylon?

7          MR. HOFFMANN:  And Babylon Bee and Kelly Chang

8   Rickert.

9      Plaintiffs Babylon Bee, Rickert, and Kohls challenged 2655

10  under the First Amendment because the Ninth Circuit has held

11  that they have standing because it would require the platforms

12  to censor their First Amendment rights.  But those Plaintiffs

13  did not raise the 230 issue because they're not large online

14  platforms.

15         THE COURT:  My order doesn't apply to them.  Right

16  now it only applies to X Corp.

17         MS. LISKA:  Thank you, Your Honor.

18         THE COURT:  It's limited to X Corp.

19         MR. KURTZBERG:  Sorry, Your Honor.  And Rumble is

20  also --

21         THE COURT:  Rumble --

22         MR. KURTZBERG:  -- an online platform.  That is a

23  large platform that would be covered under 230.

24         THE COURT:  State agree --

25         MS. LISKA:  Our understanding --

45

1          THE COURT:  -- with that?

2          MS. LISKA:  Our understanding was that Rumble and X

3    were the two large platforms at issue.

4          THE COURT:  Okay.

5          MR. KURTZBERG:  That's correct, Your Honor.

6          THE COURT:  Here is what I normally do in this type

7    of situation.  If the Plaintiffs want to draft an order that's

8    on the docket, you can go ahead and try, without making it a

9    ten-page order, simply that the Court's decision is explained

10   in the -- in the transcript of the Court's comments at the

11   hearing.  You know, the Court has found that preemption

12   applies, that the Plaintiffs -- at least X Corp. and Rumble are

13   protected under Section 230.  And then if you want to make it

14   clear that the decision only applies to the Plaintiffs in this

15   case, it's not a nationwide, statewide, worldwide injunction,

16   feel free.  And run it by Ms. Liska so I have agreement from

17   both parties as to the form of the order.  I'll go ahead and

18   look at it and enter it on the docket.

19         MR. KURTZBERG:  We will do that, Your Honor.

20         MS. LISKA:  And then just -- as a real quick

21   procedural note -- I apologize, madam court reporter -- I think

22   it might be helpful --

23         THE COURT:  That's a good point.  Thank you for

24   raising it.

25         MS. LISKA:  I think it may be helpful -- I don't know

1   what Your Honor intends to do with respect to AB 2839, but it

2   might be helpful --

3         THE COURT:  You've got to wait and see.

4         MS. LISKA:  -- if all of the judgments get entered on

5   the same day just for purposes of easing the process of any

6   appeals that come out rather than, you know, doing a partial

7   judgment one day and a partial judgment later in time.  I don't

8   know if --

9         THE COURT:  Wait.  Say that again.

10        MS. LISKA:  It would be probably -- I think it might

11  be easier if the judgment as to AB 2655 and 2839 are entered

12  the same day so all clocks run -- there is no question about

13  when the clocks of appeal run.  I don't know if Plaintiffs are

14  concerned about that, I would guess probably not.  But that

15  would just be our request, that there be a uniform date when

16  all the judgments come in.

17        THE COURT:  There probably will only be one judgment

18  covering --

19        MS. LISKA:  The one judgment --

20        THE COURT:  There will be one judgment covering both

21  statutes.

22        MS. LISKA:  Perfect.  Thank you.

23        MR. FRANK:  If I could argue Mr. Kohls' standing.

24  You just held that we --

25        THE COURT:  For the immunity?

1          MR. FRANK:  Well, not with respect to the immunity,

2     but --

3          THE COURT:  Then you don't need to argue anything

4     because the decision is only on the basis of immunity.  I

5     didn't reach the First Amendment issues.  I'm not going to

6     reach them.  And so the -- my order isn't going to apply to

7     Mr. Kohls.

8          MR. FRANK:  Well, but he did raise First Amendment

9     claims with respect to providers that are not before the Court

10    in that the Court is now saying that its injunction does not

11    apply to.

12         THE COURT:  Right.  My injunction doesn't apply to

13    that.  You think I need to reach the First Amendment --

14         MR. FRANK:  With respect --

15         THE COURT:  -- issues --

16         MR. FRANK:  With respect to Mr. Kohls at least, yes,

17    Your Honor.

18         THE COURT:  Okay.  I'm going to respectfully

19    disagree.

20         MR. FRANK:  Thank you, Your Honor.

21         THE COURT:  Okay.  Take a break.  Come back in ten

22    minutes.

23         MS. LISKA:  Thank you, Your Honor.

24       (Recess taken, 2:15 - 2:32 p.m.)

25         THE COURT:  Go ahead.

1          MR. FRANK:  Your Honor, I apologize.  If I could just

2    get one clarification.

3       Are you holding that Mr. Kohls does not have standing to

4    seek First Amendment relief?

5          THE COURT:  I am not.

6          MR. FRANK:  Okay.

7          THE COURT:  No.  That issue hasn't been presented to

8    me so I'm not holding or finding, just limiting my decisions to

9    the immunity issue.

10          MR. FRANK:  So I -- are you denying the relief that

11   Mr. Kohls is seeking with respect to the First Amendment?

12          THE COURT:  No.  I'm not reaching that issue.  I'm

13   simply not reaching the issue.

14          MR. FRANK:  Okay.  Both sides have asked for that

15   issue to be reached and it is still live.

16          THE COURT:  Are you asking for that?

17          MS. LISKA:  I mean, our understanding --

18          THE COURT:  I still don't understand --

19          MS. LISKA:  Our understanding with it -- that Your

20   Honor has held that -- that the ruling on 28 -- 230(c) is

21   sufficient to resolve the validity of AB 2655 and there is no

22   need to reach the constitutional issues.  And we are not at

23   all -- we haven't contested that.

24          THE COURT:  The problem with your client is to the

25   extent he -- he places his -- his videos on X Corp. or Rumble,

49

1    he's protected now.

2            MR. FRANK:  Right.  But he also --

3            THE COURT:  But there is nothing in the complaint,

4    nothing that I've seen that's before me, where he -- there is

5    another provider that -- in other words, if he places his

6    content on a provider that doesn't fit the definition then he

7    doesn't have to worry because the statute doesn't apply to that

8    provider.  If he places his content on a provider that the

9    statute does cover but wasn't a plaintiff in this case, I don't

10   know who that is right now.  That's not before me.  So is

11   there -- you might have to amend the complaint --

12           MR. FRANK:  No, sir, Your Honor.  We -- we do have

13   that in the record that he -- he relies on YouTube

14   monetization.

15           THE COURT:  On YouTube?

16           MR. FRANK:  Yes, Your Honor.

17           THE COURT:  Okay.  And so in the State's view this

18   ruling wouldn't apply to content placed on YouTube?

19           MS. LISKA:  So I -- this is a conversation I'll need

20   to have with client counsel since we also represent the

21   Secretary of State's office.  So I can't really make full

22   representations.  I can say --

23           THE COURT:  I don't understand that answer at all.

24           MS. LISKA:  Well, I haven't had full conversations

25   about what -- we will follow any orders that this Court issues.

1    We're not intending to violate those orders.

2        I think that there is a good argument that this Court's

3    ruling would suggest that any interactive computer service

4    would -- the law would be unconstitutional as applied to them.

5    I -- I would say we tend to follow -- you know, like I said, my

6    clients will follow the Court's orders and rulings.  I can't

7    represent on the record what actions we will or will not take

8    until I've had a chance to confirm since we haven't had

9    full-fledged discussions about all the nuances of these issues

10   yet.  And so I'm not in a position to make those

11   representations that would be binding.

12       But I will just -- as I said, I do believe this Court's

13   ruling would apply -- the declaration at least would -- would

14   suggest the same logic applies to other interactive computer

15   services, and we may well be open to agreeing not to enforce

16   the law as to those other interactive --

17            THE COURT:  A real life example.  He wants to place

18   his videos on YouTube, which isn't a plaintiff in this case.

19            MS. LISKA:  So what I would say is we've -- there is

20   a stay of enforcement that applies broadly that remains in

21   effect until -- I want to say --

22            THE COURT:  October 25th.

23            MS. LISKA:  -- October --

24            THE COURT:  That was --

25            MS. LISKA:  So --

1          THE COURT:  I was going to bring that up.

2          MS. LISKA:  So at this time I believe there is

3     provisions in there that once the Court has entered judgment

4     that stay will expire, but until then it remains in effect.

5          And we're happy to have conversations and discussions

6     with -- with opposing counsel in the process of drafting that

7     judgment and the order with respect to what the scope of it

8     will cover.  And I think that perhaps it may be more fruitful

9     for the parties to have a chance to undergo those conversations

10    and discussions so I can at least come back and say more

11    clearly on the record what my clients are comfortable with

12    because I don't want to exceed the scope of any authority that

13    I've been given in terms of addressing nonparty entities at

14    this exact moment.

15         So that would be what I would say.  I think that perhaps

16    this would be a fruitful conversation for the parties to have

17    and to address in the -- address when dealing with the question

18    of the Court's order that's being drafted by Plaintiffs.

19         THE COURT:  I love ideas like that.

20         MR. FRANK:  Your Honor --

21         THE COURT:  What it means is if you can't resolve it

22    informally then I'll reach it.  I mean, that's a specific

23    example of where your client deserves an answer from the Court,

24    and I agree, I'm just not going to reach it today --

25         MR. FRANK:  Thank you, Your Honor.

1          THE COURT:  -- for him.

2      But, again, please know you're more than welcome to ask the

3  Court to revisit the issue given that discussions didn't pan

4  out between you and -- your client and the State.

5      Tell me again the -- Rumble -- Rumble and X Corp. are large

6  providers but Babylon isn't, right?

7          MR. WIDMALM-DELPHONSE:  Correct.

8      And, Your Honor, I would just -- for the record, I would

9  just point to Plaintiffs' Statement of Undisputed Fact

10  paragraph 197 where we also discuss where The Bee and Kelly

11  Chang Rickert post their content.  And other than Rumble and X,

12  they post their content on Facebook and YouTube.

13          THE COURT:  Why was Rumble a plaintiff in this for

14  this statute?

15          MR. WIDMALM-DELPHONSE:  For 2655?

16          THE COURT:  Yeah.

17          MR. WIDMALM-DELPHONSE:  They were a large

18  interactive --

19          THE COURT:  I'm sorry.  Not Rumble.  I meant Babylon.

20          MR. WIDMALM-DELPHONSE:  Oh.  Well, similar to

21  Christopher Kohls, Babylon Bee and Kelly Chang Rickert raised

22  First Amendment claims that they should be -- that their

23  content should be protected on all the platforms where they

24  post.

25          THE COURT:  Remind me again, is Kelly Chang Rickert

53

1    also The Babylon Bee?  Are they one in the same?

2              MR. WIDMALM-DELPHONSE:  No.

3              THE COURT:  Two different entities?

4              MR. WIDMALM-DELPHONSE:  Yes.

5              THE COURT:  Okay.  You represent both of them,

6    though?

7              MR. WIDMALM-DELPHONSE:  Yes.

8              THE COURT:  Okay.  So Mr. Kohls, Babylon Bee, and

9    Kelly Rickert should engage in discussions with the State.  If

10   that doesn't pan out I'll be happy to reach and render a

11   decision on the First Amendment arguments as well.

12             MR. WIDMALM-DELPHONSE:  Thank you, Judge.

13             THE COURT:  Okay.  Which -- Mr. Kurtzberg, you're not

14   done yet, although all the Plaintiffs are involved in this.

15        There is a stay, as Ms. Liska pointed out, through

16   October 25, 2025.  It doesn't really say anything about "or

17   until judgment is entered."

18        We're keeping the stay in place right now.  Everybody okay

19   with that?

20             MS. LISKA:  Yes.  Our position has been --

21             THE COURT:  I was asking them.

22             MS. LISKA:  Sorry.

23             MR. WIDMALM-DELPHONSE:  Yes, Your Honor.

24             MR. KURTZBERG:  Yes, Your Honor.

25             THE COURT:  Okay.  So given the stay, in theory I

54

1    will not enter judgment until after October 25, 2025, unless

2    the parties tell me to do so otherwise.

3        Is that fair?

4            MR. WIDMALM-DELPHONSE:  Thank you, Your Honor.

5            MS. LISKA:  Yes.  That's fine, Your Honor.

6            THE COURT:  Okay.

7            MR. KURTZBERG:  Thank you, Your Honor.

8            THE COURT:  I may ask to lift the stay sooner than

9    October 25th, but we'll cross that bridge when we come to it.

10       Okay.  Let's turn to AB 2839.

11       Ms. Liska, I did write a lengthy order with respect to this

12   statute back in October.  And the first and most obvious

13   question is this is -- in effect, these cross-motions for

14   summary judgment, at least from the Defendants' position, it's

15   really more a motion for reconsideration.  I have already found

16   that the Plaintiffs were likely to succeed on the merits.  So

17   what's changed since October?  What's -- why should I in any

18   way change my view of this statute just because time has

19   passed?

20           MS. LISKA:  At least two points, Your Honor.

21       The first is we hope that the Court would consider our

22   arguments as to the interpretation and scope of the statute.

23   It is notable that the proceeding on the preliminary injunction

24   was extremely rapid, and hopefully with time and reflection the

25   parties have been able to put more into their arguments, more

1    nuance, complexity.  And so --

2              THE COURT:  Can you give me an example of any new

3    argument you think I didn't consider?

4              MS. LISKA:  Well, the second point I would make is

5    that the record the Court confronts here is not the same as the

6    record that it confronted on preliminary injunction.

7    Obviously, that was a likelihood of success on the merits with

8    respect to the record before the Court at that time.

9        The Court has a much more fully fleshed record now, and so

10   I think that that certainly weighs with respect to things like

11   questions about the application of strict scrutiny, the need to

12   prohibit the dissemination of this content, the expert

13   declarations that have been placed before this Court.  I think

14   all of that provides further -- further evidentiary basis as to

15   why it is that the statute does suffice with strict scrutiny.

16       And at the very least we hope that you would reconsider our

17   arguments about, as I said, the scope.  Because we do believe

18   that the statute, as properly interpreted, for multiple reasons

19   does not cover satire and parody generally, and that that is an

20   important point with respect to the question of tailoring.

21       I also believe --

22             THE COURT:  Doesn't -- shouldn't I be concerned --

23   throughout the brief, and you just used the same phrase, it

24   doesn't cover satire and parody, and then you always have to

25   add the word "generally."

1    Can you defend the statute without using the word

2    generally?  Because --

3            MS. LISKA:  Yes, Your Honor.

4            THE COURT:  -- I don't think you can.

5            MS. LISKA:  Yes.  I believe so.

6        So the statute applies to -- you know, I think that --

7            THE COURT:  It doesn't apply to satire and parody.

8            MS. LISKA:  It applies -- I think it may help to

9    maybe reorient the focus here a little.

10       The question really isn't, you know, does a particular

11   video fall within or without the scope.  The question is the --

12   what's the --

13           THE COURT:  That's not the question?

14           MS. LISKA:  I think the question is what is the scope

15   of material it covers based on the definition.

16       And the question under the statute is whether or not

17   something constitutes materially deceptive content, which is

18   defined as digitally manipulated or created that would, quote,

19   falsely appear to a reasonable person to be an authentic record

20   of the content depicted in the media.

21           THE COURT:  Does the Harris video fall into the

22   prohibition of 2839?

23           MS. LISKA:  So, we haven't taken a position on that.

24           THE COURT:  I'm asking you to.  Does it?

25           MS. LISKA:  You know, look, I think that that may be

1    a close question, because I think that there may be some who

2    would say -- especially if you consider a redistribution of it

3    that doesn't note it's a parody, there are some who might say

4    that a reasonable person would believe it's authentic record of

5    its content, that it's showing something Harris truly did say.

6            THE COURT:  Aren't the Plaintiffs entitled to an

7    answer to that question?

8            MS. LISKA:  I mean, if they were to bring a -- an

9    as-applied challenge, perhaps, but that --

10           THE COURT:  They did bring an as-applied challenge.

11           MS. LISKA:  And if your Court concludes differently

12   and Your Honor wants to issue an order that says that

13   particular video is not materially deceptive, you know, so be

14   it.  That would not resolve the facial question as to the

15   validity of the law on a whole simply because that one video

16   may or may not fall within it.

17       The question really is the scope of its regulation.  And,

18   you know, look, I'm hesitant to say every satire or parody for

19   various reasons, some of which is I don't think the question is

20   whether an author labels it, the question is what a reasonable

21   person perceives it as.  That's throughout the First Amendment

22   jurisprudence we reference.  That's the question in defamation

23   cases, in IP cases.  It's not so much what does an author call

24   it, it's how would a person understand it.

25       And here, the real question for purposes of whether or not

1    a particular piece of media falls within the scope of AB 2839

2    is whether a reasonable person would perceive it to be an

3    authentic record of its content.

4         THE COURT:  But -- but the State of California drafts

5    a law that's supposed to bring some type of certainty to a

6    situation, and the answer you're giving me is, oh, I don't

7    know, the State is not going to take a position.  All you're

8    doing is encouraging litigation, which in and of itself will

9    create a chilling effect.

10        Who's going to prepare -- maybe that's what the State wants

11   to try to create, but that's clearly unconstitutional.

12        But who is going to do these videos without some type of

13   certainty?

14        MS. LISKA:  Well, I think --

15        THE COURT:  Tell me why -- why this law, on its face,

16   doesn't create this chilling effect.  Why would someone do this

17   at all without knowing for certain whether it's going to be --

18   be covered by -- and the other problem that everyone has with

19   this -- with this law is anybody can sue.  I can sue.  Right?

20   If I see the video, I can -- under this law I can bring a

21   lawsuit.  Right?  Anybody can sue Mr. Kohls or Ms. Rickert.

22        Who is going to -- and, again, maybe that was the idea

23   behind let's draft a law like this, but you know you can't

24   draft a law -- the State can't draft a law that creates such a

25   chilling effect.

59

1          MS. LISKA:  So I would say, Your Honor, I think

2     there's been a lot of focus on, you know, one or two examples

3     that may be at the margins.  And I think it's worthwhile

4     looking at the fact that throughout the evidentiary record here

5     there are a lot of examples that aren't in dispute.  No one is

6     disputing that an image of Donald Trump's, you know, head on

7     Buzz Aldrin would not be within the scope of the statute,

8     but --

9          THE COURT:  Why not write the law that way?  Why not

10    be --

11         MS. LISKA:  I --

12         THE COURT:  I'm not picking on you because you didn't

13    write the law, you have to defend it.  But tell the people that

14    write these laws -- because that's one of the suggestions that

15    the Plaintiffs have made.  I want to get into strict scrutiny

16    because you raised it.  But do a better job of writing this

17    law, being more specific.  Talk to lawyers who can draft these

18    types of laws that can avoid these types of constitutional

19    challenges.  But the legislature instead goes ahead and drafts

20    it anyway and puts you in the position -- and you're doing a

21    wonderful job -- but puts you in the position of having to

22    defend a law that, at least in my mind, is indefensible.

23         MS. LISKA:  So, Your Honor, I would disagree.  I

24    think that the fact that the way --

25         THE COURT:  That's why you're here, so you can

60

1    disagree.

2         MS. LISKA:  I think the way that it's defined as, you

3    know, a reasonable person would -- it would falsely appear to

4    be an authentic record of the content depicted.  Basically the

5    question is does a reasonable person believe that it's showing

6    something that truly happened in an accurate way.

7         THE COURT:  Where is that reasonable person?  On the

8    jury you mean?

9         MS. LISKA:  The law is replete with situations where

10   people have to gauge their behavior around what a reasonable

11   person would understand.

12        THE COURT:  I understand that.

13        MS. LISKA:  It's throughout negligence law.  It's

14   throughout other aspects of free speech law.  It's --

15        THE COURT:  Is it throughout First Amendment law --

16        MS. LISKA:  Absolutely.

17        THE COURT:  -- where the law creates a chilling

18   effect?

19        MS. LISKA:  Absolutely.  In the defamation context

20   you have to ask whether or not a reasonable person would

21   understand what you say is opinion or fact.

22        THE COURT:  But this isn't a defamation law at all.

23   It's not even close to a defamation --

24        MS. LISKA:  No.  But if the concern is that it's too

25   chilling for the State to say you have to base what you decide

61

1  to say on what a reasonable person would think, that is a

2  problem under IP law where the question is would a reasonable

3  person perceive something as a satire or parody.  It's a

4  problem in defamation law where the question is would a

5  reasonable person perceive this.  It's a problem in fraud where

6  materiality turns on what would a reasonable person perceive

7  this as.

8           THE COURT:  This isn't deception or fraud.

9           MS. LISKA:  It may not be, but we're dealing with

10  intentionally created things that show something demonstrably

11  false.

12      And I want to point to the fact that there is plenty of

13  things that a plaintiff could do that would make it so that a

14  person understands something clearly is a parody or satire.

15  Had they included something that said at the end of the video,

16  this video is a parody or satire, I -- that -- to me, I think

17  that that situation is going to pretty clearly fall outside the

18  scope of the law.

19           THE COURT:  But it's neither -- these videos are

20  neither defamatory or fraudulent.  They're -- they're deepfake.

21  I mean, that's the label they've been given.

22      But I want you to answer my question.  Do you think this

23  law doesn't create a chilling effect at all?

24           MS. LISKA:  You know, if it chills speech that is

25  demonstrably false, that involves false portrayals of

1   candidates that have been intentionally created to fool

2   people --

3         THE COURT:  You're really not answering my question.

4         MS. LISKA:  No.  But --

5         THE COURT:  Sorry to interrupt you.

6      It's kind of a yes or no question, and then you can

7   explain.

8         MS. LISKA:  Well, no, I don't believe that this is

9   going to chill satire and parody because I believe that

10  people -- that, A, a lot of --

11        THE COURT:  Tell me why.

12        MS. LISKA:  A lot of satire and parody is going to

13  clearly fall outside the scope of this law.  I don't -- I'm not

14  going to just -- you know, consider the most recent South Park

15  episode.  They had a -- they had an AI-generated ad at the end

16  involving Donald Trump.  Had they aired that as an election --

17  you know, someone had aired a video like that, that was a clear

18  AI parody of Trump, that was photorealistic, not going to fall

19  within the scope of this.

20        THE COURT:  That wouldn't be covered by 2839?

21        MS. LISKA:  Had they aired some of that -- I'm just

22  saying a video like that, that clearly is AI-generated but not

23  meant to be taken literally, that is not going to fall within

24  the scope of the law.

25     And I think that it's easy to -- again, a lot of the time

63

1    -- and Plaintiffs themselves say this -- most satire and

2    parody, it's pretty clear to a reasonable person --

3                 THE COURT:  Okay.  That's --

4                 MS. LISKA:  -- it's satire and parody.

5                 THE COURT:  You've got to slow down.

6                 MS. LISKA:  Sorry.  I apologize.  I will endeavor to

7    speak slower.

8                 THE COURT:  That one is easy.  I give you that.  So

9    come back to the Harris parody.

10                MS. LISKA:  Had he -- had he instead of --

11                THE COURT:  Come back to Harris.  Is that covered?

12   Can you tell Mr. Kohls if that's covered or not?

13                MS. LISKA:  Your Honor, look, I think that that's a

14   close call because I do think there is -- I do think there is

15   an argument a reasonable person would not understand it's

16   parody.

17                THE COURT:  Okay.

18                MS. LISKA:  I -- but, to me, that's one on the

19   margins.  And, look, had he included a statement at the end --

20                THE COURT:  Take a breath.

21      Okay.  So it's a close call.  So now he calls his lawyer up

22   and says, can I publish this or not?  And his lawyer says, I

23   don't know, it's a close call.

24      And so the obvious response to that for the -- for the

25   people that create these videos, whether you even like them or

1    not, or whether you think they should be on the internet or

2    not, the State clearly doesn't they think should be, that comes

3    back to the -- the point of he's going to be risk-averse.  He's

4    not going to do that.  And in his mind, that's not fair.

5    That -- my First Amendment right isn't being protected because

6    the State of California won't tell me whether that's a --

7    violates this law or not.  So you're -- you're chilling his

8    First Amendment rights.  I don't see any way around that -- of

9    the Court reaching a different conclusion.

10          MS. LISKA:  So what I would say, Your Honor, is,

11    again, had he included a disclosure in the video at the end --

12    and this is why I do think this one is a close call --

13          THE COURT:  That's compelled speech.

14          MS. LISKA:  I do think -- not saying he had to

15    include -- I'm not -- not as a compelled requirement.  And I

16    disagree that a disclosure is compelled speech in this context.

17          THE COURT:  You and I will disagree on that, too.

18          MS. LISKA:  But I would say that, you know, had he

19    included a statement -- this is why I think his video is a

20    close call, because he does identify it as a parody.  And I

21    think that his original post, it may well be that no reasonable

22    person would have thought it was real because he flagged it as

23    a parody.  And in that context, if a reasonable person would

24    have understood -- especially because it was identified as a

25    parody -- that it was a parody, it wouldn't fall within the

1    scope of the law.  And we do not dispute that fact.

2        If Your Honor concludes that that video is one that a

3    reasonable person would understand is a parody, and that does

4    not show something that was truly said by Kamala Harris, we

5    agree it's outside the scope of this statute.  That's how we

6    interpret it.

7            THE COURT:  But that just raises another problem with

8    the statute.  The problem being, anybody can file a lawsuit.

9    And so it's not only reasonable people that are filing these

10   lawsuits, there is a whole lot of unreasonable people that are

11   going to file lawsuits.  And that in and of itself is because

12   the statute allows an unreasonable person to file a lawsuit.

13   That also chills the -- the content provider, the individual

14   that creates a video, I mean, that also chills their First

15   Amendment rights.

16           MS. LISKA:  So --

17           THE COURT:  You're going after the First Amendment

18   and you've got to be more specific, less vague.  There are so

19   many problems with this law.  You saw it from my first order.

20   So many things concern me.

21       And if the State is really concerned about this, and I --

22   and, again, I will -- I will give you -- and I know Plaintiffs

23   will disagree -- I think that the -- you know, the strict

24   scrutiny analysis, I don't -- I don't find that the State fails

25   on the is there a compelling State interest here.  There is.

1    And, again, I know the Plaintiffs disagree, but I think you

2    passed that prong of the strict scrutiny analysis.  There is a

3    reason for this.  And I think -- I think the -- the briefs and

4    the law that I've reviewed would demonstrate that there is a

5    compelling State interest.

6        The problem where you lose on strict scrutiny, I think, is

7    is this the least restrictive means available.  And I know you

8    disagree with that.  But there is this whole section of the

9    briefs where the Plaintiffs -- and part of this goes to the

10   declarations entered into by -- by the parties, the expert

11   declarations, but there are so many other things the State can

12   do rather than -- than put out this -- this broad -- overbroad,

13   vague, unconstitutional law.  They could have been more

14   specific or -- or you can engage in -- in other restrictive

15   means.  Let me go through those real quickly because I want to

16   get your -- your response.

17       In the Plaintiffs' briefs they suggest several other

18   narrative alternatives that are available, one being

19   counterspeech.  I know your expert doesn't like that.  He uses

20   the phrase -- I love that phrase -- "political deepfakes are

21   sticky" and they spread misinformation too quickly.  The other

22   experts disagree with that.

23       Under strict scrutiny, though, the State has to show that

24   alternative methods would fail to achieve the government's

25   interests.  I don't think the State has -- has done that.  The

1    State hasn't shown that it's explored other alternatives before

2    jumping to complete censorship.

3        Let me get their brief real quick.  Hold on.  And I wanted

4    to go through these with you.

5        And maybe, Mr. Delphonse, you can point me to -- I thought

6    I had marked them in your brief, where you discuss all the

7    alternatives available.

8            MR. WIDMALM-DELPHONSE:  In the first brief, Your

9    Honor, it's beginning on page 22.

10           THE COURT:  Which docket number is that one?

11           MR. WIDMALM-DELPHONSE:  D -- oh, 74-1.

12           THE COURT:  No.  You don't have one at 74.  You have

13   one at --

14           MR. WIDMALM-DELPHONSE:  That was the corrected brief

15   that we filed.

16           THE COURT:  I wanted 78.  Where at 78 is --

17           MR. WIDMALM-DELPHONSE:  Oh.  78.  Yep.  That's our

18   reply brief, Your Honor.

19           THE COURT:  Right.

20           MR. WIDMALM-DELPHONSE:  And we discuss the less

21   restrictive alternatives beginning on page 12.

22           THE COURT:  12.  Okay.

23           MR. WIDMALM-DELPHONSE:  And that's the original page

24   number, not the ECF.

25           THE COURT:  Right.  That's the argument that it

68

1    flunks narrow tailoring.  "California doesn't present any proof

2    that speech about candidates is likeliest to cause the biggest

3    harm --"

4            MR. WIDMALM-DELPHONSE:  Sorry.  Your Honor, if you go

5    to page 14, there is a -- at the bottom, that's -- sorry,

6    that is --

7            THE COURT:  "California has other options."

8            MR. WIDMALM-DELPHONSE:  Yes.

9            THE COURT:  Okay.  "Rather than prohibiting knowing

10   distribution of literally false content, it could require proof

11   of specific intent to cause a legally cognizable harm."

12       That's not this statute, but you could do that.  And they

13   cite to a law in New Hampshire.

14       What do you think of that suggestion?

15           MS. LISKA:  Um --

16           THE COURT:  Was that considered, do you think?

17           MS. LISKA:  The particular statute in New Hampshire?

18           THE COURT:  Yep.  New Hampshire has a law prohibiting

19   "voter suppression by knowingly attempting to prevent --"

20           MS. LISKA:  So that does not cover the full scope of

21   this statute because the statute is not about attempting to

22   prevent another person from voting, it's about manipulating the

23   decisionmaking that they did.

24           THE COURT:  Okay.  "California could write a statute

25   targeting legally cognizable harms like fraud."

1    MS. LISKA:  Again, I'm not sure how that would reach

2    our concerns about manipulating the decision a voter makes.

3        And I think there are reasons to be worried about statutes

4    that apply retroactively only, in the sense that we would have

5    to show a voter cast a vote, which they can't undo or recast,

6    and that their decision on who to vote for was changed because

7    of what they were shown.  That is part of the concern with just

8    focusing on defamation or libel or fraud, because having to

9    show a voter -- the outcome of an election was manipulated,

10   which can't be redone, or a voter's vote was cast and they were

11   manipulated, which can't be recast, doesn't really help solve

12   the problem of the voter being manipulated to begin with.

13           THE COURT:  "California could encourage alternatives

14   that are already working in the free market."  The

15   effectiveness -- the expert for the Plaintiffs "points to the

16   effectiveness of counterspeech like community notes on X and

17   Facebook."  "Research shows that community notes are

18   accurate --" excuse me "-- reduce the spread of misinformation,

19   are viewed as more trustworthy than misinformation flags, and

20   are scaleable because they crowdsource identification,

21   labeling, and sourcing rather than rely on censorship."

22           MS. LISKA:  While I do believe the other Plaintiffs

23   in this action, Your Honor, would say that California couldn't

24   mandate the industry to include community notes features, I

25   think that runs headlong into your prior ruling today, and

1  there is no other -- it's not as though the State could itself

2  create a community notes feature to apply on top of another

3  platform.  Again, that's going to run into your prior ruling

4  today.

5      So there is not a way to -- essentially, the argument is

6  that the State shouldn't do anything and should let the market

7  solve the problem.  That's not a less restrictive alternative

8  for the government to take action with respect to, that's just

9  relying on private industry to do something.  And I'm not sure

10  there is case law that says simply waiting and seeing if

11  industry will act is a least restrictive alternative for the

12  government to do.

13          THE COURT:  Okay.  "The Political Deepfakes Incidents

14  Database show that counterspeech works.  California and its

15  experts cite this database to suggest that nefarious content is

16  proliferating online.  Regardless, it shows the effectiveness

17  of market-based alternatives like community notes."  The

18  Plaintiffs' expert Ayers notes, "94 percent of the databases'

19  content either did not violate the law, or was labeled or

20  refuted by counterspeech by community notes and comments.

21  California could start its own fact-checking team to help

22  improve these marketplace alternatives instead of sitting on

23  its hands and complaining they don't work."

24          MS. LISKA:  Again, that -- under your Court's prior

25  ruling, which, you know, of course we don't necessarily agree

71

1   with, but that would require either obligating platforms to

2   implement these sorts of processes or relying on the good will

3   of them for, you know, our own --

4           THE COURT:  It says the State could start its own

5   fact-checking.

6           MS. LISKA:  The way I understand that is to say that

7   the State could employ people to go make community notes, but

8   we're still reliant on the market to have community notes.  And

9   it feels odd that the validity of a law would suddenly change

10  whether or not Twitter decides -- I apologize -- X Corp.

11  decides to change how it does community notes features.

12          THE COURT:  Beats censorship, though, doesn't it?

13          MS. LISKA:  Well, again, the question isn't -- you

14  know, the question is whether or not this is a viable

15  alternative to the State's choice.  And as I've said --

16          THE COURT:  The problem is --

17          MS. LISKA:  -- there is no --

18          THE COURT:  -- it's a censorship law that you've got

19  to try to defend under strict scrutiny.  And in trying to

20  defend that, you've got to be able to convince me that the

21  State has looked at these alternatives and come up with the

22  least restrictive means of meeting the -- what I already said

23  was a legitimate compelling State interest.

24      It says -- the last one is -- oh, no, there is more.

25      "California should also engage in educational campaigns to

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

72

1  improve digital and media literacy."

2       I don't know if California has tried that.

3            MS. LISKA:  So, again, our point is that post hoc

4  campaigns that counterspeech doesn't work -- Your Honor may

5  disagree with us, and -- but our argument is that anything --

6  that this needs to be -- this material needs to be on the front

7  end prohibited from distribution because it -- once people are

8  exposed to it, it continues to impact their decisionmaking.

9       Their experts do not refute that misinformation is sticky.

10 They do not refute that misinformation spreads rapidly, and

11 more rapidly than counterspeech, both of which Alvarez

12 addresses.

13      And so I think under those situations, the fact that this

14 is going to come out and linger is the problem, and something

15 like counterspeech is not effective to undue those harms.

16      I also -- I -- I understand Your Honor's concerns, and I'm

17 going to just make one last pitch for the questions about the

18 scope of the statute.  And I -- I think -- I think if you look

19 at what was going on here, you know, I think the legislature is

20 concerned about a very real problem that no one disputes

21 exists, which is that you can make very sophisticated

22 audiovisual media with online technology, digital technology,

23 that is very difficult for a person to discern whether or not

24 it shows something that actually happened.

25      And we're not -- you know, I understand the concerns about

73

1    the importance of political debate, and if we were talking

2    about a law that just regulated misinformation broadly, where

3    if somebody says, you know, Donald Trump is a fascist, or

4    Kamala Harris is a socialist, that the State would shut down

5    that statement, that post.

6       We're dealing with a law that targets digitally-created and

7    manipulated media, intentionally done so, that shows a person

8    saying or doing something they did not say or do.  So it's

9    focused on a very specific thing.  And I think the legislature

10   was trying to act in good faith to create a law that addressed

11   a real problem in a way that is cognizant of the First

12   Amendment.

13      And you see that they incorporate the mens rea standard

14   from the New York Times vs. Sullivan.  They're trying to track

15   the line from defamation context to exclude out opinion versus

16   fact.  I think they're making a good faith effort.  And there

17   is nothing in the legislative history that Plaintiffs ever

18   point to or cite that indicates what they want to do is to

19   silence criticism, debate, humor.  They just want to get rid of

20   a video that shows a politician accepting a bribe that the

21   politician did not do.  A created, artificially doctored

22   video --

23            THE COURT:  Are you saying without this law there is

24   no way the politician, him or herself, could defend themselves?

25            MS. LISKA:  So it may be possible for that example --

74

 1           THE COURT:  Why not let that happen?

 2           MS. LISKA:  -- but the law also would apply to a fake

 3   video or a fake robocall that says the location of a polling

 4   place has changed.

 5           THE COURT:  That's different, though.  See, that's

 6   specific.  That -- isn't that the New Hampshire case, the

 7   robocalls?

 8           MR. WIDMALM-DELPHONSE:  Yes, Your Honor.

 9           THE COURT:  Yeah.  See, that's a specifically

10   targeted law.  That's not what California did here.

11           MS. LISKA:  But that's covered within the scope of

12   the statute.  That would be a portrayal of an elections

13   official saying or doing something they did not say or do that

14   is reasonably likely to impair confidence in an outcome of an

15   election.

16           THE COURT:  Why not just have that in -- why not just

17   draft that law --

18           MS. LISKA:  So, if Your Honor --

19           THE COURT:  -- instead of putting it in this

20   all-encompassing let's censor everything law?

21           MS. LISKA:  It only -- it's -- there are four

22   specific things it applies to:

23      Candidates saying or doing something they did not say or do

24   that is reasonably likely to undermine their reputation or

25   impair electoral outcome.

1      An elections official saying or doing something they did

2 not say or do that is reasonably likely to impair confidence in

3 the outcome of an election.

4      An elected official saying or doing something with respect

5 to an election they did not say or do that is reasonably likely

6 to impair confidence in the outcome --

7           THE COURT:  A voting machine portrayed in --

8           MS. LISKA:  Yes.  So basically a doctored picture of

9 a ballot or voting machine.

10      So it's four specific things.  It's intentionally digitally

11 created or manipulated.  It's distributed with knowledge of the

12 falsity.  And it has to be something a reasonable person would

13 believe is an authentic record of what it depicts, as in a

14 person will look at it and think it's real.

15      And we would agree that in that question it's similar to

16 the discussion in the Farah case from the D.C. Circuit where

17 it's not your initial instinct, it does consider a moment's

18 reflection.  You, of course, may immediately think it's real

19 but after a couple pause, you know, 30 seconds, a minute,

20 realize that it's fake.  So I think --

21           THE COURT:  Why not go the alternate route first

22 rather than draft a law like this that gets challenged?  The

23 legislature knew this would get challenged.  And, again, under

24 strict scrutiny, California must show that alternative methods

25 "would fail to achieve the government's interest, not simply

76

1  that the chosen route was easier."  The argument the Plaintiffs

2  have raised is that you have not shown -- the State hasn't

3  shown that it has explored other alternatives before jumping to

4  complete censorship.  That's what this is.

5          MS. LISKA:  And I think I've walked through with Your

6  Honor the reason why other alternatives clearly don't work.

7  Things like a post -- having to show actual harm, having to

8  show a vote --

9          THE COURT:  All speculation right now.  My question

10  is has California tried it.

11          MS. LISKA:  That's -- I don't -- I don't know that we

12  need to necessarily prove something that is logically true.

13  It's clear that if a voter has made their -- has cast a vote

14  and has had their vote changed, that that is a problem.  And

15  the -- and waiting until that occurs in order to -- to go after

16  someone, it's basically saying let the harm happen before we

17  actually can take action.

18          THE COURT:  How about this?  We walk down the street

19  to the legislature and say, why don't you spend a whole lot of

20  money on an educational campaign warning the public about these

21  deepfakes, and get out there and do public service

22  announcements rather than draft a law that ends up in the

23  federal district court down the street hanging by a thread

24  because the First Amendment to the United States Constitution,

25  whether you like it or not, legislators, protects this type of

1   content.

2           MS. LISKA:  So, again --

3           THE COURT:  Why not do that?  Not only legally, but

4   practically, doesn't that make more sense?

5           MS. LISKA:  So, again, I think that -- you know,

6   Plaintiffs really seem to be pushing that the State has to wait

7   until an election has been manipulated --

8           THE COURT:  No.  They're saying the State should be

9   doing other things.

10          MS. LISKA:  I --

11          THE COURT:  Which, again, the argument is the State

12  hasn't tried.  And if you're going to avoid -- you'd lose on

13  strict scrutiny in most of these First Amendment cases.  If

14  you're going to try to argue that this passes strict scrutiny

15  muster, you're not getting there.  And I -- I don't think any

16  court would find that you've gotten there.

17          MS. LISKA:  So, again, I'll -- one last --

18          THE COURT:  It's hard -- it's a hard question.  I

19  understand.  And, again, you're fighting for your client and I

20  appreciate that.  But it sort of comes back to nothing has

21  changed since my first order.  The law -- the law is what it is

22  and I don't see any new facts.  I have a few new expert

23  declarations.  And, you're right, the record is more complete.

24  But the law still says what it says and it still does what it

25  does, which is strongly discourage these video -- the Mr. Kohls

1   and the Ms. Rickerts of the world to not make these and not

2   publish these.

3            MS. LISKA:  Again, I think that the vast majority of

4   parody and satire is going to clearly fall outside the scope of

5   this law because the reasonable person will not believe it's an

6   authentic record.  And I think that the vast majority of

7   parodists and satirists should be comfortable with that

8   knowledge.  Not to mention that they have the safe harbor which

9   will also help protect them.

10       But even if they don't include a label that matches what

11   the safe harbor says, a simple disclaimer at the end would most

12   likely -- you know, I cannot imagine -- I'm always hesitant to

13   say never because you can always dream up some crazy

14   hypothetical the world will throw at you.  But I imagine that

15   if you have a video that's a parody or satire, and at the very

16   end you say, this was a parody or satire --

17            THE COURT REPORTER:  Counsel, please, slow down.

18            MS. LISKA:  My apologies.

19       -- 99 percent of the time that's going to be not within the

20   scope of this law because no reasonable person is going to

21   perceive it as a -- as an accurate, authentic record of its

22   contents.

23       Or if you prefaced your video with, you know, imagine a

24   world where Biden had been president in the pandemic, and then

25   have videos that are AI created.  Again, that is 99.9 percent

79

1   of the time outside the scope of this law because the

2   reasonable person wouldn't understand it as an authentic

3   record.

4        So I -- and I want to push back a bit on some of the

5   discussion of Moody in the opposition briefs.  I think Moody --

6   if we're doing a facial challenge, Moody lays out how that

7   should be done.  And under Moody, the Court has to consider all

8   the applications of this law.  And I understand the Court's

9   concerns when we're talking satire and parody, but I think it's

10  very different if this law is being applied to something that

11  falls within traditional defamation or libel, something that

12  involves foreign adversaries, something that involves --

13            THE COURT:  But if it does fall within those then the

14  person who is being defamed can protect themselves.  They --

15  why does the State have to step in and draft a law like this to

16  protect that person?

17       Again, it comes back to why can't the candidate or the

18  elected official defend themselves if it really is defamation

19  or fraud?  The laws are clear.  The laws are a little

20  different.  This law tries to do what defamation and fraud

21  wouldn't allow it to do.  And that's a problem.

22       I understand your argument.  I've read the briefs.

23       I want to ask you more about severability.  I raised the

24  issue in my preliminary injunction order as to whether any part

25  of this might be severable.  And you have, for example,

80

1   labeling requirements, that "If the media consists of audio

2   only --" I'm reading from the statute now "-- the disclosures

3   shall be --" there should be a disclosure that will be "read in

4   a clearly spoken manner."  And then you also have visual media,

5   they would put text or disclosure that appears "in a size that

6   is easily readable that," in effect that says, this blank has

7   been manipulated for purposes of satire or parody, something

8   along those lines.

9       You think that survives?  You think that the labeling

10  requirement at least is severable?

11          MS. LISKA:  Yes.  We think the labeling requirement

12  is severable.  I mean, I -- if you were --

13          THE COURT:  It basically would require someone -- I

14  mean, I know in the briefs they -- they say, under the statute

15  this is what the labeling requirement would look like, and it

16  blocks out the entire picture.  But you think that the labeling

17  could be put on the video in a manner in which it wouldn't

18  block the content?

19          MS. LISKA:  Correct.  I think that the -- my --

20  because there's a very specific subsection that has the "for

21  visual media the text --" shall appear in the size reasonable

22  "and no smaller than --" Your Honor could excise that whole

23  subsection, or even just cut the language "and no smaller

24  than --" the rest of that sentence.

25          THE COURT:  Why isn't that compelled speech?

81

1          MS. LISKA:  Because if you look at cases like NIFLA,

2    normally what is going on in a compelled speech context is that

3    you have people who don't want to say anything and they're

4    being compelled to speak whether they want to say something or

5    not.

6        This is much more similar to something like an

7    advertisement where you must disclose who the advertiser is.

8    It's a, if you want to speak, you must include some additional

9    speech.  We're not going to force you to go and say anything if

10   you aren't trying to speak to begin with.

11       So, you know, like, NIFLA is a very classical compelled

12   speech requirement, where pregnancy centers had to include a

13   certain notice in their center.  So every center had to include

14   it.  Or Barnette, where every child has to say the pledge of

15   allegiance.  Those are compelled speech.

16       This does not require any person to speak unless they're

17   already planning to make a post, and then they must include

18   something in the post as a very factual, not controversial

19   disclosure.  And, again, to the extent that there are concerns

20   about things like the size of the font, you know, we've argued

21   those can easily be severed out of the statute altogether.

22          THE COURT:  Mr. Delphonse, you've been awfully quiet

23   because I haven't asked you any questions, but do you want to

24   respond to that one?

25          MR. WIDMALM-DELPHONSE:  Yes, Your Honor.  I guess

1    beginning with the last point first.

2         So conditioning speech on complying with the State's

3    disclaimer requirement, that doesn't change the First Amendment

4    burden or the analysis at all.  I mean, states regularly make

5    that argument.  For example, in 303 Creative -- right? -- we're

6    not saying you have to speak, but if you do then you have to

7    create this speech that you don't want to do against your

8    conscience.  And the Supreme Court's never accepted that

9    argument.  It is compelled speech because it changes what they

10   want to say.  And as Riley notes, that's something -- that's a

11   decision that's left up to the speaker, not the government.

12        And, Your Honor, just going to the severability, I would

13   just make three quick points.

14        Which is that the -- the disclaimer requirement is

15   intrinsically tied to the other -- the -- the provisions that

16   prohibit speech in the first place.  So they can't be severed

17   because those provisions are unconstitutional, we argue, and

18   the disclaimer requirement doesn't make any sense if those

19   other provisions are held unconstitutional because they're

20   content and viewpoint based.

21        And then the other -- point two would be that a disclaimer

22   doesn't -- parody and satire doesn't need a disclaimer to

23   receive First Amendment protection.

24        And, Your Honor, the last thing I would argue is that going

25   back to changing the message, especially as to parody and

83

1    satire, a disclaimer kills the joke.  I mean, the whole point

2    is that you're supposed to be -- kind of be taken in, you do a

3    double take.  And so this idea that you have to provide the

4    disclaimer when the whole point of the speech is not to have a

5    disclaimer, it just -- it falls apart.

6            THE COURT:  Okay.  What about my view of the strict

7    scrutiny analysis --

8            MR. WIDMALM-DELPHONSE:  Your Honor, so --

9            THE COURT:  -- do you want to comment on that?

10           MR. WIDMALM-DELPHONSE:  Yes.  I can also comment on

11   compelling interest, but I'll focus on less restrictive

12   alternatives.

13       And what I would just highlight, Your Honor, is that the

14   record now further supports those less restrictive alternatives

15   for at least three reasons, Your Honor.

16       First is that just looking at California's expert,

17   R. Michael Alvarez, he does not disprove that counterspeech

18   won't work.  That's California's argument that they make based

19   on his -- based on his declaration, but he actually supports

20   counterspeech.

21       And, Your Honor, this is just quoting from his declaration.

22   This is paragraph 34 where he says -- he's talking about

23   technical detection alone likely is insufficient.  And he says,

24   "Complementary approaches including digital media literacy

25   initiatives --"

84

1          THE COURT REPORTER:  I'm sorry.  Slow down.

2          THE COURT:  Exactly.

3          MR. WIDMALM-DELPHONSE:  "-- are likely required."

4     Paragraph 38.  Again, I'm just going to quote from his

5     brief.  "There are two ways that political misinformation can

6     be mitigated: pre-bunking or de-bunking, with current research

7     noting that each can be effective."

8          Paragraph 39.  "While both pre-bunking and de-bunking --"

9     oh, sorry.  "Both pre-bunking and de-bunking are promising

10    methods for countering misinformation and political deepfakes."

11         And then paragraph 40, he is speaking about initiatives to

12    improve digital media literacy.  He says, quote/unquote, "Not

13    surprisingly, with strengthened media literacy skills and

14    greater political sophistication, people can be more likely to

15    identify political deepfakes and less likely to believe that

16    they are accurate."

17         So, Your Honor, you could ignore the declarations that we

18    put into the record because California's expert supports the

19    less restrictive alternative that you identified at the PI

20    stage.

21         Your Honor, I would just make two quick additional notes.

22    Is that there is the additional benefit of educating voters.

23    Professor Lucas -- Professor Lucas's declaration speaks to that

24    it's likely more effective because it teaches citizens to be

25    self-reliant and discerning rather than trusting the State to

85

1    parse truth from fiction for them.

2        And then Professor Ayers' declaration shows that free

3    market alternatives are working.  As you noted, community

4    notes, etc., highly effective, responsive.  And, of course,

5    they have the credibility that a government censor doesn't

6    have.

7        So, Your Honor, I would just say that specifically as to

8    counterspeech, the record supports that less restrictive

9    alternative even more.

10            THE COURT:  Do you think -- you go after the statute

11    on both a facial challenge and an as-applied challenge.  I know

12    you assume -- or argue that you've -- you've met the

13    requirements for both challenges.  Are both equally valid, do

14    you think, or does the as-applied challenge have a little more

15    strength than your facial challenge?

16            MR. WIDMALM-DELPHONSE:  I would --

17            THE COURT:  That's sort of an unfair question, but.

18            MR. WIDMALM-DELPHONSE:  Well, I don't think there is

19    any doubt that the as-applied challenge is sort of fatal in

20    fact.  I mean, it -- you know, you think about Free Speech

21    Coalition v. Paxton.  They held -- right? -- that a statute has

22    only been upheld once in the First Amendment context under

23    strict scrutiny.  And that case involved special deference to

24    the government.  There is no deference here.  And if it's fatal

25    in fact, and California concedes that it triggers strict

86

1  scrutiny as applied, then that's sort of a done deal.

2      As to the facial challenge, Your Honor, we would -- I mean,

3  I would make four points, if time would allow.

4      One is that under Trump v. CASA, I think we have to

5  distinguish between the Court's holding and the relief.  And at

6  least as to the holding I think it's a hundred percent clear

7  that the Court can still engage in these doctrinal tests and

8  find that the statute is facially defective and

9  unconstitutional.

10      When it comes to the relief, Trump v. CASA does leave a lot

11  of questions unanswered, but we do think it -- we argue that

12  it's very doubtful that they sub silentio overturn decades of

13  precedent, invalidating laws in the First Amendment context,

14  whether it's content viewpoint discrimination or for being

15  overbroad.  That's RAV v. City of St. Paul.  That's Iancu v.

16  Brunetti.  So they didn't -- they didn't deal with the First

17  Amendment context.

18      And I would point to HM Florida v. Florida.  That was a

19  district court case enjoining a Florida law essentially

20  burdening the speech of drag shows.  And that went up to the

21  First -- to the Supreme Court where they -- and this isn't --

22  this is not cited in our brief but I'm happy to provide the

23  citation to the Court after this hearing.  The Supreme Court

24  refused to stay the injunction.  It was a universal injunction

25  against this Florida law.  And the -- the concurrences in that

1    court talked -- in that case talked about how the First

2    Amendment context is different.

3        So I think that there is some -- there is support in the

4    case law that the First Amendment context is a special beast.

5        Your Honor --

6            THE COURT:  So -- hang on.  I want to follow that

7    through.  It's an interesting question.

8        I'm looking at your proposed order.  Your proposed order

9    would enjoin Defendants permanently from enforcing AB 2839.

10   And if the Court declares that, 2839 violates First and

11   Fourteenth Amendments, Article 1, Section 2 of the California

12   Constitution facially and as applied to Plaintiffs Christopher

13   Kohls, Babylon Bee, and Kelly Chang.

14       So if I declare that, what's the practical impact?

15   Ms. Liska has sort of raised that.  Does it apply only to the

16   Plaintiffs here or does it apply everywhere?

17           MR. WIDMALM-DELPHONSE:  I'm sorry, Your Honor.  I

18   want to make sure I understand.  So if the Court issues a

19   declaratory judgment --

20           THE COURT:  If I sign your proposed order, what's the

21   practical effect?

22           MR. WIDMALM-DELPHONSE:  So, Your Honor, we drafted

23   that proposed order before Trump v. CASA.  So the practical

24   effect of that order, if I'm remembering it correctly, would be

25   to universally enjoin the State.

88

1          THE COURT:  And you think I can do that?

2          MR. WIDMALM-DELPHONSE:  We do under the First

3   Amendment, Your Honor.

4      Can I add one note, Your Honor?

5          THE COURT:  Go ahead.

6          MR. WIDMALM-DELPHONSE:  So in addition to the -- in

7   addition to the sort of First Amendment carveout in general, I

8   would argue that the overbreadth is an even more special beast,

9   if you will, that would allow the Court to facially enjoin the

10  statute.  Reason being that that's just the nature of

11  overbreadth.  It's a third-party standing doctrine.  It allows

12  someone to challenge the law even if it can constitutionally be

13  applied to that person.  And the overbreadth doctrine has its

14  detractors on the Supreme Court but they've applied it.  And so

15  the very nature of overbreadth is that it's universal relief.

16          THE COURT:  Ms. Liska.

17          MS. LISKA:  I think what we would say is that the

18  as-applied challenge is certainly more straightforward than the

19  facial.  And that is because I think that Moody makes clear,

20  and the cases that implement Moody, like the Ninth Circuit

21  NetChoice case the parties cite -- Moody makes clear that the

22  overbreadth standard is functionally the facial challenge

23  standard now, and that requires a consideration of the full

24  range of applications.

25      We may well -- you know, they do not meet their burden to

1   show that full range.  We certainly haven't contested strict

2   scrutiny as applied, but there may be applications that

3   wouldn't trigger strict scrutiny that involves types of speech

4   that are less protected, like fraud and defamation, which may

5   go to questions about the tailoring but certainly raise

6   questions about what the full range of applications would be.

7       And so I don't think that they've made their showing under

8   Moody that the applications that are unconstitutional

9   substantially outweigh the constitutional applications.

10          THE COURT:  I know that's your argument.  I will tell

11  you, I would disagree.  But I understand that's your argument.

12          MS. LISKA:  Yeah.  That would be our argument.  And

13  that if they haven't made that showing, they shouldn't prevail

14  on a facial claim.

15          THE COURT:  If I do find that it's both facially --

16  that the facial challenge and the as-applied challenge are

17  successful, do you have concerns about the scope of the

18  permanent injunction as you did with the other injunction?

19          MS. LISKA:  Our concerns in the context of

20  Section 230(c) were mostly because we haven't contested that X

21  and Rumble are interactive computer services, but there may be

22  other entities that would have been regulated that we would

23  have contested that.  So because of the nature of that

24  argument, that was more my concern.

25          THE COURT:  Okay.

1          MS. LISKA:  I understand the general practice would

2    be -- should this Court conclude the statute is

3    unconstitutional, my understanding is our office would

4    generally not enforce it throughout the state out of respect

5    for the Court's ruling, obviously following proper appellate

6    practice --

7          THE COURT:  Take it to the Ninth Circuit.

8          MS. LISKA:  Yeah.  All of -- all of that.

9      But, you know, I -- that's my understanding of what we

10   typically do.  Is just because it -- as they say, it's usually

11   the case that a finding that a statute is facially invalid

12   would lead a government actor not to enforce it any further.

13         THE COURT:  Is there a stay in this -- of this

14   statute right now similar to --

15         MS. LISKA:  No.  Because of the Court's preliminary

16   injunction, there has been no need for a stay.

17         THE COURT:  Okay.  I am going to take this one under

18   submission and actually issue a written order for this statute

19   rather than kill my court reporter with a lengthy decision

20   delivered orally.  So we'll get it out as soon as we can.

21     I will try to, if judgments go against you, enter the

22   judgments on the same day so the appellate clock starts running

23   on the same day.

24     Any other concerns or anything else you want to add to the

25   record at this point?

1              MS. LISKA:  If I may, Your Honor.  I would just ask

2     that in the -- in the course of your ruling on the First

3     Amendment, should you find strict scrutiny is not met, it would

4     be helpful if you could give a sense of guidance to the

5     legislature as to what it could have done differently here.

6         I mean, I -- I'm not trying to give you a massive -- but if

7     your concern was there is no specific carveout for

8     satire/parody, or if the concern is the font size, or if the

9     concern is the scope of the material regulated is too broad,

10    some indication, you know, might be helpful.  Or if it simply

11    is the State can't do any laws like this, that's fine as well.

12    But this is a bill that my understanding is the legislature is

13    very cognizant of the litigation over and is desirous of

14    potentially amending in ways that would reform constitutional

15    invalidities.

16             THE COURT:  I will make no promises.  I appreciate

17    your request.  I will make no promises.

18             MS. LISKA:  I understand.

19             THE COURT:  Initially my reaction to that is that's

20    what the court of appeals is for, not the district court.

21        And I'm very cognizant these days of how far I should or

22    shouldn't go in my orders.  So I'll -- I appreciate the request

23    but, honestly, it's unlikely that any type of order would

24    contain that type of discussion.

25        Go ahead --

1        MR. WIDMALM-DELPHONSE:  Thank you, Your Honor.

2        THE COURT:  -- Mr. Delphonse.

3        MR. WIDMALM-DELPHONSE:  I would make three or four

4   points really quickly.

5        One is that -- just to clarify that we are seeking a

6   facial, declaratory, and injunctive relief.

7        Your Honor, just as to the argument --

8        THE COURT:  You don't want me to sign your proposed

9   order as written?

10        MR. WIDMALM-DELPHONSE:  I -- I actually don't recall

11   what our proposed order said.  I'm sorry.

12        THE COURT:  You might want to take a look at it.

13        MR. WIDMALM-DELPHONSE:  Yes.

14        THE COURT:  You can submit another proposed order if

15   you'd like --

16        MR. WIDMALM-DELPHONSE:  Thank you, Your Honor.

17        THE COURT:  -- just for purposes of the docket --

18        MR. WIDMALM-DELPHONSE:  Sure.

19        THE COURT:  -- that you think reflects the latest

20   Supreme Court ruling.  But, again, I'm going to have a written

21   order.  If I want to incorporate it into the written order then

22   I'll consider it.

23        MR. WIDMALM-DELPHONSE:  Your Honor, the only other --

24   I would just note that as to the -- my friend on the other side

25   made arguments about, you know, can we basically have a

93

1    prophylactic law.  And I would just note that a lot of the less

2    restrictive alternatives we suggest, including specific

3    intent --

4              THE COURT:  Right.

5              MR. WIDMALM-DELPHONSE:  -- they don't limit the State

6    in terms of -- it doesn't require the State to show that the

7    harm has actually occurred.  So I just wanted to push back on

8    the -- that idea.

9         Your Honor, I would point to specific examples in the

10   record, like Exhibit 14 to Ms. Liska's declaration.  There is a

11   video -- there a deepfake video of President Biden invoking the

12   draft.  We would argue that that's protected speech.  And

13   that's just another example of speech that is protected that

14   California believes is covered by the statute.

15        So there is -- there is examples in the record that

16   California itself cites to that are protected speech and they

17   believe would be protected -- that they believe would be

18   covered by the law.

19             THE COURT:  Do you think the Harris video is covered

20   by the law?

21             MR. WIDMALM-DELPHONSE:  Yes.

22             THE COURT:  Okay.

23             MR. WIDMALM-DELPHONSE:  And --

24             THE COURT:  So you would have told your client don't

25   do it --

94

1          MR. WIDMALM-DELPHONSE:  Well --

2          THE COURT:  -- or he runs the risk of someone suing

3     him?

4          MR. WIDMALM-DELPHONSE:  Yes.  Well, there is

5     absolutely a risk that someone could file a lawsuit.  As you

6     know, anyone can do it.

7        And I -- I guess the last thing I would just note is I

8     think California has a hard time describing what the law does

9     without -- and they're avoiding the actual text that the law

10    uses.  My friend on the other side keeps repeating, you know,

11    there has to be a reasonable belief, has to be demonstrably

12    false, taken literally true, intentionally created to fool

13    someone, but the statute doesn't use any of those words.

14         THE COURT:  Yeah.  You point that out in your briefs.

15       I mean, it appears to be an attempt to take defamation and

16    fraud laws and create a statute that they're trying to defend

17    on -- on those principles.  And it's -- I mean, I'm not hiding

18    anything from all of you, the -- I think the statute just fails

19    miserably in terms of accomplishing what it would like to do.

20    And it's become, as these Plaintiffs have pointed out -- and

21    you're up against pretty good lawyers there -- it's become a

22    censorship law and there is no way that's going to survive.

23         MS. LISKA:  Can I just -- just to clarify for the

24    record.

25       We point to examples of deepfakes.  I don't believe that we

1    have ever stated that those examples are within the scope of

2    the law, things like the draft video.  I just want to be clear

3    on that.  That we -- we -- we intentionally point to examples

4    of things that aren't going to be within the law just to

5    illustrate the existence of deepfakes out there in the world.

6               THE COURT:  Okay.  I'm going to cut you off.

7         I appreciate the arguments.  I appreciate the briefs.  You

8    all are terrific lawyers.  Been very helpful to the Court.

9    It's one of the great pleasures of being a district court judge

10   when you get really good lawyers in your courtroom.  So I thank

11   you for that.  And we'll hopefully get an order out to you.

12        The proposed order on the other statute, if you could get

13   it to me hopefully within two weeks.  Talk to the State's

14   lawyer, Ms. Liska, and see if you can work something out so I

15   have something in front of me.  That would be helpful to me as

16   well.  We'll get an order out before the end of the month, I

17   can guarantee that.

18        And then hopefully -- if Mr. Kohls and the State don't work

19   out their issues, as I said, you're more than welcome to

20   raise -- raise it with me again simply by notifying the Court.

21   But I have deep trust in Ms. Liska that something will be

22   worked out.

23        Thank you.  You have a difficult job, but thank you for

24   your advocacy as well.

25               MS. LISKA:  Thank you, Your Honor.

96

1          THE COURT:  Thanks, everyone.

2      Have a great day.  Thanks for coming out.  Enjoy

3   Sacramento.  We have a major league baseball team now.

4              (Proceedings adjourned, 3:34 p.m.)

5                   ---oOo---

6   I certify that the foregoing is a correct transcript from the

7   record of proceedings in the above-entitled matter.

8

9                   /s/ Kimberly M. Bennett
                    KIMBERLY M. BENNETT
10                  CSR No. 8953, RPR, CRR, RMR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25