## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| X CORP., | Case No. 25-cv-1649 (LMP/DLM) |
| Plaintiff, | |
| v. | **ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS** |
| KEITH ELLISON, *in his official capacity as Attorney General of Minnesota*, | |
| Defendant. | |

Erick G. Kaardal, **Mohrman, Kaardal & Erickson, P.A., Minneapolis, MN**; Floyd Abrams, Joel Kurtzberg, and Jason David Rozbruch, **Cahill Gordon & Reindel LLP, New York, NY**, for Plaintiff.

Peter J. Farrell, Janine Kimble, Madeleine DeMeules, and Ian Taylor, Jr., **Minnesota Attorney General's Office, St. Paul, MN**, for Defendant.

Minnesota Statutes Section 609.771 prohibits, under certain circumstances, the dissemination of "deepfakes" with the intent to injure a political candidate or influence the result of an election. Plaintiff X Corp., which operates the social networking service X, alleges that the law, as applied to X Corp., is preempted by Section 230 of the Communications Decency Act of 1996 ("CDA").[1] ECF No. 1 ¶¶ 71–83. X Corp. therefore brings suit against Keith Ellison, in his official capacity as Attorney General of Minnesota ("Attorney General Ellison") and now moves for judgment on the pleadings on its

---

[1]    X Corp. also alleges that Section 609.771 violates the First Amendment, the free-speech guarantee of the Minnesota Constitution, and is void for vagueness under the Fourteenth Amendment. *See id.* ¶¶ 87–120. The Court previously stayed consideration of those claims pending the Eighth Circuit's decision in *Kohls v. Ellison*, No. 25-1300 (8th Cir.). ECF No. 29 at 4–5.

Section 230 claim.   ECF No. 33.   Because X Corp. has not plausibly demonstrated Article III standing to bring a pre-enforcement challenge to Section 609.771, X Corp.'s motion is denied, and its Section 230 claim is dismissed without prejudice.

## BACKGROUND

### *Legal Background*

As the Court has previously explained, false political speech is nothing new in our Nation.  *See Kohls v. Ellison*, No. 24-cv-3754 (LMP/DLM), 2025 WL 66765, at *1 (D. Minn. Jan. 10, 2025).  The newest frontier in false political speech is deepfakes, which are "highly realistic video, audio, and other digital content generated by artificial intelligence ("AI") that show a person doing or saying something they did not."   ECF No. 1 ¶ 6. Deepfakes have become particularly prominent in the political sphere; as just one example, the complaint in this case depicts an AI-generated image posted on X of President Donald Trump being arrested by a group of police officers.  *Id.* ¶¶ 7, 16.

Like several other jurisdictions, Minnesota sought to address the purported harmful effects of deepfakes in the political arena.  Accordingly, in 2023, the Minnesota Legislature passed, and the Governor signed into law, H.F. 1370, which was codified at Minn. Stat. § 609.771 (2023):

> Use of deep fake to influence an election; violation. A person who disseminates a deep fake or enters into a contract or other agreement to disseminate a deep fake is guilty of a crime and may be sentenced as provided in subdivision 3 if the person knows or reasonably should know that the item being disseminated is a deep fake and dissemination:
>
> (1) takes place within 90 days before an election;
>
> (2) is made without the consent of the depicted individual; and

> > (3) is made with the intent to injure a candidate or influence the result of an election.

Minnesota Statutes section 609.771, subd. 1(c) defines a "deep fake" as:

> [A]ny video recording, motion-picture film, sound recording, electronic image, or photograph, or any technological representation of speech or conduct substantially derivative thereof:

> > (1) that is so realistic that a reasonable person would believe it depicts speech or conduct of an individual who did not in fact engage in such speech or conduct; and

> > (2) the production of which was substantially dependent upon technical means, rather than the ability of another individual to physically or verbally impersonate such individual.

The parties recognize that the statute has both a "dissemination" provision and a "contract" provision. *See* ECF No. 38 at 2; ECF No. 41 at 27–28. Provided that the other requirements of the statute are met, the "dissemination" provision makes it illegal to "disseminate[]" a deepfake, and the "contract" provision makes it illegal to "enter[] into a contract or other agreement to disseminate a deep fake." Minn. Stat. § 609.771, subd. 2(a) (2023).

Both criminal and civil penalties attach for violating the statute. Individuals who violate the statute face up to 90 days in prison and a $1,000 fine, or up to five years in prison and a $10,000 fine if certain aggravating circumstances are present. *Id.*, subd. 3. As for civil remedies, the statute authorizes the Attorney General, county or city attorneys, the individual depicted in the deepfake, or the candidate injured by the deepfake to seek injunctive relief against the individual violating the statute. *Id.*, subd. 4.

3

In 2024, the Minnesota Legislature passed, and the Governor signed into law, H.F. 4772, which amended Section 609.771 in three ways. Laws of Minnesota 2024, ch. 112, art. 2, §§ 76–78.

*First*, the Legislature expanded the temporal scope of the statute: instead of prohibiting the dissemination of deepfakes just "90 days before an election," the statute now prohibits the dissemination of deepfakes "within 90 days before a political party nominating convention," or "after the start of the absentee voting period prior to a presidential nomination primary, or a regular or special state or local primary or general election." Minn. Stat. § 609.771, subd. 2(a)(3) (2024).

*Second*, the Legislature attached political penalties to the statute: if a candidate for state or local office is convicted of violating the statute, the candidate will be deemed to have "forfeited the[ir] nomination or office" and "is disqualified from being appointed to that office or any other office for which the legislature may establish qualifications under the Minnesota Constitution . . . ." *Id.*, subd. 3(b)–(c).

*Third*, the Legislature amended the mens rea requirement for the statute from "knows or reasonably should know" to "knows or acts with reckless disregard." *Id.*, subd. 2(a).

### *Factual and Procedural Background*

X Corp. runs the social media platform X. ECF No. 1 ¶ 23. X allows users "to create and share ideas and information instantly through various product features, including public posts." *Id.* X Corp. admits that users on X post content that could qualify as

deepfakes under Section 609.771. *See id.* ¶¶ 7–8, 16, 36. To address what it views as "problematic content," X Corp. implements various policies and features on X, including:

(1) "Community Notes," which allow "users to flag content that they believe needs context, which could include 'deep fakes'";

(2) the ability for any user to comment on another user's post, which provides "additional context or disagreement in the form of 'replies' to a post";

(3) the ability for any user to reply to another user's post "by making a separate post that quotes and comments on the posted content";

(4) Grok AI, which leverages X's AI chat bot "to provide detailed context and information about particular posts, which can help the user understand whether the content is truthful and/or is generated using artificial intelligence"; and

(5) an Authenticity Policy, "under which users 'may not share inauthentic media, including, manipulated, or out-of-context media that may result in widespread confusion on public issues, impact public safety, or cause harm." *Id.* ¶¶ 35–42.

X Corp. believes that Section 609.771, however, is a bridge too far. In its view, Section 609.771 "impermissibly substitutes the State's content-moderation policies in this important area for those of social media platforms and impermissibly imposes liability on them for noncompliance with the State's preferred content-moderation policies." *Id.* ¶ 35. In the present action, X Corp. alleges that Section 609.771, as applied to it and other social media companies, violates the First Amendment, the Fourteenth Amendment, and the free-speech guarantee of the Minnesota Constitution, and is preempted by Section 230. *See id.* ¶¶ 71–120. X Corp. now moves for judgment on the pleadings on its Section 230 claim.

5

ECF No. 33.  Attorney General Ellison opposes X Corp.'s motion, arguing that X Corp. lacks standing, that its claims are not ripe, and that Section 609.771 is not preempted by Section 230.  ECF No. 38.

<u>**ANALYSIS**</u>

The Court evaluates a Rule 12(c) motion for judgment on the pleadings under the same standards applicable to a Rule 12(b)(6) motion to dismiss.  *See Spagna v. Phi Kappa Psi, Inc.*, 30 F.4th 710, 715 (8th Cir. 2022).  At this stage of the proceedings, the Court must "accept as true all facts pleaded by the non-moving party and grant all reasonable inferences from the pleadings in favor of the non-moving party."  *Corwin v. City of Independence*, 829 F.3d 695, 699 (8th Cir. 2016) (citation omitted).  But the complaint nevertheless must "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (citation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  When deciding the motion, the Court may consider "the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record."  *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010).

## I.    X Corp. Lacks Article III Standing To Bring a Pre-Enforcement Challenge

Although X Corp. is eager to get to the merits, the Court must evaluate whether it has jurisdiction to consider those merits at all.  "Federal court jurisdiction is restricted to 'cases and controversies.'"  *Missouri v. Yellen*, 39 F.4th 1063, 1067 (8th Cir. 2022) (citation omitted).  "Standing to sue is a doctrine rooted in the traditional understanding of a case or

controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To meet the "irreducible constitutional minimum" required to establish standing, a plaintiff has the burden to show that it: (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Arc of Iowa v. Reynolds*, 94 F.4th 707, 710 (8th Cir. 2024) (quoting *Spokeo*, 578 U.S. at 338).

Attorney General Ellison only challenges X's standing under the injury-in-fact requirement. To show an injury-in-fact, X Corp. must allege an injury that is "concrete, particularized, and actual or imminent." *Id.* The injury-in-fact requirement ensures that a plaintiff has a "personal stake in the outcome of the controversy." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted). And it serves the salutary purpose of preventing federal courts from "adjudicat[ing] hypothetical or abstract disputes" or acting as "a roving commission to publicly opine on every legal question." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

There is no dispute that X Corp. has neither been threatened with nor subjected to penalties under Section 609.771. But standing may nevertheless exist with the "threatened enforcement of a law," and a plaintiff need not "expose [it]self to actual arrest or prosecution to be entitled to challenge a statute." *Driehaus*, 573 U.S. at 158 (citation omitted). Such standing exists for a pre-enforcement challenge when a plaintiff alleges that it has "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 1000 (8th Cir. 2022) (citation omitted). Although this formulation of standing implies that a plaintiff is

bringing a constitutional challenge, the pre-enforcement standing framework also applies to cases in which a plaintiff claims that a state statute is preempted by Section 230. *See, e.g.*, *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1028–29 (W.D. Tex. 2024); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 818–19 (M.D. Tenn. 2013); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1269–71 (W.D. Wash. 2012). Both parties accept that the pre-enforcement standing framework applies to X Corp.'s Section 230 claim. ECF No. 38 at 7–10; ECF No. 41 at 13–18.

Attorney General Ellison argues that X Corp. does not engage in conduct that is proscribed by Section 609.771. ECF No. 38 at 7–10. To rebut that argument, X Corp. must identify "intended future conduct" that is "arguably proscribed by the statute it wishes to challenge."[2] *L.H. v. Indep. Sch. Dist.*, 111 F.4th 886, 893 (8th Cir. 2024) (citation modified). To determine whether X Corp.'s conduct is "arguably proscribed" by Section 609.771, the Court must first determine what exactly is proscribed by Section 609.771. This requires the Court to interpret the scope of Section 609.771. *See Christian Action League of Minn. v. Freeman*, 31 F.4th 1068, 1072 (8th Cir. 2022). Put simply, if X Corp.'s

---

[2]    It is not entirely clear whether X Corp. must show that its intended conduct is "arguably proscribed" by Section 609.771, or whether its intended conduct is in fact proscribed by Section 609.771. Eighth Circuit case law has used different formulations of this standard. *Compare L.H. v. Indep. Sch. Dist.*, 111 F.4th 886, 893 (8th Cir. 2024) (using "arguably proscribed"), *with Christian Action League of Minn. v. Freeman*, 31 F.4th 1068, 1074 (8th Cir. 2022) (using "proscribed"); *see also Christian Action League of Minn.*, 31 F.4th at 1075 (Smith, J., dissenting) (recognizing the case law's split in its use of "proscribed" and "arguably proscribed"). Happily, the Court need not resolve that linguistic dispute because it makes no difference here: X Corp. lacks standing either way. The Court therefore applies the standard that is more generous to X Corp.: "arguably proscribed."

conduct as described in the pleadings is arguably proscribed by the statute, X Corp. has standing; if the statute does not prohibit X Corp.'s conduct, X Corp. lacks standing. *See id.* The parties offer slightly different arguments as to the "dissemination" and "contract" provisions of Section 609.771, so the Court considers those two provisions separately.

### A.    "Dissemination" Provision

The Court can happily begin with a point of agreement: both Attorney General Ellison and X Corp. accept that Section 609.771 is not a strict liability statute—that is, the statute prohibits the dissemination of deepfakes only upon a showing of intent.  ECF No. 38 at 9; ECF No. 41 at 15–16.  The statute incorporates two separate mens rea requirements, both of which must be proven to establish a violation of Section 609.771.  First, a "person"[3] must "disseminate[]" a deepfake "know[ing] or act[ing] with reckless disregard" about whether the item being disseminated is a deepfake.  Minn. Stat. § 609.771, subd. 2(a). Second, the dissemination of the deepfake must be "made with the intent to injure a candidate or influence the result of an election."  *Id.*, subd. 2(a)(2).

That is where the parties' positions (and agreement) diverge.  Attorney General Ellison asserts that X Corp.'s pleadings do not demonstrate that X Corp. itself ever acts with any particular mens rea when deepfakes are disseminated on X.  ECF No. 38 at 9.  X Corp. responds that a "single complaint through X's reporting process about any of the

---

3    Attorney General Ellison does not contest that X Corp. is a "person" under Section 609.771.

billions of posts on X each year, can be argued to put [X Corp.] on notice of a prohibited 'deepfake' under the statute."  ECF No. 41 at 15.

Theoretically, perhaps, but there is no actual allegation or evidence in the pleadings that X Corp. has ever been put on notice of a deepfake through its "reporting processes." Indeed, X Corp. admitted as much at oral argument.[4]  In its pleadings, X Corp. points to purported "reporting processes" for X users, but the exhibit it cites discusses the process for reporting copyright infringement to X Corp.'s copyright agent, ECF No. 1-7 at 5, which does not squarely relate to reporting deepfakes.  In fact, that exhibit undermines X Corp.'s argument that it has been put on notice of a specific deepfake on its site, as the exhibit explains that X Corp. "may not monitor or control the Content posted via [X]."  *Id.*  X Corp. also points to its Authenticity Policy, which states that X Corp. "may use [its] own technology or receive reports through partnerships with third parties in order to determine if media have been manipulated or presented out of context."  ECF No. 1-9 at 11.  But again, there is no showing in the pleadings that X Corp. has ever received a report of a deepfake through its own technology (whatever that is) or through its "partnerships with third parties" (whoever those are).[5]

---

[4]     Specifically, the Court asked: "So what specifically, though, in the record before me would you point to that puts X on knowledge?"  Counsel for X Corp. responded: "There is not something in the record where somebody has specifically alleged that X Corp. has knowledge."  ECF No. 45 at 10:23–11:10.

[5]     Although X Corp. does not reference it, there is an allegation in the complaint suggesting that X Corp. is aware of at least one purported deepfake circulating on X.  *See* ECF No. 1 ¶¶ 7–8 (describing a March 2023 deepfake posted on X).  But even assuming X Corp.'s knowledge of that deepfake means it disseminates that deepfake knowingly or

Given the dearth of evidence of X Corp. being put on notice of a deepfake posted on X through its reporting processes, and particularly because all reasonable inferences from the pleadings must be drawn in Attorney General Ellison's favor, *see Corwin*, 829 F.3d at 699, the Court cannot conclude as a matter of law that X Corp. has plausibly demonstrated that it disseminates deepfakes knowingly or with reckless disregard.

But perhaps the more glaring issue with X Corp.'s pleadings is that they offer no allegations or evidence that X Corp. disseminates deepfakes "with the intent to injure a candidate or influence the result of an election," Section 609.771's second mens rea requirement. Minn. Stat. § 609.771, subd. 2(a)(2). The statutory language of this second mens rea requirement classifies Section 609.771 as a specific-intent crime.[6] *See State v. Fleck*, 810 N.W.2d 303, 308 (Minn. 2012) ("The phrase 'with intent to' is commonly used by the Legislature to express a specific-intent requirement."). A specific-intent crime requires a mental state "above and beyond any mental state required with respect to the *actus reus* of the crime." *Id.* (citation omitted). The relevant characteristic of a specific-intent crime is "an intent to cause a particular result." *State v. Jama*, 923 N.W.2d 632, 634 (Minn. 2019) (citation omitted).

---

with reckless disregard (a huge inferential leap, to be sure), X Corp. still fails to show that it does so with the necessary intent to injure a candidate or influence the result of an election.

[6]    The Court applies Minnesota's rules of statutory interpretation when interpreting a Minnesota statute. *See In re Dittmaier*, 806 F.3d 987, 989 (8th Cir. 2015).

The pleadings do not demonstrate that X Corp. ever disseminates deepfakes with the specific intent to injure a candidate or influence the result of an election. Again, X Corp. admitted as much at oral argument.[7] In fact, the pleadings demonstrate the opposite: X Corp. alleges that "X allows users to create and share ideas and information *instantly*," ECF No. 1 ¶ 23 (emphasis added), which indicates that when a deepfake is disseminated, X Corp. is agnostic about a user's motivation for disseminating the deepfake. And at no point does X Corp. allege or put forward any evidence that it allows deepfakes to continue circulating on X to injure a particular candidate or to influence the result of an election. Indeed, X Corp. alleges that it largely plays an uninvolved, backseat role when it comes to addressing deepfakes, instead ceding content moderation to X users who can offer Community Notes, comments, and replies to clarify potentially deceptive AI-generated media. *Id.* ¶¶ 35–42. Although the pleadings vaguely suggest that X Corp. may, from time to time, involve itself in addressing deepfake posts, ECF No. 1-9 at 11, nothing in the pleadings suggests that X Corp.'s approach to addressing these posts reflects any specific intent to "cause [the] particular result" of injuring a candidate or influencing an election, *Jama*, 923 N.W.2d at 634; *see* ECF No. 1-9 at 11 (explaining that X Corp. may address inauthentic media "that may result in widespread confusion on public issues, impact public

---

[7]    Specifically, the Court asked: "So where do we have in the pleadings here that X Corp. has the intent by posting one of these deepfakes that's been disseminated to injure a candidate or to influence the result of an election?" Counsel for X Corp. responded: "I don't think that we have anything in the record where we say we have that intent in posting something." ECF No. 45 at 13:3–13:13.

safety, or cause serious harm," without reference to any criteria relevant to injuring a candidate or influencing the outcome of an election).

X Corp. hardly contests any of this; in fact, in its response to Attorney General Ellison's standing argument, X Corp. does not even reference the specific-intent requirement of Section 609.771.  *See* ECF No. 41 at 15–16.  However, X Corp. suggests in passing that it acts with "the intent to injure a candidate or influence the result of an election" whenever it is notified of a political deepfake on X.  *Id.* at 27.

How so?  X Corp. never quite explains how its mere awareness that a deepfake is posted on X transmutes the poster's intent into X Corp.'s own.  On the contrary, X's Terms of Service seem to convey the opposite position, as they affirmatively distance X Corp. from the views of X's users, and explain that X Corp. "do[es] not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications" posted on X and does not "endorse any alleged facts or opinions expressed" by X's users.  ECF No. 1-7 at 5.  In short, even if X Corp. is aware of a political deepfake disseminated on X, the Terms of Service make clear that X Corp. does not endorse the intent of the user who posted the deepfake.

An example from X Corp.'s complaint illustrates the weakness in its argument.  X Corp. alleges that it is aware of a March 2023 deepfake post on X which depicts President Trump being arrested by a group of police officers.  ECF No. 1 ¶¶ 7–8.  X Corp. even seems to be cognizant of the poster's intent: to criticize the criminal prosecution of President Trump.  *Id.* ¶ 7.  Nowhere, however, is there any hint of X Corp.'s *intent* in disseminating this deepfake.  Nowhere does X Corp. allege, for example, that it

disseminates this deepfake to injure (or support) President Trump or to influence the result of an election. And although X Corp. alleges that it could be subjected to criminal liability "for merely having these pictures displayed on its platform," *id.* ¶ 8, that allegation is plainly contradicted by the text of Section 609.771, specifically its two mens rea requirements. So long as X Corp. lacks the "intent to injure a candidate or influence the result of an election," it cannot be held liable under Section 609.771 for disseminating the March 2023 deepfake. Minn. Stat. § 609.771, subd. 2(a)(2). As X Corp. conceded at oral argument, its pleadings demonstrate no such intent. ECF No. 45 at 13:3–13:13.

X Corp. suggests that the Court can brush aside those mens rea requirements because "Section 230 will provide immunity in every instance covered by [X Corp.'s] Section 230 claim." ECF No. 41 at 19–20. X Corp. leans heavily on the Eighth Circuit's decision in *Johnson v. Arden*, 614 F.3d 785 (8th Cir. 2010), but that case involved whether Section 230 immunized an internet service provider from state tort claims that were actually brought against it in court, *see id.* at 790–92—not, as here, a pre-enforcement challenge to a state law. Having chosen to bring a pre-enforcement challenge to Section 609.771, X Corp. must demonstrate that it intends to engage in "future conduct" that is "arguably proscribed" by Section 609.771. *L.H.*, 111 F.4th at 893. That includes demonstrating that X Corp, at the very least, arguably possesses the requisite mens rea of the statute that X Corp. argues is preempted by Section 230. *See Zanders v. Swanson*, 573 F.3d 591, 594 (8th Cir. 2009); *see also Kearns v. Cuomo*, 981 F.3d 200, 211 (2d Cir. 2020) (holding that plaintiff lacked standing to bring a pre-enforcement challenge to a statute because the plaintiff never alleged that "he would possess the requisite *mens rea*" under

14

the statute); *Plunderbund Media L.L.C. v. DeWine*, 312 F. Supp. 3d 654, 661, 667 (N.D. Ohio 2018) (concluding that plaintiffs failed to show their intended speech was arguably proscribed by the challenged cyber-harassment statute because they did not report an intent to act with the mens rea required by the statute), *aff'd*, 753 F. App'x 362, 370 (6th Cir. 2018) (affirming that plaintiffs lacked standing to bring a pre-enforcement challenge to a cyber-harassment statute because the statute required a "specific mental state," which the plaintiffs failed to allege they would satisfy). Although it may be true that Section 230 grants "broad" immunity to counter the "obvious chilling effect" that the "specter of tort liability" poses to interactive computer service providers like X Corp., *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) (citation omitted), X Corp. has the burden at this stage to demonstrate a "credible threat" that it would be subject to such liability, *Sch. of the Ozarks*, 41 F.4th at 1000. By failing to allege or demonstrate through its pleadings that it disseminates deepfakes "with the intent to injure a candidate or influence the result of an election," X Corp. has alleged no such credible threat.[8] Minn. Stat. § 609.771, subd. 2(a)(2).

---

[8] X Corp. points to *Kohls v. Bonta*, in which the U.S. District Court for the Eastern District of California granted summary judgment to X Corp. on its claim that a deepfake law similar to Minnesota's was preempted by Section 230. *See* ECF No. 42-1. X Corp.'s standing, however, was never challenged in that lawsuit. *See generally* ECF No. 42-2. *Bonta* is also distinguishable because the California law at issue in that case did not include a requirement that a deepfake be disseminated with the "intent to injure a candidate" or "influence the result of an election." *See* Cal. Elec. Code § 20012. Under the California law, all that was required for prosecution was that the content disseminated was "reasonably likely to harm the reputation or electoral prospects of a candidate"—an objective standard, not a mens rea standard of specific intent. *See id.* § 20012(b)(1)(A).

It is possible that discovery would have uncovered that X Corp.'s manner of disseminating or otherwise responding to deepfakes on X reflects an intent by X Corp. to injure a candidate or influence the result of an election; after all, intent may be drawn inferentially "from the totality of circumstances." *State v. Colgrove*, 996 N.W.2d 145, 152 (Minn. 2023) (citation omitted). But at this juncture, it is X Corp.'s "strict" burden to "clearly establish[] that no material issue of fact remains to be resolved" such that judgment as a matter of law is warranted. *See Nat'l Car Rental Sys., Inc. v. Comput. Assocs. Int'l, Inc.*, 991 F.2d 426, 428 (8th Cir. 1993) (citation omitted). Given that there are *no facts* in the pleadings even arguably suggesting that X Corp. possesses the requisite specific intent of Section 609.771, X Corp. has therefore failed to identify "intended future conduct" that is "arguably proscribed" by Section 609.771, which deprives X Corp. of Article III standing to bring this pre-enforcement challenge. *L.H.*, 111 F.4th at 893.

## B.    "Contract" Provision

Most of X Corp.'s briefing focused on the "dissemination" provision of Section 609.771, not the "contract" provision. But at oral argument, X Corp. all but abandoned its reliance on the "dissemination" provision of Section 609.771 and instead argued that it need not demonstrate its own intent in disseminating a deepfake under the "contract" provision of Section 609.771. Recall that the "contract" provision prohibits a person to "enter[] into a contract or other agreement to disseminate a deep fake" with knowledge or reckless disregard that the image is a deepfake and when the "dissemination" is made "with the intent to injure a candidate or influence the result of an election." Minn. Stat. § 609.771,

16

subd. 2(a)(2). According to X Corp., the intent requirement under the "contract" provision relates to the original poster's intent, not X Corp.'s own intent.

As an initial matter, that argument is forfeited because it was raised for the first time at oral argument. *See Anderson v. Rugged Races LLC*, 496 F. Supp. 3d 1270, 1285 n.11 (D. Minn. 2020). But even assuming the Court agreed with X Corp.'s interpretation of the intent requirement under the "contract" provision (a point the Court does not decide), X Corp. would still lack standing because X Corp. has failed to plausibly allege that it engages in conduct arguably proscribed by the "contract" provision.

The parties spend little time dissecting the language of the "contract" provision, but interpreting the scope of that provision is critical to understanding whether X Corp. has alleged conduct that falls within the "contract" provision's scope. *See Christian Action League of Minn.*, 31 F.4th at 1072. The "contract" provision prohibits "enter[ing] into a contract or other agreement to disseminate a deep fake." Minn. Stat. § 609.771, subd. 2. The plain language of this provision indicates that the qualifying phrase "to disseminate a deep fake" applies to both "contract" and "other agreement." That is because the "contract" provision contains a classic example of the series-qualifier rule, which provides that "when there is a straightforward, parallel construction that involves all nouns or verbs in a series, a qualifier normally applies to the entire series." *State v. Khalil*, 956 N.W.2d 627, 634 (Minn. 2021) (citation modified). "Parallel construction means that words or phrases are arranged so that every element of the parallel series is a functional match of the others and serves the same grammatical function in the sentence." *State v. Pakhnyuk*, 906 N.W.2d 571, 577 (Minn. Ct. App. 2018) (citation modified), *aff'd*, 926 N.W.2d 914 (Minn. 2019).

Here, every element of the series—"contract" and "other agreement"—are both singular nouns, modified by a sole qualifier, which indicates that the two elements of the parallel series are "functional match[es]" of each other and serve "the same grammatical function in the sentence." *Id.*; *see In re Estate of Pawlik*, 845 N.W.2d 249, 252 (Minn. Ct. App. 2014) (applying series-qualifier rule when a single modifier applied to a parallel series comprised of only nouns). Because the qualifier "to disseminate a deep fake" is applicable as much to "contract" as to "other agreement," "the natural construction of the language demands that the [qualifier] be read as applicable to all." *Pawlik*, 845 N.W.2d at 252 (quoting *Porto Rico Ry., Light & Power Co. v. Mor*, 253 U.S. 345, 348 (1920)).

Moreover, the qualifier "to disseminate a deep fake" is an adverbial infinitive phrase, which "usually qualif[ies] the meaning of the verb, telling when, where, how, why, under what conditions, or to what degree an action occurred." *State v. Townsend*, 941 N.W.2d 108, 111 (Minn. 2020) (citation omitted). Here, the qualifier "to disseminate a deep fake" modifies the verb "enters," and "describes the purpose" for which a person enters into a contract or other agreement under Section 609.771. *Id.* Properly construed, then, the contract provision prohibits two types of conduct: (1) entering into a contract for the purpose of disseminating a deepfake, and (2) entering into some other type of agreement for the purpose of disseminating a deepfake.

With this interpretation of the contract provision in mind, consider now X Corp.'s argument: "by requiring users to agree to its Terms of Service before they may use the platform, after which the user could engage in conduct prohibited by the statute," X Corp. "'enters into a contract or other agreement to disseminate a deep fake.'" ECF No. 41

at 29–30 (quoting ECF No. 1 ¶ 34).  No doubt this plausibly alleges that X Corp. enters into a contract with X's users.  But nowhere does X Corp. allege or show that it enters into the Terms of Service with X's users *for the purpose of* disseminating deepfakes.  Nothing in the Terms of Service reflects any purpose—either on the part of X Corp. or X's users— to disseminate deepfakes.  *See* ECF No. 1-7.  In fact, the Terms of Service require X users to follow X Corp.'s rules and policies, *id.* at 6, which includes a requirement *not* to post certain deepfakes, ECF No. 1-9 at 11 (prohibiting X users from posting "synthetic and manipulated media" that "may result in widespread confusion on public issues, impact public safety, or cause serious harm").  And, as discussed above, the Terms of Service distance X Corp. from the actions of its users, providing that "[a]ll Content is the sole responsibility of the person who originated such Content," and that X Corp. does not "endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications posted."  ECF No. 1-7 at 5.  It is wholly unclear how X Corp.'s agreement to the Terms of Service—which distance X Corp. from its users' actions and discourage the dissemination of certain deepfakes—demonstrates X Corp.'s purpose to disseminate deepfakes in concert with its users.  Simply because X's users may later post deepfakes after agreeing to the Terms of Service (but perhaps in violation of the Terms of Service) does not mean that X Corp. has entered into the Terms of Service (or another agreement) *in order to* disseminate deepfakes.

Attorney General Ellison offers a helpful analogy.  *See* ECF No. 38 at 24.  Consider a tenant who enters into an agreement with a landlord to rent an apartment.  After entering into the rental agreement, the tenant begins using drugs in the apartment.  No one would

suggest that the landlord entered into the rental agreement with the tenant *for the purpose of* allowing the tenant to use drugs in the apartment. Yet, X Corp.'s logic would suggest otherwise: by merely agreeing to allow the tenant to occupy the apartment, X Corp. would say that the landlord has entered into an agreement with the tenant for the purpose of allowing the tenant's unlawful conduct. Not only does that argument run counter to the plain language of Section 609.771, but it would also tend to eviscerate the fundamental requirement that parties must reach "a meeting of minds on the essential terms" of an agreement. *See Ryan v. Ryan*, 193 N.W.2d 295, 297 (Minn. 1971). Accordingly, because X Corp. has not demonstrated that it engages in conduct "arguably proscribed" by the "contract" provision of Section 609.771, it lacks standing to challenge that portion of the statute. *L.H.*, 111 F.4th at 893. And because the Court has concluded that X Corp. also lacks standing to challenge the "dissemination" provision of Section 609.771, X Corp. lacks standing to bring its Section 230 claim.

## II. Dismissal of the Section 230 Claim is Appropriate

"[I]f a plaintiff lacks standing, the district court has no subject matter jurisdiction." *Young Am. Corp. v. Affiliated Comput. Servs. (ACS), Inc.*, 424 F.3d 840, 843 (8th Cir. 2005) (alteration in original) (citation omitted). And Federal Rule of Civil Procedure 12(h)(3) provides that if "the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." The parties agreed at oral argument that if the Court determines that X Corp. lacks standing to bring its Section 230 claim, then Rule 12(h)(3) would require the Court to dismiss the Section 230 claim. Having found that X Corp. lacks standing to bring its Section 230 claim in this pre-enforcement posture, the

Court dismisses that claim without prejudice. *See County of Mille Lacs v. Benjamin*, 361 F.3d 460, 464 (8th Cir. 2004) ("A district court is generally barred from dismissing a case with prejudice if it concludes subject matter jurisdiction is absent.").

## <u>CONCLUSION</u>

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    X Corp.'s Motion for Judgment on the Pleadings (ECF No. 33) is **DENIED**;

2.    Count II of the complaint is **DISMISSED WITHOUT PREJUDICE**; and

3.    Pursuant to the Court's July 3, 2025 Order (ECF No. 29), this case is **STAYED** pending further order of the Court.

Dated: December 2, 2025                    *s/Laura M. Provinzino*
                                           Laura M. Provinzino
                                           United States District Judge