**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| X CORP.,<br><br>Plaintiff,<br><br>-against-<br><br>KEITH ELLISON, in his official capacity, as Attorney General of Minnesota,<br><br>Defendant. | **Case No. 25-cv-1649 (LMP/DLM)**<br><br>**JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

Plaintiff X Corp., by and through its attorneys, Cahill Gordon & Reindel LLP and Mohrman, Kaardal & Erickson, P.A., alleges for its complaint against the above-named Defendant, as follows:

## NATURE OF THE ACTION

1. Plaintiff X Corp. brings this action challenging the constitutionality and legal validity of Minnesota Statutes § 609.771 ("Section 609.771"), which prohibits—under threat of injunctive or equitable relief and criminal penalties, including imprisonment and significant fines—"person[s]," which includes social media companies, such as X Corp.,[1]

[1] Section 609.771 does not define "person," and under Minnesota law "'Person' may extend and be applied to bodies politic and corporate, and to partnerships and other unincorporated associations." Minn. Stat. § 645.44(7); *see* § 645.44(1) (this definition applies to "Minnesota Statutes or any legislative act," including the word "person" "unless another intention clearly appears"); *Webb* v. *State*, 2021 WL 161959, at *3 (Minn. Ct. App. Jan. 19, 2021) ("[Section 645.44(7)'s definition of person] applies to all Minnesota statutes, including criminal statutes, unless otherwise provided."). Defendant does not contest that X Corp. is a "person" under Section 609.771. ECF No. 47 at 9 n.3.

from (i) disseminating or (ii) entering into a contract to disseminate certain election-related content of which the State of Minnesota disapproves and deems to be a "deep fake." Section 609.771 authorizes lawsuits against such persons who are "in the course of violating" the statute ***or*** who are "reasonably believed to be about to violate" the statute. § 609.771(4).

2. The statute (a) violates the free speech rights of X and other social media platforms under the First and Fourteenth Amendments of the United States Constitution, both facially and as-applied to Plaintiff; (b) is preempted by the immunity afforded to X Corp. by 47 U.S.C. § 230(c)(1); and (c) violates the First and Fourteenth Amendments of the United States Constitution, because its requirements are so vague and unintelligible that social media platforms cannot understand what the statute permits and what it prohibits, which will lead to blanket censorship, including of fully protected, core political speech.

3. Section 609.771 has the effect of impermissibly replacing the judgments of social media platforms about what content may appear on their platforms with the judgments of the State. And it imposes liability on the platforms to the extent that their judgments about content moderation are inconsistent with those imposed by the State.

4. X's policies include a core commitment to the rights of X's users to engage in freedom of expression. As X's Platform Use Guidelines make clear: "Defending and respecting the user's voice is one of our core values at X. This value is a two-part

commitment to freedom of expression and privacy. . . . [that is] grounded in the United States Bill of Rights. . . ."[2]

5. In practice, there are countless examples of content on X, such as those set forth below, that would arguably violate Section 609.771 but would not violate X's policies. In those instances, X takes action only where it determines that the content violates X's policies. Reasonable people may disagree about those determinations. The United States Constitution demands that those difficult decisions be made by X, not the State of Minnesota.

6. Worse yet, Section 609.771 creates an enforcement system, backed with the threat of ***criminal liability***, that incentivizes platforms to err on the side of removing any content that presents even a close call as to whether it is a "deep fake" prohibited by the statute. Under this enforcement system, platforms that keep up content presenting a close call under the statute run the risk of criminal penalties, but there is no penalty for erring on the side of too much censorship. This system will inevitably result in the censorship of wide swaths of valuable political speech and commentary and will limit the type of "uninhibited, robust, and wide-open" "debate on public issues" that core First Amendment protections are designed to ensure. *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 270 (1964).

[2] Ex. 1 (*Defending and respecting the rights of people using our service*, X, https://help.x.com/en/rules-and-policies/defending-and-respecting-our-users-voice (last visited Aug. 26, 2026)).

7. All that is necessary to violate Section 609.771—and risk the imposition of jail time—is for a social media company, like X Corp., to "disseminate[] a deep fake" or to "enter[] into a contract or other agreement to disseminate a deep fake" when the company "knows or acts with reckless disregard about whether" the item is a deep fake, as long as the item is disseminated (i) within 90 days before a political party nominating convention or after the start of the absentee voting period prior to a presidential nomination primary, or a regular or special state or local primary or general election, (ii) without the consent of the individual depicted, and (iii) with the intent to injure a candidate or influence the result of an election. *See* § 609.771(2). X Corp. provides the X platform with full knowledge that its users will attempt to, and ultimately will, influence the result of an election (as, of course, is the user's constitutional right).

8. A "Deep fake," according to Section 609.771, is "any video recording, motion-picture film, sound recording, electronic image, or photograph, or technological representation of speech or conduct substantially derivative thereof: (1) that is so realistic that a reasonable person would believe it depicts speech or conduct of an individual who did not in fact engage in such speech or conduct; and (2) the production of which was substantially dependent upon technical means, rather than the ability of another individual to physically or verbally impersonate such individual." § 609.771(1)(c). According to Defendant Ellison, deep fakes are "highly realistic video, audio, and other digital content

generated by artificial intelligence (AI) that show a person doing or saying something they did not."[3]

9. X believes that freedom of expression is especially important in the context of speech about politics, elections, and political candidates. In that context, X's users post videos and images, including videos and images that are arguably deep fakes under Section 609.771, and almost always make those posts with the intent of influencing the outcome of elections. Given X's commitment to free speech, X's policy is to allow its users to engage in such speech as long as it does not violate X's policies.

10. X's judgments about whether videos and images are misleading or violate its rules and policies, however, often raise controversy. As in the instances described below, some X users may believe that a video or image is misleading and should be taken down as violative of X's rules, but X may disagree.

11. Many users of the X platform post images or videos that arguably constitute deep fakes under Section 609.771, and do so with the intent required by Section 609.771. Here is an example of such an instance. In March 2023, an X user named Eliot Higgins (@EliotHiggins) used artificial intelligence to imagine what the arrest of Donald Trump could look like as a way of providing political commentary reminding the public that the

[3] Ex. 2 (Defendant Attorney General Keith Ellison's Memorandum Opposing Preliminary Injunction at 4, *Kohls* v. *Ellison*, No. 24-cv-03754 (LMP/DLM) (D. Minn. Nov. 1, 2024), ECF No. 19 ("Ellison PI Opp.")).

then-criminal prosecutions of now-President Trump constituted acts of "violence of the state" perpetrated on the current president:[4]




12. X evaluated whether, in light of its policies—including X's "Authenticity" Policy, which covers "Synthetic and Manipulated Media"[5]—the image posted by @EliotHiggins should be removed or labeled. Following its review, X decided *not* to remove or label the video because, in X's judgment, the image did not violate X's policies, even though the image arguably violated Section 609.771.[6]

---

[4] Ex. 3 (eliothiggins.bsky.social (@EliotHiggins), X (Mar. 20, 2023, 5:22 PM), https://x.com/EliotHiggins/status/1637927681734987777 (last visited Aug. 26, 2026)).

[5] Ex. 4 (*Authenticity*, X (Apr. 2025), https://help.x.com/en/rules-and-policies/authenticity (last visited Aug. 26, 2026)).

[6] *See* Ex. 5 (MNHouseInfo, *House Floor Session 3/30/23 – Part 2* (at 1:21:10), YOUTUBE (Mar. 30, 2023), https://www.youtube.com/watch?v=OyAZkqMGgMQ&t=4870s (last visited Aug. 26, 2026)) (Bill Sponsor, Minnesota Representative Zack Stephenson, advocating for the law to cover the images posted by Higgins). All exhibit transcripts, which were downloaded directly from the websites, are auto-generated and uncertified.

13. Here is another example. On July 26, 2024, Christopher Kohls, a content creator who goes by the name Mr Reagan, posted a video titled *Kamala Harris Campaign Ad PARODY*.[7] The video depicts an AI-generated campaign advertisement for Kamala Harris, narrated by a voice that sounds like Kamala Harris, making statements such as "Joe [Biden] taught me rule number one: carefully hide your total incompetence," and "I was selected because I am the ultimate diversity hire." Kohls also uploaded the video to YouTube. There, the video acknowledges that "Sound or visuals were significantly edited or digitally generated."[8]

14. Several users on X reposted Mr. Kohls's video without the statement in the original post that the video was a "Kamala Harris Campaign Ad PARODY." For example, on July 27, 2024, Mary Franson, a Minnesota State Representative,[9] reposted the video without any disclaimer that the video was a parody or that the sounds or visuals were significantly edited or digitally generated:[10]

---

The transcripts and audios were reviewed to confirm the accuracy of the portions quoted herein.

[7] *See* Ex. 6 (Mr Reagan [American flag emoji] (@MrReaganUSA), X (July 26, 2024, 9:23 AM), https://x.com/MrReaganUSA/status/1816826660089733492 (last visited Aug. 26, 2026)).

[8] *See* Ex. 7 (Mr Reagan, *Kamala Harris Ad PARODY*, YOUTUBE (July 26, 2024), https://www.youtube.com/watch?v=sVspeqNnoWM (last visited Aug. 26, 2026); *Kohls* v. *Ellison*, 2025 WL 66765, at *3 (D. Minn. Jan. 10, 2025).

[9] Franson plans to run for reelection as a Minnesota State Representative in 2026 and 2028.

[10] *See* Ex. 8 (Plaintiffs Christopher Kohls & Mary Franson's Verified Complaint ¶ 5, *Kohls* v. *Ellison*, No. 24-cv-03754 (LMP/DLM) (D. Minn. Sept. 27, 2024), ECF No. 1); *Kohls*, 2025 WL 66765, at *5; *see also id.* ("[R]easonable people—like United States Senator Amy Klobuchar, California Governor Gavin Newson, and the leader of Public Citizen—considered Musk's dissemination of the July 26 Video (which is effectively what




15. X received complaints from several users about the posting and reposting of Mr. Kohls's Kamala Harris video. For example, on July 29, 2024, Robert Weissman, the Co-President of Public Citizen, a consumer advocacy organization, sent a letter to X—titled "Take Down Harris Deepfakes Now"—"urg[ing]" X to "take down or robustly label" the Harris Ad Parody video.[11] The letter claimed that the video "clearly violates X policies on posting of synthetic media," including because the video was "likely to cause widespread confusion and deceive many viewers into believing that Harris actually stated the things the AI-generated voice says." The letter suggested that, "[a]t minimum," the "video should be labeled, its visibility should be reduced and likes and reposts should be turned off." The letter further emphasized that this confusion was "consequential" and that the "stakes are high in this case" because the "AI-generated voice statements ratify themes

Representative Franson shared) to be realistic."). Unless otherwise indicated, emphases in quotes are added and internal citations and quotations are omitted.

[11] Ex. 9 (Robert Weissman, Public Citizen, *Letter to Elon Musk and X: Take Down Harris Deepfakes Now* (July 29, 2024), https://www.citizen.org/article/letter-to-elon-musk/).

that Harris opponents are trying to connect to her candidacy." As such, the letter demanded that, "given its potential effect on a presidential election and the broad circulation of the media," X "should take down all posts of the video immediately."

16. X evaluated whether, in light of its policies—including X's "Authenticity" Policy, which covers "Synthetic and Manipulated Media"—the Harris Ad Parody video should be removed or labeled. Following its review, X decided *not* to remove or label the video because, in X's judgment, the video did not violate X's policies, even though the video arguably violated Section 609.771.

17. Here is another example of a post on X that arguably includes a deep fake under Section 609.771. On July 30, 2025, the X user il Donaldo Trumpo (@PapiTrumpo) posted a video on X that, using AI, depicted Senator Amy Klobuchar making outlandish statements about an American Eagle advertisement involving the actress Sydney Sweeney.[12] The @PapiTrumpo account is labeled as a "Parody account" by the account user. In the video, which was posted with a "parody account" label, a voice resembling Senator Klobuchar's stated that "we want representation . . . if Republicans are going to have beautiful girls . . . in their ads, then we want ads for Democrats too . . . we want ugly [women] wearing pink wigs . . . and fake nails being loud and twerking on top of a cop car at a waffle house . . . just because we're the party of ugly people doesn't mean we can't be featured in ads."

[12] *See* Ex. 10 (il Donaldo Trumpo (@PapiTrumpo), X (July 30, 2025, 9:29 PM), https://x.com/papitrumpo/status/1950730533039698025?s=42 (last visited Aug. 26, 2026)).

18. On July 31, 2025, the X user andy (@reapingandy) reposted the video without any disclaimer stating that the video was a parody or that the sounds or visuals in the video were significantly edited or digitally generated. The users' caption on the video read: "BREAKING!!!: Senator Amy Klobuchar of Minnesota weights [sic] in on Sydney Sweeney's new American Eagle ad."[13]




19. Some people, including Senator Klobuchar, complained to X about the video and even demanded that X take it down. For example, on August 1, 2025, Jacquelyn Lopez of Elias Law Group, as counsel to Senator Klobuchar, sent a letter to X "demand[ing]" that the video be "remove[d]" on the "grounds that it violates X's Terms of Service," and specifically X's "Authenticity" Policy.[14] The letter stated that a "a viewer may reasonably

---

[13] *See* Ex. 11 (andy (@reapingandy), X (July 31, 2025, 2:22 PM), https://x.com/reapingandy/status/1950985354154070289 (last visited Aug. 26, 2026)).

[14] *See* Ex. 12 (Letter from Jacquelyn Lopez (Elias Law Group), as counsel to Senator Amy Klobuchar, to X (Aug. 1, 2025)).

believe that [the video] is genuine; in fact, many of the replies to the post show individuals who believe the video depicts Senator Klobuchar's actual statements." In addition, the letter stated that, "[e]ven more concerningly, the deep fake video is increasing the number of threats made against the Senator on your platform." The letter further emphasized that: the "deep fake video is a manipulated, inauthentic account of an official proceeding in the United States Senate – an issue of deep public concern"; the "comments under the video make clear it is generating confusion and deceiving people into believing Senator Klobuchar made the statements depicted"; the "deep fake video unquestionably harms Senator Klobuchar– it falsely depicts her as making deeply offensive statements about women"; the "deep fake video has also resulted in increased threats against the Senator"; and the "damage to Senator Klobuchar is already great (with 1 million views on just one of the posted accounts alone) and it is only growing as this video remains on the site."

20. The letter also stated, "The deep fake video clearly violates X's Terms of Service and must be immediately removed. We demand that you remove this false depiction of Senator Klobuchar from your website or at the very least mark it as altered content. If you fail to do so, our client will be forced to consider all legal options. In the meantime, X Corp. is placed on notice to preserve all electronically stored information and documents of any kind or nature related to the deep fake video, the posting thereof, and any related information."

21. Under Section 609.771(4), Senator Klobuchar is permitted to bring a cause of action for equitable or injunctive relief if she believes that the video violates Section

609.771. While Senator Klobuchar has not sued X under Section 609.771, her threat to "consider all legal options" against X remains outstanding.

22. On August 20, 21, and 22, 2025, several X users reported the repost of the Klobuchar video by the X user andy (@reapingandy). That post did not include any parody or other disclaimer. Those users that reported the video claimed that the repost violated X's policies and rules and should be taken down or labeled as a deep fake. Given those reports, as well as Ms. Lopez's letter, X evaluated whether, in light of its policies—including its "Authenticity" Policy, which was cited in Ms. Lopez's letter—the Klobuchar video should be removed or labeled. Following its review, X decided to label the video with the following text: "Stay Informed Manipulated media Find out more," with the words "Find out more" hyperlinked to X's Authenticity Policy, as follows:




23. Here is another example of a post on X that arguably includes a deep fake under Section 609.771. In June 2026, North Star Dawn, a Political Action Committee, ran

a television advertisement that—using AI—depicted a person who looks like Minnesota Lieutenant Governor Peggy Flanagan standing in front of a pile of cash and stretching out her hand to receive money. News reports suggested that the advertisement might violate Section 609.771. *See* Ex. 13 (Ashley Grams, *Minnesota U.S. Senate candidate Lt. Gov. Peggy Flanagan slams ad for using "AI deepfake"*, CBS NEWS (June 4, 2026), https://www.cbsnews.com/minnesota/news/peggy-flanagan-slams-ad-for-using-ai-deepfake/); Ex. 14 (Briana Bierschbach, *Minnesota drew a line on election deepfakes. Did this ad cross it?*, MINN. STAR TRIBUNE (June 8, 2026), https://www.startribune.com/minnesota-drew-a-line-on-election-deepfakes-did-this-ad-cross-it/601854535).

24. On June 4, 2026, the X user Minnesota McMurphy[dog emoji; paw emoji; bone emoji] (@DogDad_MN) posted a screenshot of the advertisement, writing, "Is this what you're bitching about, it looks real to me? Lt. Gov. and US Senate candidate Peggy Flanagan criticizing attack ad which claims includes an AI deepfake." *See* Ex. 15 (Minnesota McMurphy[dog emoji; paw emoji; bone emoji] (@DogDad_MN), X (June 4, 2026, 12:12 PM), https://x.com/DogDad_MN/status/2062568253596049763 (last visited Aug. 26, 2026)).




25. Given the news reports suggesting that the advertisement might arguably violate Section 609.771, X evaluated whether, in light of its policies, the post and screenshot of @DogDad_MN should be removed or labeled. Following its review, X concluded that the post and screenshot did not violate X's policies and decided *not* to remove or label the post and screenshot, even though the post and screenshot arguably violated Section 609.771.

26. All of the X posts discussed above are at least "arguably" deep fakes under Section 609.771—although, as illustrated above, just as reasonable minds may disagree about what posts violate X's policies, reasonable minds may also disagree about what posts violate Section 609.771. The posts listed here are merely illustrative examples of the many kinds of "close calls" X has had to make, and will continue to have to make, under Section 609.771's censorship regime, which seeks to supplant X's protected editorial discretion with the State's judgments about the kinds of content that should reside on X and other social media platforms. Without Section 609.771, X could apply its own judgment about

whether a video or image should be taken down or labeled and the only question would be whether the video or image violates X's rules and policies. With Section 609.771, however, in deciding whether or not a video or image should be taken down or labeled, X is forced to consider the State's views about permissible content (as set forth in Section 609.771) in addition to considering its own rules and policies, and those decisions need to be made in the shadow of criminal and civil actions and/or liability.

27. The threat of enforcement of Section 609.771 against social media platforms like X is real—either under a theory of direct liability or under a theory of aiding and abetting a violation of Section 609.771 by one of X's users. *See* Minn. Stat. § 609.05(1) (providing for aiding and abetting liability).

28. As the examples above illustrate, there are many videos or images that are posted on X that arguably constitute deep fakes under Section 609.771. And there are many videos or images that present close calls under Section 609.771—i.e., some people will maintain that they violate Section 609.771, while others will disagree.

29. For some of these close calls, e.g., the Amy Klobuchar deep fake video discussed above, X may determine that the video violates X's policies and require it to be labeled or removed. But for other close calls, e.g., the Kamala Harris parody video discussed above, X may determine that the video does *not* violate X's policies, even though reasonable minds could disagree. Reasonable minds could also disagree as to whether such videos or images constitute "deep fakes" under Section 609.771.

30. In connection with these close calls, X's users post the videos or images to engage in core, protected political speech. In almost all such cases, the users post the

material with the intent to influence the outcome of an election and X knows that the users are posting the material to try to influence the outcome of an election. That, of course, is the main reason that people engage in political speech in the first place.

31. Given X's commitment to free speech, if X determines that a video or image does not violate X's policies and rules, X will protect its users' right to free speech by allowing the post to be disseminated, even if the post arguably violates Section 609.771. Given that such posts involve speech about elections, X knows that its users make the posts with the intent to influence the outcome of an election. And X knows that, in many instances, its users will succeed in doing so.

32. In cases involving close calls—for example, the images and videos cited above that arguably violate Section 609.771 but that X determined do not violate X's rules and policies—X will permit the posts to be disseminated on the X platform and does so with the intent of allowing its users to engage in protected political speech for the purpose of influencing the outcome of an election. X does so knowing that its users make these posts with the intent to influence the outcome of an election and X does so with the intent of allowing its users to effect that influence. In such circumstances, X is arguably a "person" that "disseminates a deep fake" with the requisite mens rea to trigger either a direct violation of Section 609.771 or aiding and abetting such a violation.

33. Thus, a social media company, like X Corp., could be accused of violating Section 609.771 or of aiding and abetting a violation of Section 609.771—and potentially be subjected to criminal liability—for merely disseminating this type of content on its platform within the time periods set forth under Section 609.771(2)(a)(3)(i)–(ii), as doing

so results in the "dissemination" of a deep fake that satisfies the three requirements of Section 609.771(2) (set forth above in Paragraph 7), as long as the company "knows or acts with reckless disregard" about whether the material in question was a "deep fake" under the statute.

34. Section 609.771 cannot withstand constitutional scrutiny because it forces platforms like X to adopt the State's judgment as to permissible content on their platform, rather than apply the platform's own judgment.

35. As the United States Supreme Court has observed, our strong First Amendment protections for such speech are based on our nation's "profound national commitment" to protecting "uninhibited, robust, and wide-open" "debate on public issues," even if it often "include[s] vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Sullivan*, 376 U.S. at 270. As such, the First Amendment provides the strongest of protections for such speech, and will not tolerate even indirect efforts by the government to incentivize others to censor or restrict such speech. *See, e.g.*, *Smith* v. *Cal.*, 361 U.S. 147, 154–155 (1959) (striking down, on First Amendment grounds, city ordinance providing for strict liability on booksellers for possession of books later judged to be obscene, which encouraged "self-censorship" and "impeded" the "distribution of all books, both obscene and not obscene"); *Nat'l Rifle Ass'n of Am.* v. *Vullo*, 602 U.S. 175, 190 (2024) ("A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf."); *Interstate Cir., Inc.* v. *City of Dallas*, 390 U.S. 676, 678, 684 (1968) (recognizing that a film exhibitor's First Amendment rights were implicated by a law requiring it to inform the government whether films were "suitable"

for children); *NetChoice, LLC* v. *Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024) (strict scrutiny applies to governmental efforts to "deputize[] private actors into censoring speech based on its content").

36. Section 609.771's problematic enforcement system provides enormous incentives for social media platforms, such as X, to censor speech on their platforms that the government disfavors—here, content that constitutes a "deep fake" under the statute. It does this by providing for enforcement of violations of the statute through (i) criminal penalties, including jail time and fines, and (ii) causes of action that can be brought—by the Minnesota Attorney General, every Minnesota county attorney, every Minnesota city attorney, depicted individuals, and candidates for nomination or election to a public office who are injured or likely to be injured by dissemination—for injunctive or equitable relief against persons "violating" or "reasonably believed to be about to violate" the statute. §§ 609.771(3), (4).

37. Platforms may be prosecuted criminally or can be sued if governmental officials, depicted individuals, or candidates think the platform has not censored enough content; but the platform may not be prosecuted or sued by anyone if it has arguably censored too much content under the statute. The result is a system that highly incentivizes platforms to remove any content that presents a close call to avoid criminal penalties and costly lawsuits altogether.

38. Section 609.771 suffers from a compendium of serious First Amendment infirmities. Primary among them is that Section 609.771 imposes a system of prior restraint on speech, which is the "most serious and the least tolerable infringement on First

Amendment rights." *Neb. Press Ass'n* v. *Stuart*, 427 U.S. 539, 559 (1976). The statute authorizes lawsuits to be brought and injunctions to issue against individuals "reasonably believed to be about to violate" the statute—i.e., it authorizes injunctions preventing individuals from publishing "deep fakes" before they are even published. § 609.771(4). This constitutes a classic prior restraint and cannot withstand constitutional scrutiny. Section 609.771's authorization of injunctive or equitable relief as to content that has already been disseminated (i.e., as to persons that are "in the course of violating" the statute, § 609.771(4)) also constitutes a prior restraint on speech, because it authorizes speech to be taken down prior to a final determination that the content is unprotected under the First Amendment. *See, e.g.*, *Garcia* v. *Google, Inc.*, 786 F.3d 733, 747 (9th Cir. 2015) (forcing Google through "takedown order" to remove content previously published on YouTube prior to a final determination that the content was unprotected amounted to a "classic prior restraint on speech").

39. Section 609.771 also violates the First Amendment because it runs counter to the United States Supreme Court's recent decision in *Moody* v. *NetChoice, LLC*, in which the Court held, in no uncertain terms, that when a social media platform "present[s] a curated and 'edited compilation of [third party] speech,'" that presentation "is itself protected speech." 603 U.S. 707, 744 (2024) (quoting *Hurley* v. *Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 570 (1995)); *see also Moody*, 603 U.S. at 729–30 ("A private party's collection of third-party content into a single speech product (the operators' 'repertoire' of programming) is itself expressive, and intrusion into that activity must be specially justified under the First Amendment."); *id.* at 738 (quoting *Miami Herald*

*Pub. Co.* v. *Tornillo,* 418 U.S. 241, 258 (1974) ("The choice of material, the decisions made [as to] content, the treatment of public issues—whether fair or unfair—all these constitute the exercise of editorial control and judgment. . . . For a paper, and ***for a platform too***.")). Because Section 609.771 impermissibly replaces the judgments of the covered platforms about what speech may be permitted on their platforms with those of the government, it cannot be reconciled with *Moody*.

40. Section 609.771 disregards numerous significant First Amendment holdings by the Supreme Court in *Moody*—specifically, that (i) it is not a "valid, let alone substantial" interest for a state to seek "to correct the mix of speech" that "social-media platforms present," *id.* at 740; (ii) a "State 'cannot advance some points of view by burdening the expression of others,'" *id.* at 744 (quoting *Pac. Gas & Elec. Co.* v. *Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 20 (1986)); (iii) the "government may not, in supposed pursuit of better expressive balance, alter a private speaker's own editorial choices about the mix of speech it wants to convey," *id.* at 734; (iv) "it is no job for government to decide what counts as the right balance of private expression—to 'un-bias' what it thinks biased, rather than to leave such judgments to speakers and their audiences. That principle works for social-media platforms as it does for others," *id.* at 719; and (v) "[h]owever imperfect the private marketplace of ideas," a "worse proposal" is "the government itself deciding when speech [is] imbalanced, and then coercing speakers to provide more of some views or less of others," *id.* at 733. *See also Hustler Mag., Inc.* v. *Falwell*, 485 U.S. 46, 56 (1988) ("[I]t is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas.").

41. Section 609.771 also runs counter to the First Amendment's staunch protection of core political speech. Section 609.771 censors speech about "public issues and debate on the qualifications of candidates," to which the "First Amendment affords the ***broadest protection***" to ensure the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *McIntyre* v. *Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995). It imposes unintelligible prohibitions on allowing a specific category of speech under threat of enormous liability if it is not removed to the government's satisfaction. The statute greatly incentivizes covered platforms to censor all content that could reasonably fall within the statute's purview to avoid substantial enforcement costs. This, in turn, will severely chill important political speech—specifically, the use of exaggerated or unfavorable visual means to undermine and combat political opponents, which, as the Supreme Court has recognized, is ingrained in the historical fabric of U.S. political commentary and subject to the strongest of First Amendment protections.

42. Whether it be "Walt McDougall's characterization" in 1884 "of Presidential candidate James G. Blaine's banquet with the millionaires at Delmonico's as 'The Royal Feast of Belshazzar,'" or contemporary imaginings of Donald Trump's arrest,[15] or what a

[15] Ex. 3 (eliothiggins.bsky.social (@EliotHiggins), X (Mar. 20, 2023, 5:22 PM)); *see also* Ex. 5 (MNHouseInfo, *House Floor Session 3/30/23 – Part 2* (at 1:21:10), YOUTUBE (Mar. 30, 2023) (Bill Sponsor, Minnesota Representative Zack Stephenson, advocating for the law to cover the images posted by Higgins).

second term under President Biden would look like,[16] "graphic depictions and satirical cartoons have played a prominent role in public and political debate," and "it is clear that our political discourse would [be] considerably poorer without them." *Falwell*, 485 U.S. at 54–55. Indeed, "YouTube videos, Facebook posts, and X tweets are the newspaper advertisements and political cartoons of today, and the First Amendment protects an individual's right to speak regardless of the new medium these critiques may take." *Kohls* v. *Bonta*, 752 F. Supp. 3d 1187, 1195–96 (E.D. Cal. 2024) (holding that California Assembly Bill ("AB") 2839, providing causes of action against individuals who post certain election-related "materially deceptive content" generated with artificial intelligence, likely violated the First Amendment on its face because the statute's "legitimate sweep pales in comparison to the substantial number of its applications . . . which are plainly unconstitutional"); *accord Kohls* v. *Bonta*, 797 F. Supp. 3d 1177 (E.D. Cal. 2025) (granting plaintiffs' motion for summary judgment and holding that AB 2839 violated the First Amendment).

43. There is a long history of the strongest of First Amendment protections for speech critical of government officials and candidates for public office that includes tolerance for potentially false speech made in the context of such criticisms. And there is a long history of skepticism of any governmental attempts to regulate such content, no matter how well-intentioned they may be. As both the Supreme Court and Judge Learned

[16] Ex. 16 (GOP, *Beat Biden*, YOUTUBE (Apr. 25, 2023), https://www.youtube.com/watch?v=kLMMxgtxQ1Y (last visited Aug. 26, 2026)).

Hand have noted, "[t]he First Amendment" "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues than through any kind of authoritative selection. To many, this is, and always will be, folly; but we have staked upon it our all." *Sullivan*, 376 U.S. at 270 (quoting *United States* v. *Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943) (Hand, J.)). Section 609.771 runs counter to these principles by attempting to impose by "authoritative selection" the permissible content on social media platforms, rather than allowing the "multitude of tongues" engaging in political debate and commentary on those platforms to do so.

44. Accordingly, Section 609.771 violates the First Amendment of the United States Constitution, both facially and as-applied to X Corp. Section 609.771 imposes a prior restraint on speech that forces platforms to censor only certain election-related content of which the State of Minnesota disapproves and also directly and impermissibly interferes with the constitutionally protected content-moderation speech rights of social media platforms like X. And Section 609.771 does so notwithstanding that less speech-restrictive alternatives would advance Minnesota's "interest in electoral integrity."[17]

45. Section 609.771 also directly contravenes the immunity provided to social media platforms by 47 U.S.C. § 230(c)(1), which prohibits treating interactive computer service providers like X Corp. as the "publisher or speaker of any information provided by another information content provider." Section 609.771 does so because it provides causes of action for "injunctive or equitable relief" and for criminal penalties, including

[17] Ex. 2 (Ellison PI Opp.) at 30–31, 33–34, 38.

imprisonment, against platforms such as X if they disseminate, or enter into an agreement to disseminate, user content that violates the statute.

46. So too does Section 609.771 violate the First and Fourteenth Amendments of the United States Constitution for vagueness. The statute's requirements are so vague and unintelligible that social media platforms cannot understand how to comply with them; thus, those subject to its language will be compelled to over-censor speech to avoid costly litigation potentially leading to criminal liability, over countless judgment calls surrounding whether the statute prohibits particular pieces of content. And here, the vagueness concern is particularly acute because Defendant Ellison holds specific animus toward Plaintiff X Corp. and its owner Elon Musk that appears to be motivated by political disagreements. As recently as February 4, 2025, Defendant Ellison called Musk a "rich punk," a "billionaire baby," and a "fascis[t]," and said it is ***"certainly possibl[e]"*** that he will file a ***criminal*** action against Musk.[18]

47. In pursuing this action, X Corp. seeks declaratory and injunctive relief on the grounds that Section 609.771 (i) violates the free speech rights of X and other social media platforms under the First Amendment of the United States Constitution, both facially and as-applied to Plaintiff; (ii) directly conflicts with, and is thus preempted by, the immunity afforded to X Corp. by 47 U.S.C. § 230(c)(1); and (iii) violates the First and Fourteenth

[18] *See* Ex. 17 (The Dean Obeidallah Show, *Minn AG Keith Ellison: We will be looking into potential crimes committed by Elon Musk* (at 04:29, 09:23, 10:00, 16:54), YOUTUBE (Feb. 4, 2025), https://www.youtube.com/watch?v=SqE7XG-39n4 (last visited Aug. 26, 2026)); *see also id.* (at 05:15) ("we've filed lawsuits [against Musk], ***we're gonna file more***").

Amendments of the United States Constitution because its requirements are so vague and unintelligible that social media platforms cannot understand what the statute permits and what it prohibits, which will lead to blanket censorship, including of valuable political speech.

48. In pursuing this action, X Corp. seeks to vindicate the deprivation of constitutional rights under color of state statute, ordinance, regulation, custom, and/or usage. X Corp. is also entitled to attorneys' fees and costs if it prevails on any of its Section 1983 claims. *See* 42 U.S.C. § 1988.

## **PARTIES**

49. Plaintiff X Corp. is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in Austin, Texas. X Corp. provides the X service, which is a real-time, open, public conversation platform, where people can see every side of a topic, discover news, share their perspectives, and engage in discussion and debate. X allows people to create, distribute, and discover content and has democratized content creation and distribution. X allows users to create and share ideas and information instantly through various product features, including public posts.

50. Defendant Keith Ellison is the Attorney General of the State of Minnesota and is charged with enforcing Section 609.771. *See* § 609.771(4)(1). Defendant Ellison has refused to disavow enforcement of Section 609.771 against X Corp. X Corp. sues Attorney General Ellison in his official capacity as the person charged with enforcing Section 609.771.

## JURISDICTION

51. This Court has jurisdiction over X Corp.'s federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a) and 42 U.S.C. § 1983, because X Corp. alleges violations of its rights under the U.S. Constitution and laws of the United States.

52. This Court has authority to grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and under the Court's inherent equitable jurisdiction.

## VENUE

53. Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because the Defendant is located, resides, and has offices in this judicial district and in the State of Minnesota, and the violations of X Corp.'s rights are occurring and will occur within this judicial district. Section 609.771 was also enacted in this judicial district.

## FACTUAL ALLEGATIONS

### I. Section 609.771's Statutory Scheme

54. Section 609.771 applies to a "person who disseminates a deep fake or enters into a contract or other agreement to disseminate a deep fake" if the "person knows or acts with reckless disregard about whether the item being disseminated is a deep fake and dissemination: (1) is made without the consent of the depicted individual; (2) is made with the intent to injure a candidate[19] or influence the result of an election; and (3) takes place

[19] "Candidate" means "an individual who seeks nomination or election to a federal, statewide, legislative, judicial, or local office including special districts, school districts, towns, home rule charter and statutory cities, and counties." § 609.771(1)(b).

either: (i) within 90 days before a political party nominating convention; or (ii) after the start of the absentee voting period prior to a presidential nomination primary, or a regular or special state or local primary or general election." § 609.771(2)(a).[20]

55. As noted above, under the statute, a "deep fake" is defined as "any video recording, motion-picture film, sound recording, electronic image, or photograph, or any technological representation of speech or conduct substantially derivative thereof: (1) that is so realistic that a reasonable person would believe it depicts speech or conduct of an individual who did not in fact engage in such speech or conduct; and (2) the production of which was substantially dependent upon technical means, rather than the ability of another individual to physically or verbally impersonate such individual." § 609.771(1)(c).

56. A person who disseminates a deep fake or enters into a contract or other agreement to disseminate a deep fake under the conditions forbidden under the statute is "guilty of a crime" and "may be sentenced . . . (1) if the person commits the violation within five years of one or more prior convictions under this section, to imprisonment for not more than five years or to payment of a fine of not more than $10,000, or both; (2) if the person commits the violation with the intent to cause violence or bodily harm, to imprisonment for not more than 364 days or to payment of a fine of not more than $3,000, or both; or (3)

[20] Under Section 609.771(2)(a)(3)(ii), the statute's prohibitions will be triggered on September 18, 2026, because (i) Minnesota sends absentee ballots "at least 46 days before the election," and (ii) there will be an election in Minnesota this year on November 3. *See* Ex. 18 (*2026 Minnesota Absentee Ballot Application*, https://www.sos.mn.gov/media/2444/english-regular-absentee-ballot-application.pdf (last visited Aug. 26, 2026)).

in other cases, to imprisonment for not more than 90 days or to payment of a fine of not more than $1,000, or both." §§ 609.771(2)(a), (3)(a)(1)–(3).

57. In addition, a "cause of action for injunctive or equitable relief may be maintained against any person who is reasonably believed to be about to violate or who is in the course of violating this section by: (1) the attorney general; (2) a county attorney or city attorney; (3) the depicted individual[21]; or (4) a candidate for nomination or election to a public office who is injured or likely to be injured by dissemination." § 609.771(4).

58. Section 609.771 "does not apply to a broadcaster or cable television system that disseminates a deep fake produced by a candidate if the broadcaster's or cable television system's dissemination is required by federal law." § 609.771(2)(b).

59. Section 609.771 only applies "(i) within 90 days before a political party nominating convention; or (ii) after the start of the absentee voting period prior to a presidential nomination primary, or a regular or special state or local primary or general election." § 609.771(2)(a)(3).

60. Under Minnesota Statutes § 609.05(1), "[a] person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime."

[21] "Depicted individual" means "an individual in a deep fake who appears to be engaging in speech or conduct in which the individual did not engage." § 609.771(1)(d).

## II. Section 609.771 Impermissibly Substitutes the Government's Judgment About Content Moderation for That of Social Media Platforms

61. X and other social media platforms already maintain robust policies and features that address what they view as problematic content. Because those policies are different from, and in certain respects conflict with, those set forth in Section 609.771, Section 609.771 impermissibly substitutes the State's content-moderation policies in this important area for those of social media platforms and impermissibly imposes liability on them for noncompliance with the State's preferred content-moderation policies. This violates the First Amendment.

62. For instance, the X platform has a feature called "Community Notes" that allows users to flag content that they believe needs context, which could include "deep fakes," as defined under Section 609.771. Through Community Notes, users of the X platform may provide additional context or information about content that will appear along with the content if enough of the community's "contributors," who otherwise hold diverse viewpoints, deem the additional commentary to be helpful. And, in recognition of the fast-paced nature of social media, X has accelerated Community Notes, and now indicates "Lightning Notes" that start appearing on posts within an hour of being proposed, or within an hour of the post itself going live. Any user can become a Community Notes "contributor," so long as they (i) have no recent X rule violations, (ii) joined X at least six months ago, and (iii) provide a phone number. X provides contributors with alias profiles that are not linked to their main X profile, and X Corp. does not write or edit these notes.

63. In addition, on July 1, 2025, X Corp. announced an addition to its Community Notes program that allows developers to create and program AI to write Community Notes to fact-check posts on the X platform. *See* Ex. 19 (Community Notes (@Community Notes), X (July 1, 2025, 3:35 PM), https://x.com/CommunityNotes/status/1940132205486915917) (last visited Aug. 26, 2026)) (announcing the introduction of this program); Ex. 20 (Haiwen Li et al., *Scaling Human Judgment in Community Notes with LLMs* 1 (2025), https://arxiv.org/pdf/2506.24118) (explaining that such a program introduces "an open ecosystem where both humans and [large language models (a type of AI)] can write notes," but where "the decision of which notes are helpful enough to show remains in the hands of humans," and that this "approach can accelerate the delivery of notes, while maintaining trust and legitimacy through Community Notes' foundational principle: A community of diverse human raters collectively serve as the ultimate evaluator and arbiter of what is helpful").

64. X's Community Notes feature is so effective that Meta has recently started to employ a similar system on Facebook, Instagram, and Threads. *See, e.g.*, Ex. 21 (*Community Notes: A New Way to Add Context to Posts*, META TRANSPARENCY CENTER (July 20, 2026), https://transparency.meta.com/features/community-notes (last visited Aug. 26, 2026)); Ex. 22 (*Community Notes: Keeping People Better Informed*, META, https://www.meta.com/technologies/community-notes/?srsltid=AfmBOoq6DSXD1zwdy-5eQco4jitlC1mhSBU0zhig1djhOOJ0QmSHinN3 (last visited Aug. 26, 2026)).

65. In addition, any X user may comment on posted content, providing additional context or disagreement in the form of "replies" to a post or by making a separate post that quotes and comments on the posted content. These general post and reply features on X are likewise an effective form of counterspeech to combat deceptive or misleading content.

66. Another feature on the X platform that combats deceptive or misleading content using counterspeech is a tool called "Grok AI – Explain This Post." The tool, which users can employ by clicking a button on the top-right corner of a post, leverages Grok, X's artificial intelligence chat bot, to provide detailed context and information about particular posts, which can help the user understand whether the content is truthful and/or is generated using artificial intelligence.

67. X also maintains an "Authenticity" Policy that covers "Synthetic and Manipulated Media," under which users "may not share inauthentic media, including, manipulated, or out-of-context media that may result in widespread confusion on public issues, impact public safety, or cause serious harm ('misleading media')." Ex. 4 (*Authenticity*, X (Apr. 2025)). Under the policy, in "situations where [X is] unable to reliably determine if [the content] is misleading media, [X] may not take action." *Id.* How X enforces its Authenticity Policy "depend[s] on the severity of the violation as well as any previous history of violations." *Id.* One such way in which X may "take action" to enforce its policy is to label posts containing misleading media, to help people understand the content's authenticity, and to provide additional context. *See, e.g.*, ¶ 22 above.

68. Under X's Authenticity Policy—which is publicly available to all users of the platform as well as to the public generally—X considers, e.g., the following in determining whether to remove and/or label content:

a. Whether the media is "significantly and deceptively altered, manipulated, or fabricated in a way that fundamentally changes its meaning and can result in widespread confusion on public issues, impact public safety, or cause serious harm"; and

b. Whether the media is "shared in a deceptive manner or out-of-context or with intent to deceive people about the nature or origin of the content and can result in widespread confusion on public issues, impact public safety, or cause serious harm[.]" *Id.*

69. X's Authenticity Policy also makes clear that "[s]haring manipulated or out-of-context media in non-deceptive ways" is "[a]llowed" under the policy. *Id.*

70. X's Authenticity Policy authorizes users to "report" content, which could be "deep fakes" under the statute, to X for removal. *Id.*

71. Other covered platforms—e.g., Meta, YouTube, TikTok, Snapchat, Rumble, and Google Search—likewise have their own policies designed to address false, misleading, and/or manipulated media. *See* Ex. 23 (Jumai Adedoja Fabuyi et al., *Deepfake Regulations and Their Impact on Content Creation in the Entertainment Industry*, 24:12 ARCHIVES OF CURRENT RSCH. INT'L 52, 61–63 (2024)) (analyzing how Facebook, YouTube, TikTok, and Twitter "moderat[e] deepfake content" and finding "***effective*** moderation practices industrywide"). Each has a different approach to addressing such

content. *See id.* at 63 (noting that "YouTube and TikTok exhibit high alignment between flagged and removed content, reflecting proactive real-time moderation," while "Facebook and Twitter show moderate increases in flagged volumes with lower removal rates, suggesting varied thresholds for content removal"). And each approach is different from the State's approach embodied in Section 609.771.

72. Social media content moderation is an inherently controversial undertaking. How social media companies apply their content-moderation rules to particular posts is a sensitive and controversial exercise that is subject to rigorous debate and controversy. Put another way, deciding what content should appear on a social media platform is a question that engenders considerable debate among reasonable people about where to draw the correct proverbial line. This is particularly true of election-related content and is certainly true of the type of content that is arguably covered by Section 609.771's definition of deep fakes.

73. The State has never explained why X's Authenticity Policy, combined with, e.g., its "Community Notes" program, use of Grok AI, and other comment and reply features, are insufficient to address the "deep fake" content targeted by Section 609.771. In fact, they work very well.

74. Nor has the State explained why the policies of other social media platforms, coupled with counterspeech from other users of the platforms—including counterspeech from Defendant Ellison's office and other government officials—are insufficient to address the "deep fake" content targeted by Section 609.771 in a less speech-restrictive manner.

## III. Section 609.771 Pressures Social Media Platforms to Censor Any Content That Could Arguably be Considered a "Deep Fake" Under the Statute

75. Compliance with Section 609.771 would be highly burdensome, given the amount of content on X in general (roughly 142 billion posts per year) and the quantity of election-related content that X Corp. will have to decide whether to remove. For example, from November 5–6, 2024 (i.e., the most recent U.S. presidential election), there were 942 million posts on X globally, which was an all-time global daily record. *See* Ex. 24 (Global Government Affairs (@GlobalAffairs), X (Nov. 14, 2024, 9:57 AM), https://x.com/GlobalAffairs/status/1857075415640117628 (last visited Aug. 26, 2026)). In addition, in the first six months of 2024, when elections were occurring in the EU and India, X received 224,129,805 user reports related to content on the platform.

76. It would be untenable and very costly for X Corp. to have to litigate its content-moderation decision-making as to each report of a "deep fake" under the statute, and Section 609.771 would thus heavily incentivize platforms like X to avoid these disputes and their attendant costs by erring on the side of censorship.

77. Indeed, empirical evidence suggests that social media platforms, such as Plaintiff, YouTube, Facebook, and TikTok, in "respons[e] to ***regulatory pressures***," have been "collectively enhancing their detection and removal efforts to address flagged deepfake content," "supporting an overall trend towards more active moderation." *See* Ex. 23 (Jumai Adedoja Fabuyi et al., *Deepfake Regulations and Their Impact on Content Creation in the Entertainment Industry*, 24:12 ARCHIVES OF CURRENT RSCH. INT'L 52, 63

(2024)) (noting an "overall upward trend in both flagged and removed [deep fake] content").

78. Section 609.771's perverse incentive structure—i.e., severe criminal penalty for leaving potential "deep fake" content on the platform and complete immunity for removing the content—resembles that of the Digital Millenium Copyright Act ("DMCA"), which similarly provides immunity from liability if material is taken down but potential liability if it is not. Substantial empirical evidence supports the view that such enforcement regimes lead to over-censorship and takedowns of a significant amount of constitutionally protected material:

a. *See* Ex. 25 (Wendy Seltzer, *Free Speech Unmoored in Copyright's Safe Harbor: Chilling Effects of the DMCA on the First Amendment*, 24 HARV. J.L. & TECH. 171 (2010)) (asserting that the DMCA encourages internet service providers to respond to copyright complaints by removing content to ensure immunity from liability, leading to the censorship of protected speech);

b. *See* Ex. 26 (Jennifer M. Urban et al., *Notice and Takedown in Everyday Practice* (2017) at 41) (finding, based on a survey of online service providers, that "[m]ost [online service providers] reported acting conservatively in order to avoid liability, opting to take down content even when they are uncertain about the strength of the underlying claim");

c. *See* Ex. 27 (*Liability or Deniability? Platform Power as Section 230 Turns 30, Hearing Before the U.S. S. Comm. on Com.* (Mar. 18, 2026) (Statement

of Daphne Keller) at 3, https://www.commerce.senate.gov/wp-content/uploads/meetings/a41deed8-ef84-7dd4-fc8a-3c5eab051cd3/Keller-Testimony-March-18-2026.pdf) ("Abundant evidence shows that under the 'notice and takedown' systems established by many non-230 platform liability laws, platforms' safest, cheapest, and easiest course is simply to honor every claim. This makes users' online expression vulnerable to a 'heckler's veto,' and gives individuals, companies, and governments an avenue to silence speech simply by complaining about it.");

d. *See* Ex. 28 (Jennifer M. Urban & Laura Quilter, *Efficient Process or "Chilling Effects"? Takedown Notices Under Section 512 of the Digital Millennium Copyright Act*, 22 SANTA CLARA HIGH TECH. L.J. 621, 638, 687 (2006)) (finding, based on an empirical study of sample DMCA takedown requests, a "surprising number of questionable takedowns" and noting that "§ 512 gives [online service providers] strong incentives to maintain their safe harbor and few incentives to question takedown");

e. *See* Ex. 29 (Alfred C. Yen, *Internet Service Provider Liability for Subscriber Copyright Infringement, Enterprise Liability and the First Amendment*, 88 GEO. L.J. 1833, 1888 (2000)) (arguing that the DMCA safe harbor scheme creates a First Amendment issue by incentivizing risk averse internet service providers to remove content even where copyright infringement is unclear).

## IV. Defendant Ellison's Animus Toward Plaintiff X Corp. and Elon Musk

79. Defendant Ellison has displayed specific animus toward X Corp. and its owner Elon Musk.

80. On September 2, 2024, Defendant Ellison's X account posted the following message in Portuguese thanking Brazil: "obrigado Brasil!" Ex. 30 (Keith Ellison (@keithellison), X (Sept. 2, 2024, 5:33 PM), https://x.com/keithellison/status/1830720700019028109?lang=en (last visited Aug. 26, 2026)).

81. Defendant Ellison's post followed the Brazilian government blocking the X platform throughout the country and initiating a criminal investigation against Elon Musk, which occurred because X refused to follow Brazilian court orders to censor opposition voices, including opposition government officials in Brazil.

82. Not only has Defendant Ellison failed to publicly explain the meaning of his September 2, 2024 post, or even condemn the Brazilian government's censorship of oppositionist government officials, he has continued to post about, and criticize, Musk.

83. As recently as February 4, 2025, on a YouTube show, Defendant Ellison called Musk a "rich punk," a "billionaire baby," and a "fascis[t]." *See* Ex. 17 (The Dean Obeidallah Show, *Minn AG Keith Ellison: We will be looking into potential crimes committed by Elon Musk* (at 04:29, 10:00, 16:54), YOUTUBE (Feb. 4, 2025)). Defendant Ellison even said, in no uncertain terms, that it is "certainly possibl[e]" he will file a ***criminal*** action against Musk. *Id.* (at 9:23); *see also id.* (at 05:15) ("we've filed lawsuits [against Musk], ***we're gonna file more***").

84. While Defendant Ellison has every right to voice personal opinions, what he may not do is use the government as a vehicle to criminally target individuals based on personal or political animus, as he has threatened to do. Defendant Ellison's specific animus toward X Corp. and Musk exacerbates Section 609.771's constitutional infirmities as-applied to X Corp. This is particularly so, given that the statute's vagueness gives Defendant Ellison unfettered discretion to selectively prosecute those, like X Corp. and Elon Musk, who he apparently perceives to be his political enemies.

## FIRST CAUSE OF ACTION

**(Declaratory Relief and Injunctive Relief for Violations of the First Amendment of the United States Constitution (42 U.S.C. § 1983)—Facial and As-Applied)**

85. X Corp. realleges and incorporates herein by reference each and every allegation set forth above.

86. Section 609.771 violates the First Amendment of the United States Constitution by providing injunctive or equitable enforcement and carrying criminal penalties of imprisonment and significant fines against social media platforms like X, if they do not censor content on their platforms to the State's liking—that is, if the platform violates the statute or is "reasonably believed to be about to violate" the statute.

87. First, Section 609.771 imposes a prior restraint on speech, which is the "most serious and the least tolerable infringement on First Amendment rights," *Stuart*, 427 U.S. at 559, and does so as to speech concerning "public issues and debate on the qualifications of candidates," to which the "First Amendment affords the ***broadest protection***" to protect

the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *McIntyre*, 514 U.S. at 346.

88. The statute imposes a prior restraint on speech because Section 609.771(4) provides causes of action for injunctive or equitable relief, backed by criminal penalty, against persons that have not yet violated the statute, i.e., before the content has ever been disseminated. *See* § 609.771(4) (imposing causes of action for injunctive or equitable relief against persons "reasonably believed to be ***about to violate***" the statute). Section 609.771 also imposes such lawsuits with respect to content that has already been disseminated—that is, against persons that are "in the course of violating" the statute, § 609.771(4)—which is a prior restraint on speech as well. *See, e.g.*, *Garcia*, 786 F.3d at 747 (forcing the "takedown" of previously published speech was a "classic prior restraint"). Because Section 609.771 is a "system of prior restraints of expression," there is "heavy presumption against its constitutional validity," which it does not overcome. *Bantam Books, Inc.* v. *Sullivan*, 372 U.S. 58, 70 (1963); *accord Garcia*, 786 F.3d at 747 (noting the "historical and heavy presumption against such restraints").

89. Second, because Section 609.771 imposes content-, viewpoint-, and speaker-based speech restrictions, it triggers constitutional review under strict scrutiny, which it cannot withstand.

90. Social media platforms, such as X, "present[] a curated and 'edited compilation of [third party] speech,'" which "is itself protected speech." *Moody*, 603 U.S. at 744 (quoting *Hurley*, 515 U.S. at 570); *see also id.* at 729–30 ("A private party's collection of third-party content into a single speech product (the operators' 'repertoire' of

programming) is itself expressive, and intrusion into that activity must be specially justified under the First Amendment.”).

91. By forcing social media platforms to remove and modify particular speech that they may not otherwise remove or modify—i.e., certain election-related “deep fake[s]”—Section 609.771 forces platforms to “speak a particular message,” thus “alter[ing] the content of their speech” and rendering the statute “content-based.” *X Corp.* v. *Bonta*, 116 F.4th 888, 900 (9th Cir. 2024) (quoting *Nat’l Inst. of Fam. & Life Advocs.* v. *Becerra (“NIFLA”)*, 585 U.S. 755, 766 (2018)); *see also Wash. Post* v. *McManus*, 944 F.3d 506, 511–13, 519 (4th Cir. 2019) (striking down state law that required, in an effort to address foreign interference in U.S. elections, “online platforms,” within “48 hours of an ad being purchased,” to “display somewhere on their site the identity of the purchaser, the individuals exercising control over the purchaser, and the total amount paid for the ad,” and declaring the law “a compendium of traditional First Amendment infirmities” that would “chill speech”); *id.* at 515 (“[E]ach banner feature of the Act—the fact that it is content-based, targets political expression, and compels certain speech—poses a real risk of either chilling speech or manipulating the marketplace of ideas.”). Section 609.771 also impermissibly substitutes the judgment of the government for that of social media platforms as to what constitutes a “deep fake” covered by the statute and whether it should remain on their platforms.

92. In addition, the underlying content that the statute targets—i.e., the content delineated in Section 609.771(2)(a)—is itself constitutionally protected. In other words, because Section 609.771(2)(a) does not require actual injury, the speech prohibited

thereunder is not inherently defamatory speech that is unprotected by the First Amendment. *See Kohls*, 752 F. Supp. 3d at 1193 (holding that AB 2839 "does much more than punish potential defamatory statements since the statute does not require actual harm").

93. Accordingly, Section 609.771 is a content-based law—that is, it "target[s] speech based on its communicative content," *Reed* v. *Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015)—and no exception applies here to the longstanding rule that such regulations trigger strict scrutiny. *NIFLA*, 585 U.S. at 767 (quoting *Brown* v. *Ent. Merchs. Assn.*, 564 U.S. 786, 792 (2011) ("This Court's precedents do not permit governments to impose content-based restrictions on speech without 'persuasive evidence . . . of a long (if heretofore unrecognized) tradition' to that effect.")). By "specifically target[ing] speech within political or electoral content pertaining to candidates," Section 609.771 "delineates acceptable and unacceptable content based on its purported truth or falsity and is an archetypal content-based regulation that our constitution considers dubious and subject to strict scrutiny." *See Kohls*, 752 F. Supp. 3d at 1195.

94. The statute triggers strict scrutiny for two additional reasons. First, it discriminates based on the identity of the speaker, by exempting, pursuant to Section 609.771(2)(b), certain "broadcaster or cable television system[s]." *See, e.g.*, *Sorrell* v. *IMS Health Inc.*, 564 U.S. 552, 571 (2011) (laws that interfere with the speech rights of only certain speakers "justify application of heightened scrutiny" particularly when they are aimed at specific content); *see also Moody*, 603 U.S. at 738 (quoting *Tornillo*, 418 U.S. at 258) (the First Amendment applies to social media platforms as it does to traditional media). Second, Section 609.771 discriminates based on viewpoint, because it permits

election-related content that is "'positive' about a person," while restricting such content if it is "derogatory." *Iancu* v. *Brunetti*, 588 U.S. 388, 393 (2019) (quoting *Matal* v. *Tam*, 582 U.S. 218, 249 (2017) (Kennedy, J., concurring) (explaining that such differential treatment "reflects the Government's disapproval of a subset of messages it finds offensive" and "is the essence of viewpoint discrimination")).

95. Section 609.771 may stand, then, only if the government proves that the statute is "narrowly tailored to serve compelling state interests," *NIFLA*, 585 U.S. at 766 (quoting *Reed*, 576 U.S. at 163), and no "less restrictive alternative would serve the [g]overnment's purpose," *X Corp.*, 116 F.4th at 903 (quoting *United States* v. *Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000)).

96. Section 609.771 fails strict scrutiny because, even if Minnesota has a compelling interest in electoral integrity, the statute is not the "least restrictive means" available to further that interest, and the State may "regulate the content of constitutionally protected speech" only "if it chooses the least restrictive means" to do so. *Playboy Ent. Grp., Inc.*, 529 U.S. at 813; *see also Kohls*, 752 F. Supp. 3d at 1191, 1195–96 (striking down AB 2839 under strict scrutiny because it was not the "least restrictive means available for advancing the State's interest" in "protecting the integrity and reliability of the electoral process," given that "[o]ther statutory causes of action such as privacy torts, copyright infringement, or defamation already provide recourse to public figures or private individuals whose reputations may be afflicted by artificially altered depictions peddled by satirists or opportunists on the internet"); *Ex parte Stafford*, 726 S.W.3d 231, 238–40 (Tex. Crim. App. 2024) (applying strict scrutiny and striking down on First Amendment grounds

Texas statute prohibiting "knowingly represent[ing] in a campaign communication that the communication emanates from a source other than its true source" because there were "narrower means of achieving the State interests," including enforcing an existing statute). Moreover, it is not a "valid, let alone substantial" interest for a state to seek "to correct the mix of speech" that "social-media platforms present." *Moody*, 603 U.S. at 740; *see also id.* at 744 (quoting *Pac. Gas & Elec. Co.*, 475 U.S. at 20) ("[A] State 'cannot advance some points of view by burdening the expression of others.'").[22]

97. Section 609.771 also fails strict scrutiny because it is woefully underinclusive, as it only applies during a fraction of the year. *See* § 609.771(2)(a)(3) (applying only "(i) within 90 days before a political party nominating convention; or (ii) after the start of the absentee voting period prior to a presidential nomination primary, or a regular or special state or local primary or general election"). This undermines any argument by the government that Section 609.771 supports a compelling state interest in banning deep fakes.

98. Section 609.771 is facially invalid under the First Amendment because "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Ams. for Prosperity Found.* v. *Bonta*, 594 U.S. 595, 615 (2021). It is also unconstitutional as-applied to X Corp.

99. The mens rea requirement of Section 609.771 does little to mitigate the real and reasonable threat of enforcement of Section 609.771 against platforms like X because

[22] Nor would Section 609.771 survive under any lesser standard of review.

(i) many posts on X contain images or videos that arguably contain "deep fakes," as defined under Section 609.771; (ii) many of those posts present close calls as to whether the images or videos violate Section 609.771 and reasonable minds can disagree about whether such images or videos violate X's rules and policies or violate Section 609.771; (iii) when X concludes that a post that arguably contains a deep fake does not violate its rules and policies, X's policy is to allow the post to be disseminated on the platform so as to enable its users to exercise their free speech rights to the maximum extent practicable; (iv) in the context of political speech, X knows that its users post political deep fakes with the intent of influencing the outcome of elections and that allowing users to do so will result in influencing the outcome of an election, and believes that, as long as a post does not violate X's rules and policies, that its users should be able to do so; (v) given X's policies about free speech, if a political post that arguably contains a deep fake does not violate X's rules and policies, X intends to allow its users to disseminate the post for the purpose of trying to influence the outcome of elections; (vi) when X disseminates such posts on its platform with that intention, it arguably violates Section 609.771 either directly or by aiding and abetting a violation of Section 609.771 by its users; and (vii) the threat of criminal prosecution and/or civil enforcement actions under the statute have a chilling effect on X's content-moderation practices that violates the First Amendment.

100. There is a *bona fide* and actual controversy between X Corp. and Defendant because Defendant is charged with enforcing, and intends to enforce, Section 609.771, even though it violates the First Amendment of the United States Constitution, both facially and as-applied to X Corp.

101. X Corp. maintains that Section 609.771 is illegal and unconstitutional. Defendant claims otherwise.

102. X Corp. requests a judicial determination regarding the validity of Section 609.771 to prevent the harm caused by its enactment. Such a determination is both necessary and appropriate to avoid the deprivation of X's and other social media platforms' constitutional rights, which would occur if Section 609.771 is applied to X or any other platform.

103. Given the violation of the First Amendment of the United States Constitution, X Corp. seeks injunctive relief against enforcement of Section 609.771. X and other social media platforms covered by the statute would be irreparably harmed if they were forced to comply with Section 609.771's requirements and have no adequate remedy at law.

## SECOND CAUSE OF ACTION

**(Declaratory Relief and Injunctive Relief for Immunity Under and Preemption by 47 U.S.C. § 230(c)(1))**

104. X Corp. realleges and incorporates herein by reference each and every allegation set forth above.

105. 47 U.S.C. § 230(c)(1) directly conflicts with, and thus preempts, Section 609.771.

106. 47 U.S.C. § 230(e)(3) provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."

107. Section 609.771 imposes liability on social media platforms by holding them responsible for the content of what is on their platforms, as if they were the publisher of that content. It requires removal of content that the State disfavors (i.e., "deep fake[s]" that are otherwise covered by the statute) and imposes criminal liability on the platforms if they do not comply to the satisfaction of the State. *See* §§ 609.771(2)–(3).

108. "Liability" under Section 230(e)(3) includes being subjected to the kind of injunctive and other equitable relief authorized by Section 609.771(4).

109. X is an "interactive computer service," as that term is defined under 47 U.S.C. § 230(f)(2).

110. Section 609.771 directly contravenes the immunity provided to social media platforms by 47 U.S.C. § 230(c)(1), which prohibits treating interactive computer service providers as the "publisher or speaker of any information provided by another information content provider."

111. Section 609.771 violates Section 230(c)(1) because it provides causes of action for "injunctive or equitable relief" and for potential criminal penalties, including imprisonment and fines, on account of content posted on their platforms by users. Section 609.771 thus treats social media platforms "as the publisher or speaker of [] information provided by another information content provider," 47 U.S.C. § 230(c)(1), and imposes liability against them that is inconsistent with the immunity provided by Section 230(c)(1).

112. Section 230(c)(1) bars "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *Johnson* v. *Arden*, 614 F.3d 785, 792 (8th

Cir. 2010) ("declin[ing]" to "construe § 230(c)(1) as permitting liability against [service provider] for material originating with a third party"); *see, e.g.*, *Barnes* v. *Yahoo!, Inc.*, 570 F.3d 1096, 1102–03 (9th Cir. 2009) (finding that Yahoo! was entitled to immunity under Section 230(c)(1) for "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content"), *as amended* (Sept. 28, 2009); *Calise* v. *Meta Platforms, Inc.*, 103 F.4th 732, 744 (9th Cir. 2024) (finding that Meta was immune under Section 230(c)(1) from claims that would require it to "actively vet and evaluate third-party ads" in order to remove them).

113. The mens rea requirement of Section 609.771 does little to mitigate the real and reasonable threat of enforcement of Section 609.771 against platforms like X because (i) many posts on X contain images or videos that arguably contain "deep fakes," as defined under Section 609.771; (ii) many of those posts present close calls as to whether the images or videos violate Section 609.771 and reasonable minds can disagree about whether such images or videos violate X's rules and policies or violate Section 609.771; (iii) when X concludes that a post that arguably contains a deep fake does not violate its rules and policies, X's policy is to allow the post to be disseminated on the platform so as to enable its users to exercise their free speech rights to the maximum extent practicable; (iv) in the context of political speech, X knows that its users post political deep fakes with the intent of influencing the outcome of elections and that allowing users to do so will result in influencing the outcome of an election, and believes that, as long as a post does not violate X's rules and policies, that its users should be able to do so; (v) given X's policies about free speech, if a political post that arguably contains a deep fake does not violate X's rules

and policies, X intends to allow its users to disseminate the post for the purpose of trying to influence the outcome of elections; (vi) when X disseminates such posts on its platform with that intention, it arguably violates Section 609.771 either directly or by aiding and abetting a violation of Section 609.771 by its users; and (vii) the threat of criminal prosecution and/or civil enforcement actions under the statute have a chilling effect on X's content-moderation practices that undermines the purpose of the immunity provided by Congress to interactive computer service providers under Section 230(c)(1) and that triggers application of that immunity.

114. There is a *bona fide* and actual controversy between X Corp. and Defendant because Defendant is charged with enforcing, and intends to enforce, Section 609.771, even though such enforcement is precluded and preempted by 47 U.S.C. § 230(c)(1).

115. X Corp. maintains that Section 609.771 is invalid and void as a matter of law because it is preempted by 47 U.S.C. § 230(c)(1). Defendant claims otherwise.

116. X Corp. seeks a declaratory judgment that Section 609.771 is legally invalid and unenforceable, because it is precluded and preempted by 47 U.S.C. § 230(c)(1).

117. Given the violation of 47 U.S.C. § 230(c)(1), X Corp. seeks injunctive relief against enforcement of Section 609.771. X Corp. would be irreparably harmed if it were forced to comply with, or litigate, Section 609.771's requirements and has no adequate remedy at law.

## THIRD CAUSE OF ACTION

**(Declaratory Relief and Injunctive Relief for Violations of the First and Fourteenth Amendments of the United States Constitution (42 U.S.C. § 1983) for Vagueness)**

118. X Corp. realleges and incorporates herein by reference each and every allegation set forth above.

119. Section 609.771 is void for vagueness under the First and Fourteenth Amendments of the U.S. Constitution because the statute's prohibitions are so unintelligible that they "fail[] to provide a person of ordinary intelligence fair notice of what is prohibited" and are "so standardless that [they] authorize[] or encourage[] seriously discriminatory enforcement." *Fantasysrus 2, L.L.C.* v. *City of E. Grand Forks, Minn.*, 881 F. Supp. 2d 1024, 1032 (D. Minn. 2012) (quoting *United States* v. *Williams*, 553 U.S. 285, 304 (2008)).

120. X, other social media platforms, and other "persons" covered by the statute cannot understand what Section 609.771 prohibits. Nor would "a person of ordinary intelligence."

121. Those covered by the statute cannot understand what constitutes a "[d]eep fake" under Section 609.771(1)(c), because they cannot understand what content is "so realistic that a reasonable person would believe it depicts speech or conduct of an individual who did not in fact engage in such speech or conduct." § 609.771(1)(c)(1). Nor can they determine when "production" of the content is "substantially dependent upon technical means." § 609.771(1)(c)(2).

122. Those covered by the statute cannot understand what it means under the statute to "disseminate[] a deep fake or enter[] into a contract or other agreement to disseminate a deep fake." § 609.771(2)(a).

123. Those covered by the statute cannot understand when such dissemination is made "with reckless disregard about whether the item being disseminated is a deep fake"; "without the consent of the depicted individual"; or "with the intent to injure a candidate or influence the result of an election." § 609.771(2)(a).

124. Due to the vagueness and ambiguity of these terms and phrases, Section 609.771 fails to provide "a reasonable opportunity to know what" the statute "prohibit[s]." *D.C.* v. *City of St. Louis, Mo.*, 795 F.2d 652, 653 (8th Cir. 1986).

125. Section 609.771 "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* (emphasis in original); *see also, e.g.*, *NAACP* v. *Button*, 371 U.S. 415, 432 (1963) (holding that the "standards of permissible statutory vagueness are strict in the area of free expression"). This is particularly dangerous with this statute, given that Defendant is charged with enforcing Section 609.771 and has openly expressed animus toward Elon Musk, the Executive Chairman and Chief Technology Officer of X Corp.

126. There is a *bona fide* and actual controversy between X Corp. and Defendant because Defendant is charged with enforcing, and intends to enforce, Section 609.771, even though it violates the First and Fourteenth Amendments of the United States Constitution for vagueness.

127. X Corp. maintains that Section 609.771 is illegal and unconstitutional because it is void for vagueness under the First and Fourteenth Amendments of the United States Constitution. Defendant claims otherwise.

128. X Corp. requests a judicial determination regarding the validity of Section 609.771 to prevent the harm caused by its enactment. Such a determination is both necessary and appropriate to avoid the deprivation of X's and the other social media platforms' constitutional rights, which would occur if Section 609.771 is applied to X or any other social media platform.

129. Given the violation of the First and Fourteenth Amendments of the United States for vagueness, X Corp. seeks injunctive relief against enforcement of Section 609.771. X and other covered platforms would be irreparably harmed if they were forced to comply with Section 609.771's requirements and have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, X Corp. respectfully requests that this Court enter judgment in X Corp.'s favor and grant the following relief:

1. A declaration that Section 609.771 violates the First Amendment of the United States Constitution, both facially and as-applied to X Corp.;

2. A declaration that Section 609.771 is precluded and preempted by 47 U.S.C. § 230(c)(1) and is therefore null and void and has no legal effect;

3. A declaration that Section 609.771 violates the First and Fourteenth Amendments of the United States Constitution for vagueness;

4. A permanent injunction enjoining Defendant and his employees, agents, and successors in office from enforcing Section 609.771;

5. An award of fees, costs, expenses, and disbursements, including attorneys' fees, to which X Corp. is entitled pursuant to 42 U.S.C. § 1988 and other applicable law; and

6. Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, X Corp. demands a trial by jury in this action of all issues so triable.

Dated: August 26, 2026

By: /s/ Joel Kurtzberg

CAHILL GORDON & REINDEL LLP
Joel Kurtzberg (admitted *pro hac vice*, SBN NY 2835007)
Floyd Abrams (admitted *pro hac vice*, SBN NY 1758184)
Jason Rozbruch (admitted *pro hac vice*, SBN NY 5753637)
32 Old Slip
New York, NY 10005
Phone: 212-701-3120
Facsimile: 212-269-5420
jkurtzberg@cahill.com
fabrams@cahill.com
jrozbruch@cahill.com

Erick G. Kaardal (SBN 229647)
MOHRMAN, KAARDAL & ERICKSON, P.A.
150 S. Fifth St., Ste. 3100
Minneapolis, MN 55402
Phone: 612-746-7724
Facsimile: 612-341-1076
kaardal@mklaw.com