UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

X CORP.,

Plaintiff,

vs.

KEITH ELLISON, in his official capacity, as Attorney General of Minnesota,

Defendant.

Court File No. 25-cv-1649 (LMP/DLM)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT**

## INTRODUCTION

Deepfakes are highly realistic video, audio, and other digital content generated by artificial intelligence (AI). They depict a person doing or saying something they did not do or say. In this case, Plaintiff X Corp. (X) challenges Minnesota Statutes section 609.771, which criminalizes the knowing or reckless dissemination of deepfakes that are intended to injure a candidate or influence an election.

The claims in the amended complaint all fail for lack of standing. The Section 230 claim is also not ripe. The amended complaint should thus be dismissed.

## FACTS

### I. LEGISLATIVE HISTORY.

In May 2023, a broad, bipartisan coalition in the Minnesota legislature acted to address the harmful effects of deepfakes in elections. *See* 2023 Minn. Laws ch. 58, § 2 (codified at Minn. Stat. § 609.771). The legislature amended the law in May 2024,

imposing a stricter mens rea requirement for violations. 2024 Minn. Laws ch. 112, art. 2, §§ 76-78 (codified at Minn. Stat. § 609.771, subds. 2-4). The amendments also attached political penalties for candidates who disseminate prohibited deepfakes. *Id.* In current form, section 609.771 contains a dissemination and contract provision.

Under the dissemination provision, a person who disseminates a deepfake violates the electoral deepfake statute under certain circumstances—if the person knows or acts with reckless disregard about whether the item being disseminated is a deepfake and dissemination is (a) made without the consent of the depicted individual; (b) with the intent to injure a candidate or influence the result of an election; and (c) takes place within specific temporal proximity to certain election events. Minn. Stat. § 609.771, subd. 2. Under the contract provision, a person who "enters into a contract or other agreement to disseminate a deep fake" violates the electoral deepfake statute under the same circumstances noted above. *Id.*

Legislators acknowledged the limited liability of social media companies during the statute's initial passage and subsequent amendment.

> Mr. Chair, Representative Torkelson, I agree with you that these platforms should be held more culpable than they currently are for the content that is being disseminated on them. […] As an aside, there are limitations in what we can do in federal law with regard to this […]

Hearing on H.F. 1370 Before H. Comm. On Elections Finance and Policy, 2023 Leg., 93rd Sess. (statement of Rep. Stephenson).

> The last part is that I think it's really, really important for us to put in and this starts on line 3.15 and goes down to 3.19. That […] social media, newspapers, you know, electronic publications, they're not in violation of this

> law for putting out political ads that someone might purchase and put out on their airwaves. And I really think that's very important that we pass and put into law, especially as we head into an election cycle. I would really like it to be clear that we are not holding […] our news media accountable for the deepfakes that other people might create[.]

Hearing on S.F. 3550 Before Sen. Comm. On Elections, 2024 Leg., 93rd Sess. (statement of Sen. Erin Maye Quade).

## II. X CORP. AND ITS CHALLENGE TO SECTION 609.771.

X Corp. is a social media organization. It provides "the X service, which is a real-time, open, public conversation platform." (ECF 53 ¶ 49.) Users sign up to use the platform by agreeing to X's Terms of Service, which incorporate various policies, including an Authenticity Policy. (*Id.* ¶ 19; *see also id.* ¶¶ 67-70.) On X's platform, users may create, share, and discover content, including through public posts. (*Id.* ¶ 49.) X alleges that various users have posted content that would "arguably" violate section 609.771's prohibition against election-related deepfakes. (*Id.* ¶¶ 11, 26.) The amended complaint includes allegations about four exemplar posts: an image that appears to depict Donald Trump; a video that appears to depict Kamala Harris; a video that appears to depict Amy Klobuchar; and a video that appears to depict Peggy Flanagan. (*Id.* ¶¶ 11-26.) For each of the four posts, X describes reports it received about each post and what action, if any, it took in response. (*Id.*)

X does not allege that the Attorney General has enforced section 609.771 against it or that the Attorney General (or anyone else) has threatened enforcement of section 609.771 against it. In its original complaint, X instead alleged that the Attorney General

has displayed "specific animus" towards X and its owner Elon Musk, referencing one post on X and comments on a YouTube show. (ECF 1 ¶¶ 47-51.) Over a year has passed; the amended complaint does not allege any new facts about the Attorney General's alleged animus. (ECF 53 ¶¶ 79-83.)

## PROCEDURAL BACKGROUND

X sued Attorney General Keith Ellison on April 23, 2025, alleging that section 609.771 violated the First Amendment, Section 230 of the Communications Decency Act, and the Fourteenth Amendment's prohibition on vagueness. (*See generally* ECF 1.) The Attorney General answered the complaint on May 15, 2025, and thereafter moved to stay the case pending the resolution of related litigation in the Eighth Circuit. (ECF 16, 18, 21.) The Court granted and denied the motion in part, staying X's First Amendment claim while allowing its Section 230 claim to proceed. (ECF 29.) X then moved for judgment on the pleadings on its Section 230 claim. (ECF 33.) The Court denied this motion for lack of standing and thus dismissed X's Section 230 claim without prejudice for lack of jurisdiction. (ECF 47.)

The Court lifted the stay on August 13, 2026. (ECF 51.) X then filed an amended complaint with the Attorney General's consent. (ECF 53.) The amended complaint alleges the same First Amendment, Section 230, and Fourteenth Amendment claims. (*Id.* ¶ 56.)

The Attorney General now moves to dismiss the amended complaint for lack of standing and ripeness.

## LEGAL STANDARD

A motion to dismiss for lack of standing implicates subject matter jurisdiction. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy," which is necessary to a court's exercise of jurisdiction under Article III. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To establish standing, a plaintiff has the burden to show it: (1) suffered an injury in fact, (2) fairly traceable to the defendant's challenged conduct, and (3) likely redressable by a favorable judicial decision. *Arc of Iowa v. Reynolds*, 94 F.4th 707, 710 (8th Cir. 2024) (citation omitted). Ripeness is likewise a matter of subject matter jurisdiction. *See KCCP Tr. v. City of N. Kan. City*, 432 F.3d 897, 899–900 (8th Cir. 2005); *Wax'n Works v. City of St. Paul*, 213 F.3d 1016, 1020 (8th Cir. 2000).

When presented with a motion under Rule 12(b)(1), a court's first step "is to determine the procedural nature" of the challenge—whether it is a "facial attack" or a "factual attack." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). The Attorney General's challenge here is facial, so the court evaluates whether the plaintiff has sufficiently alleged a basis for subject matter jurisdiction. *See Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914-15 (8th Cir. 2015). This analysis is restricted to the face of the pleadings and entails the same standard as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Osborn*, 918 F.2d at 729 n.6.

## ARGUMENT

As the Court noted in its order denying X's motion for judgment on the pleadings, section 609.771 allows for liability under two theories: a contract theory and a dissemination theory. (ECF 47, at 3.) Rather than establishing X's standing under either theory, the amended complaint again shows that the conduct X engages in could not possibly subject it to liability under either provision, or as an aider or abettor. Because X has not alleged any present or contemplated conduct that could give rise to a credible threat of enforcement under section 609.771, it lacks a cognizable injury. X therefore lacks standing, which means that this Court lacks jurisdiction and must dismiss the amended complaint. The Section 230 claim fails for the additional reason that it is not ripe.

### I. X Fails to Allege Conduct Arguably Proscribed Under Section 609.771's Contract Theory of Liability.

In a pre-enforcement suit like this one, a plaintiff may establish a cognizable injury by showing either a history of enforcement against others for similar conduct or an express threat of enforcement against the plaintiff itself. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 16 (2010). Here, X does not allege any history of enforcement of section 609.771. (*See generally* ECF 53.) Thus, X must show a "credible threat of prosecution" to establish a cognizable injury. *Id.*; *see also Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 1000 (8th Cir. 2022). To do so, X must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Sch. of the Ozarks*, 41 F.4th at 1000 (citation

omitted).[1] Making this showing entails alleging facts sufficient to show the mens rea required in the challenged statute. *See Kearns v. Cuomo*, 981 F.3d 200, 211 (2d Cir. 2020); *Plunderbund Media L.L.C. v. DeWine*, 312 F. Supp. 3d 654, 661, 667 (N.D. Ohio 2018), *aff'd*, 753 F. App'x 362, 370 (6th Cir. 2018). Section 609.771 includes two such mens rea requirements: (1) knowledge or reckless disregard about whether the item being disseminated is a deepfake, and (2) dissemination (or contracting for dissemination) with the specific intent to injure a candidate or influence the result of an election. Minn. Stat. § 609.771, subd. 2(a), (a)(2).

Section 609.771's contract theory of liability prohibits any person from entering into a contract or other agreement "*to* disseminate a deepfake." *Id.* subd. 2(a) (emphasis added). This Court already construed the operative statutory language, calling it "critical to understanding whether X Corp. has alleged conduct that falls within the [statue]'s scope." (ECF 47, at 17.) The statute's plain language "prohibits two types of conduct: (1) entering into a contract for the purpose of disseminating a deepfake, and (2) entering into some other type of agreement for the purpose of disseminating a deepfake." (*Id.* 18.) Employing this interpretation, the Court rejected X's argument that its Terms of Service constitute the type of contract that is prohibited by section 609.771. "[N]owhere does X Corp. allege or show that it enters into the Terms of Service with X's users *for the purpose of* disseminating deepfakes." (*Id.* 19 (emphasis original).)

[1] This Court previously observed that courts differ regarding whether the standard is "proscribed" or "arguably proscribed." (ECF 47, at 8 n.2.) Herein, the Attorney General applies the standard more lenient to X (i.e., "arguably proscribed).

Nothing about X's amended complaint changes that analysis here. X does not allege that its Terms of Service have changed or that its implementation or enforcement of those terms have changed. (*See generally* ECF 53.) Nor does X include any new allegations about the purpose(s) that animate those Terms of Service. The closest X comes is its new allegation that it provides its platform "with full knowledge that its users will attempt to, and ultimately will, influence the result of an election." (*Id.* ¶ 7.) But providing the platform with knowledge that its users may attempt to influence elections with deepfakes is not the same as providing the platform *so* users can attempt to influence the election with deepfakes. (*See* ECF 47, at 11-14 (discussing section 609.771's specific intent mens rea requirement)); *see also State v. Jama*, 923 N.W.2d 632, 634 (Minn. 2019) (distinguishing between general- and specific-intent crimes).

Indeed, X's Terms of Service continue to "affirmatively distance X Corp. from the views of [its] users" by stating that X "'do[es] not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications' posted on X and does not 'endorse any alleged facts or opinions expressed' by X's users." (ECF 47, at 13 (alteration original) (citing ECF 1-7, at 5); *compare* ECF 1-7, at 5 (terms of service referenced in complaint) *with* https://perma.cc/TAL3-5C4R[2] (current terms of service).) The terms also prohibit users from sharing "inauthentic content on X that may

[2] A new version will go into effect on October 9, 2026. *See* https://perma.cc/7B3B-SDPT. The amended complaint no longer appends the Terms of Service but it continues to reference them, (*e.g.*, ECF 53 ¶¶ 19, 20), so the Court may take judicial notice of the Terms of Service as fairly embraced by the pleadings. *See Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003).

deceive people or lead to harm."[3] The Court's prior conclusion that X's pleadings "do not demonstrate that X Corp. ever disseminates deepfakes with the specific intent to injure a candidate or influence the result of an election" still holds true. (ECF 47, at 12); *see Kearns*, 981 F.3d at 211; *Plunderbund*, 312 F. Supp. 3d at 661, 667.

X includes a few new allegations about its Authenticity Policy, including allegations about instances in which it evaluated specific posts against that policy. (*E.g.*, ECF 53 ¶¶ 12, 16, 19, 22.) But none of those allegations make any new assertions about how the Authenticity Policy influences the nature of the contracts that X forms with its users under its Terms of Service, or even whether it has any such influence whatsoever. As before, X is left with its Terms of Service. These are the same Terms of Service that this Court previously found were inadequate to establish the specific type of contract with users—a contract *to disseminate deepfakes*—that is necessary for liability under section 609.771. X has not plausibly alleged that it currently engages in or intends to engage in conduct that would be proscribed under section 609.771's contract theory of liability.

Indeed, the amended complaint's allegations about contracting are so scant that X may have abandoned the theory. The original complaint alleged:

> Thus, a social media company, like X Corp., could be accused of violating the statute—and potentially be subjected to criminal liability—for merely having these pictures displayed on its platform within the time periods set forth under Section 609.771(2)(a)(3)(i)–(ii), as doing so would be *contracting with a user* (through Terms of Service), resulting in the "dissemination" of a deep fake that satisfies the three requirements of Section

---

[3] *See* https://perma.cc/TAL3-5C4R (incorporating Authenticity Policy); https://perma.cc/7B3B-SDPT (same); *see* X Corp., *Authenticity* (Apr. 2025), https://perma.cc/3KLW-9S9H.

> 609.771(2) (quoted above in Paragraph 5), as long as the company "knows or acts with reckless disregard" about whether the material in question was a "deep fake" under the statute.

(ECF 1 ¶ 8 (emphasis added).)

That contracting allegation does not appear in the amended complaint. (*See* ECF 53 ¶ 33.) Similarly, paragraph 34 from the original complaint is not in the amended complaint. (*Compare generally* ECF 53 *with* ECF 1 ¶ 34.) Regardless, for the reasons discussed above, X's contract theory claim, if any, fails now in the same fashion it failed earlier. (ECF 47, at 20 ("X Corp. has not demonstrated that it engages in conduct "arguably proscribed" by the "contract" provision of Section 609.771[.]").)

## II. X ALSO FAILS TO ALLEGE CONDUCT ARGUABLY PROSCRIBED UNDER SECTION 609.771'S DISSEMINATION THEORY OF LIABILITY.

X's amended complaint fares no better when tested against section 609.771's dissemination theory of liability. This part of the statute prohibits the dissemination of material when two mens rea requirements are met. First, a person must know or act with reckless disregard about whether the material is a deepfake. (ECF 47, at 9 (citing Minn. Stat. § 609.771, subd. 2(a)).) And second, a person must disseminate the material with the specific intent to injure a candidate or influence the result of an election. (*Id.* (citing Minn. Stat. § 609.771, subd. 2(a)(2)).) The amended complaint does not plausibly allege that X is currently engaging in or contemplating conduct that would satisfy either mens rea requirement, let alone both.

A deepfake is material that depicts an individual engaging in speech or conduct when the material is "so realistic" that a reasonable person would believe that the depicted

individual actually said or did what the person is depicted to have said or done. *Kohls v. Ellison*, No. 24-CV-3754 (LMP/DLM), 2025 WL 66765, at *4-5 (D. Minn. Jan. 10, 2025), *aff'd*, 166 F.4th 728 (8th Cir. 2026) (construing Minn. Stat. § 609.771, subd. 1(c)(1)). Under this definition, material only qualifies as a deepfake within the meaning of section 609.771 if it is not just realistic, but in fact is "so realistic" that it would be mistaken for a genuine record of the person's past speech or activity. *Id*. The statutory definition of deepfake "categorically excludes constitutional parody from its sweep." *Id.*

The amended complaint is X's effort to plead around this Court's determination in its prior order that X lacked any "actual allegation or evidence in the pleadings that X Corp. has ever been put on notice of a deepfake through its 'reporting processes.'" (ECF 47, at 10.) X's attempt to generate such allegations is unsuccessful. The amended complaint offers allegations about four specific posts as examples of material that would arguably violate section 609.771. (ECF 53 ¶¶ 5, 11, 13-14, 17-18, 23, 26.) However, these allegations are still insufficient.

### A. X Has Not Plausibly Alleged That Each Post Would Meet the Statutory Definition of an Electoral Deepfake.

As a threshold matter, X has not plausibly alleged that each of these posts would even meet the statutory definition of an electoral deepfake. Start with the post that purports to depict Donald Trump's arrest. (*Id.* ¶ 11; *see also* ECF 53-3.) X alleges that the image "arguably violated" section 609.771 (though it does not explain why). (ECF 53 ¶ 11.) But this image is not a deepfake within the meaning of section 609.771 because it falls within the statute's parody exemption. The accompanying text explains that the image was

"ma[d]e," as opposed to "taken" or "photographed." (ECF 53 ¶ 11; *see also* ECF 53-3.) The text further explains that the image is not genuine, and in fact is factually impossible as it purports to depict something happening (Trump's arrest) while waiting for that very thing to happen. By describing the image's origin and its factual impossibility, this text functions like a parody disclaimer, which removes material from section 609.771's sweep. *See Kohls*, 2025 WL 66765, at *5 ("[B]y labeling his videos as 'PARODY,' Kohls is announcing to his viewers that the videos 'cannot reasonably be interpreted as stating actual facts about an individual.'"). This image does not qualify as a deepfake within the meaning of section 609.771 and, therefore, its presence on X cannot "arguably violate" the statute.[4]

Regarding the Vice President Harris video, the Attorney General acknowledges this Court has already concluded that "a reasonable person could consider the July 26 Video reposted by Representative Franson, on its own, so realistic as to depict speech or conduct that did not actually occur and would be prohibited under Minn. Stat. § 609.771." *Kohls v. Ellison*, No. 24-CV-3754 (LMP/DLM), 2025 WL 66765, at *5 (D. Minn. Jan. 10, 2025), *aff'd*, 166 F.4th 728 (8th Cir. 2026). (*See* ECF 53 ¶ 11.) The Attorney General respectfully disagrees. The video was not deceptive or misleading enough to require corrective measures; for the same reasons it also failed to qualify as a deep fake under Minnesota's statute, because a reasonable person would not have believed Vice President Harris made the speech heard in the video. The Legislature made a significant choice in limiting the deep fake definition to material be "so realistic that a reasonable person ***would*** believe"

---

[4] Several identified posts (or accounts) are labeled parody. (ECF 53 ¶¶ 13, 17.)

that it was genuine—rather than "so realistic that a reasonable person ***could*** believe" that it was genuine, in that the first wording requires that most, if not all, reasonable people would be fooled, rather than the mere possibility that ***a*** reasonable person could be fooled.

Regarding the Klobuchar video, X added a disclaimer so a member of the public would not believe it was authentic. *See Kohls*, 2025 WL 66765, at *5 (inclusion of "PARODY" disclaimer took material outside the scope of the statute).[5]

The final example X includes is a video in the style of a campaign ad purporting to show the lieutenant governor and senatorial candidate smiling and holding her hand out while narration and background images suggest that she welcomes and has received a large amount in donations from pharmaceutical and oil and gas companies. (*See* ECF 53 ¶ 23.) Taking the totality of this material into consideration, the Attorney General agrees with X that it was not likely to mislead viewers into believing that the video includes a genuine video recording of the lieutenant governor.

### B. X Has Not Plausibly Alleged an "intent to injure a candidate or influence the result of an election."

More fundamentally, X fails to plausibly allege the necessary mens rea for disseminating this or any other alleged deepfake on its platform. Just like in its complaint,

[5] X attaches a letter from Senator Klobuchar's counsel about the video. (ECF 53-12.) The letter does not refer to any statutes and instead refers only to X's own terms of service. It asks that X either remove the video "or at the very least mark it as altered content." (*Id.*) The letter further notes, "If you fail to do so, our client will be forced to consider all legal options." (*Id.*) X did indeed mark the video as altered content. (ECF 53 ¶ 22.) It's unclear how an August 2025 letter that requested relief that X has already provided is relevant to any credible threat of enforcement theory.

at no point does X allege X has the "intent to injure a candidate or influence the result of an election." Minn. Stat. § 609.771, subd. 2. This is critical, as the parties agree this is not a strict liability statute. (ECF 47, at 9.)

The amended complaint alleges X has "full knowledge that its users will attempt to, and ultimately will, influence the result of an election." (ECF 53 ¶ 7; *see also id.* ¶¶ 30-32.) The Court has already noted that the statute is a specific intent crime. (ECF 47, at 11.) That is, the mens rea for the crime is "an intent to cause a particular result." *State v. Jama*, 923 N.W.2d 632, 634 (Minn. 2019) (citation omitted), cited by ECF 47, at 11.) Plainly, based on how it is pled, X does not itself have the intent to injure a candidate or influence the result of an election. X's intent is to allow *others* to do so—which makes sense, as X's platform exists to allow people to post on it for whatever reason they want.

Another way to look at it is that the amended complaint says nothing about X's candidate or party preferences. Yet, any user (whether they want a democrat or republican or independent to win) can post to X's platform. X alleges that *user* has an intent to injure a candidate or influence the outcome of an election. But X does not allege—nor could it—that it shares the same intent as every user that posts on its platform. Does X want a republican to win because a user posted the Senator Klobuchar deepfake and *at the same time* want Senator Klobuchar to win because a different user posted a deepfake of her republican opponent? X cannot want both to win; *users* want a particular result. X has not

alleged *X* wants a particular result. The Court has already rightly rejected X's attempt to transmute the poster's intent into X's intent. (ECF 47, at 13.)[6]

### C. X Has Not Plausibly Alleged That It Either "knows . . . whether the item being disseminated is a deep fake," or "acts with reckless disregard about whether the item being disseminated is a deep fake."

Additionally, X has not plausibly alleged that it either "knows . . . whether the item being disseminated is a deep fake," or "acts with reckless disregard about whether the item being disseminated is a deep fake." Minn. Stat. § 609.771, subd. 2(a). Since the statute limits the scope of "deep fake" to material that would cause a reasonable person to believe that the depicted person actually did or said something that they did not, this intent requirement means that liability only attaches to those who either know that the materials they are disseminating would deceive reasonable people, or act with reckless disregard of that possibility.

The analysis would be similar to the analysis required under Minnesota's child pornography statute, as the Minnesota Supreme Court explained in the course of upholding that law against a First Amendment challenge. *See State v. Mauer*, 741 N.W.2d 107, 111 (Minn. 2007). Like the election deep fake law, the child pornography law also contains both objective and subjective components. The objective component of each is independent

[6] X's terms of service note, "We do not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications posted or otherwise obtained via the Services or endorse any alleged facts or opinions expressed via the Services." https://perma.cc/7B3B-SDPT, https://perma.cc/TAL3-5C4R. They also state, "[w]e may not monitor or control the Content posted, generated, inputted, or created via the Services, and we cannot take responsibility for such Content." *Id.*

of the defendant's *mens rea*—material at issue either does or does not qualify as a deep fake or involve a minor, but the subjective component addresses the defendant's degree of awareness of that objective fact. As *Mauer* explained, the child pornography statute made it a felony to possess pornographic material involving a minor "knowing or with reason to know its content and character," which the court read as "refer[ring] to the nature of the 'pornographic work,' the definition of which requires that individuals depicted in the work are minors." *Id.* (construing Minn. Stat. § 617.247, subd. 4(a) (2006)).

The Court then discussed each of the two mental states referenced in the statute. First, the Court incorporated the state's criminal code definition of "know" in explaining that "[f]or a person to '"know" requires only that the actor believes that the specified fact exists.'" *Id.* at 114 (quoting Minn. Stat. § 609.02, subd. 9(2) (2006)). The Court then addressed the second mental state referenced in the statute, concluding that "a possessor of child pornography has 'reason to know' that a pornographic work involves a minor where the possessor is subjectively aware of a 'substantial and unjustifiable risk' that the work involves a minor." *Id.* at 115. The Court further found that because the latter standard equated to recklessness, it satisfied the First Amendment's scienter requirement. *Id.*

Although the election deep fake law uses slightly different terminology, its scienter requirements parallel those in the child pornography statute, and thus liability requires that a defendant either believe that material is a deepfake—which the statutory definition limits to material that is misleading, as well as realistic-looking—or be aware of a substantial and unjustifiable risk it could be a deep fake, which would require awareness of a substantial

possibility that reasonable viewers would find it deceptive. X, however, has not alleged either. Instead, it alleges that it has a policy against the posting of misleading synthetic media and that it conscientiously applied that policy in at least four instances, selecting a course of action based on its judgment of whether action was required to address these items' potential for deception. (*See, e.g.*, ECF 53 ¶ 10 ("As in the instances described below, some X users may believe that a video or image is misleading and should be taken down as violative of X's rules, but X may disagree.").) These allegations simply cannot be squared with liability under Minnesota's statute.

***

A final note on intent. X "has the burden at this stage to demonstrate a 'credible threat' that it would be subject to liability" under the electoral deepfake statute. (*Id.* at 15 (citing *Sch. of the Ozarks*, 41 F.4th at 1000).) It has not alleged that it disseminates deepfakes with the specific intent "to injure a candidate or influence the result of an election." (*Id.*) It has not alleged that it knows or acts with reckless disregard whether the item being disseminated is a deepfake. And X has not alleged that the Attorney General has enforced section 609.771 against it, or that the Attorney General (or anyone else) has threatened enforcement of section 609.771.

Because X has failed to "allege or demonstrate through its pleadings that it disseminates deepfakes 'with the intent to injure a candidate or influence the result of an election,'" (ECF 47, at 15), and has failed to allege it knows or acts with reckless disregard

whether the item being disseminated is a deepfake, X has not alleged a credible threat that it would be subject to liability under the statute.

## III. X ALSO FAILS TO ALLEGE CONDUCT ARGUABLY PROSCRIBED UNDER SECTION 609.771 UNDER AN AIDING AND ABETTING THEORY.

X also cannot establish standing based on its new allegation that it could face liability as an aider or abettor. (*See* ECF 53 ¶ 27.)

Section 609.771 itself contains no aiding-and-abetting provision, and instead only addresses primary violations via the dissemination and contract provisions discussed above. *See* Minn. Stat. § 609.771, subd. 2(a). Thus, any liability for aiding or abetting could only arise from Minnesota's general aiding-and-abetting statute, which provides that a person is criminally liable for another's crime if the person "intentionally aids, advises, hires, counsels, or conspires with or otherwise procures" the other person to commit it. Minn. Stat. § 609.05, subd. 1. To "intentionally aid" another, the defendant must: (1) know that the principal is going to commit a crime and (2) intend the defendant's own presence or actions to further its commission. *State v. McAllister*, 862 N.W.2d 49, 52 (Minn. 2015). Minnesota law requires something more than mere knowledge or passive acquiescence. *State v. Ulvinen*, 313 N.W.2d 425, 428-29 & n.1 (Minn. 1981) (explaining that mere knowledge of a contemplated crime, or failure to disclose it without further involvement, does not establish accomplice liability); *see also State v. Pendleton*, 759 N.W.2d 900, 907 (Minn. 2009) ("[I]n order to be an accomplice, the witness must have played a knowing role in the crime-the witness' mere presence at the scene is not sufficient.").

To establish standing to bring a pre-enforcement challenge to a law based on potential liability as an aider and abettor, a party would need to demonstrate that its actions could be mistaken for purposely aiding criminal behavior. For example, in *Woodhull Freedom Foundation v. United States*, the plaintiff identified specific conduct she wished to continue: operating a website on which sex workers could meet and exchange information. 948 F.3d 363 (D.C. Cir. 2020). The plaintiff challenged a law prohibiting conduct that "promote[d] or facilitate[d]" prostitution, and the D.C. Circuit concluded that the plaintiff had identified "some desired conduct that might trigger an enforcement action." 948 F.3d at 372-73. Even though plaintiff's website opposed prostitution, the court held plaintiff's intentional hosting of sex workers' discussions could be interpreted as "facilitating" prostitution. *Id.* at 371-72. Conversely, in *K.C. v. Individual Members of the Medical Licensing Board of Indiana*, plaintiff medical providers successfully pled standing, which was not contested, based on the breadth of the statute's aiding-and-abetting provision. 121 F.4th 604 (7th Cir. 2024). Notably, that provision swept more broadly than Minnesota's accomplice-liability statute does here and did not require proof of intent to further another's criminal act. *See id.* at 648 n.4 (Jackson-Akiwumi, J., dissenting) (noting that the challenged law "prohibits *any action* that aids or abets a gender-transition procedure" (emphasis original)).

*Twitter v. Taamneh* is also instructive. 598 U.S. 471 (2023). In that case, a party sought to hold social media companies liable for allegedly aiding and abetting a terrorist attack. The plaintiffs alleged that ISIS had used social media platforms to recruit members

and raise funds; and that the companies were aware and failed to stop them. *Id.* at 478. The Court noted as a general proposition that a social media company "transmit[ting] most content without inspecting it" cannot create aiding and abetting liability. *Id.* at 499. The case rested on an alleged failure to stop ISIS from using the platforms. But "both tort and criminal law have long been leery of imposing aiding-and-abetting liability for mere passive nonfeasance." *Id.* at 500. The Court concluded Twitter could not be liable under an aiding and abetting theory.[7]

Thus, even assuming section 609.05 could supply accomplice liability for a violation of section 609.771, X would need to identify facts showing both that it knew of a user's section 609.771 offense *and* that X intended its own conduct to further that offense. The amended complaint alleges—at most—notice of particular posts followed by moderation decisions made under its Authenticity Policy. (ECF 53 ¶¶ 11-25.) These facts do not plausibly allege that X knew the poster had the criminal purpose required by Section 609.771. And a decision not to remove content, without facts suggesting that X made the decision to aid the user in violating the statute, does not establish X's separate intent to aid the crime under Section 609.05.

[7] Although the relevant claim in that case required a showing of "substantial assistance" (which is not present here), the Court's statements about criminal and tort aiding and abetting liability are nevertheless relevant. *See also Wiley Wiley, Co -Trs. for Wiley v. Fleet Farm LLC*, 799 F. Supp. 3d 860, 893 (D. Minn. 2025) (describing that in *Twitter*, "all Twitter was alleged to have done was maintain its social media platform, which was 'generally available to the internet-using public with little to no front-end screening'").

As this Court has already explained, X's "mere awareness" that a deepfake appears on the platform does not transform the user's intent into X's own—indeed, X's Terms of Service affirmatively distance X from its users' views and purposes. (*See* ECF 47, at 12-14.) That reasoning applies with equal if not more force to accomplice liability. X's new aiding-and-abetting theory requires that X deliberately chose to assist a crime committed by another, or that its behavior could "arguably" be so interpreted. Nothing in the amended allegations suggests that X's content-moderation decisions fit that purpose: All X has done is "maintain its social media platform," which is "generally available to the internet-using public with little to no front-end screening." *Wiley Wiley, Co -Trs. for Wiley v. Fleet Farm LLC*, 799 F. Supp. 3d 860, 893 (D. Minn. 2025). Indeed, X's allegations about its Authenticity Policy and how it applies that policy directly refutes any inference that X intends to facilitate unlawful dissemination of deceptive election deepfakes. *See* X Corp., *Authenticity* (Apr. 2025), https://perma.cc/3KLW-9S9H (prohibiting "shar[ing] inauthentic media, including, [sic] manipulated, or out-of-context media that may result in widespread confusion on public issues," but permitting "[s]haring manipulated or out-of-context media in non-deceptive ways").

X's alleged facts negate the intent that would be required under Section 609.06 and defeat any attempt to base standing on the supposed threat of accomplice liability, as courts have repeatedly held that such allegations are required to support standing to bring a pre-enforcement challenge. *See Kearns*, 981 F.3d at 211; *Plunderbund*, 753 F. App'x at 370.

## IV. X'S SECTION 230 CLAIMS ARE NOT RIPE.

X's claims under Section 230 are also unripe. The Attorney General has not commenced any claim under the electoral deepfake statute against X, civil or criminal, and X does not allege the existence of any such action in its complaint. (*See generally* ECF 53.) Thus, there is no "cause of action" from which X currently needs immunity or the ability to argue that the electoral deepfake statute is preempted. 47 U.S.C. § 230(e)(3). As a result, X's Section 230 claims fail as a matter of law.[8]

Ripeness is closely related to standing and mootness. This doctrine consists of jurisdictional as well as prudential requirements. *Iowa League of Cities v. EPA*, 711 F.3d 844, 867 (8th Cir. 2013). In the First Amendment context, the jurisdictional aspect of ripeness merges with standing. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014). But the prudential aspect of ripeness merits independent consideration. *See Iowa League of Cities*, 711 F.3d at 867.

From a prudential perspective, ripeness is "peculiarly a question of timing." *Id.* The party seeking review must show (1) the fitness of its issues for judicial decision; and (2) the hardship of withholding the same. *Id.*; *Neb. Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1038-39 (8th Cir. 2000). As to the first of these requirements, issues are unfit for judicial decision when adjudication would rest upon "contingent future events that may not occur as anticipated." *Parrish v. Dayton*, 761 F.3d 873, 875-76

[8] X does not plead and does not identify in its brief the cause of action under which it proceeds for its Section 230 claim.

(8th Cir. 2014); *Sch. of the Ozarks, Inc.*, 41 F.4th at 998 ("A case is fit for judicial decision when it would not benefit from further factual development . . . ."). As to the second requirement, hardship refers to "traditional damages and behavior modification that could result in the absence of judicial review." *Neb. Pub. Power*, 234 F.3d at 1038.

**A. X's Section 230 Claims Are Not Fit for Judicial Review.**

X's claims are not yet fit for judicial review. X asks the Court to declare that it has immunity from an unidentified cause of action that has not yet been alleged against X, and that any such causes of action are preempted by Section 230. These inchoate causes of action are precisely the sort of "contingent future events that may not occur as anticipated" and that make X's claims ill-suited for judicial resolution at this time. *Parrish*, 761 F.3d at 875-76; *see Publius v. Boyer-Vine*, 237 F. Supp. 3d 997, 1026-27 (E.D. Cal. 2017) (citing *Google, Inc. v. Hood*, 822 F.3d 212, 225-26 (5th Cir. 2016)) (concluding anticipatory immunity claim under Section 230 was unripe).

For example, the Court does not yet know (and neither do the parties) whether any action the Attorney General or a county attorney might bring will be civil or criminal.[9] *See* Minn. Stat. § 609.771, subd. 2 (providing for criminal liability), subd. 4 (providing for civil liability). Nor does the Court know what conduct by X might prompt an action under the electoral deepfake statute. The nature of an interactive computer service provider's conduct determines whether Section 230 is even applicable, *i.e.*, whether a claim against

[9] In addition, the Attorney General's criminal prosecution authority depends on referral from the relevant county attorney. Minn. Stat. § 8.01.

X would be an attempt to hold X liable for *its own* conduct, which is not protected by Section 230, or simply the posts of others, which may be. If the Court proceeds to consider X's claim at this time, it risks adjudicating the intersection between the electoral deepfake statute and Section 230 even though enforcement actions by the Attorney General might not ever implicate Section 230 or its immunity provision. X's Section 230 claims thus stand to benefit from "further factual development." *Iowa League of Cities*, 711 F.3d at 867. The Court should avoid such speculative terrain and instead conclude that these claims are not fit for judicial decision at this time.

**B. No Harm Will Flow From Treating X's Section 230 Claims As Unripe.**

Nor will postponing X's Section 230 claims cause any hardship. X has and will have every right to raise its immunity and preemption defenses should an enforcement action arise in the future. *See Neb. Pub. Power*, 234 F.3d at 1038; *Publius*, 237 F. Supp. 3d at 1026-27 ("[I]f the attorney general did file such a suit, Google could raise its claimed § 230 immunity as a defense." (quoting *Hood*, 822 F. F.3d at 227 n.12)).

For this and the reasons stated above, X fails both requirements of the prudential ripeness inquiry. Entertaining its Section 230 claims is nothing more than a recipe for the Court to entangle itself in an abstract disagreement that is neither "definite" nor "concrete." *Neb. Pub. Power*, 234 F.3d at 1037-38. The Court should instead conclude that X's Section 230 claims are unripe and, accordingly, dismiss X's Section 230 claim.

## CONCLUSION

For the reasons stated herein, Attorney General Ellison respectfully asks the Court to dismiss the amended complaint.

Dated: September 19, 2026

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

s/ Janine Kimble
PETER FARRELL (#0393071)
Acting Solicitor General

JANINE KIMBLE (#0392032)
MADELEINE DEMEULES (#0402648)
Assistant Attorneys General

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1424 (Voice)
(651) 282-5832 (Fax)
Peter.Farrell@ag.state.mn.us
Janine.Kimble@ag.state.mn.us
Madeleine.DeMeules@ag.state.mn.us

ATTORNEYS FOR DEFENDANT

|#6451200-v2