UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

X CORP.,

Plaintiff,

vs.

KEITH ELLISON, in his official capacity, as Attorney General of Minnesota,

Defendant.

Court File No. 25-cv-1649 (LMP/DLM)

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT**

In this case about deepfakes, which are highly realistic video, audio, and other digital content generated by artificial intelligence (AI), Plaintiff X Corp. (X) challenges a Minnesota law that prohibits the dissemination of certain election-related deepfakes. X's amended complaint does not contain allegations sufficient to establish standing or the ripeness of X's Section 230 claims, so Defendant Keith Ellison (the Attorney General) moved to dismiss.

X's response does not—and cannot—change its deficient pleadings. X has not established standing and its Section 230 claim is not ripe. Dismissal is therefore appropriate, and the Attorney General's motion should be granted.

## ARGUMENT

In his principal brief, the Attorney General explained why X lacks standing under either of the two theories of liability the statute supports—a contract theory and a dissemination theory. X does not respond to the Attorney General's arguments that any

claims under the statute's contract theory of liability should be dismissed, so the Court should treat the Attorney General's arguments on this issue as unopposed. *See Doll v. Trellis Walnut Towers LLC*, No. 24-cv-136 (ECT/TNL), 2024 WL 4355084, at *3 (D. Minn. Sep. 30, 2024) (failure to respond to an argument results in waiver) (collecting cases). Instead, X largely focuses on the appropriate legal standard for its burden to establish standing and the dissemination theory of liability. But its arguments about each are unavailing.

Finally, X is wrong that its Section 230 claim is ripe. It has no standalone cause of action under Section 230, just a speculative defense to hypothetical future suits. That claim should be dismissed as well.

## I. X'S ARGUMENT ABOUT THE STANDING STANDARD IS A RED HERRING, AND X'S VAGUE THIRD-PARTY CLAIMS LACK STANDING.

As this Court observed in its earlier decision, the Eighth Circuit has used varying language to describe the standard for standing in facial, pre-enforcement challenges. (ECF 47, at 8 n.2 (citing *L.H. v. Indep. Sch. Dist.*, 111 F.4th 886, 893 (8th Cir. 2024), and *Christian Action League of Minn. v. Freeman*, 31 F.4th 1068, 1074 (8th Cir. 2022)).) In some instances, the court has said that a plaintiff must allege intended conduct that is "proscribed by a statute." *Christian Action League*, 31 F.4th at 1072 ("So this appeal turns on a single question: is CAL's planned conduct criminalized by the Statute?"). In other decisions, the court has appeared to relax the standard somewhat, requiring only that a plaintiff allege conduct that is "arguably . . . proscribed by the statute it wishes to challenge." *L.H.*, 111 F.4th at 893; *but see id.* ("Thus, '[a] plaintiff can establish an injury

in the First Amendment context in two ways: by identifying protected speech in which it would like to engage *but that is proscribed by statute*, or by self-censoring to avoid the *credible threat of prosecution*.'" (citing *Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 1000 (8th Cir. 2022) (alteration and emphasis original))).

This Court previously applied the more lenient standard, and the Attorney General followed suit in this motion. X responds that the Attorney General did so only in name; it also argues that there is no legitimate dispute in Eighth Circuit caselaw on the proper standard. (Resp. 15.) X is wrong on both points.

### A. *Henderson* Did Not Address or Resolve Any Dispute About the Applicable Legal Standard for Standing.

X asserts that the Eighth Circuit's recent decision in *Henderson v. Springfield R-12 Sch. Dist.*, 163 F.4th 478 (8th Cir. 2025) (en banc), *cert. denied sub nom. Springfield Sch. Dist. v. Henderson*, No. 26-156, 2026 WL 2976208 (mem.) (U.S. Oct. 5, 2026), resolved any debate over the appropriate standard. (Resp. 15.) The Attorney General reads *Henderson* differently. In its decision, the *en banc* court acknowledged the very dispute at issue here but expressly declined to resolve it: "While this Court has sometimes described the standing inquiry as more lenient and forgiving in the context of First Amendment claims, [. . . ] we do not resolve or debate the correctness of the Court's precedent because there is no need to apply a more lenient standard in this case." 163 F.4th at 492.

X reads too much into *Henderson* for additional reasons. For example, one of the cases that the Eighth Circuit relied on for its holding uses the more restrictive "proscribed" language. *Id.* (citing *281 Care Comm. v. Arneson*, 638 F.3d 621 (8th Cir. 2011)); *see*

*281 Care Comm.*, 638 F.3d at 627 ("Reasonable chill exists when a plaintiff shows 'an intention to engage in a course of conduct arguably affected with a constitutional interest, *but proscribed by [the] statute*, and there exists a credible threat of prosecution." (alteration original, emphasis added)). *Henderson* thus cannot bear the weight that X places on it.

### B. Any Dispute About the Standard Does Not Matter Because the Attorney General Properly Applied the "Arguably Proscribed" Standard.

Contrary to X's assertions of lip service, the Attorney General's motion correctly applies the "arguably proscribed" standard.

X says, without citing any authority, that that a litigant can establish standing simply by advocating a "non-frivolous" interpretation of a statute, even if that interpretation contravenes the statute's plain and unambiguous language. (Resp. 15. ("If reasonable minds can disagree about whether conduct triggers the statute, the conduct is 'arguably proscribed.'").) But accepting X's argument that any "non-frivolous" argument about a statute's meaning is sufficient to confer standing is irreconcilable with this Court's recognition of the need to determine a statute's meaning in order to conduct the standing analysis. *See Kohls v. Ellison*, No. 24-cv-3754, 2025 WL 66765, at *4 (D. Minn. Jan. 10, 2025) ("To determine whether Plaintiffs' past or planned conduct is 'arguably proscribed' by Minn. Stat. § 609.771, the Court must interpret its scope." (citing *Christian Action League*, 31 F.4th at 1072)). And as the Supreme has held, the "first step in [a] proper facial analysis is to assess the [] laws' scope." *Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024) The Supreme Court has thus endorsed the Attorney General's approach—and that of this Court in *Kohls*—that focuses first on construing the applicable statute.

Consistent with this requirement, the Attorney General analyzed how to properly construe the deepfake statute. (Mot. 6-17.) And when the statute is properly construed, X's intended course of conduct does not fall within the statue's ambit. X cannot manufacture standing by advocating for "non-frivolous" interpretations of the statute that its plain language does not sustain. *See State v. Jama*, 923 N.W.2d 632, 636 (Minn. 2019) (construing statutes according to plain language, and applying that plain meaning when a statute is unambiguous); *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (explaining standing is met when "[a] law is aimed directly at plaintiffs, who, *if their interpretation of the statute is correct*, will have to take significant and costly compliance measures or risk criminal prosecution." (emphasis added)).

This approach is also consistent with *Henderson*. There, the plaintiffs claimed that they had self-censored. 163 F.4th at 492-93. The Eighth Circuit determined that the plaintiffs reasonably believed that negative consequences would follow if they engaged in their intended speech and accordingly found standing. *See id.*; *see also id.* at 494 (requiring fear of adverse consequences to be "objectively reasonable" and "more than minimal or wholly subjective"). The theory of injury that gave rise to standing in *Henderson* flowed directly from the plaintiffs' reasonable self-censoring of their own protected speech—chill that actually occurred. *Id.* at 492-93 ("The record contains evidence indicating the plaintiffs stopped voicing their opinions and self-censored when it became apparent that their opposing views were considered unacceptable [. . .] to avoid negative consequences that the school district itself repeatedly said it would impose [. . .] .").

Here, however, X does not plausibly allege any self-censorship. Nor does X allege that any of its users have self-censored or otherwise changed their posting behavior. Rather, it asserts a different theory of injury than the plaintiffs in *Henderson*, focusing on the alleged difficulty of making "close calls" about other people's speech. (*E.g.*, Resp. 19, 21-22, 37-38.) Adjusting a content moderation policy is different than refraining from speaking altogether, which distinguishes X's circumstances from the chilled first-party speech at issue in *Henderson*. 163 F.4th at 492.

Further, to the extent that the amended complaint alleges that X believes negative consequences will befall it if it resolves these "close calls" in a certain way, those allegations are not objectively reasonable. Based on the plain, unambiguous language of the deepfake statute, the exemplar posts that X identifies are not objectively reasonable examples of posts that will prompt liability. (*See* Mot. 10-18; § II.A, *infra*.) Indeed, X's response goes out of its way to argue that it has engaged in criminal conduct. (*See, e.g.*, Resp. 23-34; Am. Compl. ¶ 32.) Nothing about that is "objectively reasonable." *Henderson*, 163 F.4th at 494.

X cannot establish standing simply by advocating a "non-frivolous" interpretation of a statute when that interpretation contravenes the statute's plain and unambiguous language. Nor can it establish standing without showing objectively reasonable chill. X therefore lacks standing.

### C. To the Extent X Raises Third-Party Claims, X Lacks Standing to Raise Such Claims.

To the extent X seeks to bring claims on behalf of its users, it lacks third party standing.[1] *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991) (test for third-party standing). To satisfy third-party standing, a party must show (1) an injury-in-fact; (2) a close relationship to the third party; and (3) some hindrance that prevents the third party's ability to protect his or her own rights. *Id.*

Even apart from the first prong, X's pleadings fail to satisfy either the second or third prong. There is no indication third parties cannot bring claims on their own. The *Kohls* litigation proves the opposite. And X's interests are not aligned with those of its users when its own terms of service prohibit users from engaging in the very conduct that the deepfake statute proscribes. (Am. Compl. ¶¶ 9, 12 & n.5.) X argues that a post may not violate its terms of service but still violate the statute. (Resp. 22-23.) Not so. Its terms of service permit "[s]haring manipulated media in *non-deceptive* ways." (*Id.* (emphasis added); *see also id.* 12 (citing Am. Compl. ¶¶ 67-70).) In other words, sharing manipulated media in deceptive ways is prohibited by X's terms of service, which implicate the statue because it

[1] X's complaint does not clearly state whether it brings claims on its users' behalf and instead appears to allege first-party speech. (*See* Am. Compl. ¶¶ 39, 40, 90, 94 (citing *Moody*).) Its response appears to clarify that its principal arguments proceed on behalf of third-party users in addition to X as a first-party speaker. For example, X distinguishes the alleged chilling of its first-party speech as an independent basis for standing, (*see, e.g.*, Resp. 37-38), which suggests that the chilling it alleges in the rest of its argument goes also (or only) to the speech of third-party users. (*See also id.* 42 (asserting, in Section 230 discussion, that hardship will accrue absent adjudication because of censorship to X "*and its users*" (emphasis added)). To the extent that X's response clarifies that it does allege claims on behalf of its users, the Attorney General now asserts that X lacks standing to litigate such claims in its users' stead.

defines an image or video that deceives a person into believing it is real as a deepfake. Minn. Stat. § 609.711, subd. 1(c).

While X asserts that its pleaded allegations about intent control over its terms of service, (Resp. 27-28), that assertion only holds to the extent that its allegations do not contradict the terms of service. *See Miller-Fields v. Londregan*, No. 24-cv-1372 (NEB/TNL), 2025 WL 457544, at *1 n.1 (D. Minn. Jan. 21, 2025) ("The Court takes all factual allegations in the complaint as true on a motion to dismiss, [. . .] but is not obligated 'to accept a version of events that is "blatantly contradicted by the record."'" (citing *Ching ex rel. Jordan v. City of Minneapolis*, 73 F.4th 617, 621 (8th Cir. 2023), and *Smithrud v. City of St. Paul*, 746 F.3d 391, 397 (8th Cir. 2014))). Here, the terms of service easily contradict X's conclusory legal assertions and should control the Court's assessment of X's intent and its relationship to its users.

## II. X'S DISSEMINATION THEORY OF LIABILITY IS UNFOUNDED.

X's dissemination theory of liability fails for three reasons. First, the posts it identifies are not deepfakes. Second, X's allegations do not supply the necessary intent. Third, X's allegations would not establish liability under an aiding-and-abetting theory.

### A. X's Cherry-Picked Posts Are Not Deepfakes.

For the reasons in the Attorney General's principal brief, the posts contained in X's amended complaint do not qualify as deepfakes under the deepfake statute. (Mot. 11-13.) X's response hinges on its arguments about the nature of the "arguably proscribed" standard that governs standing. (*E.g.*, Resp. 20-22 (asserting that possibility of "different conclusions about whether a particular, widely circulated video is a prohibited deep fake"

is "by definition . . . arguable"); *id.* (An 'arguable (i.e., non-frivolous) interpretation gives rise to standing in the First Amendment context, even if it is ultimately incorrect.").)

X's "allegations" that these exemplar posts "arguably violate Section 609.771" are legal conclusions entitled to no deference, not factual allegations that must be taken as true. (Am. Compl. ¶ 5); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Hawse v. Page*, 7 F.4th 685, 688-89, 689 n.6 (8th Cir. 2021) (applying plausibility to standing determinations). In any event, and as discussed above, X makes too much out of too little with its standing argument. Most critically, X's allegations about these exemplar posts do not plausibly allege that it has meaningfully changed its conduct or chilled its speech because of the deepfake statute. (*See, e.g.*, Am. Compl. ¶¶ 12 (alleging that X "decided *not* to remove or label the video" (emphasis original); 17-22 (alleging that X decided not to remove a video even after receiving feedback alleging it was a deepfake).) Indeed, the Vice President Harris video that X argues is one that cannot be "seriously dispute[d]" as a deepfake, (Resp. 20), is one that X admits it decided not to remove, (Am. Compl. ¶¶ 13-16).

Whether or not these exemplar posts are deepfakes, these pleading omissions show that X's allegations do not actually establish the reasonable chilling of speech necessary for an injury-in-fact sufficient to confer standing. *See 281 Care Comm.*, 638 F.3d at 628 (finding standing when plaintiffs made a "decision to chill their speech" that was "objectively reasonable"); *Henderson*, 163 F.4th at 492-94 (finding standing when plaintiffs self-censored). Without the requisite chilling, X cannot establish standing.

### B. X's Allegations Do Not Supply the Missing—And Required—Intent.

Section 609.771 imposes liability only when a person disseminates a deepfake "with the intent to injure a candidate or influence the result of an election." Minn. Stat. § 609.771, subd. 2(a)(2). As X concedes, this is a specific-intent mens rea, requiring "an intent to cause a particular result." *Jama*, 923 N.W.2d at 634; (*see* Resp. 24). Thus, as this Court has already recognized, the statute does not impose liability for mere knowledge of the fact that others may seek to influence an election. (ECF 47, at 11-16.)

The amended complaint still fails to plead facts showing that X itself holds the requisite specific intent. X alleges only that its *users* frequently post political content intending to influence elections, and that X is aware that such user intentions exist. (Am. Compl. ¶¶ 30-32.) But a user's intent is not X's intent, and as this Court has previously explained, X cannot "transmute the poster's intent into X Corp.'s' own." (ECF 47, at 13). That central defect remains unchanged, and X's lackluster efforts to plead around it fail for two reasons.

First, X relies almost exclusively on conclusory allegations. (*E.g.*, Am. Compl. ¶¶ 7, 32 (alleging that it "provides the X platform with full knowledge that its users will attempt to, and ultimately will, influence the results of an election," and that for close cases it will permit dissemination "with the intent of allowing its users to engage in protected political speech for the purpose of influencing the outcome of an election."). These paragraphs are superficial legal conclusions, not factual allegations entitled to deference. *Iqbal*, 556 U.S. at 678. Rather than alleging specific factual matter that could establish what X knew, and when, and why; these paragraphs are circular—alleging that X had the

requisite intent because it acted with the intent that the statute requires. *Id*. at 681 ("These bare assertions, much like the pleading of conspiracy in *Twombly,* amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim.").

At no point, for example, does X plead any factual matter that might establish the intentions of the users who posted any of the four exemplar posts on which X relies, let alone that any of those users acted with the specific intent of influencing the outcome of an election. X correctly notes that an accomplice need not have the principal's intent, only the intent to aid. (Resp. 29.) But X fails to demonstrate that it at least knew of its users' alleged criminal intent when it hosted their content.

Second, X is wrong that its terms of service "are irrelevant." (*Id*. 27-28.) To the contrary, these terms govern the entire interaction between X and its users and are thus highly relevant to the dissemination analysis. X's conclusory allegations about its intent do not override the terms of service when those allegations contradict X's own terms. *See Miller-Fields*, 2025 WL 457544, at *1 n.1. As noted above, the terms of service contradict X's conclusory legal assertions and should control the Court's assessment of X's intent and its relationship to its users.

Finally, X attempts—unsuccessfully—to shoehorn its allegations into Minnesota's statutory definition of intent. (Resp. 23-26 (citing Minn. Stat. § 609.02(9)(4)).) It says that it offers its platform so users can disseminate election-related posts that, it alleges, it knows are made "to influence the outcome of an election." (Am. Compl. ¶¶ 31-32.) Again, these "allegations" are wholly conclusory and entitled to no deference. *See Iqbal*, 556 U.S. at 678. To the extent they constitute factual matter rather than legal conclusions, these

allegations fall short of the plausibility bar. It is not plausible that all posts that "involve speech about elections" are made "with the intent to influence the outcome of an election." (Am. Compl. ¶ 31.) Users could make such posts for many other reasons, from gaining personal or professional clout to earning money. *Cf. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) ("Hence, when allegations of parallel conduct are set out in order to make a[n antitrust] claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."). X has not supplied any "further factual enhancement" to nudge its allegations about its users' intent across "the line between possibility and plausibility." *Id.*

Without fact-based allegations that establish how X's "manner of disseminating or otherwise responding to deepfakes on X reflects an intent by X Corp. to injure a candidate or influence the result of an election," (ECF 47, at 16), X has failed to allege that merely hosting third-party content on its platform independently satisfies the statute's mens rea requirement. Its allegations amount to nothing more than a commitment to carrying political speech.

### C. X's Allegations Also Do Not Establish Liability Under an Aiding-and-Abetting Theory.

The Attorney General has argued that X cannot establish standing on an aiding-and-abetting theory. (Mot. 18-21.)[2] X essentially responds that it could be liable as an aider and abettor for failing to do something, i.e., seeing a post and failing to remove it.

[2] X wrongly argues the Attorney General "concedes" that the general aiding-and-abetting statute may supply accomplice liability for the deepfake statute. (Resp. 28-29.) The

(Footnote Continues on Following Page)

Aiding and abetting liability occurs when someone advances a crime; classic examples are the driver of the get-away car and the lookout. A person must play a knowing role in *committing* the crime. *See State v. Merrill*, 428 N.W.2d 361, 367 (Minn. 1988) (defendant had "some knowing role in the commission of the crime" and took "no steps to thwart its completion"). Here, X does not plausibly allege that it plays any role in committing the underlying crime (violating the deepfake statute) when it merely allows a post to remain on its website—a post it did not create or pre-screen. *See Twitter, Inc. v. Taamneh*, 598 U.S. 471, 480 (2023) ("People from around the world can sign up for the platforms and start posting content on them, free of charge and without much (if any) advance screening by defendants.").

X argues that it is actively involved in disseminating content "after deliberately reviewing it." (Resp. 30.) But that is not what X alleges. X does not allege it pre-screened these posts, pushed a button to permit the posts to appear, or engaged in any other but-for action.[3] It just allowed the posts to remain after reviewing them. Thus, if the posts violated the deepfake statute (which the parties dispute), they were already posted by users with no active involvement from X.

---

Attorney General did not argue the accomplice liability statute does not apply in its motion to dismiss, but that is not tantamount to a concession; the argument could be raised at another time. *See* Fed. R. Civ. P. 12(h)(2), (3).

[3] *Wiley Wiley, Co -Trs. for Wiley v. Fleet Farm LLC*, 799 F. Supp. 3d 860 (D. Minn. 2025), is distinguishable. There, Fleet Farm took affirmative steps to decide whether a purchaser could buy a firearm and then provided one. But-for the decision to sell the firearm, the person would not have had a firearm. Here, in contrast, X alleges no pre-screening. Fleet Farm also had several affirmative obligations established by federal and state law. *Id.* at 873; *contra Taamneh*, 598 U.S. at 501 (plaintiff did not allege defendants had affirmative duties to act).

X argues *Taamneh* is distinguishable because the allegations were generalized. (*Id.* 31-32.) But in that case, the plaintiffs argued that the platforms "knew that ISIS was uploading this content to such effect, but took insufficient steps to ensure that ISIS supporters and ISIS-related content were removed from their platforms." 598 U.S. at 498. The Court also acknowledged that although the posts were not pre-screened (as here), defendants blocked some ISIS content, which implies review. *Id.* at 498-99. As to Google, the plaintiffs expressly alleged that only approved videos generate revenue, and that "Google has reviewed and approved ISIS videos." *Gonzalez v. Twitter,* Case No. 4:16-cv-03282-DMR, Third Amended Complaint (ECF 111) ¶¶ 518, 521-22 (N.D. Cal. filed Nov. 6, 2017). The plaintiffs also alleged that ads were placed on a particular ISIS video. *Id.* ¶ 533. X is wrong that the allegations in *Taamneh* were only generalized.

*Taamneh* is instructive and supports the Attorney General. X does not contest its reasoning that mere nonfeasance does not constitute aiding and abetting. The Court explained that aiding-and-abetting liability is not boundless, lest passive bystanders be accused of aiding-and-abetting. 598 U.S. at 489. If that theory were taken too far, "then ordinary merchants could become liable for any misuse of their goods and services, no matter how attenuated their relationship with the wrongdoer." *Id.* (citation omitted); *see also id.* at 499 (noting that courts do not think internet or phone providers aid-and-abet illegal drug deals even if those providers' conference or video call features make sales easier).

Finally, X does not allege a sufficient mens rea regarding awareness of a user's intended crime. Under Minnesota law, an aider and abettor must be aware of the intended

crime to aid-and-abet. *See State v. Smith*, 901 N.W.2d 657, 663 (Minn. Ct. App. 2017). In the case of a hypothetical person asked to give their bank-robbing friend a ride, if the friend "did not know of the intent to commit a crime, she could not form the necessary intent to aid the crime." *Id.* But if "the would-be robber informs the friend that he plans to rob the bank and asks for a ride to the bank in order to do so, the friend is guilty as an accomplice if she provides the ride." *Id.* ("In this second scenario, the friend both possessed knowledge of the crime, and intended to aid by providing a ride."). Here, X is like the driver in the first scenario: its pleadings establish no knowledge about the friend's (X's users) intent when asking for a ride (when sharing the exemplar posts). At no point does X allege that its users have informed them of their intent related to the posts.[4] X thus "could not form the necessary intent to aid the crime." *Id.*

## III. THE SECTION 230 ALLEGATIONS FAIL TO STATE A CLAIM FOR RELIEF.

X lacks standing, so the Court can and should dismiss its Section 230 claim. Independent of standing, dismissal is also appropriate because X's response confirms that its Section 230 theory is unripe.

### A. X Has Not Identified a Cause of Action for Its Section 230 Claim.

X continues to lack any identifiable cause of action. As the Attorney General has argued, (Mot. 22 n.8), X has not pleaded a cause of action to support its Section 230 claim. X responded not by clarifying its cause of action, but simply by asserting that the Attorney General did not make this argument when the parties briefed X's earlier motion for

[4] This is yet another reason it makes more sense for these claims to be brought by users, as in *Kohls*, who can allege their personal intent.

judgment on the pleadings before it amended its complaint. (Resp. 39; *but see* ECF 38, at 11 n.5.) X still has not identified a cause of action, nor has it alleged or argued that Section 230 contains an implied right of action. *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 288-89 (2001) (analyzing Title VI's text and structure to determine whether the statute "reveals [. . .] congressional intent to create a private right of action").

On that point, Section 230 does not evince any intent by Congress to create a private right of action for litigants like X. It lacks an express right of action and similarly lacks any signs in its text or structure that suggest Congress intended for this statute to allow affirmative litigation by entities like X. Rather than any "rights-creating" language, *id.*, Section 230 proceeds only in terms of what covered entities are entitled to avoid. *See* 47 U.S.C. § 230(c) (enumerating statute's "protection" for covered providers). This statute is thus best understood as establishing freedom *from* certain forms of liability, not rights *to* relief or other remedies obtained in affirmative litigation.

Courts have thus repeatedly concluded that no private right of action exists under this statute. *See Stearns v. Google Inc.*, No. 25-cv-03507-TLT, 2025 WL 2391555, at *2 (N.D. Cal. Aug. 18, 2025) ("There is no private right of action under the CDA."); *Greco v. O'Donnell*, No. 2:25-cv-01056-APG-MDC, 2025 WL 2049659, at *4 (D. Nev. July 22, 2025) ("The CDA is a defense of immunity and does not provide a private right of action."); *King v. Facebook, Inc.*, No. 22-15602, 2023 WL 5318464, at *1 (9th Cir. 2023) (mem.) (similar); *Belknap v. Alphabet, Inc.*, 504 F. Supp. 3d 1156, 1161 (D. Or. 2020) ("Case law is unanimous that a private right of action is not available under the [CDA]." (citation

omitted)). There is no need for this Court to take a different tack. X's scant citations on this issue are inapposite and unpersuasive. (Resp. 38-39.)

### B. X's Section 230 Claim Lacks the Factual Predicates That Make Claims Fit for Judicial Decision.

Even if X had a cause of action, the Section 230 claim remains unfit for judicial decision. "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Parrish v. Dayton*, 761 F.3d 873, 875-76 (8th Cir. 2014) (quotation omitted). As the Attorney General argues, neither the Court nor the parties know anything about what facts might give rise to the hypothetical civil (or criminal) action that one of several possible law enforcement officers might someday bring against X under the deepfake statute. (Mot. 23-24 (noting also that the parties and the Court do not know what theory of liability any such action might allege).)

X's standing arguments doom its arguments on this issue. It identifies specific fact questions about the statute's possible application that it asserts need not—and cannot—be resolved at this juncture. (*E.g.*, Resp. 23 ("Whether a prosecutor, a court, or a jury would ultimately characterize [X's decision to review and retain an allegedly questionable post] as knowing or reckless is a merits question."); 17 ("Each of those contentions [about the exemplar posts] may be arguable at a trial on the merits [. . .] .").) But it is precisely the presence of these fact questions that makes an adjudication about Section 230 premature. *Parrish*, 761 F.3d at 875-76. Unless and until a state actor with enforcement authority asserts a claim under the deepfake statute against X, the Court has no way to know whether Section 230's immunity is even implicated.

### C. Deferring Adjudication of X's Section 230 Arguments Will Not Impose Any Hardship on X.

X's claim of "hardship" collapses under scrutiny. As the Attorney General argued, (Mot. 24), no harm will occur from treating Section 230 as the defense that it is. *See Publius v. Boyer-Vine*, 237 F. Supp. 3d 997, 1026-28 (E.D. Cal. 2017) (citing *Google, Inc. v. Hood*, 822 F.3d 212, 225-26 (5th Cir. 2016)) (concluding anticipatory immunity claim under Section 230 was unripe). As noted above, X has not actually alleged any "chill" because of its perceived exposure under the deepfake statute, and certainly not any chill that qualifies as objectively reasonable. *See* § I, *supra*.

X's responsive arguments are unavailing. It argues that its inability to bring suit now, before any enforcement that might require a Section 230 defense has commenced, will cause its immunity under Section 230 to be "effectively lost." (Resp. 41 (citation omitted).) This argument turns Article III on its head. If mere enactment of a statute that could implicate a platform's entitlement to a Section 230 defense is enough to justify a preemptive claim, then no platform would ever need to show a credible threat of enforcement as part of its standing obligation. *See Animal Legal Def. Fund v. Vaught*, 8 F.4th 714, at 721 * (8th Cir. 2021) ("Where a plaintiff alleges a chill on speech, 'Article III standing and ripeness issues . . . "boil down to the same question."'" (quotation omitted)). If X finds itself on the receiving end of a lawsuit that it believes implicates Section 230, it can raise its claimed immunity as a defense then. *See Publius*, 237 F. Supp. 3d at 1027 (collecting cases holding that Section 230 is an affirmative defense).

Meanwhile, enforcing the basic tenets of Article III that apply to all litigants will not cause X to suffer any hardship that would justify a premature adjudication of Section 230 issues.

**CONCLUSION**

For the above reasons, Attorney General Ellison respectfully asks the Court to dismiss the amended complaint.

Dated: November 3, 2026

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

s/ Madeleine DeMeules
PETER FARRELL (#0393071)
Acting Solicitor General

JANINE KIMBLE (#0392032)
MADELEINE DEMEULES (#0402648)
Assistant Attorneys General

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1424 (Voice)
(651) 282-5832 (Fax)
Peter.Farrell@ag.state.mn.us
Janine.Kimble@ag.state.mn.us
Madeleine.DeMeules@ag.state.mn.us

ATTORNEYS FOR DEFENDANT

|#6481514-v1